**INSTITUTE FOR JUSTICE**
ELIZABETH L. SANZ (CA Bar No. 340538)
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
ROBERT E. JOHNSON (DC Bar No. 1013390)*
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
JEFFREY ROWES (TX Bar No. 24104956)*
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
KATRIN MARQUEZ (FL Bar No. 1024765)*
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600

* *Pro hac vice* motions to be filed

*Attorneys for Plaintiffs Novedades y Servicios, Inc. and Esperanza Gomez Escobar*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC.; and ESPERANZA GOMEZ ESCOBAR,<br><br>        *Plaintiffs*,<br><br>v.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as the Attorney General of the United States,<br><br>        *Defendants*. | Case No.: **'25CV0886 AJB DDL**<br><br>**COMPLAINT** |

1

## INTRODUCTION

1.      This case challenges a federal surveillance order that demands detailed information about everyday cash transactions in a targeted area along the southwest border. The order directs check cashers, currency exchangers, and other "money services businesses" in 30 zip codes to report all cash transactions over just $200 to federal law enforcement. Although the order will sweep up information about countless everyday transactions, the government has candidly explained that its purpose is to uncover evidence of crimes by drug cartels. Thus, the government has targeted particular types of businesses and particular types of cash transactions, in a particular geographic area, with an aim to target particular types of criminal actors. And the government has done all this without individualized suspicion or probable cause. In short, the government has issued a general warrant.

2.      In addition to violating the Fourth Amendment, the government's general warrant will impose ruinous burdens on the targeted businesses. The government estimates that every cash transaction report takes eight minutes to complete. The true time required is higher. But even accepting the government's estimate, and considering the number of over-$200 transactions, businesses in the affected zip codes face hours of new paperwork daily. Because the order only applies to certain businesses in certain zip codes, moreover, customers who do not want to provide this information will simply take their business to other stores. As a tool to target criminals, the order will be ineffective—but it will impose crushing costs on businesses and people who cannot leave the targeted jurisdiction.

3.      The surveillance order is unconstitutional and unlawful in other ways, as well. The statute under which the federal government claimed to find authority for the surveillance order cannot be read to authorize this type of vast surveillance regime; and, if it can, then it confers standardless discretion in violation of the non-delegation doctrine. The order also fails review under the Administrative Procedure Act, both because the selection of particular counties and businesses is arbitrary and capricious and because the

2

order was issued without following notice-and-comment procedures. The order should be vacated, set aside, and enjoined.

## JURISDICTION AND VENUE

4.     Plaintiffs bring their claims under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, as well as directly under the U.S. Constitution. *See Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs seek declaratory and injunctive relief against the federal government's geographic targeting order imposing reporting requirements for cash transactions over $200 in certain zip codes near the border. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) (hereinafter, the "Border GTO").

5.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as Plaintiffs' claims arise under federal law.

6.     Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. § 1391(e)(1) because the Border GTO specifically targets businesses located within the District, because Plaintiffs are challenging the application of the Border GTO to businesses that are located within the District, and because Plaintiff Novedades y Servicios, Inc. resides within the district.

## PARTIES

7.     Plaintiff Novedades y Servicios, Inc. is a corporation organized under the laws of the State of California. Novedades y Servicios is subject to the Border GTO because it is registered with FinCEN as a Money Services Business, because it provides services that fit within the definition of a Money Services Business, and because it is located within one of the zip codes subject to the Border GTO. Novedades y Servicios has its principal place of business in San Diego, CA.

8.     Plaintiff Esperanza Gomez Escobar is the owner and manager of Novedades y Servicios. She uses services offered by Money Services Businesses within the covered

zip codes, including the services offered by Novedades y Servicios, as she sends money to family members outside the United States. The Border GTO will result in the reporting of her personal information to the federal government. Esperanza resides in Riverside County, CA.

9.    Defendant Financial Crimes Enforcement Network (FinCEN) is a bureau within the U.S. Department of the Treasury with a mission to "safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence." FinCEN collects and analyzes information about financial transactions within the United States, including reports on cash transactions. FinCEN promulgated the Border GTO.

10.    Defendant Andrea Gacki is the Director of the Financial Crimes Enforcement Network (FinCEN) and is sued in her official capacity. Director Gacki signed the Border GTO.

11.    Defendant U.S. Department of the Treasury is an executive agency of the United States. FinCEN, which issued the Border GTO, is a bureau within the Treasury Department.

12.    Defendant Scott Bessent is the United States Secretary of the Treasury and is sued in his official capacity.

13.    Defendant Pam Bondi is the Attorney General of the United States. She is responsible for administration of the federal criminal law in the United States, including laws that require compliance with federal cash reporting requirements. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### Plaintiffs Provide Financial Services For Ordinary Americans

14.    Plaintiff Novedades y Servicios is a small, independently owned business that provides money transfers, money orders, and check cashing services to average people. Novedades' customers are overwhelmingly locals in the San Diego neighborhood

COMPLAINT

where Novedades is located. Most Novedades customers are regulars who use Novedades' services to do perfectly normal, legal things, such as cash payroll checks, pay rent, and send money to family.

15.    These financial services are important for customers who do not have bank accounts and who rely on businesses like Novedades for financial services that they need to live their lives.

16.    Nearly all of the financial services transactions provided by Novedades are above $200. (The average dollar amount of financial services through such businesses ranges from $300-$450.) This makes sense, because the most common reasons for using these services—things like cashing payroll checks and obtaining money orders to pay rent—involve values over $200.

17.    Plaintiff Esperanza Gomez Escobar is one of the people who uses the services offered by Novedades y Servicios. She is an American citizen who has family in Mexico, and she sends money to her siblings and mother there. She has made these transfers in the past, and intends to make such transfers in the future, including over the next six months while the GTO is in place. When she transfers money, she typically sends amounts over $200 but below $3,000.

18.    Because of the services that it offers, Plaintiff Novedades y Servicios is regulated as a Money Services Business ("MSBs").

19.    Federal law defines an MSB to include businesses that cash checks, deal in foreign exchange, issue traveler's checks or money orders, and provide money transmission services. 31 C.F.R. § 1010.100(ff).

20.    MSBs are required to register with FinCEN, to put in place various anti-money-laundering policies and procedures, to keep records of certain transactions, and to file reports with the federal government.

21.    Some MSBs are large corporations—*e.g.*, Western Union. But many are small neighborhood businesses like Novedades that cash checks, sell money orders, and provide other similar financial services. Neighborhood MSBs can stand alone or can be

COMPLAINT

situated inside other local businesses, like grocery stores or convenience stores.

22. Plaintiff Novedades y Servicios falls within the definition of an MSB because it offers money transfers, money orders, and check cashing services.

23. Plaintiff Novedades y Servicios is therefore registered with FinCEN as an MSB.

24. Federal law requires that MSBs report all cash transactions in amounts over $10,000 to FinCEN using a form called a Currency Transaction Report ("CTR"). 31 C.F.R. § 1010.311.

25. This $10,000 reporting requirement applies to all covered financial institutions across the country; it is neutral as to the location of the financial institution. *See* 31 C.F.R. § 1010.310. (applying to "all financial institutions").

26. The information that must be reported in each Currency Transaction Report is extensive, including (1) the name, address, business or profession and social security number of the person conducting the transaction; (2) similar information as to the person or organization for whom it was conducted; (3) a summary description of the nature of the transaction, the type, amount, and denomination of the currency involved and a description of any check involved in the transaction; (4) the type of identification presented; and (5) the identity of the reporting financial institution.

27. FinCEN has estimated that each Currency Transaction Report takes eight minutes to complete. 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024). However, this is an average estimate that includes large firms with automated processes to generate the reports. 85 Fed. Reg. 29022, 29029 (May 14, 2020). For non-bank filers who do not have automated processes, FinCEN estimates that each Currency Transaction Report takes 23.93 minutes to complete. *Id.*

28. Novedades y Servicios does not have automated procedures to file Currency Transaction Reports, as it typically does not handle over-$10,000 transactions and therefore typically does not need to file Currency Transaction Reports in the course of its business.

6

29.    MSBs must submit these Currency Transaction Reports to the federal government regardless of whether there is any ground for suspicion of wrongdoing.

30.    For transactions over $3,000, MSBs are required to collect information about transactions—including identifying information about the customer—and to retain that information in their records.

31.    Although MSBs are required to collect and retain this information for transactions over $3,000 but below $10,000, there is generally no requirement to report the information to the federal government.

32.    The privacy of information that MSBs collect about their customers is protected by federal law. Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3, which includes entities that provide services covered by the Border GTO. Under these requirements, a business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party" without providing notice and "a reasonable opportunity, before you disclose the information … to opt out of the disclosure." *Id.* at § 313.10.

33.    For transactions under $3,000, MSBs are not generally required to collect information about their customers.

34.    The vast majority of the money services transactions at Novedades y Servicios are far beneath these thresholds, so for most such transactions they are not required to collect any information from their customers.

35.    Novedades sometimes collects information for transactions below $3,000 for their own purposes; for instance, sometimes they ask a customer to show identification. But the information that they ask for does not encompass all the detailed information required by a Currency Transaction Report. And for some small-dollar transactions Novedades does not collect any information at all.

36.    In all the years that it has been in business, Novedades y Servicios has never completed a cash transaction over $10,000 and has therefore never had to file a Currency

7

Transaction Report.

**The March 14, 2025 Geographic Targeting Order**

37.     On March 14, 2025, FinCEN issued a Geographic Targeting Order targeting thirty zip codes near the southwest border (the "Border GTO"). *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025).

38.     Under the Border GTO, MSBs located within the targeted zip codes must file a Currency Transaction Report for every cash transaction over $200.

39.     This means that for a cash transaction as small as $201, an MSB must collect the customer information that is required by a CTR, even though federal law generally does not require MSBs to collect customer information for transactions under $3,000.

40.     This also means that for a cash transaction as small as $201, MSBs must report that customer information to FinCEN, even though such reports generally are not required for transactions under $10,000.

41.     In practice, the Border GTO means that cashing a check over $200, using over $200 in cash to purchase a money order (for instance, to pay the rent), or using over $200 in cash to make a wire transfer (for instance, to send money to family abroad) will now trigger a report to the federal government.

42.     For businesses, the Border GTO means business-crushing burdens. Currently, the vast majority of transactions by MSBs do not require CTRs, because they are well below the $10,000 reporting threshold. But those transactions are not below $200, which means that, under the Border GTO, the vast majority of transactions will require CTRs. This will result in a huge increase in costs to Border GTO-affected MSBs as they dedicate many hours per week just to gathering information from customers and then filling out paperwork to report that information to the federal government.

43.     Because neighboring zip codes are not targeted by the Border GTO, customers who do not want to provide private information can simply move their business

8

to other nearby companies. Targeted businesses will therefore lose revenue as customers flee Border GTO-affected MSBs for other MSBs not targeted by the Border GTO.

44.    For businesses, the Border GTO also invades the privacy of business records by requiring MSBs to provide information on large numbers of transactions that otherwise would not be reported to the federal government.

45.    And, of course, for individuals, the Border GTO authorizes a significant invasion of personal privacy, as everyday, ordinary, and perfectly lawful transactions of just a few hundred dollars will be reported to the federal government.

46.    The amount of time that customers spend to access services provided by MSBs will also increase, as it will take time for customers to provide the information required by the additional paperwork.

47.    By requiring MSBs to collect this information from individuals, the Border GTO also enlists MSBs to conduct surveillance on the private transactions of their own customers.

48.    FinCEN justifies the Border GTO as "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors." 90 Fed. Reg. at 12107.

49.    An internal FinCEN memorandum proposing the Border GTO, produced by the United States in another case challenging the Border GTO, states that in FinCEN's view "MSBs are vulnerable to exploitation by money launderers," and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug cartels." In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels."

50.    In FinCEN's view, some MSBs are themselves criminal actors, as "services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer."

51.    That same internal FinCEN memorandum, however, also concedes that "most of the business that MSBs conduct is legitimate and essential." Services offered by MSBs are "tailored to persons without bank accounts" and provide "competitively priced

COMPLAINT

services and [a] convenient location offered near the border."

52.    The internal FinCEN memorandum therefore acknowledges that the Border GTO will indiscriminately sweep up information about both "licit and illicit" transactions.

53.    The internal FinCEN memorandum states that the information provided by the Border GTO will "generate new leads and identify new and related subjects in ongoing cases." It "may allow the identification of a comprehensive network of potential money mules in the geographic area in question," may "create leads related to professional money launderers," and will "likely capture information about the laundering of funds related to multiple criminal typologies."

54.    According to the internal FinCEN memorandum, the Border GTO will also "support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls."

55.    The internal memorandum states that the Border GTO will "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Area, allowing FinCEN to more fully understand the money laundering risks related to MSBs."

56.    At a recent hearing in another case challenging the Border GTO, a lawyer for the United States explained that the government, through the Border GTO, is "requiring reports from these money services businesses, which are more likely to be targeted for illicit activity," because "we want a complete picture of what they're up to and who uses them."

57.    For instance, the government lawyer theorized that "[s]omething like someone who claims to be coming north to shop at HEB might actually reveal a relationship between two people, one of whom is the target of a known investigation and one of whom was not previously known to be related to that person, but now they're doing a transaction together for some reason."

58.    The Border GTO applies to thirty zip codes. Of those thirty zip codes, 19 are located in Texas and 11 are located in California.

COMPLAINT

59.    Four of the targeted zip codes (92231, 92249, 92281, and 92283) are located in Imperial County, CA.

60.    Seven of the targeted zip codes (91910, 92101, 92113, 92117, 92126, 92154, and 92173) are located in San Diego County, CA.

61.    Taken together, the targeted zip codes comprise a part of the country with a population over 1.2 million persons.

62.    Because many of the zip codes are located near active border crossings, many more people pass through the targeted zip codes every year.

63.    The targeted zip codes are not contiguous, and other zip codes next to the targeted zip codes are not always targeted. For instance, Novedades is located in zip code 92113, which is subject to the Border GTO. But most of the zip codes adjacent to 92113 (including 92102, 92114, 92136, and 91950) are not touched by the Border GTO.

64.    FinCEN's internal memorandum acknowledges that "MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels," but the Border GTO nonetheless does not include any counties in Arizona or New Mexico.

65.    To the extent that criminals are currently engaged in money laundering using over-$200 transactions at MSBs, criminals can respond to the Border GTO by simply moving their money to a zip code that is not covered by the Border GTO.

66.    The internal FinCEN memorandum proposing the Border GTO explains that FinCEN targeted these zip codes based on "risk factors that include their proximity to the border and to a border crossing" as well as based on "whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes."

67.    In other words, FinCEN targeted these counties because they are close to border crossings and because the number of Currency Transaction Reports filed in these counties (for over $10,000 transactions) is high relative to the population.

68.    The government believes that these factors are indicators of criminal activity. At a hearing in another case challenging the Border GTO, a government lawyer explained the "counties weren't chosen at random" and were "chosen based on the intelligence

COMPLAINT

available to FinCEN."

69.    In fact, however, the factors that the government relied on do not provide a reasoned basis to explain why these requirements are being imposed on these particular zip codes and not other zip codes next door.

70.    The fact that a high number of over-$10,000 transactions are occurring in these zip codes does not mean that those transactions are illegitimate. It simply means that there are more cash transactions occurring.

71.    In addition, even if the high number of over-$10,000 transactions in the zip codes was a sign of illicit financial activity (and it is not), it would not follow that small-dollar transactions *of just $201* are more likely to be associated with illicit activity in those jurisdictions.

72.    Beyond the irrelevant fact that over-$10,000 transactions occur in these jurisdictions, FinCEN has not articulated any explanation for targeting over-$200 transactions in these jurisdictions rather than in other jurisdictions along the border.

73.    The internal FinCEN memorandum states that zip code 92113, where Plaintiff Novedades y Servicios is located, is being targeted because in 2024 it had "930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the country."

74.    The fact that just 930 over-$10,000 cash transactions occurred in a zip code over a year-long period is not a colorable reason to think that over-$200 cash transactions in that zip code are more likely to be associated with criminal activity.

75.    FinCEN certainly has not established individualized probable cause to support targeting the MSBs in these jurisdictions.

76.    FinCEN also has not applied to a magistrate for a warrant to target the MSBs that are covered by the Border GTO.

77.    The internal FinCEN memorandum states that, if FinCEN believes criminals have moved to other zip codes not covered by the Border GTO, it will "expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP

12

codes or counties in any future issuances."

78.     The Border GTO became effective beginning April 14, 2025, and supposedly will end on September 9, 2025.

79.     FinCEN has repeatedly renewed and expanded past GTOs, and FinCEN gave no indication, in the Border GTO or elsewhere, that it will not renew the Border GTO after September 9.

80.     MSBs that fail to comply with the requirements of the Border GTO face civil fines up to $71,545 per violation, as well as criminal liability.

81.     Although the Border GTO was published in the Federal Register, *see* 49 Fed. Reg. 12106, it was issued by FinCEN without any prior notice or any opportunity to comment.

**Application of the Border GTO to Plaintiff Novedades y Servicios**

82.     Novedades y Servicios is subject to the Border GTO because it is a registered MSB located in zip code 92113.

83.     The Border-GTO will cause customers to leave Novedades for other MSBs that won't have to take and report their personal information. Because the Border GTO does not include nearby zip codes, customers will simply go to those nearby zip codes to make their transactions.

84.     There is at least one MSB that is just a five-minute drive from Novedades and that provides comparable services but that is located in a different zip code not subject to the Border GTO.

85.     Customers who do not want to provide their information to Novedades can therefore drive a few minutes to access the same services without being subject to the Border GTO.

86.     Novedades also expects to suffer reputational damage because its customers will view Novedades as prying into their personal information (either on its own initiative or at the behest of the government) when other MSBs outside the targeted area are not.

87.     The Border GTO will also result in an enormous increase in expenses related

COMPLAINT

particularly to preparing CTRs. For instance, Novedades cashes between 1,200-1,300 checks per month. For a filer (like Novedades) without automated filing procedures, FinCEN estimates that each CTR takes 23.9 minutes to complete. That means between 26,680 and 31,070 minutes per month—which translates to between 14.8 and 17.26 *hours* per day—just for reporting. And that does not even include the time spent explaining to customers why Novedades now has to take their personal information when it never did before.

88.   To meet these paperwork burdens (assuming customers do not just take their business elsewhere), Novedades would have to hire at least one full-time employee just to prepare CTRs.

89.   Novedades cannot afford to hire an entire full-time employee just to prepare CTRs, and Novedades also cannot survive if its customers stop coming to the business. So, either way, Novedades expects to be put out of business by the Border GTO.

90.   The Border GTO will also invade the privacy of Novedades, because it requires the affirmative disclosure of private business records without suspicion that Novedades has done anything wrong. The government has stated that part of the purpose of the Border GTO is to investigate MSBs for wrongdoing.

91.   The government has not suggested that it has probable cause to suspect Novedades of any wrongdoing, nor has the government presented a warrant for Novedades' business records.

92.   The government has not suggested that it has probable cause to suspect Novedades' customers of any wrongdoing, nor has the government presented a warrant for Novedades' customers' private information or financial records.

93.   If the government ever had a warrant based on a real concern about actual crime, Novedades would cooperate. Novedades has no desire to deal with criminals or protect criminals.

94.   The Border GTO will not be effective to fight illicit activity. In Novedades' experience, the vast majority of customers are average people who regularly use

COMPLAINT

Novedades' services to do things like pay rent, cash payroll checks, and send money to family—and the government has not suggested that they suspect anything different.

95.     The Border GTO will also be ineffective because it allows other MSBs in nearby zip codes to continue reporting only transactions over $10,000. That means illicit actors—more mobile and sophisticated than the average low-income local—will just go to nearby zip codes to do their crimes.

96.     Meanwhile, for Novedades, loss of revenue and increased costs are too much to bear. And even if the GTO is not renewed, the reputational damage will be done. Novedades will likely go out of business.

**Application of the Border GTO to Plaintiff Esperanza Gomez Escobar**

97.     As the owner and manager of Novedades y Servicios, Plaintiff Esperanza Gomez Escobar will be required to fill out Currency Transaction Reports that are required by the Border GTO.

98.     Esperanza estimates that compliance with the Border GTO will take multiple hours a day.

99.     Esperanza does not want to provide this information on her customers to the federal government because they have a right to privacy, as does she.

100.    Esperanza is worried that if the government can see Novedades' customers' private financial transactions, it can see their familial and personal affiliations, their interests, and can even profile their beliefs and thoughts.

101.    Esperanza wants no part in the invasion of customers' private lives. Her customers have a right to privacy.

102.    In addition to owning an affected business, Esperanza is also affected by the Border GTO as a customer. Esperanza's siblings and mother live in Mexico, and in the past Esperanza has transferred money to via an MSB in the 92113 zip code. These transfers are typically over $200 but below $3,000. She intends to transfer money to them in amounts over $200 from the 92113 zip code in the future, including within the next six months and beyond.

103.    Esperanza wants to keep her private life private. She has a right as an American to her privacy.

104.    Esperanza fears that if the government can see her private financial transactions, it can see her familial and personal affiliations, her interests, and can even profile her beliefs and thoughts.

105.    Esperanza also fears that the government will make a mistake and come after her with no basis. She fears she will mistakenly be put on a list of potential criminals, when in fact she has done nothing wrong, either as an individual or a business owner.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**

**The Border GTO Violates The Fourth Amendment**

**(5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

106.    Paragraphs 1-105 are hereby incorporated by reference.

107.    The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

108.    The Fourth Amendment prohibits general warrants, meaning warrants that allow government to broadly search for evidence of crimes without establishing particularized probable cause specific to the person or place to be searched.

109.    The Border GTO operates as a general warrant insofar as it was fashioned by law enforcement to sweep up information about otherwise private cash transactions throughout the targeted zip codes, in order to further law enforcement's stated objective of combatting Mexican cartels, without any individualized probable cause.

110.    The $200 threshold set by the Border GTO results in an unreasonable search because it requires businesses to report information about their customers' ordinary, everyday cash transactions without any individualized suspicion or showing of probable

16

cause.

111.   The Border GTO infringes on individuals' and businesses' reasonable expectation of privacy in their ordinary, everyday, small-dollar cash transactions, and the Border GTO demands information that businesses would otherwise have a legal and contractual obligation to hold private and confidential.

112.   The Border GTO also conscripts MSBs, forcing them to obtain information from their customers that they would not otherwise solicit, even if they do not suspect those customers of any wrongdoing, and to report that information to federal law enforcement.

113.   The Border GTO will capture voluminous information about ordinary, lawful, and legitimate transactions without any probable cause.

114.   Plaintiffs are injured by this Fourth Amendment violation insofar as the Border GTO will provide the government with information about their private cash transactions.

115.   Because the Border GTO is unconstitutional under the Fourth Amendment, it must be vacated and enjoined.

## COUNT II

**The Statute Under Which FinCEN Purported To Issue The Border GTO Violates The Non-Delegation Doctrine**

**(5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

116.   Paragraphs 1-105 are hereby incorporated by reference.

117.   Article I, section 1 of the U.S. Constitution provides that "[a]ll legislative Powers … shall be vested in a Congress of the United States." Congress therefore cannot delegate the power to make basic legislative decisions for the country to other branches of government.

118.   This means that legislative policy decisions must be made by Congress, not by executive agencies. When Congress delegates power to executive agencies, Congress must establish the governing rule of law by articulating an "intelligible principle" for the

17

agency to apply. The agency's permissible role is then to apply that intelligible principle to specific facts and circumstances.

119.    The statute under which FinCEN purported to act when issuing the Border GTO, 31 U.S.C. § 5326, does not articulate any intelligible principle to be followed when issuing geographic targeting orders. Instead, it grants open-ended authority for executive officials to issue any geographic targeting order that they find necessary to implement the anti-money laundering laws—granting executive officials unfettered discretion to determine the businesses, geographic areas, reporting thresholds, and reports that should be required.

120.    Plaintiffs are injured by this non-delegation violation insofar as FinCEN relied on this broad, open-ended grant of authority to issue the Border GTO targeting their cash transactions for additional reporting burdens.

121.    Because the Border GTO was enacted under purported statutory authority that violates the non-delegation doctrine and separation of powers principles, it must be vacated and enjoined.

## COUNT III

### The Border GTO Violates The Fifth Amendment

### (5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))

122.    Paragraphs 1-105 are hereby incorporated by reference.

123.    The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

124.    The Fifth Amendment bars the government from compelling an individual from filing reports containing information that the government intends to use to uncover evidence of criminal wrongdoing.

125.    The reports that are required by the Border GTO are provided to law enforcement and are available to law enforcement for purposes of criminal law enforcement; indeed, these law enforcement aims are the only stated reason for requiring the reports directed by the Border GTO.

18

126.   The government has candidly acknowledged that the purpose of the reports that are required by the Border GTO is to uncover evidence of criminal wrongdoing.

127.   Accordingly, for individual customers, the reporting required by the Border GTO creates a real and appreciable risk of self-incrimination.

128.   The Border GTO, meanwhile, conscripts businesses as agents of the government to gather this information from their customers, in violation of those customers' right against self-incrimination.

129.   Because the Border GTO is unconstitutional under the Fifth Amendment, it must be vacated and enjoined.

## COUNT IV

**The Border GTO Is *Ultra Vires* Because This Surveillance Presents A Major Question And Is Not Sufficiently Authorized By Statute**

**(5 U.S.C. § 706(2)(A) and (C); *Ex parte Young*, 209 U.S. 123 (1908))**

130.   Paragraphs 1-105 are hereby incorporated by reference.

131.   Under the major questions doctrine, courts hold that statutes should not be interpreted to allow agencies to adopt policies of economic and political significance unless authority to adopt such a policy is clear on the face of the statute. This doctrine upholds basic separation of powers principles insofar as it ensures that such decisions will be made by Congress, rather than by executive agencies.

132.   The surveillance regime put in place by the GTO implicates the major questions doctrine because it singles out an area with a population of over 1 million persons for additional burdensome reporting obligations not imposed on any other part of the country.

133.   The surveillance regime put in place by the GTO implicates the major questions doctrine because it will impose significant costs on the businesses that are subjected to these new obligations, while also infringing the privacy rights of those businesses' customers.

134.   The statute under which FinCEN purported to act, 31 U.S.C. § 5326,

19

contemplates more limited orders targeted at more discrete geographic areas and does not clearly authorize executive officials to adopt this type of sweeping surveillance system for an area comprising over 1 million persons.

135.   Accordingly, the Border GTO is *ultra vires* and exceeds the authority granted to the executive branch by the statute under which FinCEN purported to act.

136.   Plaintiffs are injured by this *ultra vires* action insofar as FinCEN has acted without statutory authority to issue burdensome reporting obligations that target their otherwise private cash transactions.

137.   Because the Border GTO is *ultra vires* and exceeds the authority granted to the executive branch, it must be vacated and enjoined.

## COUNT V

**The Border GTO Is Arbitrary and Capricious, And Contrary To Law,**

**In That It Targets Counties, Businesses, and Transactions**

**Without Sufficient Explanation**

**(5 U.S.C. § 706(2)(A))**

138.   Paragraphs 1-105 are hereby incorporated by reference.

139.   Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

140.   The Border GTO is arbitrary and capricious insofar as it selected thirty zip codes without articulating any satisfactory explanation why those particular zip codes should be targeted for higher reporting obligations.

141.   FinCEN has stated, outside the Border GTO itself, that it selected these zip codes because these zip codes have a high proportion of CTRs filed given their population. But that fact merely reflects the fact that there are cash transactions occurring in these zip codes—transactions that have not been shown to be criminal in nature.

142.   The Border GTO also is arbitrary and capricious insofar as it offers no satisfactory explanation for setting the reporting threshold for MSBs within those zip

COMPLAINT

codes at just $200.

143.   FinCEN has articulated no satisfactory explanation as to why high numbers of over-$10,000 transactions in a zip code would be a reason to require reporting for transactions over $200 in that same zip code.

144.   Under 31 U.S.C. § 5326(a), FinCEN may impose a GTO if "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof." FinCEN has not articulated any such "reasonable grounds" to support the sweeping obligation imposed by the Border GTO.

145.   Because the Border GTO is arbitrary and capricious, and contrary to law, it must be vacated and enjoined.

<u>**COUNT VI**</u>

**The Border GTO Was Promulgated Without Following**

**Notice-And-Comment Procedures**

**(5 U.S.C. § 706(2)(D))**

146.   Paragraphs 1-105 are hereby incorporated by reference.

147.   Under the APA, agencies must engage in notice-and-comment rulemaking before adopting rules that affect the rights and obligations of regulated entities, unless some statutory exception applies. *See* 5 U.S.C. § 553.

148.   Under the APA, agency action is a "rule" requiring notice-and-comment procedures if it sets out prescriptive requirements to be followed for broad classes of persons, rather than adjudicating the rights and obligations of specific identified individuals.

149.   Under the APA, the Border GTO is a rule requiring notice-and-comment rulemaking because it prescribes reporting requirements for all MSBs within a large geographic area covering thirty separate zip codes, with a population over a million persons.

150.   However, FinCEN promulgated the Border GTO without any notice to

1  affected parties and without any opportunity to comment.

2      151.   Because the Border GTO was issued in violation of procedural requirements

3  set out in the APA, it must be vacated and enjoined.

4                          **PRAYER FOR RELIEF**

5      In light of the foregoing, Plaintiffs respectfully request the following relief:

6      A.     An order vacating and setting aside the Border GTO;

7      B.     An injunction enjoining the Defendants from implementing the Border GTO

8  to require MSBs to collect and report information on over-$200 cash transactions in the

9  targeted zip codes;

10     C.     A declaration that the Border GTO is unlawful insofar as it violates the

11 Fourth and Fifth Amendments, was purportedly issued under a statute that violates the

12 non-delegation doctrine, is *ultra vires* insofar as it was issued without statutory authority,

13 and violates the Administrative Procedure Act;

14     D.     An award of Plaintiffs' costs and expenses in this action, together with

15 reasonable attorneys' fees, under the Equal Access to Justice Act or otherwise; and

16     E.     Any other legal or equitable relief to which Plaintiffs may show themselves

17 to be justly entitled.

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Dated: April 15, 2025                    Respectfully submitted,


                                         /s/ Elizabeth L. Sanz
Jeffrey Rowes (TX Bar No. 24104956)*     Elizabeth L. Sanz (CA Bar No. 340538)
INSTITUTE FOR JUSTICE                    INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970             901 N. Glebe Road, Suite 900
Austin, TX 78701                         Arlington, VA 22203
(512) 480-5936                           (703) 682-9320
jrowes@ij.org                            bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*     Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE                    INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180       16781 Chagrin Blvd., Suite 256
Miami, FL 33131                          Shaker Heights, OH 44120
(305) 721-1600                           (703) 682-9320
kmarquez@ij.org                          rjohnson@ij.org

*Pro Hac Vice Motions to be filed

*Attorneys for Plaintiffs*

COMPLAINT