ADAM GORDON
United States Attorney
KATHERINE L. PARKER
Assistant U.S. Attorney
California Bar No. 222629
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7634
Fax: (619) 546-7751
Email: Katherine.Parker@usdoj.gov

Attorneys for Defendant
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC.; and ESPERANZA GOMEZ ESCOBAR,<br><br>    Plaintiffs,<br><br>    v.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasure; and PAM BONDI, in her official capacity as the Attorney General of the United States,<br><br>    Defendants. | Case No.: 25-cv-0886-JLS-DDL<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' _EX PARTE_ MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date: April 22, 2025<br>Time: 9:30 a.m.<br><br>Hon. Janis L. Sammartino |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 1

III.  LEGAL STANDARD .......................................................................................... 5

IV.   ARGUMENT ....................................................................................................... 6

    A.    Plaintiffs Fail to Establish "Serious Questions" Supporting Preliminary
        Injunctive Relief ......................................................................................... 6

        1.    Reporting Requirements Do Not Violate the
              Fourth Amendment ........................................................................ 7

        2.    The GTO is Not Subject to Notice-and-Comment
              Requirements ................................................................................ 10

        3.    The GTO is not "Arbitrary and Capricious" ..................................... 12

        4.    The Non-Delegation Doctrine is Inapplicable ................................... 14

        5.    The Major Questions Doctrine is Inapplicable ................................. 15

    B.    Plaintiffs' Assertions of Irreparable Harm are Speculative and Belied by
        Their Delay in Filing ................................................................................. 16

    C.    The Balance of Equities Favors Defendants ............................................... 17

V.    CONCLUSION .................................................................................................. 19

*Defendants' Opposition to Plaintiffs' Ex Parte*
*Motion for a Temporary Restraining Order*
    i    25-cv-0886-JLS-DDL

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States,*
  *295 U.S. 495 (1935)* ................................................................ 14

*Alabama Association of Realtors v. Department of Health and Human Services,*
  *594 U.S. 758 (2021)* ........................................................ 15, 16

*Alliance for the Wild Rockies v. Cottrell,*
  *632 F.3d 1127 (9th Cir. 2011)* .............................................. 6

*Alliance for the Wild Rockies v. Petrick,*
  *68 F.4th 475 (9th Cir. 2023)* ................................................. 6

*Andreiu v. Ashcroft,*
  *253 F.3d 477 (9th Cir. 2001)* ................................................. 6

*Brock v. Emerson Electric Company,*
  *834 F.2d 994 (11th Cir. 1987)* .............................................. 9

*Califano v. Yamasaki,*
  *442 U.S. 682 (1979)* ............................................................. 18

*California Bankers Association v. Shultz,*
  *416 U.S. 21 (1974)* ........................................................ 7, 8-10

*Caribbean Marine Services Company, Inc. v. Baldrige,*
  *844 F.2d 668 (9th Cir. 1988)* ................................................ 16

*City of Los Angeles v. Patel,*
  *576 U.S. 409 (2015)* ......................................................... 9, 10

*Department of Commerce v. New York,*
  *588 U.S. 752 (2019)* ............................................................. 12

*Donovan v. Master Printers Association,*
  *532 F. Supp. 1140 (N.D. Ill. 1981)* ...................................... 10

*Dae Shin Enterprises, Inc. v. United States,*
   169 F.3d 21 (D.C. Cir. 1999) ......................................................................... 18

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ......................................................................... 5

*Gill v. Whitford,*
   585 U.S. 48 (2018) ........................................................................................ 18

*Goldie's Bookstore, Inc. v. Superior Court,*
   739 F.2d 466 (9th Cir. 1984) ......................................................................... 16

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) ......................................................................... 5

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ........................................................................ 1

*Lydo Enterprises, Inc. v. City of Las Vegas,*
   745 F.2d 1211 (9th Cir. 1984) ....................................................................... 17

*Maharaj v. Ashcroft,*
   295 F.3d 963 (9th Cir. 2002) ......................................................................... 6

*McLaughlin v. Kings Island, Division of Taft Broadcasting Company,*
   849 F.2d 990 (6th Cir. 1988) ......................................................................... 9

*Miller ex rel. NLRB v. California Pacific Medical Center,*
   991 F.2d 536 (9th Cir. 1993) ......................................................................... 17

*Mistretta v. United States,*
   488 U.S. 361 (1989) ...................................................................................... 14

*National Biodiesel Board. v. Environmental Protection Agency,*
   843 F.3d 1010 (D.C. Cir. 2016) ..................................................................... 11

*Neustar, Inc. v. Federal Communications Commission,*
   857 F.3d 886 (D.C. Cir. 2017) ....................................................................... 11

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................. 6, 17

*Panama Refining Company v. Ryan,*
  *293 U.S. 388 (1935)* ........................................................................................ 14

*Perez v. Mortgage Bankers Association,*
  *575 U.S. 92 (2015)* .......................................................................................... 12

*Sanchez v. Sanchez, No. 10-cv-1628 JLS (RBB),*
  *2010 U.S. Dist. LEXIS 122180 (S.D. Cal. Nov. 17, 2010)* ............................ 17

*Stuhlbarg International Sales Company, Inc. v. John D. Brush & Co., Inc.,*
  *240 F.3d 832 (9th Cir. 2001)* ............................................................................. 5

*United States v. W. H. Hodges & Company, Inc.,*
  *533 F.2d 276 (5th Cir. 1976)* .......................................................................... 10

*United States v. Brignoni-Ponce,*
  *422 U.S. 873 (1975)* .......................................................................................... 6

*Utility Air Regulatory Group v. Environmental Protection Agency,*
  *573 U.S. 302 (2014)* ........................................................................................ 15

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
  *435 U.S. 519 (1978)* ........................................................................................ 12

*Warth v. Seldin,*
  *422 U.S. 490 (1975)* ........................................................................................ 18

*Wayte v. United States,*
  *470 U.S. 598 (1985)* .......................................................................................... 6

*West Virginia v. Environmental Protection Agency,*
  *597 U.S. 697 (2022)* ........................................................................................ 15

*Whitman v. American Trucking Associations, Inc.,*
  *531 U.S. 457 (2001)* ................................................................................. 14, 15

*Winter v. Natural Resources Defense Council, Inc.,*
  *555 U.S. 7 (2008)* ................................................................................... 5, 6, 17

# STATUTES

5 U.S.C. § 551(6) ................................................................................................................ 10
5 U.S.C. § 705 .................................................................................................................... 18
8 U.S.C. § 1324a(b) ............................................................................................................. 8
8 U.S.C. § 1324a(f) .............................................................................................................. 8
12 U.S.C. § 1829b ................................................................................................................ 1
12 U.S.C. § 1951 .................................................................................................................. 1
12 U.S.C. § 1960 .................................................................................................................. 1
26 U.S.C. § 6012 .................................................................................................................. 9
31 U.S.C. § 5313 .................................................................................................................. 2
31 U.S.C. § 5313(a) ............................................................................................................ 11
31 U.S.C. § 5318(a)(7) ......................................................................................................... 3
31 U.S.C. § 5311 .............................................................................................................. 1, 3
31 U.S.C. § 5314 .............................................................................................................. 1, 3
31 U.S.C. § 5326 ................................................................................................... 10, 11, 15
31 U.S.C. § 5326(a) ............................................................................................... 3, 10, 15
31 U.S.C. § 5326(c) .............................................................................................................. 3
52 U.S.C. § 30104 ................................................................................................................ 8
Pub. L. 100–690 ................................................................................................................... 2

# RULES

Federal Rule of Civil Procedure 65(c) ............................................................................... 18

# REGULATIONS

10 C.F.R. § 1010.312 ........................................................................................................... 5
31 C.F.R. § 1010.100(ff) ...................................................................................................... 4
31 C.F.R. § 1010.311 ........................................................................................................... 2
31 C.F.R. § 1010.370 ........................................................................................................... 3
31 C.F.R. § 1010.970 ........................................................................................................... 3

# OTHER AUTHORITIES

90 Fed. Reg. 12106 ..................................................................................................... 4, 5, 10
*Wright, et al.,* 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.) ........................................... 17

## I.    INTRODUCTION

On March 11, 2025, acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) issued a Geographic Targeting Order (GTO) that requires money services businesses (MSBs) in certain counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. In support of this Order, the agency found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out the purposes of the [Bank Secrecy Act ("BSA")] or to prevent evasions thereof" and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

Plaintiffs, one MSB in San Diego County and the individual owner of that business, filed this action to enjoin the GTO. Plaintiffs cannot show a likelihood of success on the merits that would justify what the Ninth Circuit has described as the "extraordinary and drastic remedy" of preliminary injunctive relief. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Rather, this case involves a temporary, geographically limited modification to an existing FinCEN reporting requirement. None of Plaintiffs' claims warrant the drastic remedy of a TRO, as discussed below. Although another district court has entered a TRO enjoining the GTO as to a limited number of entities, that order was issued without supporting reasoning. As set forth below, the GTO is a lawful, reasoned modification of an existing reporting requirement and injunctive relief is unwarranted.

## II.    BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA). The BSA authorizes the Secretary of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. Generally speaking, the authority to impose requirements is codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1960, 31 U.S.C. §§ 5311-5314, and 5316-5336, including notes thereto. Among many other requirements and authorities, the

BSA and its implementing regulations require financial institutions to file a currency transaction report (CTR) for transactions in currency greater than $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

In the Anti-Drug-Abuse Act of 1988, Congress amended the BSA to give the Secretary additional authority to collect information about certain currency transactions in geographic areas thought to pose particular risks. Pub. L. 100–690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 18, 1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. Rep. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
>
> (1) to obtain such information as the Secretary may describe in such order concerning—
>
> (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a). By these plain terms, the GTO statute authorizes the Treasury Secretary to issue a GTO to "obtain information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . , the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id.*

The only prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[1] *Id*. A GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(c). The Secretary's authority to issue a GTO has been delegated to the Director of FinCEN. *See* Treasury Order 180-01 (Jan. 14, 2020), available at https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01. FinCEN has issued regulations which further govern the form of GTOs. *See* 31 C.F.R. § 1010.370. Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including requirements imposed by a GTO. *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

---

[1] The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions. *See* 31 U.S.C. § 5311.

On March 11, 2025, FinCEN issued the GTO at issue in this case, which covers MSBs operating in portions of five counties in Texas and two counties in California (a total of 30 ZIP codes). *See* Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (published Mar. 14, 2025), Attached as Exhibit 1; *see also* Compl. ¶ 37. MSBs are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters. *See generally* 31 CFR § 1010.100(ff). The GTO took effect on April 14, 2025.

Under this GTO, covered MSBs must submit currency transaction reports within 15 days for currency transactions involving between $200 and $10,000. *See* Ex. 1, 90 Fed. Reg. at 12107. A covered MSB is also required to verify the identity of the customer. *Id.* To assist covered businesses, FinCEN published FAQs on their website. *See* https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. Additionally, FinCEN hosted webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the GTO were explained, and several questions concerning applicability and reporting were answered. *See* https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about. The webinar and the FAQs confirm that, other than the applicable amount and a code unique to the GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000 and are to be filed in the same way. *See, e.g.*, FAQ Items 3, 7 (noting that "[t]he GTO does not alter any existing BSA obligation of Covered Businesses (as defined in the GTO), except as otherwise noted in the order itself"; and that the only changes noted in the GTO are that "Covered Businesses are required to report transactions of more than $200 but not more than $10,000, and must record the term "MSB0325GTO").

As Plaintiffs acknowledge, *see* Compl. ¶¶ 20, 24, 30, 31, MSBs are subject to a range of legal requirements and internal policies that pre-date the GTO, including registering with FinCEN, filing other CTRs, developing and maintaining an effective AML program, filing suspicious activity reports, and maintaining detailed records. *See* Exhibit 2, AR Mem. at 3-4 (collecting regulations). Other regulations require verification of identity for specific types of transactions. *See, e.g.*, 31 C.F.R. § 1022.210(d)(1)(i)(A); 10 C.F.R. § 1010.312.

With this opposition, Defendants submit three pieces of evidence:

- FinCEN's issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (Mar. 14, 2025), attached as Exhibit 1;

- A redacted internal memorandum that forms part of the Administrative Record supporting the GTO (AR Mem., or AR Memorandum), attached as Exhibit 2; and

- Screenshots of a sample Currency Transaction Report, available at https://sdtmut.fincen.treas.gov/docs/CTRX.pdf, attached as Exhibit 3.

## III.   LEGAL STANDARD

In general, the showing required for a temporary restraining order is the same as that required for a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, Inc., 240 F.3d 832, 839 (9th Cir. 2001). To prevail on a motion for a temporary restraining order, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must demonstrate a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). When "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* factors]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

The final two factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—merge when the Government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has specifically acknowledged that "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte v. United States*, 470 U.S. 598, 611 (1985); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975); *Maharaj v. Ashcroft*, 295 F.3d 963, 966 (9th Cir. 2002) (movant seeking injunctive relief "must show either (1) a probability of success on the merits and the possibility of irreparable harm, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor.") (*quoting Andreiu v. Ashcroft*, 253 F.3d 477, 483 (9th Cir. 2001)).

## IV. ARGUMENT

### A. Plaintiffs Fail to Establish "Serious Questions" Supporting Preliminary Injunctive Relief

Plaintiffs do not argue that they can establish a "substantial likelihood of success on the merits," and instead invoke the Ninth Circuit's alternative "serious legal questions" standard. Pls.' Motion, ECF No. 8-1, at 9:27-10:6. Under either standard, Plaintiffs' motion should be denied because they have shown neither a "likelihood of success" nor "serious questions." "[S]erious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff" may support an injunction in some cases if the other *Winter* requirements are also met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

This alternate "serious questions" test may be less demanding, but it "does not erase the Supreme Court's admonition that an injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (cleaned up), quoting *Winter,* 555 U.S. at 22. A "serious question does not exist where the plaintiff's claim is merely plausible or just because there are legal questions not directly answered by past precedent." *Id.* (district court erred in applying "serious questions" standard and granting injunction). Here, Plaintiffs' claims are

all legally infirm, and therefore do not implicate the "serious questions" test.

### 1. Reporting Requirements Do Not Violate the Fourth Amendment

Plaintiffs have not shown a substantial likelihood of success on their Fourth Amendment claim, and have not established "serious questions" warranting a TRO. In arguing that the GTO is a "general warrant," Plaintiffs give short shrift to the key precedent on the Fourth Amendment and financial reporting requirements, the Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974).

*Shultz* (like this case) involved a Fourth Amendment challenge to a BSA reporting requirement. Among the challenged BSA provisions in *Shultz* was a requirement that banks make "certain reports of domestic transactions [to the government] where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations." 416 U.S. at 30-31, 37. For each covered transaction, the BSA required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information. *Id.* at 39 n.15. Congress created these "precise and detailed reporting requirements," *id.* at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law., *id.* at 38; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and fully consistent with the Fourth Amendment. The Court started by connecting its Fourth Amendment analysis to the specific context of corporate reporting requirements, where it has long been clear "that organizations engaged in commerce c[an] be required by the Government to file reports dealing with particular phases of their activities." *Id.* at 65; *see also id.* at 59 ("Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge, reporting requirements are by no means per se violations of the

Fourth Amendment." (citation omitted)). As to the BSA's constitutionality, the Court's rationale had two primary components: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA "d[id] not impose unreasonable reporting requirements" under the Fourth Amendment. *Id.* at 67.

*Shultz* establishes the proper Fourth Amendment rubric applicable to the GTO, which takes a similar form and arose in similar circumstances. Just like the reporting in *Shultz*, the GTO requires companies to "file reports dealing with particular phases of their activities." *Id.* at 65. Like the reporting requirements challenged in *Shultz*, the GTO was motivated by increasing use of covered entities for illicit purposes: "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border." *See* Ex. 2, AR at 5.

*Shultz* disproves Plaintiffs' Fourth Amendment claim, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38.

Consistent with *Shultz*, Congress routinely enacts other reporting requirements, including as to information used for law enforcement purposes. For example, federal law requires employers to collect and make available information about new employees' eligibility to work. *See* 8 U.S.C. § 1324a(b) (employment verification reporting requirements); *id.* § 1324a(f) (criminal penalties). Political campaigns are required to report contributions and expenditures. *See* 52 U.S.C. § 30104; *id.* § 30107(a)(9) (FEC may "report

apparent violations to the appropriate law enforcement authorities"). Taxpayers, of course, are required to file tax returns. *See* 26 U.S.C. § 6012. Plaintiffs have identified no authority casting Fourth Amendment doubt on such reporting enactments.

Plaintiffs' insistence that "the border GTO operates as a general warrant", Mot. at 12:27, simply cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional. The requirements for a warrant or a certain level of suspicion that Plaintiffs seek to impose on cases involving statutory reporting schemes come from (and are applicable to) cases involving discretionary and often physical searches. In cases where agencies or officers have discretion to control the timing, manner, scope, and frequency of individual searches, an opportunity for pre-compliance review may mitigate any risk of abuse or harassment. *See Brock v. Emerson Elec. Co.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis," like *Shultz*).

For instance, Plaintiffs rely heavily on *Patel*, which concerned on-demand "inspections" of hotel guest records by city police. 576 U.S. at 412-14. The Supreme Court required pre-compliance review because of a "risk that searches … will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he availability of precompliance review … reduces the risk that officers will use these administrative searches as a pretext to harass business owners.").

Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994-95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (11th Cir. 1987) (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies

the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant"). This distinction is present in *Shultz* itself. *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

Here, the GTO requires reporting of specific information under specific statutory criteria, rather than providing officers with leave to conduct limitless, discretionary searches of Plaintiffs' premises, persons, or files. *See* 31 U.S.C. § 5326; 90 Fed. Reg. at 12107. Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment or abuse present in *Patel* and similar cases. In *Shultz*, the Supreme Court already determined what Fourth Amendment analysis is applicable to statutory reporting requirements, and the GTO is constitutional under those principles.

## 2. The GTO is Not Subject to Notice-and-Comment Requirements

Plaintiff argues that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a). But the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA. *See* 90 Fed. Reg. 12106. The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). The GTO is fundamentally investigatory rather than legislative in nature; it is limited in scope and time and tied to specific facts found by the agency in this geographic area. *Cf. U.S. v. W.H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was

not subject to rulemaking requirements).

Most importantly, Congress specifically authorized the agency to act by order rather than by rule here. That is in sharp contrast to the statutory provision governing other CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order outside of the GTO context. *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO).

This reading of the statute is buttressed by the purposes of a GTO – to target a specific threatened geographic area for a time-limited period. GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO to issue a GTO and they could not be used effectively to respond to dynamic threats and developing financial intelligence. The legislative history confirms as much. *See* H. Rep. 100-716, 100th Cong. 2d Sess. 5 (June 8, 1988) (testimony of Deputy Assistant Secretary Gerald Hilsher) ("Because time would be of the essence in maximizing the utility of the information obtained pursuant to a targeting order, Treasury is pleased to see that the bill exempts any order issued pursuant to proposed section 5326 from the normal delayed effective date provisions required for regulations under the Administrative Procedure Act.").

Finally, notice-and-comment rulemaking is not required simply because the GTO affects a group of businesses. *See Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment."); *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (internal citation omitted) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis."). In any event, the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See*

1   *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,

2   435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

### 3.  The GTO is not "Arbitrary and Capricious"

4       Far from being "arbitrary and capricious" in violation of the APA, the GTO is

5   reasonable and considers all relevant factors. The APA's arbitrary and capricious standard

6   is not meant for "second-guessing" of an agency's "weighing of risks and benefits," and

7   courts should not "substitute[] [their] judgment for that of the agency." *DOC v. New York*,

8   588 U.S. 752, 777 (2019).

9       The Order itself reflects the agency's reasoned finding that the additional

10  recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out

11  the purposes of the BSA or to prevent evasions" and further "Treasury's efforts to combat

12  illicit finance by drug cartels and other illicit actors along the southwest border of

13  United States." Exhibit 1, 90 Fed. Reg. at 12107. This finding is further buttressed by

14  analysis in the attached AR memorandum. Surveying available intelligence and other data,

15  FinCEN found that MSBs along the southwest border are uniquely vulnerable to money

16  laundering activities by drug cartels that use both witting and unwitting MSBs as part of

17  various illegal schemes to transport and launder drug money. *See* AR Mem. at 4-9.

18  "FinCEN assesses that cash remittances conducted by MSBs along the southwest border

19  are an important avenue for this illicit activity, particularly since cartels also engage in bulk

20  cash smuggling along the border, and so collect cash near border crossings." *Id.* at 8-9.

21  FinCEN further found that, "[b]y lowering the CTR threshold, the information reported

22  under this GTO would help . . . identify cartel-related, money laundering and to conduct

23  targeted investigations and prosecutions of suppliers and facilitators that enable the flow

24  of deadly drugs such as fentanyl into the United States" in part because the reports "are

25  expected to generate new leads and identify new and related subjects in ongoing cases."

26  *Id*.

27      FinCEN further noted that the reduced dollar reporting threshold "will help make

28  structuring more difficult, thereby increasing the cost of doing business for cartels" and

"help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules." *Id*. The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 9-13 (surveying information about selected counties and explaining why some other counties were excluded). Finally, the AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts . . . " and would "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." *Id*. at 13-14.

Plaintiffs' proffered bases for how the GTO is "arbitrary and capricious" all fail in light of the record. As set forth above, contrary to Plaintiffs' assertions, FinCEN has articulated precisely why it selected the much-lower $200 threshold, why it selected the counties it did, why this temporary reporting is crucial to targeting cartel activity and money laundering and has articulated important governmental interests that outweigh the burdens on impacted MSBs. The administrative record demonstrates that FinCEN reasonably found that reducing the CTR threshold would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads. AR Mem. at 8-9. MSBs in these seven counties are vulnerable to abuse and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA. The AR Memorandum explicitly acknowledges that the GTO may place an increased burden on "covered businesses." FinCEN reasoned that the GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and "does not expect these

Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services." AR Mem. at 14. The AR Memorandum explains precisely why these seven counties were chosen and includes the specific data relied upon. *See* AR Mem. at 9-13.

### 4.  The Non-Delegation Doctrine is Inapplicable

Under the nondelegation doctrine, Congress "is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is vested." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935). The Supreme Court has recognized, however, "that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "In our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* The Supreme Court has invalidated statutes under the nondelegation doctrine only twice, both times in 1935. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref.*, 293 U.S. at 388.

To survive a challenge under the non-delegation doctrine, Congress must only articulate an intelligible principle pursuant to which a person authorized to act must conform. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). The GTO statute does exactly that. By its explicit terms, the GTO statute is far from being the open-ended authority the Plaintiffs claim it to be. The GTO statute states that additional recordkeeping and reporting requirements can only be imposed upon a finding that reasonable grounds exist for concluding that such requirements are necessary to carry out the purposes, or prevent evasions of, the BSA. The GTO statute explicitly describes the kinds of transactions about which information can be collected and from which parties, and limits the application of any requirements to businesses in a geographic area. The GTO statute further limits the duration of additional requirements, subject to renewal upon a further finding of necessity.

finding – that the GTO was "necessary to carry out the purposes" of the BSA . *Id.* Plaintiffs cite no case applying the non-delegation doctrine to the BSA, to GTOs, or indeed to any even remotely comparable reporting requirement, and thus have not presented a "serious question" appropriate for injunctive relief.

### 5.  The Major Questions Doctrine is Inapplicable

Finally, Plaintiffs' "major questions" claims do not support the drastic remedy of a TRO. Under the major questions doctrine, courts have rejected claims of regulatory authority where (1) the underlying claim of authority concerns an issue of "vast economic and political significance," and (2) Congress has not clearly authorized the agency to act on the issue. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014) (internal quotation marks omitted). But Congress here has explicitly authorized exactly this agency action. By its plain terms, the GTO statutory provision authorizes "additional recordkeeping and reporting requirements" beyond those required by other regulatory provisions. *See* 31 U.S.C. § 5326(a). And it explicitly permits the Secretary to set the reporting threshold without any limitation on what that threshold might be. *Id*. § 5326(a)(1)(A) ("which the Secretary may prescribe"). In setting a lower threshold than that required by other regulations for one category of businesses in portions of seven counties, FinCEN has not exceeded its statutory authority.

This case therefore lacks the hallmarks of the major questions decisions that Plaintiffs invoke, all of which grounded their analysis in the text, structure, and context of the relevant statutes. Here, FinCEN is not asserting regulatory power that is "markedly different" from the type of authority that Congress expressly identified in the relevant provision, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (per curiam) (cited at Pls.' Mot. 23:9-10) or claiming "an unheralded power representing a transformative expansion in [its] regulatory authority" that Congress has conspicuously and repeatedly declined to enact," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (quotation marks omitted) (cited at Pls.' Mot. at 23:11). Nor is this a case where an agency responsible for public health has attempted to regulate something far afield from its core expertise, such as "the landlord-tenant

relationship." *Ala. Ass'n*, 594 U.S. at 764. Instead, here, the federal agency responsible for financial reporting has issued a temporary modification to long-existing requirements for financial reporting. There is thus nothing "breathtaking," *Ala. Ass'n*, 594 U.S. at 764, or "extravagant," *Util. Air*, 573 U.S. at 324, about FinCEN's temporary, geographically limited modification of an existing reporting requirement, and injunctive relief based on the "major questions" doctrine would be unwarranted.

### B. Plaintiffs' Assertions of Irreparable Harm are Speculative and Belied by Their Delay in Filing

A plaintiff seeking a TRO "must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). The proffered irreparable harm must not be speculative. *See Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (overturning TRO where finding of irreparable harm was "not based on any factual allegations" and, thus, "speculative"). Here, Plaintiff Esperanza Gomez Escobar's declaration is rife with speculation about her customers' activities, character, and motivations. She states, for example, without support, that many customers "will not want to provide their very sensitive personal information" and that customers "do not understand the purpose of the Border GTO." Gomez Escobar Decl. at ¶¶ 27, 29. She speculates at length about what her customers "might think." *Id.* ¶ 29. Such speculation is insufficient to justify a TRO.

Plaintiffs also overstate the alleged increased burden caused by the GTO. The CTR is a simple form on which most of the information is specific to the MSB, and presumably would be the same every time. Moreover, Plaintiff Gomez Escobar acknowledges that her business is already registered with FinCEN and subject to FinCEN's reporting requirements. Gomez Escobar Decl. ¶ 7, 8. She acknowledges the reporting done for money orders for over $2,500, and states that such transactions take five minutes or less. *Id.* ¶ 12. She further states that Plaintiffs' policy is already to check identification for "all check cashing." *Id.* ¶ 15. Snapping a photo of the ID and check to input into a CTR later, and of

course entering data at a later time will take a few minutes more, but the GTO allowed MSBs more than a month of lead time to learn the process before the first reporting is required.

Moreover, delay in seeking injunctive relief indicates an absence of urgency. *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.,* 991 F.2d 536, 544 (9th Cir. 1993) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").

Here, the GTO was announced on March 11, 2025. Plaintiffs waited 35 days to file their complaint, and another day to file their TRO motion. Plaintiffs' five-week delay in seeking injunctive relief tips the scale against issuing emergency relief, particularly in light of the weakness of their legal claims, discussed above. *See Sanchez v. Sanchez*, No. 10-cv-1628 JLS (RBB), 2010 U.S. Dist. LEXIS 122180 at **15-16 (S.D. Cal. Nov. 17, 2010) (26-day delay between filing of complaint and filing of TRO application weighs against issuance of TRO).

## C. The Balance of Equities Favors Defendants

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright et al., FPP § 2947 (3d ed.).

Here, Plaintiff has provided only speculative evidence of injury likely to be caused by a new, temporary recordkeeping and reporting requirement. In the face of their evidence, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry significant weight.

1    It is particularly in the public interest for FinCEN to act swiftly on these issues in light of

2    the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their

3    devastating criminal activity. *See* AR Mem. at 8.

4         Should the Court grant Plaintiff's motion, relief would properly be limited to

5    plaintiffs' proffered injury, based on the constitutional and equitable principles mandating

6    that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill*

7    *v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be

8    no more burdensome to the defendant than necessary to provide complete relief to the

9    plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is

10   inconsistent with Article III's judicial power, which "exists only to redress or otherwise

11   protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

12        The APA's § 705 likewise explicitly incorporates the constitutional and equitable

13   limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action

14   only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at

15   43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties

16   complainant"). Under these principles, relief should be limited to the Plaintiffs in this action.

17        Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief

18   "only if the movant gives security" for "costs and damages sustained" by Defendants if they

19   are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the

20   Court issues an injunction here, Defendants request that the Court require Plaintiffs to post

21   an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v.*

22   *United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad

23   discretion in the district court to determine the appropriate amount of an injunction bond").

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

## V.     CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court deny the *ex parte* motion.

DATED:  April 18, 2025                              Respectfully submitted,

ADAM GORDON
United States Attorney

*/s/  Katherine L. Parker*
KATHERINE L. PARKER
Assistant United States Attorney

Attorneys for Defendant
United States of America