**INSTITUTE FOR JUSTICE**
ELIZABETH L. SANZ (CA Bar No. 340538)
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
ROBERT E. JOHNSON (DC Bar No. 1013390)*
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
JEFFREY ROWES (TX Bar No. 24104956)*
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
KATRIN MARQUEZ (FL Bar No. 1024765)*
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
* *Pro hac vice* motions pending

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
Jeffrey Atteberry (SBN 266728)
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
(424) 258-5190

*Attorneys for Plaintiffs Novedades y Servicios, Inc. and Esperanza Gomez Escobar*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>*Defendants.* | Case No.: 3:25-cv-00886-JLS-DDL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: May 15, 2025<br>Time: 9:00 a.m. PDT<br>Courtroom: 4D<br>Judge: Hon. Janis L. Sammartino |

# TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................iii

Introduction ..............................................................................................................1

Statement of Facts ....................................................................................................1

    I.   Plaintiff Business Performs Simple Transactions for Hardworking People............1

    II.  FinCEN Suddenly Drops the Threshold for a Currency Transaction Report from $10,000 to $200 in 30 Border Zip Codes. .......................................................3

    III. The Administrative Record Contains No Evidence That the GTO Will Achieve Any Law Enforcement Goal. ...................................................................................4

    IV. The Administrative Record Ignores the GTO's Destructive Impact on the "Legitimate and Essential" Work of MSBs by Dropping the Threshold to $200. ................................................................................................................6

Legal Standard ........................................................................................................8

Argument....................................................................................................................9

    I.   Plaintiffs Face Irreparable Harms Because the Border GTO Will Destroy Their Business and Invade Their Privacy. .......................................................................9

    II.  Plaintiffs Are Likely to Prevail on the Merits of Their Claims. ..........................10

        A.  The GTO Likely Violates the Fourth Amendment....................................11

            1.   The $200 threshold is unreasonable because it destroys business privacy...............................................................................................11

            2.   The $200 GTO unreasonably invades personal financial privacy......14

        B.  The Border GTO Likely Violates the Administrative Procedure Act.........15

            1.   The failure to do Notice and Comment is fatal to the GTO. ..............16

            2.   The GTO is arbitrary and capricious. ................................................17

i

C.  The GTO Is Likely *Ultra Vires* Under the Major Questions Doctrine........21

D.  The Border GTO Likely Violates the Non-Delegation Doctrine. ...............22

III. Profound Irreparable Harms and Serious Questions About the Constitutional Merits Means that Plaintiffs Are Entitled to a Preliminary Injunction.................24

Conclusion ........................................................................................................25

ii

# TABLE OF AUTHORITIES

**CASES**                                                                                                            **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) .......................................................................................................... 24

*Adidas Am., Inc. v. Skechers USA, Inc.*,
890 F.3d 747 (9th Cir. 2018) ............................................................................................ 10

*Airbnb, Inc. v. City of New York*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019) .............................................................................. 14

*Ala. Ass'n of Realtors v. DHHS*,
594 U.S. 758 (2021) .......................................................................................................... 22

*Altera Corp. & Subsidiaries v. Comm'r*,
926 F.3d 1061 (9th Cir. 2019) .......................................................................................... 18

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......................................................................................... 24

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......................................................................................................... 22

*Cal. Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974) ............................................................................................................ 12

*Carpenter v. United States*,
585 U.S. 296 (2018) .................................................................................................... 14–16

*Donovan v. Lone Steer, Inc.*,
464 U.S. 408 (1984) .......................................................................................................... 13

*Donovan v. Master Printers Ass'n*,
532 F. Supp. 1140 (N.D. Ill. 1981) .................................................................................. 13

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2021) ................................................................................. 9, 18, 25

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......................................................................................................... 10

iii

*FHFA v. SFR Invs. Pool 1, LLC,*
　2018 WL 1524440 (D. Nev. Mar. 27, 2018)...................................................................... 13

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
　98 F.4th 1180 (9th Cir. 2024)........................................................................................ 11

*Hemp Indus. Ass'n v. DEA,*
　333 F.3d 1082 (9th Cir. 2003)....................................................................................... 16

*Hernandez v. Sessions,*
　872 F.3d 976 (9th Cir. 2017).................................................................................... 10–11

*hiQ Labs, Inc. v. LinkedIn Corp.,*
　31 F.4th 1180 (9th Cir. 2022)......................................................................................... 9

*Idaho v. Coeur d'Alene Tribe,*
　794 F.3d 1039 (9th Cir. 2015)....................................................................................... 10

*In re Application for Hist. Cell Site Data,*
　747 F. Supp. 2d 827 (S.D. Tex. 2010).......................................................................... 15

*Jarkesy v. SEC,*
　34 F.4th 446 (5th Cir. 2022)..................................................................................... 23–24

*Jarkesy v. SEC,*
　603 U.S. 109 (2024)..................................................................................................... 23

*Meyer v. Portfolio Recovery Assocs., LLC,*
　707 F.3d 1036 (9th Cir. 2012)....................................................................................... 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
　463 U.S. 29 (1983)....................................................................................................... 18

*Pacito v. Trump,*
　2025 WL 655075 (W.D. Wash. Feb. 28, 2025)............................................................ 16

*Patel v. City of Los Angeles,*
　576 U.S. 409 (2015)..................................................................................................... 13

*Patel v. City of Los Angeles,*
　738 F.3d 1058 (9th Cir. 2013)....................................................................................... 13

iv

*Regents of Univ. of Cal. v. DHS,*
    908 F.3d 476 (9th. Cir. 2018)..........................................................................24

*Riley v. California,*
    573 U.S. 373 (2014)........................................................................................11

*Safari Club Int'l v. Zinke,*
    878 F.3d 316 (D.C. Cir. 2017) ......................................................................16

*Snitko v. United States,*
    90 F.4th 1250 (9th Cir. 2024)........................................................................11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001)..........................................................................10

*United States v. Fla. E. Coast Ry. Co.,*
    410 U.S. 224 (1973)........................................................................................17

*United States v. Holcomb,*
    132 F.4th 1118 (9th Cir. 2025) ......................................................................11

*United States v. Jones,*
    565 U.S. 400 (2012)........................................................................................14

*United States v. Miller,*
    425 U.S. 435 (1976)........................................................................................15

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950)........................................................................................12

*United States v. Smith,*
    110 F.4th 817 (5th Cir. 2024)........................................................................14

*United States v. Spurlock,*
    2025 WL 1095512 (D. Nev. Apr. 11, 2025)..................................................14

*West Virginia v. EPA,*
    597 U.S. 697 (2022)........................................................................................21

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001)........................................................................................23

v

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................8

*Yesler Terrace Cmty. Council v. Cisneros*,
  37 F.3d 442 (9th Cir. 1994) ..............................................................................17

**CODES AND STATUTES**

5 U.S.C. § 551(4) ...................................................................................................16

5 U.S.C. § 551(7) .............................................................................................16, 21

5 U.S.C. § 706(2) ...................................................................................................24

16 C.F.R. § 313.10(a)(1)(iii) ..................................................................................15

16 C.F.R. § 313.3(k)(1) ..........................................................................................14

31 C.F.R. § 1010.410(e) ...........................................................................................2

31 C.F.R. § 1010.100(ff) ...........................................................................................1

31 C.F.R. § 1010.311 .................................................................................................2

31 C.F.R. § 1010.415 .................................................................................................2

31 C.F.R. § 1010.821 .................................................................................................4

31 C.F.R. § 1022.320(a)(2) ........................................................................................2

31 C.F.R. § 1022.410(b)(3) ........................................................................................2

31 U.S.C. § 5311 ......................................................................................................23

31 U.S.C. § 5321(a)(1) ...............................................................................................4

31 U.S.C. § 5321(a)(6)(A) ..........................................................................................4

31 U.S.C. § 5326 ......................................................................................................21

31 U.S.C. § 5326(a) ..........................................................................................*passim*

**OTHER AUTHORITIES**

85 Fed. Reg. 29,022 (May 14, 2020) ........................................................................4

89 Fed. Reg. 7,767 (Feb. 5, 2024) .........................................................................3–4

90 Fed. Reg. 12,106 (Mar. 14, 2025) ................................................................3–4, 16

Fed. Trade Comm'n,
  *How to Comply with the Privacy of Consumer Financial Information Rule of the Gramm-Leach-Bliley Act*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act ...................................................... 15

FinCEN.gov,
  *FinCEN Announces $390,000,000 Enforcement Action Against Capital One, National Association for Violations of the Bank Secrecy Act* (Jan. 15, 2021), https://www.fincen.gov/news/news-releases/fincen-announces-390000000-enforcement-action-against-capital-one-national ........................................................ 4

FinCEN.gov,
  *FinCEN Assesses Record $1.3 Billion Penalty against TD Bank* (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank ...................................................... 4

FinCEN.gov,
  Geographic Targeting Order (Apr. 19, 2024), https://www.fincen.gov/sites/default/files/shared/RRE-GTOs-Phase-18-Order.pdf ......................................

*Pacito v. Trump*,
  No. 25-1313 (9th Cir. Mar. 3, 2025) ........................................................ 16

*Tex. Ass'n of Money Servs. Bus. (TAMSB) v. Bondi*,
  No. 5:25-cv-00344-FB (W.D. Tex.) ........................................................ 9

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 3:25-cv-00886-JLS-DDL

**INTRODUCTION**

This Court entered a Temporary Restraining Order on April 22, 2025 against the challenged Geographic Targeting Order ("GTO" or "Border GTO")). (ECF 16.) Plaintiffs now seek a preliminary injunction. They have compelling evidence that will enable the Court to understand how irrational the $200 GTO is. For example, businesses in Texas not covered by Judge Biery's TRO have had to suspend transactions over $200 to clear out the tremendous backlog of reporting paperwork that exploded in a few days. Customers are going to non-targeted zip codes. A bank in Laredo, Texas, which is not subject to the GTO, just put up a billboard advertising its money-changing services. In short, FinCEN's new GTO will not create a picture of what cartel behavior looks like. It will, however, create a picture of what happens when a government agency arbitrarily and capriciously tramples on law-abiding businesses and their customers. This destructive, unprecedented, illegal, and unconstitutional GTO should be preliminarily enjoined.

Below, Plaintiffs provide the greater factual detail the Court asked for at the TRO hearing. After that, Plaintiffs demonstrate their entitlement to a preliminary injunction: irreparable harm to their business (Part I); likely success on their claims that dropping the reporting threshold by 98 percent violates the Fourth Amendment, Administrative Procedure Act, and major-questions and nondelegation doctrines (Part II); and the absence of any countervailing government interest in this unlawful reporting requirement (Part III).

**STATEMENT OF FACTS**

**I.    Plaintiff Business Performs Simple Transactions for Hardworking People.**

Plaintiff Novedades, a one-person storefront in southern San Diego, is a Money Services Business ("MSB"). Decl. of Esperanza Gomez in Supp. of Pls.' Mot. for Prelim. Inj. ("Gomez PI Decl.") ¶¶ 5–7. As an MSB, it provides check cashing, money transfers, and money orders. 31 C.F.R. § 1010.100(ff). Customers use Novedades to cash paychecks to buy groceries across the street; to wire money to family; and to purchase money orders for responsibilities like rent. Gomez PI Decl. ¶¶ 9, 16, 33, 34, 44, 58. Novedades' owner, Plaintiff Esperanza Gomez, is an American citizen who opened Novedades in 2020. *Id.*

1

¶¶ 1, 6. Ms. Gomez or her employees interact with customers every day, most of whom are regulars. *Id.* ¶ 32. Ms. Gomez herself uses these services to send money to her family in Mexico. *Id.* ¶ 70.

At the TRO hearing, the Court expressed interest in more detail about how Novedades operates. Here is a chart summarizing Novedades' transactions by dollar amount and federal reporting requirement (prior to the GTO here):

| | **Under $3,000** | **$3,000 – $10,000** | **Over $10,000** |
|---|---|---|---|
| **Typical Transaction Volume** | **Many.** 2,200–2,500 transactions per month.[1] | **Rare.** Less than 1% of all transactions.[2] | **None.** Novedades has never had a transaction that large.[3] |
| **Information Gathering** | **Voluntary** by the business. Typically minimal (e.g., verify employment). Many transactions involve no information gathering at all.[4] | **Required** by federal law. *See* 31 C.F.R. §§ 1010.410(e), 1010.415. Less extensive than CTR (e.g., no requirement to record information of person on whose behalf transaction is conducted). | **Required** by federal law. *See* 31 C.F.R. § 1010.311. Requires ID, social security number, and other personal information for both person conducting transaction and other involved persons. |
| **Reporting Obligation** | **None.** (Except for rare suspicious transactions that involve over $2,000. *See* 31 C.F.R. § 1022.320(a)(2).) | **None.** (Except for rare suspicious transactions that involve over $2,000. *See* 31 C.F.R. § 1022.320(a)(2).) | **All** over-$10,000 transactions require a CTR. *See* 31 C.F.R. § 1010.311. Suspicious transaction reporting also applies. |
| **Estimated Time Per Transaction[5]** | 1–5 minutes | 10 minutes | 25 minutes |

[1] *See* Gomez PI Decl. ¶ 27.
[2] *See id.*
[3] *See id.* ¶¶ 28, 38, 50.
[4] *See id.* ¶¶ 14, 15, 20, 22, 27. Plaintiffs note that currency exchange transactions of $1,000 and above are subject to recordkeeping requirements. *See* 31 C.F.R. § 1022.410(b)(3). Because Novedades does not offer currency exchange, it is not subject to recordkeeping obligations at $1,000 thresholds.
[5] This includes the time to gather information from the customer and to report information

2

**II.      FinCEN Suddenly Drops the Threshold for a Currency Transaction Report from $10,000 to $200 in 30 Border Zip Codes.**

On March 14, 2025, FinCEN issued an order—effective April 14, 2025—under which MSBs in 30 zip codes in California and Texas must file a Currency Transaction Report ("CTR") for every transaction over $200. *See Issuance of a Geographic Targeting Order . . . Along the Southwest Border*, 90 Fed. Reg. 12,106 (Mar. 14, 2025) (ECF 18). Administrative Record ("AR") 001–003. The prior threshold was $10,000. No New Mexico or Arizona zip codes are included. And the targeted zip codes are not contiguous. Some targeted zip codes are surrounded by non-targeted zip codes. *See* Decl. of Elizabeth L. Sanz in Supp. of Pls.' Mot. for Prelim. Inj. ("Sanz PI Decl.") ¶¶ 10–12, Exs. D–F (providing maps of targeted zip codes).

**The Information Required:** The CTR has four sections with 128 boxes for information. *See* Sanz PI Decl. ¶ 9, Ex. C (sample CTR). In addition to providing detailed information about the entity facilitating the transaction, *Id.* at 013–14, and form the currency takes, *id.* at 016, each person involved in the transaction must reveal highly personal information, including: full legal name, age, gender, address, phone number, email address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list of dozens), the number from a valid driver's license (or passport or alien registration card [i.e. green card]), amounts of money, and bank account numbers that transmit or receive the money, *id.* at 015.

**FinCEN's Own Estimates of Time Burden:** The CTR form estimates that it takes 40 minutes to complete. *See* Sanz PI Decl. ¶ 9, Ex. C at 012 (sample CTR, Paperwork Reduction Act Notice). Elsewhere, FinCEN estimates that non-bank filers who do not have automated processes—like Novedades—require 23.93 minutes per CTR. *See* 89 Fed. Reg. 7,767, 7,768 (Feb. 5, 2024).[6] Ms. Gomez and witnesses from Texas MSBs trying to comply

_____

to the federal government. For details on time estimates, *see* Gomez PI Decl. ¶¶ 11, 14, 21, 26, 27, 30, 50.

[6] In general, FinCEN has estimated that each CTR takes eight minutes to complete. 89 Fed.

3

find it takes at least 15 minutes, more often 20 minutes or more. *See, e.g.*, Gomez PI Decl. ¶ 50 (25 minutes); Decl. of Arnoldo Gonzalez in Supp. of Pls.' Mot. for Prelim. Inj. ("Gonzalez Decl.") ¶ 18 (estimating 25 minutes); Decl. of Clarissa Ashley Light in Supp. of Pls.' Mot. for Prelim. Inj. ("Light Decl.") ¶ 21 (estimating 20 minutes); Decl. of Andres Payan, Jr. in Supp. of Pls.' Mot. for Prelim. Inj. ("Payan Decl.") ¶ 27 (15 minutes); Decl. of Antonio Carpio in Supp. of Pls.' Mot. for Prelim. Inj. ("Carpio Decl.") ¶ 22 (estimating 20–30 minutes).

**Steep Criminal and Civil Penalties:** Willful violations carry a *per-violation* penalty of $71,545, as well as criminal penalties of up to five years in prison.[7] Even negligent violations carry per-violation penalties of $1,430.[8] These are the same penalties that apply to other violations of the Bank Secrecy Act. Financial institutions regularly pay eye-watering sums for alleged reporting failures—for instance, a $390 million settlement against Capital One, including negligent failure to file CTRs; or a $1.3 billion penalty against T.D. Bank, including for late-filed CTRs.[9]

### III. The Administrative Record Contains No Evidence That the GTO Will Achieve Any Law Enforcement Goal.

FinCEN justifies the GTO as part of "Treasury's efforts to combat illicit finance by drug cartels." 90 Fed. Reg. at 12,107. AR002. Since the TRO proceeding, the government has filed a 443-page Administrative Record in support of the GTO. (ECF 18.) The Admin Record consists of the sources cited in the FinCEN internal memorandum addressed to

---

Reg. 7,767, 7,768 (Feb. 5, 2024). But that number is an average that includes large firms with automated processes to generate reports. 85 Fed. Reg. 29,022, 29,029 (May 14, 2020).

[7] 31 U.S.C. § 5321(a)(1); 31 C.F.R. § 1010.821.

[8] *See* 31 U.S.C. § 5321(a)(6)(A); 31 C.F.R. § 1010.821.

[9] *FinCEN Announces $390,000,000 Enforcement Action Against Capital One, National Association for Violations of the Bank Secrecy Act* (Jan. 15, 2021), https://www.fincen.gov/news/news-releases/fincen-announces-390000000-enforcement-action-against-capital-one-national (last accessed Apr. 26, 2025); *FinCEN Assesses Record $1.3 Billion Penalty against TD Bank* (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank (last accessed Apr. 26, 2025).

FinCEN Director Andrea M. Gacki (dated "March XX, 2025") regarding the Border GTO that the Court already saw in the TRO briefing. AR004–020. There is nothing new here. Notably, the Administrative Record is **not** the result of notice-and-comment rulemaking or an adjudication in which non-FinCEN parties were able to contribute evidence. The sources are reports and news articles that FinCEN itself cherrypicked as part of its internal process.

Tracing statements in the Memo to sources in the Admin Record reveals no evidence about what fraction of MSB transactions over the $200 level are illicit (0.01%, 0.1%, 1%?). There are just general descriptions of money laundering.

- "[I]llicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico." Memo at 6 (AR009). No discussion of legitimate versus illegitimate transactions.

- "Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including 'money mules,' to move funds to Mexico via U.S.-based MSBs." Memo at 7 (AR010). But the source is a single page from an FBI document about how to avoid being duped into becoming a "money mule." *See* AR304. No discussion of what fraction of MSB transactions involve money mules.

- "Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations." Memo at 7 (AR010). But the source is a 2019 FinCEN report that identifies MSBs as one of many tools drug cartels use, including online virtual currency such as bitcoin, "bulk cash smuggling," "trade-based money laundering," and "funnel account activity." AR309–314. No discussion of what fraction of MSB transactions are illicit versus legitimate.

- The Memo identifies two criminal cases involving MSBs (from **outside** the targeted zip codes) whose owners were active conspirators. Memo at 7 (AR010)

5

(citing AR323–402)). Nothing in the Record connects these cases to a $200 CTR requirement for legitimate MSBs.

The Memo asserts that dropping the CTR threshold to $200 will enable "targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States." Memo at 9 (AR012). But FinCEN cites no evidence for this and there is none in the Admin Record that the new CTRs will generate leads and prosecutions, no evidence that FinCEN can transform millions of new CTRs into successful prosecutions, and no evidence that cartel countermeasures in non-targeted zip codes won't nullify any asserted GTO benefit.

The Memo asserts that the 30 targeted zip codes were selected because the number of CTRs at the $10,000 level was higher in proportion to population. Memo at 10 (AR013). That, according to FinCEN, means that those zip codes will have "a large number of transactions below the $10,000 threshold relative to other ZIP codes." *Id.* There is no evidence in the Record to explain how that conclusion follows from the premise.

**IV.    The Administrative Record Ignores the GTO's Destructive Impact on the "Legitimate and Essential" Work of MSBs by Dropping the Threshold to $200.**

FinCEN set the $200 threshold "because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate." Memo at 13 (AR016). Yet FinCEN also recognizes that "most of the business that MSBs conduct is legitimate and essential." *Id.* at 4 (AR007). FinCEN acknowledges a "higher burden" on MSBs, but, because the GTO is "merely a reporting obligation," the agency assumes that the GTO will not "materially alter typical fees charged." *Id.* at 14 (AR017). FinCEN cites no source in the Admin Record that the impact will be minimal because there is no such evidence.

To the contrary, the limited evidence in the Admin Record about impacts on legitimate business indicates that $200 is ruinously low. The January 15, 2025 report by the Center for Strategic and International Studies ("CSIS")—*Understanding the Impact of*

6

*Remittances on Mexico's Economy and Safeguarding Their Future Impact*—attempts to balance the cartel fight against legitimate money transfers to Mexico. AR148–167. It recommends that the basic level of "recordkeeping" (**not** a CTR) for "transactions above $3,000" be reduced to "$1,000." AR163. The CSIS report chose $1,000 because it was significantly above "the <u>average size</u> of a remittance [which is] in the low to mid three hundreds with its <u>highest point</u> being $390." *Id.* (emphasis in original).[10]

Plaintiffs' declarations and those of MSB witnesses in California and Texas establish:

- MSBs provide legitimate services to legitimate customers. They take abundant precautions to avoid criminals. Gomez Decl. ¶¶ 21, 29, 36; Decl. of Mariceli Castro in Supp. of Pls.' Mot. for Prelim. Inj. ("Castro Decl.") ¶¶ 44–46; Light Decl. ¶¶ 15–16; Payan Decl. ¶ 16.

- The GTO is adding dozens of hours of work per day, which the MSBs cannot cope with financially, even if it were possible to suddenly find and train enough qualified and trusted workers to process confidential financial information. For instance, for Ms. Gomez, there aren't enough hours in the day to process all of the CTRs that would be required under the Border GTO. Gomez PI Decl. ¶ 50 (estimating 30 extra hours of work per day). *See also* Light Decl. ¶¶ 21, 31 (estimating 10–20 extra hours per day); Payan Decl. ¶ 33 (concerns about convenience store employees handling sensitive customer information); Carpio Decl. ¶ 22 (estimating 64 extra hours per day); Castro Decl. ¶ 25 (noting that, because of the time it takes to collect information for CTRs, they are losing money with each transaction).

- Texas MSBs are having to stop doing transactions over $200, at least for several days, to try to clear paperwork backlogs, at great cost to the businesses. Light

---

[10] Plaintiffs do not endorse lowering the basic recordkeeping requirement to $1,000. They are simply illustrating the less invasive recommendations that FinCEN ignored.

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 3:25-cv-00886-JLS-DDL

Decl. ¶¶ 34 (loss of thousands of dollars in monthly commissions); Payan Decl. ¶ 18, 24 (same).

- The GTO threatens ruin through civil fines of $1,400 for each CTR that is even simply late-filed—and fines over $70,000 if the agency deems a violation "willful." *See* Gomez PI Decl. ¶ 59; Carpio Decl. ¶ 31; Castro Decl. ¶ 49; Light Decl. ¶ 33; Payan Decl. ¶ 30.

- Customers do not want to provide personal information and are going elsewhere, including banks (exempt from the Border GTO) and non-targeted zip codes. *See* Gomez PI Decl. ¶¶ 43–44 (noting customers left without completing transactions and said they'd go to nearby unaffected MSBs while Border GTO was in effect); Carpio Decl. ¶¶ 39–40, 43 (noting customers' frustration and unwillingness to complete transactions, and that they are going to unaffected MSBs and into Mexico); Castro Decl. ¶¶ 34–36 (noting customer frustration, 50-60% decrease in business, and proximity of unaffected MSBs); Decl. of Anuar Contreras in Supp. of Pls.' Mot. for Prelim. Inj. ("Contreras Decl.") ¶¶ 7–11 (going to credit union instead of Payan's Fuel Center due to privacy concerns); Light Decl. ¶ 19 (customers walking out); Payan Decl. ¶ 23 (customers walking out, choosing banks instead).

- Businesses not subject to the new GTO, such as banks, are going after these customers. Gomez PI Decl. ¶ 49 (noting unaffected MSB called customer to tell them to go there instead); Gonzalez Decl. ¶ 23 (picture of new bank billboard advertising currency exchange services).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When

8

the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2021). The Ninth Circuit "use[s] a 'sliding scale' approach . . . [s]o, when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (cleaned up).

## ARGUMENT

A preliminary injunction is warranted. Part I explains Plaintiffs irreparable economic and constitutional harms from the chaos that the GTO is inflicting on law-abiding businesses. Part II demonstrates the GTO's lawless nature: Fourth Amendment, Administrative Procedure Act, major-questions and nondelegation doctrine claims that raise serious questions. In Part III, Plaintiffs establish that, under the Ninth Circuit's sliding scale, a preliminary injunction should issue to maintain the status quo by preventing FinCEN from enforcing the GTO until a final resolution of the merits.

## I. Plaintiffs Face Irreparable Harms Because the Border GTO Will Destroy Their Business and Invade Their Privacy.

Novedades will suffer irreparable harm. It will likely be destroyed. Even during the few days the GTO was in effect, Novedades saw over half of customers informed of the new requirement walk out the door—and, even with reduced transaction volume, began to fall badly behind on the required paperwork (posing the risk of crippling penalties). *See* Gomez PI Dec. ¶¶ 43, 50–59. Businesses in Texas—not protected by this Court's TRO (nor one covering ten Texas MSBs)[11]—report profound harms, including lost customers, lost earnings, and incapacitating paperwork necessitating periodic shutdowns of transactions over $200. For instance, Payan's Fuel Center, an El Paso gas station and convenience store that also cashes checks, saw a 35% decline in its check cashing business, then got so buried in CTR paperwork that it decided to stop cashing checks above $200,

---

[11] *See Tex. Ass'n of Money Servs. Bus. (TAMSB) v. Bondi*, No. 5:25-cv-00344-FB (W.D. Tex.).

9

which will cost thousands of dollars per month in lost commissions and fees. Payan Decl. ¶¶ 18, 24. *See also* Carpio Decl. ¶¶ 21–26 (hours of added work, lost customers, increased compliance and staffing costs); Light Decl. ¶¶ 19–22 (lost customers, backlog of hundreds of CTRs). Monetary losses are irreparable where, as here, "sovereign immunity likely would bar [the plaintiff] from recovering monetary damages incurred during the course of this litigation." *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Other irreparable economic harms include "threatened loss of prospective customers or goodwill," *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), as well as "loss of control over business reputation," *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018). Plaintiffs face those harms, as well, as Plaintiffs' customers can patronize nearby businesses in adjacent zip codes not subject to the GTO. Gomez PI Dec. ¶¶ 46, 49. Plaintiffs are also likely to suffer a loss of reputation and goodwill, having been branded by FinCEN as possible conduits for cartel money. *See id.* ¶ 47. *See also* Contreras Decl. ¶¶ 7–12 (individual expressing discomfort with personal information being reported to government as reason he discontinued check cashing at MSB). Again, businesses in Texas not protected by the TRO report these very harms. *See* Payan Decl. ¶ 25 (describing the Border GTO as putting a "black flag" over the business); Light Decl. ¶¶ 36, 40 (loss of goodwill).

Irreparable harm also "follows inexorably from [a] conclusion that the government's current policies are likely unconstitutional" under the Fourth Amendment. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). In addition, the lost financial privacy is irreparable harm because, once information is reported to FinCEN, the disclosure cannot be undone. *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044–45 (9th Cir. 2012) (loss of privacy resulted in "irreparable harm"). *See also* Contreras Decl. ¶¶ 7–12 (reporting fear over invasion of financial privacy).

## II.    Plaintiffs Are Likely to Prevail on the Merits of Their Claims.

Under the Ninth Circuit's sliding scale, Plaintiffs need identify only "serious questions" going to the merits because the irreparable harms detailed above are so severe.

10

"Serious questions are ones that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (cleaned up). "They need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (cleaned up). Regardless of whether the Court views the claims through the "serious questions" or "likelihood of success" lens, Plaintiffs can show what they need to.

### A.    The GTO Likely Violates the Fourth Amendment.

The Border GTO is a drastic form of surveillance that functions as a "reviled 'general warrant' . . . which allowed . . . an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). *See also United States v. Holcomb*, 132 F.4th 1118, 1123, 1127 (9th Cir. 2025) (invalidating expansive warrant); *Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) (invalidating "inventory" search that amounted to a general warrant). Requiring a CTR for every transaction over $200 covers the vast majority of customers visiting Plaintiffs' business. Gomez PI Dec. ¶¶ 27, 41. FinCEN is thus treating almost every customer and MSB as a potential criminal. This turns the rules of ordinary criminal investigation on their head. Normally, the government obtains personal information via a warrant supported by probable cause. Here, by contrast, FinCEN has issued a general warrant that applies to everyone so it can go on fishing expeditions in the named zip codes.

Two sets of financial privacy interests are at stake: the interest of the business (Plaintiff Novedades), and the interest of MSB customers (Ms. Gomez). Plaintiffs take both in turn.

### 1.    The $200 threshold is unreasonable because it destroys business privacy.

Under the Fourth Amendment, a financial reporting requirement must be reasonable. The $200 GTO is not. This follows directly from the Supreme Court's decision upholding the $10,000 reporting requirement in *California Bankers Ass'n v. Shultz*, 416 U.S. 21

11

(1974). *Shultz* held that the key Fourth Amendment question was whether the reporting requirement was "reasonable," including whether the "information is sufficiently described and *limited in nature*." *Id.* at 67 (emphasis added). The Court focused on the $10,000 threshold (equivalent to $70,000 today). That very high threshold limited reporting to "abnormally large transactions in currency," and hence was "reasonable" vis-à-vis business privacy interests because it intruded on few transactions. *Id.*; *see also id.* at 78 (Powell, J., concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions").[12] But here the $200 GTO (about $30 in 1974) intrudes on most transactions, thus obliterating financial privacy. That is not reasonable. *Schultz* would have come out differently had the Supreme Court faced a reporting threshold of $30.

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority in *Shultz*, is also instructive. The Court in *Morton Salt* upheld an agency order directing twenty companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. *Id.* at 634–35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651–52. The Court underscored that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652 (emphasis added). The $200 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

The costs imposed by the GTO also amount to an "undue burden." *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981); *see also Donovan v. Lone*

---

[12] Justice Powell's concurrence was joined by Justice Blackmun. 416 U.S. at 78. With three Justices dissenting, *see id.* at 79, 91, 93, the concurring Justices provided necessary votes for the decision.

*Steer, Inc.*, 464 U.S. 408, 415 (1984) (holding, under Fourth Amendment, that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). Even a small business like Ms. Gomez' would have to spend more hours than there are in a day to complete the CTRs. Gomez PI Decl. ¶ 50. Texas MSBs are having to pause transactions above $200 after only a few days to clear out paperwork backlogs, which will cost thousands in monthly commission revenue. Light Decl. ¶ 34; Payan Decl. ¶ 18, 24. An obligation of that scope "threatens to unduly disrupt or seriously hinder normal operations of a business." *FHFA v. SFR Invs. Pool 1, LLC*, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018) (cleaned up).

The Border GTO also likely violates the Fourth Amendment because it is neither uniform across the country (as in *Shultz*) nor applied to businesses in an ongoing agency adjudication (as in *Morton Salt*). This matters because the Fourth Amendment guards against abuses of freewheeling investigatory discretion. *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1064 (9th Cir. 2013) (scrutinizing hotel records)*, aff'd*, 576 U.S. 409 (2015). Yet, without notice and comment or an administrative adjudication against specific parties, FinCEN claims authority to issue a GTO requiring businesses in any geographic area to report any information that FinCEN deems "necessary to carry out the purposes of" the banking laws, 31 U.S.C. § 5326(a), even if those businesses are not the subject of investigation based on individualized suspicion. FinCEN's basic stance toward MSBs and their customers—everyone is a potential criminal—is not only inherently antithetical to the Fourth Amendment, it also poses an unacceptable risk that a GTO will "be used as a pretext to harass [businesses] and their [customers]." *Patel*, 576 U.S. at 421.

In that regard, the sweeping GTO puts this case on all fours with *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474–75 (S.D.N.Y. 2019), which granted a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The court in *Airbnb* analogized the bulk reporting requirement to a vastly

overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.* at 491. Also unlike with a typical subpoena there was no procedure for pre-compliance review. *Id.* at 493. The *Airbnb* court explained that, historically, "[a]n attempt . . . to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* 494–95. So too here.

### 2.    The $200 GTO unreasonably invades personal financial privacy.

The GTO is also unreasonable as to individuals, including Plaintiff Gomez. The GTO is likely *per se* unreasonable as to individuals because there is no warrant supported by individualized probable cause. *See Carpenter v. United States*, 585 U.S. 296, 319 (2018) (holding that, when government subpoenas corporate records, "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party"). *See also United States v. Spurlock*, 2025 WL 1095512, at *1, *7 (D. Nev. Apr. 11, 2025) (invalidating "tower dump" search of cell phone location data for 1,686 customers); *United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024) (invalidating general search of Google phone data for thousands of customers). Customers, including Ms. Gomez herself, have both interests necessary to implicate the Fourth Amendment's full protections. *See United States v. Jones*, 565 U.S. 400, 414 (2012) (Sotomayor, J., concurring) (Fourth Amendment right requires "a subjective expectation of privacy" and societal recognition of that expectation as "reasonable"). First, Ms. Gomez expects that her private financial transactions will be kept private and confidential. *See* Gomez PI Decl. ¶¶ 71–75. And, second, society recognizes that expectation as reasonable, as reflected in federal law that protects the privacy of information about transactions like these. *See In re Application for Historical Cell Site Data*, 747 F. Supp. 2d 827, 841–42 (S.D. Tex. 2010) (explaining, in context of cellphone location data, that "an act of Congress affecting proprietary interest in a thing is undeniably relevant to the legitimate-expectation-of-privacy inquiry"). Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services

14

covered by the Border GTO.[13] Under these requirements, a business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party" without providing notice and "a reasonable opportunity, before you disclose the information . . . to opt out of the disclosure." *Id.* at § 313.10(a)(1)(iii). These regulations confirm that this information is not merely private, but that this expectation of privacy is one that society is prepared to consider reasonable.

The third-party doctrine does not apply. At the recent TRO hearing, the government argued that customers' privacy lacks Fourth Amendment protection under the so-called "third-party doctrine" because *United States v. Miller*, 425 U.S. 435 (1976), held that bank customers' privacy interests were not implicated by the requirement that banks report transactions over $10,000. However, *Miller* must be read in conjunction with *Carpenter*, which explains that the third-party doctrine does not apply when customers *do* have a legitimate privacy interest in corporate records; addressing *Miller*, the Court in *Carpenter* specifically warned that courts should not "uncritically extend existing precedents" to new contexts. 585 U.S. at 318. In *Carpenter*, the Court warned against uncritical extension of *Miller* to the "novel" context of digital cell-site location data; here, the Court likewise should not uncritically extend a case about reporting of abnormally large transactions to a requirement that encompasses ordinary, everyday transactions over $200. Customers do have a legitimate privacy interest in such transactions, and the government needs a warrant.

**B.    The Border GTO Likely Violates the Administrative Procedure Act.**

Typically, when an agency action imposing new rules is challenged under the APA, a reviewing court looks to comments in the administrative record that were compiled as part of the notice-and-comment requirement for rulemaking. The court then examines

---

[13] *See* Fed. Trade Comm'n, *How to Comply with the Privacy of Consumer Financial Information Rule of the Gramm-Leach-Bliley Act*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act (last accessed Apr. 16, 2025) (explaining that regulatory definition includes "check cashers, wire transfer services, and sellers of money orders").

whether the agency adequately considered and addressed legitimate concerns. Here, however, FinCEN impermissibly failed to follow notice-and-comment procedures. And, in part because of this failure, FinCEN failed to consider important questions going to the scope and validity of the GTO, rendering it arbitrary and capricious.

### 1.    The failure to do Notice and Comment is fatal to the GTO.

The GTO is invalid because FinCEN did not go through the notice and comment process required for substantive rules. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). A rule "create[s] rights, impose[s] obligations, or effect[s] a change in existing law." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087–88 (9th Cir. 2003). For instance, in *Safari Club International v. Zinke*, 878 F.3d 316, 320 (D.C. Cir. 2017), an agency made a "determination" that importing elephant ivory from Zimbabwe was banned because it would not "enhance the survival of the species." That "determination" qualified as a rule because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." *Id.* at 333; *see also Pacito v. Trump*, 2025 WL 655075, at *19 (W.D. Wash. Feb. 28, 2025) (granting preliminary injunction in part because suspension of admission of refugees was a rule insofar as it "effect[ed] legal changes of general applicability"), *appeal docketed*, No. 25-1313 (9th Cir. Mar. 3, 2025).

Here, the Border GTO is plainly a "rule." MSBs in 30 zip codes—a massive area with a population of over a million persons—now have a new obligation carrying the full force of law to process CTRs for transactions above $200 that did not exist prior to April 14, 2025. Failure to comply can result in enormous "civil or criminal penalties for violating any of the terms of this Order." 90 Fed. Reg. at 12,108. The declarations establish that MSBs are justifiably afraid of breaking the law. Gomez PI Decl. ¶ 59; Carpio Decl. ¶ 31; Castro Decl. ¶ 49.

The GTO is not an "order" outside the rulemaking requirement. An "order" is the result of an "adjudication." 5 U.S.C. § 551(7). "Two principal characteristics distinguish

16

rulemaking from adjudication." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id.*; *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (rulemaking involves "proceedings for the purpose of promulgating policy-type rules or standards" and an adjudication involves "proceedings designed to adjudicate disputed facts in particular cases.). "Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)." *Yesler*, 37 F.3d at 448. Here, the GTO is a rule (and not an order) because it does not address the rights of specific individuals involved in a specific adjudication; it does not address a concrete dispute; and it *does* affect the rights of "broad classes of unspecified individuals."

The fact that the "O" in GTO stands for "Order" is immaterial. Yes, the statute authorizes FinCEN to act via "order." *See* 31 U.S.C. § 5326(a). But, legally, the GTO is a "rule" under the APA, no matter what FinCEN calls it. Indeed, the only way to harmonize the statute and the APA is to read Section 5326(a)'s use of the word "order" as identical to the term "order" in the APA. This means that FinCEN may issue such orders only as part of an adjudication with specific parties, not, as it did here, impose new obligations on 30 zip codes via a stroke of Defendant Gracki's pen. The fact that the GTO is a "rule," and not an "order," means that the GTO not only violates the APA, but also exceeds FinCEN's authority under Section 5326(a), making it *ultra vires*.

### 2.     The GTO is arbitrary and capricious.

Had FinCEN done notice and comment, it may have realized that a $200 GTO would be a disaster for MSBs, drastically impair their ability to function, drive customers to non-targeted zip codes or banks, and therefore fail entirely in its goal of gaining insight into cartel money laundering in low-dollar amounts. But instead of doing that required notice and comment, FinCEN appears to have rushed out the new GTO after a few weeks of internal review that did not consider any of the real-world effects of this unprecedented and unconstitutional financial surveillance. That has resulted in an arbitrary and capricious

17

agency action.

"[T]he touchstone of 'arbitrary and capricious' review is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). An "agency rule" is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. In *East Bay Sanctuary Covenant v. Garland*, the Ninth Circuit invalidated as arbitrary and capricious a Department of Justice and Department of Homeland Security rule that "denie[d] asylum to aliens arriving at our border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled." 994 F.3d at 968. The Court found the rule arbitrary and capricious because of its dubious underlying assumptions and its failure to consider serious collateral effects. *Id.* at 980 (holding that "the agencies have not justified the Rule's assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim" and "the agencies failed to adequately consider the effect of the Rule on unaccompanied minors").

The glaring defects in the GTO may be summarized as follows:

**(1) The scope of the problem:** The Administrative Record contains nothing about how frequently money laundering occurs at MSBs. Is it one in every 100,000 transactions? More? Less? Whether a drastic reduction in the reporting threshold is a "reasoned" solution depends on the size and nature of the problem.

**(2) $200 is arbitrary:** FinCEN set the threshold at $200 to capture all but de minimis illegal transactions. But that also captures all but de minimis *legal* transactions. Dropping the threshold by 98 percent and subjecting everyone to invasive surveillance is irrational and paranoid—the product of FinCEN's belief that a cartel member is around every corner, behind every door, and under every bed. A reasoned approach would have begun with an

18

incremental, not drastic, change. Or, if FinCEN thinks that cartels are actually laundering money in small-dollar increments (despite the lack of support for that idea in the record), why not drop the threshold to $100? Or even $10 or $5? Indeed, one of FinCEN's own sources notes the logistical nightmare for the cartels of attempting to move large amounts of cash in low-dollar increments: "[I]t would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." AR160. That report explains that rather than use implausible numbers of low-dollar money transfers via American MSBs, the cartels often resort to China-based money launderers. *Id.*

**(3) The 30 zip codes are arbitrary:** No evidence supports the conclusion that the 30 zip codes have an atypically large number of low-dollar transactions because FinCEN thinks the number of $10,000 transactions is high. And even if it did somehow follow that these zip codes likely have a high volume of small-dollar transactions, it does not follow that those transactions are more likely to be illegitimate than transactions in any other zip code. The fact that a zip code has a larger number of over-$10,000 transactions does not mean those over-$10,000 transactions are in any way illegitimate—or that over-$200 transactions in the area are more likely to be illegitimate. After all, if the number of transactions indicates crime and FinCEN has CTRs for them, where are the prosecutions proving that CTRs lead to convictions? If a supposedly abnormal number of $10,000-plus CTRs aren't leading to prosecutions, what reasoned basis can there be for believing that prosecutions will follow by exponentially increasing the number of CTRs with a $200 threshold?

The number of over-$10,000 transactions in these zip codes is not even objectively that large: The zip code where Novedades is located, for instance, was targeted based on just 930 transactions in a one-year period, *see* Memo at 11 (AR014), and some other zip codes were targeted based on even lower numbers. *See* Memo at 10 (AR013). A few hundred over-$10,000 transactions (all meticulously documented via CTRs) in a neighborhood are not a reasoned basis for targeting businesses that are not even involved in those transactions. FinCEN has simply piled supposition on supposition to target these

19

neighborhoods and businesses.

**(4) No consideration of cartel countermeasures:** Cartel members can drive a few minutes past Plaintiff Novedades to an MSB not in a targeted zip code. Or go to Arizona or New Mexico. Or use bitcoin, bulk cash smuggling, or the other laundering techniques FinCEN identifies. FinCEN acknowledged this problem in its memorandum but offered no solution for it—simply adopting a GTO that will crush law-abiding businesses and do nothing to gain intelligence about cartel members, who will easily change tactics.

**(5) No capacity to act on the CTRs:** To find more needles, FinCEN is exponentially increasing the size of the haystack. But does FinCEN have the capacity to turn millions of new CTRs into actionable leads and real prosecutions? Nothing in the Record supports this. FinCEN cites two criminal cases, but those involved corrupt MSBs.

**(6) FinCEN ignored the destructive impact on legitimate businesses:** The declarations establish FinCEN's wholesale failure to consider the GTO's impact on legitimate businesses. FinCEN handwaves away the burden in a sentence or two, but it is all but impossible to keep up with the blizzard of CTRs, especially for small MSBs without automated processes. It isn't just the testimony here. The American Bankers Association is on record (in another regulatory proceeding where notice-and-comment rulemaking procedures *were* followed) about how "grossly" FinCEN has historically underestimated the time and customer-relations burden imposed by CTR reporting. *See* Sanz PI Decl. ¶ 7, Ex. A (Comment of American Bankers Association (Apr. 5, 2024)) at 002. MSBs face crippling civil and criminal penalties for failing to comply with the GTO, including fines of over $70,000 and prison time *per violation*. Each CTR that isn't filed on time is a potential violation. Even penalties for negligent violations can quickly mount; MSBs in Texas report being behind on hundreds of CTRs, which could easily translate to hundreds of thousands of dollars in penalties if they do not catch up. MSBs have to cut back or halt business altogether. *See* Light Decl. ¶¶ 18, 34; Payan Decl. ¶¶ 18, 24. Many, like Plaintiff Novedades, won't survive.

20

### C.    The GTO Is Likely *Ultra Vires* Under the Major Questions Doctrine.

The Border GTO is also *ultra vires* because it exceeds the agency's authority under Section 5326(a). That statute contemplates limited information-gathering requirements directed at particular businesses (or groups of businesses) in the context of particular agency investigations, based on particularized facts. In other words, the statute authorizes the sort of limited reporting obligation that the Supreme Court allowed in *Morton Salt*. The statute does not authorize the wholesale reporting requirement imposed here.

The plain language of Section 5326(a) confirms this reading. First, Section 5326(a) states that the agency should act through an "order." As discussed above the APA notice-and-comment analysis, an "order" is the result of an "adjudication." 5 U.S.C. § 551(7). There is no adjudication here. Second, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." Read in conjunction with the word "order," that language limits GTOs to an *identified* business or group of businesses, not a *category* of businesses such as "MSBs" that apply indiscriminately to everyone meeting certain regulatory criteria. Finally, Section 5326(c) also requires that an "order" issued be confidential—a requirement that FinCEN ignored here (instead proceeding via notice in the Federal Register). Because the GTO applies to everyone in the targeted zip codes, it cannot be confidential. Simply put, the statute doesn't authorize the GTO.

This conclusion is confirmed by the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (cleaned up); *see also Biden v. Nebraska*, 600 U.S. 477, 501–03 (2023); *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Here, FinCEN is reading a statute that authorizes confidential, post-adjudication orders as authority to impose sweeping, intrusive, burdensome, destructive, and unprecedented financial surveillance across 30 zip codes at the $200 level. If Congress intended 31 U.S.C. § 5326 to permit all of that, we

21

would expect Congress to say so clearly. Yet it did not. In that regard, this case is on all fours with *Biden v. Nebraska*, where the Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. at 496–97. The Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506–07. So, too here. The word "order" does not mean "rule." And hence a statute allowing FinCEN to issue an order to a "business" or "group of businesses" does not allow FinCEN to impose a massive financial dragnet across a stretch of California and Texas with over one million people.[14]

### D.    The Border GTO Likely Violates the Non-Delegation Doctrine.

The Border GTO also raises serious questions under the non-delegation doctrine. Under the separation of powers, Congress writes laws and the Executive executes them. Congress cannot delegate its legislative authority to the Executive Branch. The non-delegation doctrine thus invalidates laws that unconstitutionally delegate lawmaking power. *See Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024). Under the non-delegation doctrine, "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Id.* at 460–61 (citation omitted). The Border GTO runs afoul of the non-delegation doctrine because the statute that FinCEN relied on to promulgate it, 31 U.S.C. § 5326(a), contains no such intelligible principle.

Under the government's reading, the relevant statute authorizes the Treasury

---

[14] The government may argue that the major questions doctrine should not apply because FinCEN has issued GTOs in the past. However, past GTOs have not been as sweeping as the GTO at issue here. The most aggressive GTO targeted non-financed real estate transactions over $300,000; such non-financed real estate purchases are far closer to the over-$10,000 transactions at issue in *Shultz* than they are to the $200 transactions at issue here. *See* FinCEN, Geographic Targeting Order (Apr. 19, 2024), *available at* https://www.fincen.gov/sites/default/files/shared/RRE-GTOs-Phase-18-Order.pdf    (last accessed Apr. 29, 2025).

Department to issue any geographic targeting order that it wants because the statute does not contain any limiting principle for the agency to apply. The statute allows the Secretary to require reports on "any transaction" involving a "financial institution or nonfinancial trade or business," to direct the business to report "such information as the Secretary may describe," and to impose such an order in any "geographic area." 31 U.S.C. § 5326(a). The only prerequisite is a belief that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle." *Id.* Those "purposes" in turn consist of an aspirational commitment to fight every major category of malfeasance: through "criminal, tax, or regulatory investigations," identifying spying ("intelligence or counterintelligence"), "laundering of money," and "tracking of money that has been sourced through criminal activity" with the objective being to "protect the financial system of the United States from criminal abuse" and "safeguard the national security of the United States." *Id.* § 5311.

The drastic and sudden nature of the GTO illustrates the lack of any intelligible principle. Overnight, the FinCEN director—without any input from Congress—cut the $10,000 threshold for a CTR by 98 percent in zip codes with over one million people. And, by FinCEN's own admission, this dragnet will sweep in countless innocent people and businesses that engage in ordinary, law-abiding behavior. This vast expansion in financial surveillance of ordinary people, based on a grant of "exclusive authority and absolute discretion" to the Treasury Secretary, violates the nondelegation doctrine. *Jarkesy*, 34 F.4th at 462; *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001) (explaining that nondelegation doctrine is violated where Congress provides "no guidance for the exercise of discretion"). Or, put differently, "[i]nstead of prescribing rules of conduct, [Section 5326(a)] authorizes the making of codes to prescribe them." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541 (1935). That delegation to an agency exceeds constitutional bounds.

23

### III. Profound Irreparable Harms and Serious Questions About the Constitutional Merits Means that Plaintiffs Are Entitled to a Preliminary Injunction.

The preliminary injunction should be granted. Plaintiffs have shown profound irreparable harms and raised serious questions going to the merits. On the Ninth Circuit's "sliding scale," preliminary relief is warranted. No separate analysis is required for the public interest and balance of equities. "Plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up).

Furthermore, preserving the status quo will work no practical harm to FinCEN. There is no urgent law enforcement need for the GTO. It isn't intended to stop any imminent crime. The GTO's stated purpose is data collection. FinCEN wants to assemble possibly millions of CTRs in the targeted zip codes so that the database can one day be examined for patterns that might reveal something about Mexican drug cartels. In any case, that data will not even be reliable because the GTO is disrupting how MSBs function.

The only remaining question asks what relief should look like. At the TRO stage, the Court entered an injunction that covers the entirety of the Southern District of California, and a preliminary injunction should be at least as broad. After all, Plaintiffs are proceeding under the APA, and "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th. Cir. 2018) (cleaned up). That is because the APA provides that a court shall "*hold unlawful and set aside*" agency action that is "arbitrary [and] capricious," "not in accordance with law," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2) (emphasis added). When an agency action has been vacated it ceases to exist, and it cannot lawfully be applied to anyone. *See also E. Bay Sanctuary*, 994 F.3d at 987 ("Section 706(2) does not tell a circuit court to 'set aside' unlawful agency action only within the geographic boundaries of that circuit.").

24

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary injunction for the pendency of this case.

Dated: April 29, 2025                         Respectfully submitted,

                                              **INSTITUTE FOR JUSTICE**

                                              /s/ Elizabeth L. Sanz

Katrin Marquez (FL Bar No. 1024765)*          Elizabeth L. Sanz (CA Bar No. 340538)
2 South Biscayne Blvd., Suite 3180            901 N. Glebe Road, Suite 900
Miami, FL 33131                               Arlington, VA 22203
(305) 721-1600                                (703) 682-9320
kmarquez@ij.org                               bsanz@ij.org

*Pro hac vice* motions pending                Robert E. Johnson (DC Bar No. 1013390)*
                                              16781 Chagrin Blvd., Suite 256
**THE VORA LAW FIRM, P.C.**                   Shaker Heights, OH 44120
Nilay U. Vora (SBN 268339)                    (703) 682-9320
nvora@voralaw.com                             rjohnson@ij.org
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com                        Jeffrey Rowes (TX Bar No. 24104956)*
201 Santa Monica Blvd., Suite 300             816 Congress Ave., Suite 970
Santa Monica, CA 90401                        Austin, TX 78701
(424) 258-5190                                (512) 480-5936
                                              jrowes@ij.org
*Attorneys for Plaintiffs*

25