ADAM GORDON
United States Attorney
KATHERINE L. PARKER
Assistant U.S. Attorney
California Bar No. 222629
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7634
Fax: (619) 546-7751
Email: Katherine.Parker@usdoj.gov

Attorneys for Defendant
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC.; and ESPERANZA GOMEZ ESCOBAR, <br><br> Plaintiffs, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasure; and PAM BONDI, in her official capacity as the Attorney General of the United States, <br><br> Defendants. | Case No.: 25-cv-0886-JLS-DDL <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Date: May 15, 2025 <br> Time: 9:00 a.m. <br><br> Hon. Janis L. Sammartino |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 2

III.  LEGAL STANDARD .......................................................................................... 6

IV.   ARGUMENT ...................................................................................................... 7

      A. Plaintiffs Cannot Show a Likeihood of Success on Their APA Claims .............. 7

         1. Arbitarary and Carpricious .......................................................................... 8

         2. Notice-and-Comment Rulemaking ............................................................... 12

         3. Ultra Vires ................................................................................................ 13

      B. Plaintiffs Cannot Show A likelihood of Success on Their Fourth
         Amendment/Privacy Claims .......................................................................... 15

      C. Plaintiffs Have Not Established Irreparable Injury ....................................... 21

      D. The Balance of Interests Tips in Favor of Defendants ................................... 24

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                                **PAGE(S)**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) .................................................................................. 15

*Airbnb, Inc. v. City of New York*,
  373 F. Supp. 3d 467 (S.D. N.Y. 2019) ................................................... 19, 20

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) .................................................................................. 14

*Andreiu v. Ashcroft*,
  253 F.3d 477 (9th Cir. 2001) ...................................................................... 6

*Bellion Spirits, LLC v. U.S.*,
  335 F. Supp. 3d 32 (D.D.C. 2018)............................................................... 7

*Brock v. Emerson Elec. Co., Elec. & Space Div.*,
  834 F.2d 994 (11th Cir. 1987)............................................................... 18, 20

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .................................................................................. 24

*California Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974) ......................................................... 15, 16, 17, 18, 19, 20

*Carpenter v. United States*,
  585 U.S. 296 (2018) .................................................................................. 21

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015) .................................................................................. 18

*Clifford v. Peña*,
  77 F.3d 1414 (D.C. Cir. 1996)..................................................................... 4

*Donovan v. Master Printers Ass'n*,
  532 F. Supp. 1140 (N.D. Ill. 1981)............................................................. 20

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999)...................................................................... 24

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................................. 14

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................................... 7

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .................................................................................... 7

*Friends of Payette v. Horseshoe Bend Hydroelectric Co.*,
  988 F.2d 989 (9th Cir. 1993) ....................................................................... 4

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ....................................................................... 6

*Gill v. Whitford,*
 585 U.S. 48 (2018) ................................................................................... 24

*Goldie's Bookstore, Inc. v. Superior Court,*
 739 F.2d 466 (9th Cir. 1984) .................................................................. 21

*Greater Yellowstone Coalition, Inc. v. Servheen,*
 665 F.3d 1015 (9th Cir. 2011) .................................................................. 7

*J.L. v. Cissna,*
 2019 U.S. Dist. LEXIS 88356 (N.D. Cal. Mar. 18, 2019) ........................ 7

*Labrador v. Poe,*
 144 S. Ct. 921 (2024).............................................................................. 24

*Leiva-Perez v. Holder,*
 640 F.3d 962 (9th Cir. 2011) .................................................................... 6

*Maharaj v. Ashcroft,*
 295 F.3d 963 (9th Cir. 2002) .................................................................... 6

*McLaughlin v. Kings Island, Div. of Taft Broad. Co.,*
 849 F.2d 990 (6th Cir. 1988) .................................................................. 20

*Mistretta v. United States,*
 488 U.S. 361 (1989) ............................................................................... 15

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ...................... 8, 9

*Nat'l Biodiesel Bd. v. EPA,*
 843 F.3d 1010 (D.C. Cir. 2016)............................................................... 13

*Neustar, Inc. v. FCC,*
 857 F.3d 886 (D.C. Cir. 2017)................................................................. 13

*Nken v. Holder,*
 556 U.S. 418 (2009) ........................................................................... 6, 23

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,*
 475 F.3d 1136 (9th Cir. 2007)................................................................... 7

*Panama Refin. Co. v. Ryan,*
 293 U.S. 388 (1935) ............................................................................... 15

*Perez v. Mortg. Bankers Ass'n,*
 575 U.S. 92 (2015) ................................................................................. 13

*Trump v. Hawaii,*
 585 U.S. 667 (2018) ............................................................................... 24

*U.S. v. W. H. Hodges & Co.,*
 533 F.2d 276 (5th Cir. 1976) .................................................................. 13

*United States v. Brignoni-Ponce,*
 422 U.S. 873 (1975) ................................................................................. 6

*United States v. Chatrie,* No. 22-4489, 2025 WL 1242063
 (4th Cir. Apr. 30, 2025).......................................................................... 19

*United States v. Miller*,
  425 U.S. 435 (1976) .................................................................... 19, 20, 21
*United States v. Oreira*,
  29 F.3d 185 (5th Cir. 1994) .................................................................... 4
*United States v. Smith*,
  110 F.4th 817 (5th Cir. 2024) ................................................................ 18
*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
  435 U.S. 519 (1978) ............................................................................. 13
*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................. 24
*Wayte v. United States*,
  470 U.S. 598 (1985) ............................................................................... 6
*West Virginia v. Enviornmental Protection Agency*,
  597 U.S. 697 (2022) ............................................................................. 14
*Whitman v. American Trucking Associations, Inc.*,
  531 U.S. 457 (2001) ............................................................................. 15
*Winter v. National Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................... 6, 21, 23

STATUTES

5 U.S.C. § 551(6) ..................................................................................... 12
5 U.S.C. § 705 ......................................................................................... 23
5 U.S.C. § 706(2)(A) ............................................................................ 7, 12
8 U.S.C. § 1324a(b) ................................................................................ 18
12 U.S.C. § 1829b ..................................................................................... 2
12 U.S.C. § 1951-60 ................................................................................. 2
26 U.S.C. § 6012 ..................................................................................... 18
31 U.S.C. § 5311 ................................................................................. 3, 12
31 U.S.C. § 5311(3) ................................................................................ 11
31 U.S.C. § 5311-14 ......................................................................... 2, 3, 12
31 U.S.C. § 5313 ................................................................................... 2, 3
31 U.S.C. § 5313(a) ................................................................................. 12
31 U.S.C. § 5318(a)(7) .............................................................................. 4
31 U.S.C. § 5326 ............................................................................... passim
31 U.S.C. § 5326(a) ......................................................................... 3, 12, 14
31 U.S.C. § 5326(d) .................................................................................. 3
52 U.S.C. § 30104 ................................................................................... 18

Pub. L. No. 100–690 .................................................................................. 2
Pub. L. No. 107–56 .................................................................................... 2
Pub. L. No. 116-283 ................................................................................... 2

1

RULES

2

Fed. R. Civ. P. 65(c)....................................................................................................... 24

3

REGULATIONS

4

31 F.F.R. § 1010.100(ff) ................................................................................................ 4
31 C.F.R. § 1010.100(xx) .............................................................................................. 9
31 C.F.R. § 1010.311 ................................................................................................. 2, 4
31 C.F.R. § 1010.370 .................................................................................................... 4
31 C.F.R. § 1010.410(e)(2) ........................................................................................... 6
31 C.F.R. § 1010.970 .................................................................................................... 4
85 Fed. Reg. 29022 ..................................................................................................... 22
89 Fed. Reg. 7767 ....................................................................................................... 22
90 Fed. Reg. 12106 (Mar. 14, 2025)............................................................................ 4

10

11

OTHER AUTHORITIES

12

Wright et al., Fed Prac. & Proc. Civ. § 2947 (3d ed. 1998) ............................... 23

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order on March 11, 2025 ("March 2025 GTO") that requires money services businesses ("MSBs") in portions of specific counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. In support of the March 2025 GTO, FinCEN found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the [Bank Secrecy Act] or to prevent evasions thereof" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

Plaintiffs—one MSB and its owner—cannot show a likelihood of success on the merits. FinCEN is acting pursuant to explicit and well-established statutory authority. The administrative record shows that FinCEN acted reasonably in doing so. The Administrative Procedure Act ("APA") does not require notice and comment rulemaking for the order issued here. The Supreme Court has already ruled that similar Bank Secrecy Act reporting requirements do not run afoul of the Fourth Amendment, and the Constitution does not otherwise protect MSBs from this sort of recordkeeping obligation.

Moreover, Plaintiffs have not demonstrated the sort of irreparable injury that justifies extraordinary relief. Plaintiffs' implausible allegations do not support the claim that the March 2025 GTO will be devastating for MSBs. Mere speculation about the actions of third parties and exaggerated allegations about the burdens of compliance are insufficient to establish plaintiffs' claims. Plaintiffs' heavy reliance on statements from out of state MSBs who are not Plaintiffs in this action or the related Texas action is also improper. The balance of interests tips sharply in Defendants' favor. FinCEN requires the requested information as soon as practicable to address the ongoing threat posed by cartels that launder money through the U.S. financial system, and the record establishes that MSBs along the southwest border are particularly vulnerable to these types of money laundering abuses.

## II.    BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA).[1] The BSA authorizes the Secretary of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. These requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, 31 U.S.C. §§ 5311-14 and 5316-36, including notes thereto. The BSA and its implementing regulations require financial institutions to file certain reports, including a currency transaction report ("CTR") for transactions in currency greater than an amount set by the Secretary – currently, $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

Separately, in the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain transactions in geographic areas thought to pose particular risks. Pub. L. No. 100–690, title VI, § 6185(c), 102 Stat. 4181, 4355 (1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. R. Rep. No. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting

---

[1] The BSA consists of the Currency and Foreign Transactions Reporting Act of 1970, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107–56, 115 Stat. 272 (2001) and other legislation, including the Anti-Money Laundering Act of 2020 (AML Act) (sections 6001-6511, of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388).

requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—

    (1) to obtain such information as the Secretary may describe in such order concerning—

        (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

        (B) any other person participating in such transaction;

    (2) to maintain a record of such information for such period of time as the Secretary may require; and

    (3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a); *see also* Ex. 1, Declaration of Director Andrea Gacki ("Gacki Decl.") ¶ 6. This authority is separate from and in addition to the regulatory authority to require other CTRs in 31 U.S.C. § 5313.

    Thus, the statute authorizes the Secretary of the Treasury to issue a GTO to "obtain such information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id.* The primary prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[2] *Id.* A GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(d). The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN. *See* Treasury Order 180-01 (reaffirmed Jan. 14, 2020), available at https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-

---

[2] The purposes of this particular subchapter include requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions. *See* 31 U.S.C. § 5311.

180-01. FinCEN has issued regulations which further govern the form of such GTOs. *See* 31 C.F.R. § 1010.370. FinCEN has repeatedly exercised this authority. *See* Gacki Decl. ¶ 7 (collecting multiple examples of past GTOs imposing temporary recordkeeping and reporting requirements, including at thresholds well below the $10,000 threshold set by 31 C.F.R. § 1010.311); *see also United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (describing Houston-area GTO with $100 threshold).[3]

On March 11, 2025, FinCEN issued the March 2025 GTO at issue in this case, which covers MSBs operating in portions of five counties in Texas and two counties in California (a total of 30 ZIP codes). *See* Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (Mar. 14, 2025); AR 000001-03; *see also* Compl. ¶ 37. MSBs are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters, although there are exclusions from those categories as well. *See generally* 31 C.F.R. § 1010.100(ff). The March 2025 GTO took effect on April 14, 2025. Under this GTO, covered MSBs must submit CTRs within 15 days for currency transactions involving between $200 and $10,000. AR 000002. A covered MSB is also required to verify the identity of the customer. *Id.* Defendants have filed the public, non-privileged portions of the certified administrative record. *See generally* Notice of Filing Public Administrative Record, ECF No. 18 (cited herein with the prefix "AR"). The Gacki Declaration provides further information about the background and context of the March 2025 GTO and the administrative record. *See* Ex. 1.[4] Screenshots of a sample CTR are also attached as Ex. 2.

---

[3] Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including requirements imposed by a GTO. *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

[4] Courts may consider such background and context declarations in an administrative record case. *See, e.g., Friends of Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993); *see also Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996).

To assist covered businesses, FinCEN published FAQs on their website. *See* FinCen, Frequently Asked Questions (FAQs), U.S. Dep't of the Treasury (Mar, 24, 2025), https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. Additionally, FinCEN hosted two webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the March 2025 GTO were explained, and several questions concerning applicability and reporting were answered. *See* FinCEN, FinCEN Convenes FinCEN Exchange Sessions to Provide Stakeholders with Information About U.S. Southwest Border Geographic Targeting Order, U.S. Dep't of the Treasury (Apr. 9, 2025), https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about. The webinar and the FAQs confirm that, other than the applicable amount and a code unique to the March 2025 GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000 and are to be filed in the same way. *See, e.g.*, FAQs 3, 7; *see also* Gacki Decl. ¶¶ 9, 24. Accordingly, for covered transactions, the MSB must report: information about the MSB, the MSB employee conducting the transaction, the type and amount of the transaction, and the customers involved in the transactions. *See* Ex. 2; *see also* Gacki Decl. ¶ 24. No special software is required to file a CTR, but covered institutions may choose to use various methods to streamline the process. *Id.* ¶¶ 25-26. FinCEN continues to engage with the industry to support compliance, and in fact, has already begun receiving CTRs required under the March 2025 GTO. *Id.* ¶¶ 19, 23.

As the Plaintiffs agree, *see* Compl. ¶¶ 19-32, financial institutions that meet the regulatory definition of an MSB are subject to a range of legal and regulatory requirements that pre-date the March 2025 GTO, including registering with FinCEN, filing CTRs under FinCEN's existing regulations, developing and maintaining an effective anti-money laundering (AML) program, filing suspicious activity reports, verifying customer identity for certain transactions, and maintaining detailed records. *See* AR 000006-07 (collecting regulations). Other regulations require verification of identity for specific types and

amounts of transactions. *See, e.g.*, 31 C.F.R. § 1010.410(e)(2).

On April 15, 2025, Plaintiffs filed the complaint in this action. ECF No. 1. Plaintiffs moved for a temporary restraining order the next day, and on April 22, 2025 the Court heard oral argument on that motion. ECF No. 8, 15. The Court granted the TRO as to enforcement of the March 2025 GTO in the Southern District of California. ECF No. 16. Defendants filed the Administrative Record on April 25, 2025, and Plaintiffs then filed the instant motion for a preliminary injunction.

## III. LEGAL STANDARD

To prevail on a motion for a preliminary injunction, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must demonstrate a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). When "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* factors]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

The final two factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—merge when the Government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has specifically acknowledged that "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte v. United States*, 470 U.S. 598, 611 (1985); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975); *Maharaj v. Ashcroft*, 295 F.3d 963, 966 (9th Cir. 2002) (movant seeking injunctive relief "must show either (1) a probability of success on the merits and the possibility of irreparable harm, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor.") (*quoting Andreiu v. Ashcroft*, 253 F.3d 477, 483 (9th Cir. 2001)).

## IV.   ARGUMENT

### A. Plaintiffs Cannot Show a Likelihood of Success on Their APA Claims.

A number of Plaintiffs' arguments purport to sound in the APA, including that the March 2025 GTO is arbitrary and capricious, that the March 2025 GTO exceeds FinCEN's statutory authority, and that FinCEN failed to engage in notice-and-comment rulemaking. Plaintiffs cannot establish a likelihood of success on any of these claims.

An emergency motion is particularly ill-suited to judicial review of final agency action under the APA. *See* 5 U.S.C. § 706(2)(A). APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id.* § 706. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Courts must refrain from substituting their judgment for the agency's and should limit their review to determining whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (citing *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).[5]

---

[5] Plaintiffs' constitutional claims, to the extent they are not purely legal, should also be reviewed based on the administrative record. The focus of judicial review of agency action, including challenges to agency action "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). A plaintiff cannot avoid record review by pleading a constitutional claim. *See J.L. v. Cissna*, 2019 U.S. Dist. LEXIS 88356,*3 (N.D. Cal. Mar. 18, 2019) ("extra-record discovery is generally limited to cases where the constitutional claim does not overlap with the APA claim or the substance of an agency decision"), *citing Bellion Spirits, LLC v. U.S.*, 335 F. Supp. 3d 32, 43-44 (D.D.C. 2018).

### 1. Arbitrary and Capricious

An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). Here, FinCEN acted reasonably and considered all relevant factors when issuing the March 2025 GTO. The Order itself reflects the agency's reasonable finding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the BSA or to prevent evasions" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States." AR 000002. The administrative record confirms this finding. Surveying available intelligence and data, FinCEN found that MSBs along the southwest border are uniquely vulnerable to money laundering activities by drug cartels that use both witting and unwitting MSBs as part of various illegal schemes to transport and launder drug money. *See* AR 000007-12. "FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings." AR 000011-12; *see also* Gacki Decl. ¶ 12 (describing unique vulnerabilities of these MSBs). For example, the administrative record provides examples where MSBs are targeted for funneling operations (where money is funneled to MSBs near the border from locations all over the country in smaller amounts, then cashed out or changed to pesos before being smuggled across the border), *see* AR 000009-10 n.24 (citing AR 000286, AR 000300), or targeted for the purpose of disguising illicit gains as remittances, transmitted across the border in smaller amounts, AR 000011-12 & n.32 (citing AR 000403-08). And of course, on some occasions, MSBs have become witting partners of drug trafficking organizations (DTOs) trying to move or launder money. *See* AR 000010 (citing examples

at AR 000323-402).

FinCEN further found that, "[b]y lowering the CTR threshold, the information reported under this GTO would help . . . identify cartel-related money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States" in part because the reports "are expected to generate new leads and identify new and related subjects in ongoing cases." AR 000012. FinCEN further noted that the reduced dollar reporting threshold "will help make structuring more difficult, thereby increasing the cost of doing business for cartels" and "help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules." *Id.*[6] The evidentiary memorandum that forms part of the administrative record ("AR Memorandum") explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 000012-16 (surveying information about selected counties, and explaining why some other counties were excluded); *see also* Gacki Decl. ¶¶ 12-18 (describing how and why the agency chose these ZIP codes). Finally, the AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts. . . ." and would "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money

---

[6] "[A] person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under [31 C.F.R.] §§ 1010.311, 1010.313, 1020.315, 1021.311 and 1021.313 . . . ." 31 C.F.R. § 1010.100(xx). This includes "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000 . . . ." *Id.*

laundering risks related to MSBs and cross-border cash remittances." AR 000016-17; *see* Gacki Decl. ¶¶ 19-22.

Plaintiffs argue that the March 2025 GTO is arbitrary and capricious for essentially two reasons. First, Plaintiffs challenge the $200 threshold itself, arguing that there is no "reasoned explanation" for that number and that FinCEN failed to consider the impact of that $200 threshold. PI Mot. at 18-19. These arguments fail because FinCEN considered all relevant factors and engaged in reasoned decision making. The administrative record explicitly acknowledges that the March 2025 GTO may place an increased burden on "covered businesses." FinCEN reasoned that the March 2025 GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and that FinCEN "does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services." AR 000017. Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors.[7]

Nor was the monetary threshold chosen arbitrarily. The AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts . . . ." AR 000016. Plaintiffs do not seriously dispute that the $200 threshold would realistically include the majority of transactions vulnerable to illicit activity; they just argue that it also includes licit activity. FinCEN never claimed, however, that all such activity was illicit or even suspicious; rather, this reporting

---

[7] As discussed below, FinCEN has internal estimates of the time burden imposed by CTRs; the burdens vary by type of institution and type of filing software used (and logically will vary by transaction as well), but the average burden is about 8 minutes per CTR, with many institutions (including nondepository institutions) acting more quickly. *See infra* p. 21. Plaintiffs point to what they view as low or normal numbers of CTRs in certain ZIP codes, PI Mot. 19, but fail to note that the number of CTRs in those counties were unusually high in proportion to the population. AR 000016.

requirement, which is consistent with other reporting requirements under the BSA that do not require any indicia of suspicion, because this comprehensive data is necessary to "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." *Id.* As Director Gacki explains, "FinCEN assessed that the $200 threshold is low enough both to prevent the successful structuring of transactions to avoid CTR requirements and to increase the cost of doing business for drug cartels." Gacki Decl. ¶ 19.

Second, Plaintiffs argue that there is no "reasoned basis" for targeting 30 specific zip codes. PI Mot. at 19. The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes," AR 000012-13, and the administrative record includes the specific data relied upon to reach those conclusions, AR 000013-16, 000413-43. Logically, these locations in general are likely to be targeted by cartels because they "are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash." Gacki Decl. ¶ 12. FinCEN sees a "high volume of cash transactions" near these locations already known to be targeted by cartels, AR 000013, and reasonably assessed that additional reporting would further the purposes of the BSA, such as assessing money laundering risks, AR 000019; *see also* Gacki Decl. ¶¶ 11, 28-33.

Plaintiffs insist that much of the business of MSBs is legitimate, PI Mot. 19, but this is beside the point and FinCEN has never contended to the contrary. *See* AR 000007 (acknowledging legitimate business). Rather, a full picture of MSB activity in the region is helpful to allow law enforcement to "facilitate the tracking of money that has been sourced through" or that is "intended to promote" criminal activity. *See* AR at 13-14 (comprehensive "snapshot" of MSB activity of a "significant sample" will help FinCEN assess money laundering risks); *see also* 31 U.S.C. § 5311(3). FinCEN reasonably found that reducing the

CTR threshold would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads. AR 000011-12; Gacki Decl. ¶ 19. This is, indeed, common sense. MSBs in these seven counties are particularly vulnerable to abuse, and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA. *See* 31 U.S.C. § 5311. This reporting will be used to generate analysis and information about previously unsuspected money laundering activity (e.g., uncovering possible funneling activity to a network of suspected DTO associates operating in the region, previously undetected, or because such activities are operating through multiple unwitting MSBs), and generate leads for new and existing cases (e.g., new identifying information or financial activity related to a current subject of investigation).

Accordingly, the GTO is reasonable, and there is no basis to conclude that FinCEN's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

## 2. Notice-and-Comment Rulemaking

Plaintiffs argue that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a). PI Mot. at 16-17. But the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA. *See* 90 Fed. Reg. at 12106. The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Here, Congress specifically authorized the agency to act by "order" rather than by rule. That is in sharp contrast to the statutory provision governing CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order outside of the GTO context. *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount for reportable transactions in a GTO).

This reading of the statute is buttressed by the purposes of a GTO—to target a

geographic area of particular interest for a time-limited period. GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO to issue a GTO and they could not be used effectively to respond to dynamic threats and developing financial intelligence. Congress also specifically authorized confidential GTOs, which would not be possible with notice-and-comment rulemaking. *See* 31 U.S.C. § 5326 (prohibiting unauthorized disclosure of the existence of a GTO). Here, Congress authorized the agency to act by order rather than rule, and the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

Even if Congress had not explicitly authorized the agency to act by order, the March 2025 GTO is not exclusively legislative in nature. *Cf. U.S. v. W. H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was not subject to rulemaking requirements). And the fact that the March 2025 GTO affects a group of businesses does not itself require notice-and-comment rulemaking. *See Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment") (citation omitted); *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis." (citation omitted)).

### 3. Ultra Vires

Plaintiffs appear to assert an "ultra vires" claim that FinCEN exceeded its statutory authority by issuing the March 2025 GTO, but rely entirely on the "major questions doctrine" and the non-delegation doctrine. *See* PI Mot. at 21-23. FinCEN acted within its explicit statutory authority.

Under the major questions doctrine, courts have rejected claims of regulatory authority where (1) the underlying claim of authority concerns an issue of "vast economic

and political significance," and (2) Congress has not clearly authorized the agency to act on the issue. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). But here, Congress has explicitly authorized exactly this agency action. By its plain terms, the GTO statutory provision authorizes "additional recordkeeping and reporting requirements" beyond those required by other regulatory provisions. *See* 31 U.S.C. § 5326(a). And it explicitly permits the Secretary, without limitations, to set an appropriate reporting threshold for a GTO. *Id.* § 5326(a)(1)(A) ("which the Secretary may prescribe"). The primary prerequisite is a finding that such an order is necessary to carry out the purposes of the BSA or prevent evasions thereof. FinCEN, in making the finding required by statute and imposing the temporary reporting requirements for one category of businesses in seven counties, did not exceed its statutory authority.

This case therefore lacks the hallmarks of the major questions decisions that Plaintiffs invoke, all of which grounded their analysis in the text, structure, and context of the relevant statutes. Here, FinCEN is not asserting regulatory power that is "markedly different" from the type of authority that Congress expressly identified in the relevant provision, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (cited at PI Mot. at 21) or claiming "an unheralded power representing a transformative expansion in [its] regulatory authority . . . that Congress has conspicuously and repeatedly declined to enact," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (quotation marks omitted) (cited at PI Mot. at 21). FinCEN's temporary, geographically limited reporting requirements are exactly the sort of order contemplated by Congress, and injunctive relief based on the "major questions" doctrine would be unwarranted. Plaintiffs' exaggerated allegations of harm, PI Mot. 21, would not create a major question even if those allegations were wholly accurate because the statutory language is clear and FinCEN acted well within it.

Nor does the nondelegation doctrine somehow aid Plaintiffs' ultra vires claim; in this part of the motion, Plaintiffs appear to argue, not that the agency exceeded its authority, but that Congress acted unconstitutionally. PI Mot. at 22-23. Under this doctrine, Congress "is not permitted to abdicate[,] or to transfer to others[,] the essential legislative functions with

which it is . . . vested." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). The Supreme Court has recognized, however, "that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "[I]n our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* The Supreme Court has invalidated statutes under the nondelegation doctrine only twice, both times in 1935. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refin.*, 293 U.S. at 388.

To survive a challenge under the non-delegation doctrine, Congress must only articulate an intelligible principle pursuant to which a person authorized to act must conform. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). The GTO statute does exactly that. The GTO statute states that additional recordkeeping and reporting requirements can only be imposed upon a finding that reasonable grounds exist for concluding that such requirements are necessary to carry out the purposes, or prevent evasions of, the BSA. *See* 31 U.S.C. § 5326. The GTO statute explicitly describes the kinds of transactions about which information can be collected and from which parties, and limits the application of any requirements to businesses in a geographic area. *Id.* The GTO statute further limits the duration of these additional requirements, subject to renewal upon a further finding of necessity. *Id.* In short, FinCEN has acted reasonably and pursuant to its explicit statutory authority, and Plaintiffs cannot show a likelihood of success on these claims.

## B. Plaintiffs Cannot Show a Likelihood of Success on Their Fourth Amendment/Privacy Claims.

Plaintiffs have not shown a substantial likelihood of success on their Fourth Amendment claims. The key and controlling precedent in this area is the Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), and Plaintiffs' efforts to distinguish *Shultz* fail. *Shultz* (like this case) involved a Fourth Amendment challenge to various BSA recordkeeping and reporting requirements, including CTRs (which Treasury

required for currency transactions over $10,000) as well as certain other reports set at lower thresholds. *Id.* at 35-41. For each covered transaction, the BSA required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information. *Id.* at 39 n.15. Congress created these "precise and detailed reporting requirements," *id.* at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law, *id.* at 38; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and consistent with the Fourth Amendment. The Court connected its Fourth Amendment analysis to the specific context of corporate reporting requirements, where it has long been clear "that organizations engaged in commerce c[an] be required by the Government to file reports dealing with particular phases of their activities." *Id.* at 65; *see also id.* at 59 ("Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge . . . , reporting requirements are by no means per se violations of the Fourth Amendment." (citation omitted)). As to the constitutionality of the BSA reporting requirements at issue, the Court's rationale had two components: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA provisions at issue "d[id] not impose unreasonable reporting requirements" and did not require a warrant or probable cause. *Id.* at 67.

*Shultz* establishes the proper Fourth Amendment rubric applicable to the March 2025 GTO, which takes a similar form and arose in similar circumstances. MSBs along the southwest border are already engaged in a highly regulated industry subject to extensive recordkeeping and reporting requirements, as well as audits. *See, e.g.*, Compl. ¶¶ 19-32; Gomez Decl. (ECF 22-2) ¶¶ 7, 15, 20. Neither the individual Plaintiff nor Novedades have

shown a reasonable expectation of privacy that would impact reporting requirements like this one. Just like the reporting in *Shultz*, the GTO requires companies to "file reports dealing with particular phases of their activities." 416 U.S. at 65. Like the reporting requirements challenged in *Shultz*, the March 2025 GTO was motivated by increasing use of covered entities for illicit purposes: "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border." *See* AR 000008; Gacki Decl. ¶¶ 11-22, 30, 33.

*Shultz* disproves Plaintiffs' Fourth Amendment claim, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). And Plaintiffs' attempt to distinguish *Shultz* based on the GTO's temporary $200 threshold (PI Mot. at 10-11) fails. The Supreme Court held that a reporting requirement passes Fourth Amendment muster if "the information is *sufficiently described and limited in nature*, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce." 416 U.S. at 67 (emphasis added). Here, the March 2025 GTO's requirements are sufficient described in the GTO and CTR forms themselves (*see* Ex. 2) and are further explained in the FAQs. *See e.g.* FAQs 3, 7. And the requirement is plainly "limited in nature"—it is in effect for 180 days and applies to only 30 zip codes near the Southwest Border. As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Neither a warrant nor probable cause are required in this circumstance.

Plaintiffs' insistence that a warrant is required, or that GTO "operates as a general warrant", PI Mot. at 12, simply cannot be squared with *Shultz* or with the many other

statutory reporting requirements that have long been understood as constitutional.[8] The requirements for a warrant or a certain level of individualized suspicion that Plaintiffs seek to impose on cases involving statutory reporting schemes come from (and are applicable to) cases involving discretionary and often physical searches. In cases where agencies or officers have discretion to control the timing, manner, scope, and frequency of individual searches, an opportunity for pre-compliance review may mitigate any risk of abuse or harassment. *See Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis," like *Shultz*).

For instance, Plaintiffs rely on *Patel*, which concerned on-demand "inspections" of hotel guest records by city police. *City of Los Angeles v. Patel*, 576 U.S. 409, 412-14 (2015). The Supreme Court required pre-compliance review because of a "risk that searches . . . will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he availability of precompliance review . . . reduces the risk that officers will use these administrative searches as a pretext to harass business owners."). Here, the March 2025 GTO requires reporting of specific information under specific statutory criteria, rather than providing officers with leave to conduct limitless, discretionary searches of Plaintiffs' premises, persons, or files. *See* 31 U.S.C. § 5326; 90 Fed. Reg. at 12107. Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment or abuse present in *Patel* and similar cases.

Plaintiffs also rely on *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), which held that a geofence warrant violated the Fourth Amendment. In *Smith*, law enforcement was looking for a particular criminal and demanding that a private company sift through

---

[8] *See, e.g.,* 8 U.S.C. § 1324a(b) (employment verification reporting requirements); 52 U.S.C. § 30104 (political campaigns); 26 U.S.C. § 6012 (tax returns).

large amounts of purportedly private and potentially revealing location data to find the particular criminal. But that case did not involve a corporate reporting requirement, did not involve bank records, which are not confidential communications but are instead negotiable instruments to be used in commercial transitions[9], does not purport to limit the ruling in *Shultz*, and does not address a heightened regulatory reporting requirement like this one. Indeed, the key distinguishing feature of the facts in *Smith* is the highly revelatory nature of location data, as contrasted with the far less private nature of banking records. *See* 110 F.4th at 833 ("While it is true that geofences tend to be limited temporally, the potential intrusiveness of even a snapshot of precise location data should not be understated.").

Plaintiffs' reliance on *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D. N.Y. 2019) is similarly misplaced, and the analysis there in fact disproves Plaintiffs' claims. The city ordinance at issue in *Airbnb* required the challenged businesses—services that advertised and accepted bookings for short-term rentals—to submit a monthly report with detailed information about every transaction, with no limitations. After reviewing the relevant Fourth Amendment authorities, the district court noted two features of the ordinance that mitigated its impact: (1) it did not "entail the on-site presence of state officers or any physical entry" into the plaintiffs' businesses and (2) it did not give the government "discretion as to the information that [the business] is required to produce." 373 F. Supp. 3d at 490. The March 2025 GTO shares those two features, which counsel against finding a Fourth Amendment violation. Moreover, in granting a preliminary injunction in *Airbnb*, the district court relied on a factor that is not present here: the ordinance did "not have a

---

[9] *See United States v. Chatrie*, No. 22-4489, 2025 WL 1242063, at *40 (4th Cir. Apr. 30, 2025) (Berner, J., concurring) ("In *Miller*, the [Supreme] Court rejected the assertion that an individual holds a reasonable expectation of privacy in his bank records…. In the Court's view, these were 'not confidential communications but negotiable instruments to be used in commercial transactions.'" (quoting *United States v. Miller*, 425 U.S. 435, 442 (1976))); *see also id.* at *21 (Wynn, J., concurring in the judgment) ("*Carpenter* expressly recognized that the deeply revealing nature of 'cell phone location records' puts them in a 'qualitatively different category' from 'telephone numbers and bank records.'" (quoting *Carpenter v. United States*, 585 U.S. 296, 309 (2018))).

temporal sunset" and was "devoid of any tailoring." *Id.* at 491. Here, the March 2025 GTO is limited both temporally and geographically, and those limitations flow directly from FinCEN's regulatory authority under the BSA, as described in detail above.

Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994-95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (11th Cir. 1987) (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant"). This distinction is present in *Shultz* itself. *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

Finally, Plaintiff Gomez, an MSB owner, argues that the reporting requirement violates her own Fourth Amendment rights because she may have to report her own currency exchange transactions. PI Mot. at 14. Ms. Gomez does not indicate where she does her regular currency exchanges. Even assuming that they are covered transactions, the customer of a financial institution "can assert neither ownership nor possession" in the business records of the financial institution, even where the Government requires those records to be maintained, and thus cannot object to their disclosure. *United States v. Miller*, 425 U.S. 435, 440 (1976). Because the Supreme Court rejected the argument in *Shultz* that the financial institution has a Fourth Amendment right to avoid reporting requirements and rejected the argument in *Miller* that the customer has a protected right to avoid such

requirements, Ms. Gomez does not have some special kind of protected interest simply because she is both.

Plaintiffs' reliance on *Carpenter v. United States*, 585 U.S. 296 (2018), is also misplaced. *Carpenter* held *Miller*'s conclusion that a customer lacked an expectation of privacy in financial records held by a bank (i.e., the third-party doctrine) should not be extended to wireless customers' location information as transmitted to cell site towers. 585 U.S. at 318. But that type of stretch is not required here. Whether bank customers have a privacy interest in information held by a financial institution is precisely the issue here. *Carpenter* did not overrule *Miller*; it expressly recognized that location information differs from bank records of "negotiable instruments to be used in commercial transactions." *Carpenter*, 585 U.S. at 314 (quoting *Miller*, 425 U.S.C. at 442); *see also id.* at 309 ("qualitatively different category"); *id.* at 314 ("world of difference"); *id.* at 315 ("privacy concerns far beyond those considered in … *Miller*"). *Miller* controls: individual MSB customers do not have a Fourth Amendment privacy interest in the MSB's records.

## C. Plaintiffs Have Not Established Irreparable Injury.

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The proffered irreparable harm must not be speculative. *See Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (overturning TRO where finding of irreparable harm was "not based on any factual allegations" and, thus, "speculative"). Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that . . . plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Here, Plaintiffs submitted evidence that it may be costly to comply with the GTO, but the estimates of those costs appear to be exaggerated, there is no evidence that Plaintiffs have explored automated alternatives like automated batch-filing, and Ms. Gomez otherwise just speculates about the future actions of customers who may not want to provide

the additional information required by the GTO. As a baseline, the Paperwork Reduction Act (PRA) notice cited by Plaintiffs estimates that each CTR takes eight minutes to complete, an average of ranges from 3.24 minutes to over 20 minutes per CTR depending on filing method. *See* Agency Information Collection Activities, 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024); *see also* Gacki Decl. ¶ 26. Notably, many nondepository institutions like MSBs use automated batch filing, and for them, the average time per CTR is estimated at 4.76 minutes per CTR. Plaintiff Gomez acknowledges the possibility of using software to batch file CTRs, but summarily dismisses this option without explanation. *See* Gomez Decl., ECF 22-2 at ¶ 57 ("I'm not sure such software would help me."). Indeed, the PRA estimate is facially quite conservative for discrete, non-automated filers as some Plaintiffs claim to be. Plaintiff Gomez's estimate of 25 minutes for each and every CTR, Gomez Decl. ¶ 50, appears to be premised on discrete, nonautomated filings and does not consider other options. And the speculation that customers will be afraid is just that—speculation. Gomez Decl. ¶ 47 (speculating that "a lot of people . . . may not want to attract attention" and wondering about what people "might think.").

This Court also should reject the speculative, non-party declarations on which Plaintiffs rely heavily in their attempt to establish irreparable harm. *See* ECF 22-3 (declaration from MSB manager in Texas who is not a plaintiff in the W.D. Texas action and therefore not protected by the TRO there); ECF 22-4 (manager of three non-party Texas MSBs); ECF 22-5 (non-party employee of a Texas non-party MSB); ECF 22-6 (owner of MSB already protected by Texas TRO). These declarations do not establish actual harm, but are instead rife with speculation about hypothetical future harms. *See, e.g.,* ECF 22-3 at ¶ 25 ("Once you lose a customer, they might never come back."). Moreover, this evidence is largely ad hoc and unrelated to the harms actually alleged in this case. For example, one declarant observes that "one regular bank … is advertising its currency exchange services" via a billboard. ECF 22-6, ¶ 23. The billboard at issue, however, is not in this District or State, and appears to bear no relation to the GTO, so it should have no bearing on the Court's

decision here. Defendants object to all of the non-party evidence attached to Plaintiffs' motion.

And, it bears repeating that before the parties hold a hearing on this motion, all MSBs will have had over 60 days to figure out how to come into compliance with the March 2025 GTO. In sum, Plaintiffs fail to establish irreparable harm.

### D. The Balance of Interests Tips in Favor of Defendants.

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2947 (3d ed. 1998).

In the face of Plaintiffs' weak evidence of harm to one Plaintiff MSB, the agency's finding that these recordkeeping requirements are necessary to address money laundering and cartel activities along the southwest border should carry the day. It is in the public interest for the Government to act swiftly on these issues, particularly in light of the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their devastating criminal activity. *See* AR 000011-12; Gacki Decl. ¶ 30 ("The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money laundering."). The Gacki Declaration further explains that "given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs." *Id.* ¶ 32. And an injunction "would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole." *Id.* ¶ 33.

Were the Court nonetheless to grant Plaintiffs' motion, the Court should limit any relief to the Plaintiffs, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists only to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). Plaintiffs have not established irreparable harm to any non-party, much less more broadly, and no injunction should issue at all. Were the Court to do so, however, any relief granted should be limited to identified Plaintiffs.

Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V.    CONCLUSION**

For all of the reasons set forth above, Defendants respectfully request that the motion be denied.


DATED: May 6, 2025                              Respectfully submitted,

                                                ADAM GORDON
                                                United States Attorney


                                                */s/ Katherine L. Parker*
                                                KATHERINE L. PARKER
                                                Assistant United States Attorney

                                                Attorneys for Defendant
                                                United States of America