# PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF PRELIMINARY INJUNCTION GRANT IN TEXAS CASE

# Exhibit A

```
1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION

3    TEXAS ASSOCIATION FOR MONEY          )
     SERVICES BUSINESSES (TAMSB);         )
4    HIGH VALUE, INC.; REYNOSA CASA DE     )
     CAMBIO, INC.; NYDIA REGALADO d/b/a    )
5    BEST RATE EXCHANGE; MARIO             )
     REGALADO d/b/a BORDER                 )
6    INTERNATIONAL SERVICES; LAREDO        )
     INSURANCE SERVICES, LLC; E.MEX.       )
7    FINANCIAL SERVICES, INC.; R & C, INC. )
     D/b/a TEMEX MONEY EXCHANGE; SAN       )
8    ISIDRO MULTI SERVICES, INC.; CRIS     )
     WIN INC. d/b/a BROWNSVILLE CASA DE     )
9    CAMBIO; ESPRO INVESTMENT LLC          )
     D/b/a LONESTAR MONEY EXCHANGE;        )
10   And ARNOLDO GONZALEZ, JR.,            )
                                           )
11                                         )
          Plaintiffs,                      )
12                                         )
            v.                             )  No. 5:25-cv-00344-FB
13                                         )
     PAM BONDI, ATTORNEY GENERAL           )  San Antonio, Texas
14   OF THE UNITED STATES;                 )  May 12, 2025
     SCOTT BESSENT, SECRETARY              )
15   OF THE TREASURY; UNITED STATES        )
     DEPARTMENT OF THE TREASURY;           )
16   ANDREA GACKI, DIRECTOR OF THE         )
     FINANCIAL CRIMES ENFORCEMENT          )
17   NETWORK; FINANCIAL CRIMES             )
     ENFORCEMENT NETWORK,                  )
18                                         )
          Defendants.                      )
19   _____)

20                TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE FRED BIERY
21                UNITED STATES DISTRICT JUDGE

22   A P P E A R A N C E S:

23   FOR THE PLAINTIFFS:
     Jeffrey Rowes
24   Christen Mason Hebert
     Institute for Justice
25   816 Congress Ave., Suite 970
     Austin, TX 78701
```

```
 1   FOR THE PLAINTIFFS (CONTINUED):
     Elizabeth L. Sanz
 2   Institute for Justice
     901 North Glebe Road, Suite 900
 3   Arlington, VA 22203

 4   Katrin Marquez
     Institute for Justice
 5   2 S. Biscayne Boulevard, Suite 3180
     Miami, FL 33131
 6
     Roland Gutierrez
 7   Gutierrez Law Firm
     3817 San Pedro
 8   San Antonio, TX 78212

 9   Martin Anthony Golando
     The Law Office of Martin Golando, PLLC
10   2326 Magnolia
     San Antonio, TX 78201
11
     S. Mark Murray
12   Kennedy Hatfield Asel
     Ford Murray, PLLC
13   10001 Reunion Place, Suite 640
     San Antonio, TX 78216
14
     FOR THE DEFENDANTS:
15   Amy Powell
     U.S. Department of Justice
16   Federal Programs Branch
     150 Fayetteville Street, Suite 2100
17   Raleigh, NC 27601

18   Robert D. Green
     U.S. Attorney's Office
19   Civil Division
     601 N.W. Loop 410, Suite 600
20   San Antonio, TX 78216

21   COURT REPORTER:
     Chris Poage, CRR, RMR
22   United States Court Reporter
     262 West Nueva Street, Rm. 1-426
23   San Antonio, TX  78207
     Telephone:  (210) 244-5036
24   chris_poage@txwd.uscourts.gov

25   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
```

```
 1                              INDEX

 2                                                          PAGE

 3   ISIDRO SALINAS

 4   Direct Examination by Mr. Rowes .........................45

 5   Cross-Examination by Mr. Green ..........................62

 6   Redirect Examination by Mr. Rowes .......................87

 7   Recross-Examination by Mr. Green ........................91

 8   ANDRES PAYAN, JR.

 9   Direct Examination by Ms. Sanz ..........................94

10   Cross-Examination by Ms. Powell ........................103

11   Redirect Examination by Ms. Sanz .......................118

12   ANNA ISABEL ALVARADO

13   Direct Examination by Ms. Sanz .........................122

14   Cross-Examination by Mr. Green .........................144

15   Redirect Examination by Ms. Sanz .......................151

16   ARNOLDO GONZALEZ, JR.

17   Direct Examination by Ms. Sanz .........................159

18   Cross-Examination by Ms. Powell ........................171

19   ASHLEY LIGHT

20   Direct Examination by Mr. Rowes ........................192

21   Cross-Examination by Ms. Powell ........................210

22   Redirect Examination by Mr. Rowes ......................226

23

24

25
```

```
 1      (8:30 a.m.)
 2           THE COURT:  You may be seated.
 3      Good morning, ladies and gentlemen.  We're here this
 4  morning in 25-cv-344, Texas Association for Money Services
 5  Businesses, et al, v. Pam Bondi, Attorney General of the
 6  United States, et al.
 7      And if I could have one counsel for the plaintiff stand and
 8  come to the lectern and introduce everyone who's with you here.
 9           MR. ROWES:  Good morning, Judge Biery.  My name is
10  Jeff Rowes.
11           THE COURT:  Why don't you pull the mic over.
12      Is it on, Jaemie?
13           MR. ROWES:  It is, Your Honor.  Thank you.
14      Good morning, Judge Biery.  I'm Jeff Rowes with the
15  Institute for Justice, and I will be leading the crew today.
16  Ms. Elizabeth Sanz will be presenting with me.  We also have
17  with us Senator Roland Gutierrez, and we have Marti Golando in
18  the back, and then my other colleagues from the Institute for
19  Justice, Ms. Christi Hebert and Katrin Marquez, and our
20  paralegal, Kendall Morton, with us, as well as --
21           THE COURT:  She's the most important, right?
22           MR. ROWES:  Indeed.  She's --
23           THE COURT:  -- these folks -- the lawyers just show
24  up.
25           MR. ROWES:  Yeah.  Yeah.  I mean, believe me, none of
```

1    this happens without Kendall.

2         And then we have our -- we have our representatives of the

3    different parties.

4         The government has invoked the rule.  So our testifying

5    witnesses who aren't parties will be in the hallway.

6              THE COURT:  Okay.  All right.  And for the defendants,

7    and to get to meet Ms. Powell in person.

8              MS. POWELL:  Yes.  Amy Powell for the United States

9    defendants.  With me at counsel table are Mr. Green.  And

10   Ms. Ramirez is our essential --

11             THE COURT:  The other most important person?

12             MS. POWELL:  Correct.

13             THE COURT:  Without whom, we would be clueless, or

14   some of us would be.

15        All right.  Let's see.  All right.  Mr. Rowes, would you

16   like to make a brief opening statement?

17        By the way, Ms. Christmas is the law clerk assigned, and

18   she is with us by Zoom.  And so she and I have spent a good

19   part of last week and this weekend, she more so than I, getting

20   ready for this.  But we've read, I think, everything that's

21   pertinent.

22        So, Mr. Rowes, if you'd like to make an opening statement.

23             MR. ROWES:  I would, Your Honor.  Just, would you like

24   me to take care of a couple of housekeeping things that the

25   Court might be interested in, just --

```
 1            THE COURT:  Sure.
 2            MR. ROWES:  -- before we jump in?
 3       The first thing, does the Court -- do you think you'll want
 4  us to do revised findings of fact and conclusions of law and
 5  whether or not you want to let us know about that right now?
 6            THE COURT:  Well, I haven't decided yet.
 7            MR. ROWES:  Okay.
 8            THE COURT:  If you want to add some proposed ones.
 9  But we'll deal with that.
10            MR. ROWES:  At the end of the day?  Sure.
11       I was just only able to show them to Ms. Powell right now,
12  but we received three additional declarations from plaintiffs
13  who hadn't submitted them as part of the briefing, that I'd
14  like to file with the Court just so we have them on record.
15            THE COURT:  All right.  And I think the government has
16  some opposition to that.  So I'll hear them.
17            MR. ROWES:  Sure.
18            THE COURT:  Although, in terms of making a complete
19  record, to the extent this matter goes somewhere else east of
20  here, then probably we will.  But I want to hear from the
21  defense.
22            MR. ROWES:  Thank you, Your Honor.
23       And I think the last point just to raise as housekeeping,
24  we'll probably also want to -- you'll want to talk to
25  Ms. Powell about, is that Your Honor's TRO expired on Friday.
```

My understanding is the government is willing to say that it
won't enforce until Friday.  But ultimately that means that at
the end of the day I'm going to have to file a motion to extend
it past Friday.  And so at some point we should talk about --
and maybe that's at the end of the day -- talk about what to do
about that.

      THE COURT:  Okay.  I'm not sure the TRO can be
extended again.

      MR. ROWES:  Well, I mean -- so there are cases out
there in which courts say the purpose of a TRO is to be a
bridge until the PI, and that even if, under Rule 65, the Court
technically can't extend the TRO, that courts under their
inherent power to manage their dockets do, in fact, do that.

    I think the alternative is the Court can enter at --
preliminary injunction, just a short order as a bridge until
the Court is able to make a decision.  It doesn't seem to cost
the government anything.  Judge Sammartino, out in the Eastern
-- out in the Southern District of California, has enjoined the
GTO under her TRO.  So the government's not losing anything, as
a practical matter.

      THE COURT:  Okay.  All right.  Well, we'll take all
that up.  I think --

      MR. ROWES:  Oh, okay.  Sure.  And actually, Mr. Mark
Murray is here as well, and he's been providing with some
guidance.  So I just want to introduce him.

1          THE COURT:  All right.

2          MR. ROWES:  Thank you, Roland.

3      All right.  Well, I'll jump in with my opening, if

4  that's -- if that's all right with you, Your Honor.

5      Good morning, and may it please the Court.  Today's

6  testimony, along with briefing and other evidence, will confirm

7  that the Court got it right with its TRO order.  On the merits,

8  dropping the reporting threshold by a whopping 98 percent

9  violates the APA, is unconstitutional, as an invasion of

10 financial privacy under the Fourth Amendment, and it's ultra

11 vires.

12     The testimony today will show devastating irreparable harm

13 to honest, multigenerational family businesses and core Fourth

14 Amendment interests in financial privacy.  And these immense

15 harms tip the balance of equities in favor of plaintiffs and

16 the other MSBs.

17     Setting aside that the government has no interest in

18 unlawful and unconstitutional action, what is FinCEN getting

19 out of this GTO?  A blizzard of paperwork.  There is no

20 evidence in the record that the $10,000 CTRs lead to

21 prosecutions.  Are millions more CTRs, sitting in a computer in

22 Washington, D.C., going to make a difference?  Again, there is

23 no evidence in the record.

24     Now, this isn't a full-blown trial, and we're not going to

25 put every plaintiff on.  No experts.  We're going to give the

1  Court a streamlined presentation.  Three plaintiffs who are

2  covered by the Court's TRO, two witnesses from MSBs that are

3  not covered, they'll explain how destructive the GTO is in the

4  real world.  And that's the theme, the real world.  And it's

5  the theme because that's what the administrative record has

6  ignored.

7      And it did so on purpose.  FinCEN cooked up the GTO and the

8  administrative record behind closed doors, in a few weeks,

9  without any input from MSBs who actually work on the border or

10  from the public who has been harmed.  That's a factual gap that

11  we're going to fill.  And the factual gap matters.  Under the

12  APA, the failure to consider major consequences of agency

13  action renders it arbitrary and capricious.  And so, too, under

14  the Fourth Amendment, it is unreasonable, and unreasonable

15  burdens -- reporting requirements are unconstitutional.

16      Now, I want to -- before I jump into roadmapping the

17  testimony, let me address something Your Honor will likely hear

18  from counsel for the government.  I expect Ms. Powell to argue

19  that there's nothing unusual about this GTO because FinCEN has

20  issued them before.  And there are three examples in defendant

21  Gacki's declaration.  But they're all different.

22      In 1998, there was a New York GTO against twelve specific

23  MSBs who were under investigation by a task force for sending

24  hundreds of millions of dollars to Colombia.  It turned out

25  there was more money going out of this neighborhood than all

1  the people in the neighborhood earned.

2      In 2015, the GTO was for $3,000 in L.A.'s fashion district,

3  after search warrants showed evidence that these specific

4  businesses were involved in bulk money laundering.  And the

5  U.S. Attorney who asked for the GTO said, this is

6  unprecedented.

7      And then, in 2015, there was another one in five ZIP Codes

8  in Florida, that was at the $3,000 level.

9      Now, I'm not conceding that those GTOs were legal.  They

10 weren't challenged.  But that is -- they are nothing remotely

11 like a $200 reporting requirement, spread over two states and

12 30 ZIP Codes.  At best, FinCEN's argument is that we got away

13 with taking an inch, and so now we're going to take a mile.

14 And that isn't an argument at all.

15     So let me shift gears and talk about the testimony.  Our

16 first witness will be Isidro Salinas.  He is the general

17 manager of his family business, plaintiff San Isidro

18 Multi-Services in Hidalgo, Texas.  Mr. Salinas will explain

19 that MSBs isn't a shady business with a procession of cartel

20 thugs who are changing money.

21     Your Honor might be surprised, but an MSB, in a way, can be

22 thought of like a pharmacy.  And Mr. Salinas has a

23 drive-through.  And he'll explain why that's important.  On the

24 front end, if you've ever been to the pharmacy, you want to

25 drive up, get your prescription, two or three minutes, fast,

1   friendly, accurate.

2       But on the back end, the work is detailed.  The people in

3   the pharmacy are not just throwing pills in the bottle.  And

4   the same thing is true at MSBs.  They follow anti-money

5   laundering protocols.  They look at the customers.  They pay

6   attention.  When they're filing CTRs, they check them twice.

7   The MSBs are the enemy of the cartels.  They are not the ally.

8       Mr. Salinas will testify about the GTO's burdens.  In 2024,

9   they did one CTR for every 1,500 transactions.  If their

10  customer numbers stayed the same, under the $200 GTO, they will

11  have to do a CTR for one in every four customers.  That's

12  increasing by 375 times.  That's almost a 40,000-percent

13  increase in paperwork.  Imagine if a new rule of civil

14  procedure came up that increased your chamber's paperwork by

15  40,000 percent.  The admin record has nothing to say about any

16  of this.

17      Customers don't like paperwork, and they don't like giving

18  up private financial information.  And so they do what normal

19  people do.  They'll go somewhere else.  Mr. Salinas is covered

20  by this Court's TRO.  His competitors aren't.  So he's getting

21  their customers right now.

22      Or customers can go to a non-targeted ZIP Code.

23  Mr. Salinas has a branch in McAllen that is half a mile away

24  from another MSB that isn't in a targeted ZIP Code.  That's a

25  two-minute drive, where people can cross the bridge and change

1  money in Mexico.

2      Now, the counsel for the government might ask, if people

3  are honest, why would they object to turning over their Social

4  Security number and all of their personal financial

5  information?  Well, how about identity theft?

6      Kendall, do you have the little snippet from the

7  Social Security website?  Here we go.

8      So, Your Honor, this is from the government's own

9  Social Security website.  You can see, in yellow, identity

10 theft is one of the fastest growing crimes in American society.

11 The routine and often indiscriminate use of Social Security

12 numbers creates opportunities to inappropriately obtain

13 personal information.

14     You'll hear from Andy Payan of Payan's Fuel Center in

15 El Paso.  They're not a plaintiff.  They're not covered by

16 your -- by the Court's TRO.  Their only service is cashing

17 checks, payroll checks.  So under the GTO, a waitress from

18 Wendy's, who wants to cash her $500 paycheck, has to give her

19 Social Security number to the guy behind the counter at the gas

20 station.  Now, no particular insult to them.  But who among us

21 wants to give our Social Security number to the guy at the gas

22 station?

23     The administrative record doesn't even contemplate what the

24 GTO is doing to ordinary people who need these services, many

25 of whom are low income and just getting by.

1    Next, Your Honor will hear from Anna Alvarado, of plaintiff

2  Reynosa Casa de Cambio.  Her parents started the business over

3  30 years ago, and her and her four siblings have grown it to 13

4  locations.  She is justly proud of her family business.  She is

5  proud of her anti-money laundering certifications and her

6  employees' training.  They watch out for shady characters.

7  They turn them away, or they report them.

8    And she'll take you back to the pharmacy comparison.  She

9  works in the back end as a compliance officer.  She checks

10  every CTR.  She can't order her employees to work faster

11  because the government wants hundreds of times as many CTRs.

12  It is detailed work.  They can't hire just anybody off the

13  street to process financial information, that if you get it

14  wrong, you can get immense fines and even go to prison for

15  willful violations.

16    You'll hear from plaintiff Arnold Gonzalez, the general

17  manager of plaintiff High Value, down in Laredo.  Mr. Gonzalez

18  has his own Fourth Amendment rights at stake.  He changes money

19  regularly above $200 to go see his doctor in Nuevo Laredo, on

20  the Mexican side.  He doesn't want to be put on a list of

21  potential criminals every time he visits the doctor.

22    It's Orwellian to create a paper trail for criminal

23  investigators every time you do something involving more than

24  $200, an amount of money that's barely enough to fill a grocery

25  cart these days.

1    People on the border live on both sides.  Plaintiff
2    Gonzalez's son is an American citizen, but he's married to a
3    Mexican lady.  He lives in Nuevo Laredo.  He commutes into
4    Laredo every day to work.  On the Mexican side, cash is king.
5    People just use cash.  And so he changes money regularly above
6    $200.  Changing a few hundred dollars isn't suspicious.
7    Last, you'll hear from Ashley Light of Valuta in El Paso,
8    Texas.  They're not protected by Your Honor's TRO.  Her father
9    started the family business in 1980.  They have MSB license
10   number one.  Her dad was adamantly against dirty money and
11   worked with law enforcement to root it out.
12   Ashley took over the business seven months ago, after her
13   father passed away, making her president.  Most of her
14   employees have been there for decades.  She's proud of the
15   legacy her father created, a business that serves regular, blue
16   collar people.  But they're buckling under the weight of the
17   GTO.  In 2024, they did about ten CTRs a month.  In 2024, they
18   had about 3,700 transactions a month above $200.
19            THE COURT:  Wait.  2024?  When did this --
20            MR. ROWES:  The GTO kicked in -- April 14th, 2025.
21            THE COURT:  Okay.
22            MR. ROWES:  So the point is, they were doing 3,700
23   transactions a month, that now they have to do a CTR for every
24   single one of those.  Before, they did ten.  Now, they have to
25   do 3,700.

```
 1              THE COURT:  Okay.  3,700 number was the total
 2   transactions?
 3              MR. ROWES:  Per month, in 2024.
 4              THE COURT:  Okay.  I got it.  Go ahead.
 5              MR. ROWES:  So --
 6              THE COURT:  But she'll be testifying?
 7              MR. ROWES:  She will be.  And they shut down their
 8   money order business, their money transfer business because
 9   they can't keep up.  They've lost customers.  And she's at her
10   breaking point.  She has a personal backlog of 670 CTRs that
11   she has to file.  She's working until 2:00 or 2:30 in the
12   morning, on top of being president and on top of being a mom to
13   two small kids.
14        And for what?  And here's where we circle back to the
15   merits and the balance of equities.  FinCEN's plan is doomed to
16   failure.  Its goal is to create a picture of what transactions
17   look like at the $200 level, but isn't going to get that.  It's
18   not going to get a picture of what MSBs looked like in 2024
19   when there was no GTO.
20        The GTO itself is distorting the market.  It's changing
21   what customers do.  All FinCEN is going to learn is what
22   happens when FinCEN itself imposes illegal and unconstitutional
23   burdens on honest businesses and honest people.
24        This is so ill-conceived that it would be comical if it
25   weren't serious.  Let's take the government seriously, Your
```

1   Honor, and imagine FinCEN's boogeyman, right, a cartel bad guy.

2   He goes down I-35, all the way to Laredo.  He's got a million

3   bucks in his car, in cash.  He's sitting out in front of

4   plaintiff Gonzalez' business, a few blocks from the border.

5       FinCEN's theory appears to be that this guy is going to

6   change $400 in cash into pesos and take it over the border.

7   And if he did that every day and never took a vacation, it

8   would take him seven years to get his million dollars across

9   the border in $400 increments.  Or maybe FinCEN's theory is

10  that he's going to go on Facebook and recruit 2,500 people to

11  change $400 each and carry it over the border.

12      None of this is remotely plausible in the real world.  And

13  it wouldn't work, because you'll hear from people like Anna or

14  Arnoldo that they watch out for shady people.  If the same

15  person shows up everyday with $400, they'll just start asking

16  questions, and they're not going to do business with them.

17      And imagine -- even if we take the hypothetical one step

18  further, imagine the cartel guy, with his million dollars,

19  shows up to change his first 400, and Mr. Gonzalez says, we

20  need your Social Security number and your ID because we're

21  sending all of this to the federal government, you think the

22  cartel guy's going to come back the next day, every day for

23  seven years?  No.

24      It doesn't make any sense.  It's absurd.  I don't think

25  anybody at FinCEN would actually think the GTO makes sense if

1   they thought it through like this.  And that's the point.
2   Nobody at FinCEN talked to anybody at the border who runs an
3   MSB.  This was slapped together in a few weeks behind closed
4   doors without thinking about the obvious consequences.  FinCEN
5   can't do that under the APA, and it can't do it under the
6   Fourth Amendment.
7        Our laws and our constitutional rights matter.  This
8   hearing isn't about whether the cartels are bad.  Everyone
9   agrees they are.  It's about whether FinCEN, simply by invoking
10  the specter of the cartels, can do what it wants without
11  complying with the APA or the Fourth Amendment.
12       And understood this way, this case is fundamentally about
13  the rule of law.  The rule of law is what distinguishes us from
14  the cartels.  They are agents of chaos, anarchy, lawlessness
15  and evil.  It is precisely our commitment to the rule of law,
16  especially the Constitution, that protects us from chaos,
17  anarchy, lawlessness and evil.  So it makes us stronger than
18  the cartels.
19       So in the last minute let me just explain to Your Honor the
20  simplest way to resolve this case and the simplest remedy.  The
21  simple answer, as we explain in the briefs, is that the GTO is
22  actually a rule under the APA.  It is not an order.  It needed
23  notice and comment.  That didn't happen.  That means that the
24  GTO is a nullity.  It is vacated.  And the Court can just
25  declare it unenforceable anywhere in the country.  Or the Court

1    can declare the GTO arbitrary and capricious or

2    unconstitutional.  All of these are APA violations.  The remedy

3    is all the same.  It's vacated.

4            THE COURT:  All right.  Well, in that regard -- and I

5    notice that, of course, you all have come in later, after the

6    TRO hearing.  But I promised both sides, but especially the

7    defense, that this case would be limited to these individuals.

8        So I'm not going to go back on my word.  If these other

9    folks, depending on whatever they want to do, who are not

10   parties, if they want to file their own lawsuit somewhere else,

11   or they can file it in this courthouse, it'll be randomly

12   assigned.  But anyway, that's up to the people who are not

13   plaintiffs in this case.

14       And the California case, I'm not sure if that's limited to

15   specific parties or not.  But that's up to the judge in

16   California.

17           MR. ROWES:  Sure.  The one in California is for the

18   entire state of California, Your Honor.

19           THE COURT:  I'm sorry?

20           MR. ROWES:  The TRO in California applies to all the

21   ZIP Codes in California, not just to the parties in the case.

22           THE COURT:  Okay.  All right.

23           MR. ROWES:  Just to let you know.

24       Okay.  Thank you, Your Honor.  And I'll turn it -- yeah.

25           THE COURT:  But the California judge didn't try to

1  step into Texas' business, did they?

2        MR. ROWES:  She did not, Your Honor.  And I'm not

3  asking you to step into California's business.  But I would

4  encourage -- I would encourage the Court to consider either

5  enjoining it as to everybody in Texas or, at the very least,

6  allowing people to join the association as members and

7  extending your court -- Your Honor's order to the association.

8        THE COURT:  Well, I don't know.  We'll see.  Probably

9  not --

10       MR. ROWES:  Thank you, Your Honor.

11       THE COURT:  -- because of prior commitment.

12   All right.  Ms. Powell, if you wish to respond now or later

13 or at least begin now.

14       MS. POWELL:  Sure.  I think what I'd like to do, Your

15 Honor, is also address a couple of housekeeping matters and

16 present my argument on the merits of the case.

17       THE COURT:  I'm sorry.  Pull the mic over there.

18       MS. POWELL:  Apologies.  Can you hear me better now?

19       THE COURT:  Yeah.  That's better.

20       MS. POWELL:  What I'd like to do is start with the

21 same housekeeping matters that my friend did and then address

22 the likelihood of success on the merits now.

23       THE COURT:  All right.

24       MS. POWELL:  The first issue he raised were the

25 belated declarations.  He gave them to me a few minutes ago.

1   I've not had a chance to look.  I think we would object to

2   their consideration, given the late-breaking nature of it.  And

3   I would leave it at that for now.

4           THE COURT:  Okay.

5           MS. POWELL:  He is correct that the government has

6   agreed to effectively extend the TRO through Friday.  We think

7   anything beyond that would certainly be a preliminary

8   injunction, subject to appeal.

9       The other thing I wanted to bring to the Court's attention

10  is we discovered this weekend a small error in the

11  administrative record and plan to file a notice.  It's not

12  something I expect the Court to consider at the preliminary

13  injunction phase.  I just wanted to put you on notice that

14  there was an error.

15      I can be more specific.  There's a footnote -- there's a

16  description of a criminal case in the text of the

17  administrative record memo, which I think is on the AR page

18  Bates stamped 10.  And it's footnote 27 on that page.  And it

19  cites a case called *Chavez Zepeda*.  But the case described in

20  the text does not have a Zepeda.  So we're going to supplement

21  with the correct case, which is, in fact, U.S. v. Mora, I

22  think, which is 22-361, in the same district.

23          THE COURT:  All right.

24          MS. POWELL:  Wanted to make you aware of that so it's

25  not surprising.

1      THE COURT:  Did AI do that or some human being?

2      MS. POWELL:  Some human being.

3      THE COURT:  Okay.

4      MS. POWELL:  It's definitely some human being, because

5  there is a correct description of the case in the text and just

6  a different one -- different case, which is also about money

7  services businesses in the footnote, but it is not the case

8  described in the text.

9      THE COURT:  Okay.

10     MS. POWELL:  FinCEN found that the geographic

11 targeting order was necessary to further the purposes of the

12 Bank Secrecy Act, including assessing money laundering risks,

13 including facilitating the tracking of money sourced from

14 illegal activity and collecting highly useful information for

15 those purposes.  We think it is easily within FinCEN's

16 statutory authority and that the administrative record shows

17 that they considered the relevant factors.  And that is all

18 that is required under the APA.

19     I don't know if the Court has had a chance to review

20 plaintiffs' motion to supplement the administrative record.  I

21 wanted to go ahead and put a brief response on the record here.

22 I haven't had a chance to draft one up.  But to the extent the

23 Court is considering going outside the administrative record

24 for the purposes of the preliminary injunction, we would object

25 to any consideration of extra record evidence on the merits of

1    plaintiffs' claims.  Recognizing that there are disputes about

2    facts related to injury to the plaintiffs, we would not object

3    to the extra record evidence there.  We do object to its

4    consideration on the merits.

5            THE COURT:  Okay.

6            MS. POWELL:  It is extremely rare for courts to go

7    outside the administrative record to review.  That's because

8    the APA says, you review on the basis of the whole record,

9    which the black letter law says that the information that was

10   before the decision maker at the time the decision was made.

11           THE COURT:  Well, it may not be directly on point, but

12   there's some language in *Loper Bright* that talks about the

13   Administrative Procedure Act requires courts to exercise their

14   independent judgment in deciding whether an agency has acted

15   within its statutory authority.

16      Does that apply here?

17           MS. POWELL:  I think *Loper Bright* was talking about a

18   question of statutory interpretation.  And I agree --

19           THE COURT:  Right.

20           MS. POWELL:  -- that the question of statutory

21   interpretation is based on the statute.  It's not based on any

22   factual record.  It is based on sort of whether the agency has

23   properly applied the statute.  I don't think that's a record

24   question.  I think it's a purely legal one.

25           THE COURT:  Okay.  All right.  Go ahead.

1          MS. POWELL:  The agency's entitled to presumption that
2    they properly designated the record, with the caveat that I
3    just admitted.  There was an error in our previous designation.
4    We are entitled to a presumption of good faith.  We correct
5    errors when we find them.  And that certification otherwise
6    comprises the whole of the information that was considered by
7    the decision maker at the time.  The rare exceptions where
8    courts are permitted to go outside the record do not apply
9    here.  One of those is where there is the showing of bad faith.
10   And there's no such showing here.
11        One is where it's necessary to provide context and
12   background information.  I think both parties have pointed to
13   some background and context information that we don't
14   necessarily object to, like what goes in a CTR and things like
15   that, that are understood to be part of the information before
16   the decision maker.  But it certainly doesn't require going
17   outside the record for things like testimony by the plaintiffs
18   here.
19        And the third situation is where the agency has so failed
20   to explain its decision in any meaningful way that judicial
21   review is frustrated.  In fact, most courts have noted in that
22   circumstance you shouldn't supplement but should, instead, find
23   against the agency or seek additional explanation from the
24   agency.  But that's not the case here.  We have a detailed
25   administrative record memorandum explaining the information

1   that was before the agency and why, and the supporting

2   documentation for each --

3         THE COURT:  Well, a lot of that had to do with

4   journalism articles and about this and that, and at least I

5   picked some of that up.  Was there any independent

6   investigation by law enforcement or, we think this is

7   happening, or, we read in a magazine that this is happening?

8         MS. POWELL:  The administrative record memorandum

9   collects a wide variety of sources.  A lot of those are FinCEN

10  alerts that report on ongoing law enforcement actions, news

11  articles, known typologies of criminal activity in the area.

12  And it collects newspaper articles and other sources, too.

13     I'm not sure what you mean by "independent investigation."

14        THE COURT:  Well, for example, in the 1998 New York

15  case, apparently there was reasonable suspicion and/or probable

16  cause to look at those 12 MSBs who were shipping millions of

17  dollars to Colombia, as opposed to all MSBs in New York.

18        MS. POWELL:  Right.

19        THE COURT:  Was there some use of a scalpel here to

20  say, well -- and then, of course, as we learned in the TRO

21  hearing, it's these ZIP Codes, but you can walk over here on

22  this ZIP Code, and they're not covered.

23        MS. POWELL:  Right.  So I think there actually is some

24  individualized use of a scalpel.  It is not like some other

25  GTOs, which are targeted at specific businesses and specific

1    suspicion.  It is targeted at this known and documented

2    activity where drug cartels and other criminal elements are

3    targeting MSBs along the border.  And there's multiple examples

4    of that, some of which I tried to pull out in my brief.  And

5    it's a known typology that they want to, for example, send

6    money to the border, say, for example, through wire transfers

7    to MSBs, change it out, change it to pesos, get it across the

8    border in smaller amounts, so funnel small amounts to the

9    border, change some of it to pesos and get it across the border

10   in smaller amounts.  Those are known typologies that are

11   happening.

12        And the other sort of scalpel element of it was choosing

13   those ZIP Codes that are most vulnerable to this type of

14   activity.  So the ZIP Codes that were chosen are those that are

15   close to a major border crossing, in particular.  And they left

16   out those that are not close to a major border crossing.  And

17   they chose those where there are high volumes of CTRs already,

18   suggesting a high volume of cash business in general.  Cash

19   business is often where people -- where the drug cartels go to

20   try to hide their transactions.

21           THE COURT:  Okay.  And I agree that Star County

22   doesn't have a major entry/exit port, but it has a lot of

23   crime.  But they're not targeted?

24           MS. POWELL:  Sure.  I mean, the goal of the GTO is not

25   to address all crime.  It is to address a known specific

1    problem where drug cartels are trying to get money across the

2    border.

3            THE COURT:  Okay.

4            MS. POWELL:  And they're known to be active in this

5    particular area.

6        The quote that I pulled out from the legislative history of

7    the Bank Secrecy Act on this particular provision is -- which I

8    did not bring up with me.  But it says, like, in geographic

9    areas where drug cartels are known to be particularly active,

10   is the sort of thing that they're looking to target with a GTO.

11       I do -- on the motion to supplement, I do think it would be

12   particularly inappropriate to supplement the administrative

13   record at the preliminary injunction stage without sort of a

14   fuller briefing on the record.  It is presumptive that we don't

15   supplement the administrative record.  So it'd be unusual at

16   the least to supplement -- to supplement it here at this

17   preliminary stage.

18           THE COURT:  Well, it's an unusual case.  And as I

19   indicated earlier, we're going to make a complete record for

20   wherever this goes from here.  So the motion to supplement is

21   granted, and we'll put it all in.  And then I'll pick and

22   decide what's relevant or not, and we'll go from there.

23           MS. POWELL:  On the APA claim, I want to primarily

24   address the arguments made in the reply brief, emphasizing

25   again that the standard under the APA, especially for the

1    arbitrary and capricious claim, is whether the agency

2    considered the relevant statutory factors and engaged in

3    reasoned decision making on those factors.

4        So one of the statutory factors here, for example, is not,

5    and there's nothing in the statute or legislative history that

6    would suggest otherwise -- one of the relevant factors is not

7    trying to minimize the burden on regulated entities.  There's

8    nothing that suggests that the -- that FinCEN or the acting

9    agency has to take the least restrictive means here.

10       Rather, they have to do something that is -- that is

11   necessary to effectuate the purposes of the Bank Secrecy Act.

12   And those are codified as to what those purposes are.

13           THE COURT:  So assuming the numbers that have been

14   argued and that we're hearing and the time it takes to do all

15   of these CTRs, is that not a factor to be taken into account?

16           MS. POWELL:  I would not say they could ignore the

17   burden entirely, and they don't.  The administrative record

18   memorandum goes into the burden, and it's part of the context

19   and background as well.  They consider it in several parts of

20   the record.  So I wouldn't say it's totally irrelevant.

21       I would say that it is not part of their burden to suggest

22   how to minimize that, only that the burden is part of their

23   analysis of whether it is useful under the Bank Secrecy Act.

24           THE COURT:  But all of these cases attacking *Chevron*,

25   resulting in *Loper Bright*, it seems to me had as its underlying

```
 1   theory that all these regulations that come out of Washington,
 2   D.C., are burdensome.  And so Chevron got overruled.  I realize
 3   Chevron and Loper are not directly on point.  But in terms of
 4   the concept of the overregulation being modified by the courts
 5   or Congress, seems to me to be a factor in these cases about
 6   how much it's costing General Motors or any big companies, just
 7   like this case is about how much it's costing these plaintiffs.
 8         MS. POWELL:  So I don't -- I am not arguing that they
 9   should ignore the burden entirely.  I'm arguing that they
10   didn't and their consideration of it is reasonable, even if
11   plaintiffs disagree.
12         THE COURT:  Okay.  Well, then that -- okay.  Then we
13   get to whether the consideration was sufficient --
14         MS. POWELL:  Yeah.
15         THE COURT:  -- or not.  So go ahead.
16         MS. POWELL:  I want to point to a few places in the
17   record and in the background, in context information, that go
18   into burden and how the agency considered it.
19      The memorandum itself has a summary of the sort of existing
20   information collection obligations that apply to these types of
21   money services businesses, for example, to show how the burden
22   is changing.  It explicitly states that this will impose a
23   higher regulatory burden on these entities, but it is primarily
24   a reporting obligation that is not as significant as their
25   overall AML obligations, which are more burdensome.
```

1    It explicitly considers whether there will be significant

2 pressure for these entities to change their fees, and concludes

3 that probably not, based on their knowledge of the industry.

4 And it explicitly considers including or not including

5 additional ZIP Codes and things, and decides not to, the burden

6 not being worth it in those circumstances.

7    There's also additional -- sorry.  There's also additional

8 background and context information in the Gacki declaration, or

9 the corrected version, which is at ECF 47-1.  It confirms that

10 limiting the ZIP Codes was, in part, about limiting the burdens

11 on MSBs, that it didn't seem worthwhile in those areas for now.

12 It also confirms that FinCEN was well aware of the typical

13 burdens and of the options for MSBs trying to comply with this

14 type of reporting requirement.

15    There is a published *Federal Register* notice, from some

16 years ago, about the typical burden associated with filing

17 CTRs, saying that sort of depending on the type of institution

18 and the type of filing software that they use, it can take

19 anywhere from about three minutes per CTR to over 20 minutes

20 per CTR, for an average of eight minutes overall.

21    Now, even for non-depository institutions like the

22 plaintiffs here, that filing burden ranges from about four

23 minutes to just over 20 minutes per CTR.

24         THE COURT:  Which is not a burden if you're doing ten

25 a year?

1          MS. POWELL:  It's also not inconsistent with what
2     plaintiffs are saying it takes them.  They seem to be largely
3     non-depository institutions who have nonautomated filing, so
4     they'd be on the upper end there, at least some of them.
5     Though, I do think in some instances they haven't accounted for
6     their current information collection obligations and things
7     like that.
8        But the fact is, the overall burden is eight minutes per
9     CTR.  And for those who've adopted more sophisticated software
10     or streamlined the process, it is three minutes per CTR
11     approximately.  I'm --
12          THE COURT:  Well, do you -- do you have any reason to
13     think that the quantity mentioned by plaintiffs' counsel is not
14     that big, that going from 10,000 to 200 will increase the
15     quantity exponentially?
16          MS. POWELL:  They will be filing more CTRs.  I don't
17     know that I can comment on the specific numbers more than I
18     have in the brief.  I'll ask them some questions about it.
19        The point is, I don't think there's a huge dispute of fact
20     here that there is an increased regulatory burden.  If they
21     haven't adopted or attempted to adopt more automated software
22     to deal with it, at least on a temporary basis, there are costs
23     associated with that.  We would primarily dispute that it's
24     ruinous.
25        But none of that answers the actual APA question, which is

1   whether FinCEN reasonably -- considered the relevant factors.

2   And I understand that they clearly did.  This information was

3   in the record.  It was available to the agency.  They

4   considered it, and they engaged in what's reasoned decision

5   making.  Even if the plaintiffs disagree, even if the Court

6   disagrees, that's not the question before the Court, whether

7   this was the best possible decision the agency could make, only

8   whether they engaged in reasoned decision making.

9         THE COURT:  And was there an opportunity for people

10  like the plaintiffs to have some advanced notice and

11  opportunity to comment about what this was going to do to them?

12        MS. POWELL:  No.  The GTO was issued -- well, two

13  things.  One is, no, in direct answer to your question.  The

14  GTO was issued without notice and comment.  The statute

15  explicitly authorizes issuance of an order, which does not

16  require notice and comment.  They were given about 30 days,

17  give or take, to come into compliance.

18      There is an opportunity to seek exceptive relief, if they

19  have some reason why they cannot comply but should still be

20  able to continue conducting these transactions without

21  complying.  None of them did, other than through filing

22  litigation, I suppose.

23      So there was not prior notice to the plaintiffs.  The GTO

24  was put in effect, which we think it's explicitly authorized by

25  the statute.

```
1              THE COURT:  Okay.
2              MS. POWELL:  A few points that were made in the reply,
3    I want to touch on briefly.  One is, the reply points to
4    individual pieces of evidence that they say do not, by
5    themselves, show that money services businesses along the
6    southwest border are uniquely vulnerable to abuse.
7              It is true that several of those pieces of information do
8    not contain all of those factors, money services businesses
9    along the border, uniquely subject to abuse.  But taken
10   together, they come to that conclusion.  And there are exhibits
11   within the administrative record which go to all of those
12   points in fact.
13             It doesn't -- they haven't attempted to disprove, as far as
14   I know, nor could they, really, that there are unique
15   vulnerabilities of money services businesses, and that cartels
16   target them for that reason.
17             Our opposition and the administrative record memorandum
18   pull out a few specific examples of why and how that is.  They
19   can be witting partner, like in the criminal cases we've
20   included as part of the record, like any other business, but
21   they're largely a cash business, that have two sets of books
22   and be a part of a money laundering enterprise.
23             But they're also abused, the money launderers, as
24   unwitting.  They can be targeted by them, and they're
25   vulnerable to that sort of abuse, because they handle large
```

 1   volumes of cash transactions.  So they might try to disguise
 2   cross-border transactions as remittances by adding small
 3   amounts to lots of transactions.
 4       I'll note that the math my friend gave up here, as to how
 5   it would take seven years or 2,500 people, could just as easily
 6   be achieved by five people going to two different MSBs every
 7   day during the year and get well over a million dollars across
 8   the border over the course of a year.
 9           THE COURT:  Well, we had something akin to that in the
10   Texas Lottery, that this group put together a whole bunch of
11   money and bought a whole bunch of tickets and won 60 million or
12   something.
13       Speaking of -- speaking of 60 million and the
14   sophistication and the amount of money that Americans are
15   putting into the cartel system because they are the buyers,
16   okay, and they want -- get back.  And you may or may not be
17   familiar with this.  This was last December, in Chicago, and
18   the whole Chinese, sophisticated, money laundering, crypto.
19   You familiar with that?
20           MS. POWELL:  Not the details, but I've heard other
21   crypto schemes.
22           THE COURT:  All right.  Well, anyway, it's out there.
23           MS. POWELL:  Yeah.
24           THE COURT:  And it's -- and they don't use mom and pop
25   businesses.  They use all these other things.  Anyway, it was

1   $62 million that my colleague sentenced Mr. Pan and two other

2   people.  But those are the kinds of money that are flowing into

3   that cartel business, and they have to do something with it,

4   unless they get caught, which, of course, is law enforcement.

5   In this case it was Internal Revenue.

6       But to try to launder $62 million along the border in --

7   well, I guess to get around the GTO, you'd do it at $199

8   instead of -- in other words, someone doing one of these

9   transfers, if they do $199, they don't have to have their

10  Social Security number and all?  There doesn't have to be a

11  CTR?

12          MS. POWELL:  FinCEN concluded that structuring below

13  $200 would be so low as to be infeasible.  And if they tried to

14  do it, it would be more -- it would require so many resources

15  that it would make structuring activity so much harder for drug

16  cartels.  That would also be a benefit of the GTO.

17          THE COURT:  Okay.  But $201 multiplied -- would be

18  okay?

19          MS. POWELL:  Well, I'm not saying 201 is terribly

20  likely either, right?  Like, they wanted to draw the lowest

21  possible amount beyond which it was highly unlikely cartels

22  would be able to do any structuring activity.

23          THE COURT:  Okay.  Well, that leads to the next

24  question then.  Highly unlikely.  Well, how was the number 200

25  picked instead of 350 or something else?  What's the logic of

1  all that?

2       MS. POWELL:  Sure.  So the idea is to exclude some

3  activity that is so de minimis that cartels couldn't

4  effectively use it or that would increase their costs if so.

5  So the goal is to have everything, while excluding some amount

6  that is so de minimus it is not useful to anyone.  That is how

7  they came to that number.  And that's what's written out in the

8  administrative record memorandum.

9       THE COURT:  Okay.

10      MS. POWELL:  I would note that there are several

11  places in the administrative record that show sort of low

12  dollar -- breaking up transactions into relatively low dollars.

13  Usually it's under 3,000 because they're trying to avoid some

14  reporting requirement that kicks in at 3,000, but sometimes

15  it's lower than that.

16    There are -- I think I picked out a couple of examples.

17  One was some fentanyl purchasers that were doing transactions

18  at under a thousand dollars.  That's in the AR, Page 307.

19      THE COURT:  In these ZIP Codes?

20      MS. POWELL:  I don't remember if that had specific

21  examples in these ZIP Codes.  It was examples of how they're

22  using MSBs in general.

23    Another was funneling practice.  And those did tend to come

24  to these ZIP Codes, because they tend to funnel money to near

25  the border.  And so lots of small transactions come to the

1   border.  And then at the border, they either cash it out or

2   switch it to pesos or some other currency before --

3        THE COURT:  So if there was some reasonable law

4   enforcement suspicion that Casa de Cambio A was doing what you

5   just referred to, would it be permissible then to have

6   basically a search warrant for not only Casa de Cambio A, but

7   B, C, D, E and F and G?

8        MS. POWELL:  Well, I don't want to comment on sort of

9   when they could get a search warrant.  It could be, depending

10  on the quantum of evidence, right?  That's not what they're

11  doing here now.  What they're doing here now is a standardized

12  reporting requirement across these ZIP Codes for a temporary

13  period of time.  There's no suspicion that attaches to filing

14  these reports, most of which are presumably going to be

15  entirely innocent transactions.  And we don't contend to the

16  contrary.

17    I had -- sorry.  I lost track of one thought.

18        THE COURT:  I do that all the time.  Don't worry about

19  it.

20        MS. POWELL:  Maybe it'll come back to me.

21        THE COURT:  It will.

22        MS. POWELL:  Oh, I know what it was.  One reason that

23  we need to do this is because we're not getting to -- we are

24  not capturing, without the GTO, transactions involving multiple

25  MSBs.  The idea, it is not even particularly extraordinary to

1    imagine that someone might go to multiple MSBs, especially over

2    the course of a week or a month, doing transactions that avoid

3    current reporting and recordkeeping requirements.

4            THE COURT:  All right.  But there was testimony in the

5    TRO hearing about the gentleman who testified that his business

6    is here and Laredo National Bank is across the street.  So if

7    these people, innocent or criminal, come to his casa de cambio,

8    and they don't want to do the Social Security number and this,

9    that and the other, they walk across the street to Laredo

10   National Bank and can do the same $250 but not have to be --

11   have their stuff sent to the government.

12       So if ZIP Code is important, why would credit unions and

13   banks not have to comply with this GTO?

14           MS. POWELL:  So there's a couple of reasons we don't

15   think especially illicit actors are just going to go across the

16   street to the bank.  One is, most banks don't do business for

17   non-account holders.  In order to become an account holder at a

18   bank, you have -- well, they won't do cash business with

19   non-account holders.

20       And in order to become account holder, you have to provide

21   a great deal more information than what goes into a CTR and

22   generally verify your identity in multiple ways.  Banks have

23   their own AML compliance standards, but generally you have to

24   have an account holder.  It's subject to FDIC rules about

25   customer identity verification, and they keep track of when

1    that specific customer comes in and associates cash
2    transactions with that account.
3             THE COURT:  Okay.
4             MS. POWELL:  So an illicit actor trying to avoid
5    surveillance is less likely to go to a bank, assuming they
6    don't have some bad actor inside the bank who is going to help
7    them out.
8             THE COURT:  All right.  And to the extent this
9    administrative record talks about -- I think it's Tamaulipas
10   and -- I've forgotten -- anyway, two different cartels and
11   their geographical location.  And, apparently, the theory is,
12   the money's coming through and going to those folks.  So was
13   there any inquiry of things like Wise or PayPal or Western
14   Union, to see if they were sending a lot of money to those
15   geographical areas where the cartels are located?
16            MS. POWELL:  So, in fact, the administrative record
17   includes some information about that, just because it happens
18   to be in the same documents.  I think especially what we've
19   designated as PI Exhibit 17 -- anyway, there's a FinCEN
20   advisory about illicit financial schemes that includes those
21   types of online and cryptocurrency schemes, that sort of
22   things.  They can't be targeted by a GTO in the same way unless
23   they're paying out in a particular location, for example,
24   within the U.S.
25            So I don't think it -- and plaintiffs make this argument in

1   their brief, too, that there's all these other money laundering

2   techniques out there.  That's correct.  There are.  There's a

3   ton of ways to launder money.  There's trade-based money

4   laundering.  There are cryptocurrency schemes.  All of those

5   are great ways for bad guys to try to move money along the --

6          THE COURT:  All right.  Well, that -- yes.  And that's

7   a good point.  So the cost of doing all of this versus the

8   benefit that law enforcement gets --

9          MS. POWELL:  See, that, I think I disagree with, Your

10  Honor.  Because the fact there are other money laundering

11  schemes out there doesn't mean we shouldn't target this one for

12  additional law enforcement scrutiny.  We have law enforcement

13  scrutiny and actions that are trying to target cryptocurrency

14  schemes as well.  It's not done with a GTO because it's not

15  primarily geographically based.

16         THE COURT:  But not at the -- not at the level of

17  $200.  But 10 million, 60 million, I mean, that's fine.

18         MS. POWELL:  I don't think anybody at FinCEN is going

19  to argue that we shouldn't be taking action on cryptocurrency.

20  We absolutely should.  This isn't the tool for it, and I don't

21  think we claim otherwise.

22         THE COURT:  Okay.  All right.  Go ahead.

23         MS. POWELL:  Let's see.  I think the other -- one of

24  the other examples given in the administrative record of how

25  MSBs are targeted is the use of money couriers or money mules

1  in some of the exhibits.  There's lots of different ways

2  they're used to further those funneling schemes, where lots of

3  different people are going around to different locations to

4  receive or change money.

5          THE COURT:  Okay.

6          MS. POWELL:  Oh, plaintiffs argue that FinCEN cannot

7  possibly make meaningful use of this many CTRs.  So there's

8  some explanation at a high level of generality, as you might

9  understand, in the administrative record memorandum of how they

10 can analyze CTRs.  They can globally search them.  They can

11 analyze the data within them to see where suspicious areas

12 might arise or not arise.  They can identify one person who's

13 structuring transactions across multiple MSBs.  Then other law

14 enforcement intelligence associating that person with another

15 person, they can look at a whole network of people who are

16 going to different MSBs and structuring transactions.

17     They could just get additional identifying information

18 about a known associate who's already the target of

19 investigation.  They can see the network working through

20 multiple unwitting MSBs.  This is highly useful information.  I

21 don't think there's any serious reason to doubt that.

22     We also -- and I know this is not reflected in the record

23 at this point, but my understanding is we have good reason to

24 think that at least not all illicit actors are taking action at

25 this point to evade the GTO.

1   On the ultra vires argument, plaintiffs argue essentially
2   that it's beyond their authority to set the reporting
3   requirement this low.  I do think it's important to distinguish
4   between the usual CTR statute, which is 5313 -- or 31 USC 5313,
5   and the GTO statute, which is 5326.  They are totally separate
6   authorities, and one is not tied to the others.  The GTO
7   authority authorizes the imposition of additional recordkeeping
8   and reporting requirements at a level to be determined by the
9   secretary, with the requirement that it be tied to the purposes
10  of the Bank Secrecy Act.  I think setting a level, even a very
11  low level, is firmly within that legal authority.

12  And there's not a particularly good argument that it's not.
13  There's an argument in the reply that it's not -- that the
14  statute refers to a group of businesses.  But that's exactly
15  what the GTO does.  It identifies a group of businesses in the
16  particular geographic area.

17  On notice and comment, plaintiffs in reply attack what I
18  think is a strawman, arguing that FinCEN is saying the GTO is
19  an order because we called it an order.  That is not the
20  argument.  We did call it an order.  But we called it an order
21  because Congress called it an order.  And an order is the one
22  thing under the APA that really, clearly does not require
23  notice and comment rulemaking, which is why Congress chose that
24  term in the GTO statute and did not choose that term in the
25  notice and in the regular currency transaction reporting

1   statute.

2       So I think there's also at least three other reasons sort

3   of within the statutory structure and purpose that show why

4   that's the case.  When it's temporary, in fact, it's very time

5   limited, it would be reasonably unrealistic, especially in this

6   day and age, but even before, to do notice and comment and

7   rulemaking for a rule that was going to last six months or

8   less.

9       Second, GTOs are frequently and presumptively confidential

10  unless FinCEN chooses to authorize publishing them.  So they

11  can be sent confidentially to a group of businesses who are

12  prohibited from commenting on them.  That type of setup would

13  not be possible if Congress intended it to be done pursuant to

14  notice and comment rulemaking, obviously.

15      And third, I think they are done in part to aid law

16  enforcement and intelligence collection purposes, kind of like

17  the reports in the Fifth Circuit case I cite in the brief,

18  which is *W.H. Smith*, which mandated -- there were some

19  mandatory reports within an entire state of a particular group

20  of businesses, and the Fifth Circuit found that did not require

21  notice and comment rulemaking under the circumstances.

22      On the Fourth Amendment, I don't feel like -- if the Court

23  has questions, I'm happy to go into them.  But our primary

24  position here is that, especially at the preliminary injunction

25  stage, the analysis can begin and end with the Supreme Court

1   decision in *California Bankers v. Shultz*.  It is about

2   reporting and recordkeeping requirements in the Bank Secrecy

3   Act, including Currency Transaction Reports, and concludes that

4   those are consistent with the Fourth Amendment because they're

5   described and limited in nature and reasonable under the

6   circumstances in light of threats found by Congress of money

7   laundering and attacks on the systems.

8          THE COURT:  How did Congress get involved in this and

9   whether it's reasonable or not?

10         MS. POWELL:  They made findings in the Bank Secrecy

11  Act about illicit actors engaged in money laundering and

12  abusing the U.S. financial system.  They also made findings

13  about drug cartels that are a part of the legislative

14  history -- well, I don't know if there's findings specific to

15  the GTO statute in the statute.  But there's findings in the

16  legislative history about how this is needed because of drug

17  cartels who are active in abusing the U.S. financial system in

18  particular.

19         THE COURT:  Okay.

20         MS. POWELL:  I could discuss additional cases here,

21  but I think I'd like to hold my discussion of the interests --

22  balancing of the interests and things until after we've heard

23  testimony.  Do you have any further questions about the merits

24  at this time?

25         THE COURT:  Well, there was -- you mentioned ultra

```
 1   vires, and there was another one that I'm now forgetting.
 2           MS. POWELL:  The non-delegation argument?
 3           THE COURT:  Yes.  Does that -- does that have to do
 4   with what you were just talking about, in terms of the notice
 5   and comment, or anything else you want to add about
 6   non-delegation?
 7           MS. POWELL:  Non-delegation doctrine generally
 8   requires that Congress constrain the executive's authority in
 9   some way with an intelligible principle.  There are multiple
10   constraints as well as an intelligible principle here within
11   the GTO statute.
12       It can only be used to impose recordkeeping and reporting
13   requirements.  It's got to be targeted at a business or group
14   of businesses.  It has to be tied to the purposes of the Bank
15   Secrecy Act, which are codified in the statute what those are.
16   It's subject to, you know, arbitrary and capricious review
17   under the APA, and it has to be limited in time and geographic
18   scope.  I think those are quite a lot of intelligible
19   principles and constraints on executive branch authority.
20           THE COURT:  All right.  Very well.  Thank you.
21       The motion to supplement the administrative record,
22   document number 50, is granted.
23       The proposal to have live witnesses is granted.  And,
24   therefore -- for purposes, if nothing else, to make a full
25   record.
```

1   So, Mr. Rowes, you may call your first witness.  Or

2  Ms. Sanz.

3       MR. ROWES:  Thank you, Your Honor.

4    We will -- the plaintiffs would like to call our first

5  witness, Mr. Isidro Salinas, please.

6       THE COURT:  All right.  If you'll come up, please,

7  sir.  All right.  Sir, if you'll raise your right hand, please.

8    *(The oath was administered)*

9       THE COURT:  All right.  You may be seated.

10   Counsel may proceed.

11      MR. ROWES:  Thank you, Your Honor.

12      THE COURT:  And pull the mic up to you once you --

13  yeah.  That's good.  So it picks up in the back.

14        ISIDRO SALINAS, PLAINTIFFS' WITNESS, SWORN

15                 DIRECT EXAMINATION

16  BY MR. ROWES:

17  Q.  Good morning, sir.  Would you state your name, please.

18  A.  Isidro Salinas.

19  Q.  And would you spell that for the court reporter.

20  A.  I-S-I-D-R-O.  Last name, Salinas, S-A-L-I-N-A-S.

21  Q.  And where do you work?

22  A.  I work at San Isidro Multi-Services in Hidalgo, Texas.

23  Q.  And is San Isidro Multi-Services an MSB?

24  A.  It is.

25  Q.  And "MSB" stands for money services business?

Isidro Salinas - Direct

1   A.  Correct.

2   Q.  Okay.  And San Isidro is a plaintiff in this case, correct?

3   A.  Correct.

4   Q.  Okay.  And where is it located?

5   A.  It is located -- we have three branches.  The main location

6   is located in Hidalgo, Texas, less than a mile from the

7   international bridge, crossing to Reynosa.  The second location

8   is in Pharr, Texas, less than half a mile from -- it's actually

9   right next door to the international bridge crossing.  And we

10  have a third location in McAllen.

11  Q.  Okay.  And what MSB services does Salinas do?

12  A.  So we solely offer currency exchange services.  We do not

13  offer remittances, check cashing, wire transfers.  We only do

14  cash-for-cash exchanges.  Aside from an MSB service, we also

15  offer nonresident auto insurance and Texas Lottery.

16  Q.  Okay.  But for MSBs, it's dollars to pesos?

17  A.  Dollars to pesos, pesos to dollars in cash.

18  Q.  Got it.  And what is your position?

19  A.  I'm the general manager.

20  Q.  And is it a family business?

21  A.  It is.

22  Q.  And how many family members work there?

23  A.  Currently, there's four family members.

24  Q.  And when did you start working there?

25  A.  I started working when I was 18, and I've been on and off

Isidro Salinas - Direct

1   since then.  So it's been about over 25 years.

2   Q.  And can you tell us your educational background.

3   A.  Sure.  I graduated with a -- with a degree in finance, and

4   then I obtained an MMB -- MBA.  So that's my --

5   Q.  And other than working at -- other than working at your

6   family business, where else have you worked?

7   A.  I've also worked at financial institutions, local banks in

8   the area.  I worked there for about six years or so.  Due to my

9   history or background in the MSB industry, I was able to be the

10  manager of the foreign exchange division.  So I was the head

11  trader for about four years, five years --

12  Q.  Okay.

13  A.  -- at that bank.

14      I left that bank to work for the Texas Department of

15  Banking at the non-depository division.  But I was -- I focused

16  more on the prepaid funeral contract side of it.

17  Q.  And then when did you go back to -- go back to working at

18  your family business?

19  A.  It was -- it was about in 2021 when I went back, just

20  because my parents needed help.

21  Q.  Okay.  And so I understand that your main location has a

22  drive-through; is that right?

23  A.  Correct.

24  Q.  And how many lanes do you have?

25  A.  We have three lanes.

Isidro Salinas - Direct

1  Q.  And so why do you have a drive-through at a money services

2  business?

3  A.  So we have a drive-through at the money services business

4  because, first off, customers are looking for speed,

5  reliability, and they want to exchange currency quick.  Why?

6  Because they're already on the go.  They either got out of work

7  and are heading to Mexico to either see the doctor, visit

8  family.  They want everything fast and quick.  They don't want

9  to get out of the car and have to wait in line or have family

10 members in the car, little kids.  They don't want to have to

11 get out of the car, bring them back in.  So it's convenience.

12 Q.  Okay.  So as a general manager, do you have access to

13 records about the kind of transactions, the number of

14 transactions you do?

15 A.  I do.

16 Q.  Okay.  And so did you do some research about the number of

17 transactions that your business did in 2024?

18 A.  I did, yes.

19 Q.  Okay.  How many CTRs did your business file in all of 2024?

20 A.  In all of 2024, we filed a total of 115 CTRs.

21 Q.  Okay.  So that's about ten a month?

22 A.  Correct.

23 Q.  Okay.  And are all of these CTRs for customers who come in

24 with over $10,000 in cash?

25 A.  No.  To that point, there are actually 95 CTRs that were

Isidro Salinas - Direct

1  conducted to replenish our inventory, our cash, meaning that we
2  had to go out and wholesale our dollars to purchase pesos for
3  our Hidalgo location.  So in reality, there was only 20 CTRs
4  that were customer -- real, true customer-based CTRs.
5  Q.  Okay.  So MSBs in the ZIP Codes near the border are
6  generating a lot of CTRs because they, themselves, have to buy
7  currency in bulk?
8  A.  Correct.  And to that point, we're actually -- we can view
9  it as a duplicate CTR, because the CTR -- the CTR -- the
10  business at -- the MSB that has to do the CTR is the one that
11  has the cash in.  But a couple of years ago, it came to light,
12  during an IRS Title 31 audit, that they would also require or
13  wanted to see the outgoing cash CTR.  So that's why both MSBs
14  are doing a CTR.
15  Q.  Okay.  So if I understand it, your family business buys
16  $15,000 worth of pesos wholesale, that's going to create two
17  CTRs --
18  A.  Correct.
19  Q.  -- for that one transaction --
20  A.  Correct.
21  Q.  -- in that ZIP Code?
22  A.  Correct.
23  Q.  Right.  But the actual number of customers who are doing
24  above $10,000 transactions is just about ten percent of your
25  CTRs?

Isidro Salinas - Direct

```
 1  A.  Correct.
 2  Q.  Okay.
 3          THE COURT:  So nine?
 4          MR. ROWES:  I think we said 95.
 5          THE WITNESS:  95 CTRs were for MSBs.  Twenty are for
 6  true customers.
 7          THE COURT:  Okay.  Twenty.  All right.
 8  BY MR. ROWES:
 9  Q.  Okay.  So you -- all right.  And did you -- so we figured
10  out that you do about one CTR per month for outside customers
11  in 2024, correct?
12  A.  Correct.
13  Q.  All right.  Did you look at how many transactions on
14  average you do -- you did a month in 2024 above $200?
15  A.  Yes.
16  Q.  Okay.  And how many did you do above $200 on average per
17  month in 2024?
18  A.  So on average per month it was 39,472 transactions.
19  Q.  Per month.  Not per year.
20  A.  Oh, per month?  3,288.
21  Q.  Okay.  So if the GTO had applied in 2024, in a month you
22  would have to do 3,288 CTRs?
23  A.  Correct.
24  Q.  But in 2024, under the existing rule, you had to do about
25  one per month?
```

Isidro Salinas - Direct

1  A.  Correct.

2  Q.  So it's an increase of, like, 3,288 times as many?

3  A.  Correct.

4          MR. GREEN:  Your Honor, I'm not sure if it's quite an

5  objection, but I just want to clarify for the record, is the

6  witness referring to a document?

7          THE WITNESS:  These are my calculations.  I have a

8  copy, if you'd like one.

9          THE COURT:  Okay.

10          MS. POWELL:  That'd be great.

11          MR. GREEN:  Yes, please.

12     *(Discussion off the record)*

13          THE COURT:  All right.  Go ahead.

14          MR. ROWES:  Thank you.

15  BY MR. ROWES:

16  Q.  And so about what fraction of your transactions in 2024

17  required a CTR?

18  A.  About 1,500.

19  Q.  One in 1,500?

20  A.  One in 1,500, right.

21  Q.  And if the GTO had applied, how many transactions would

22  require a CTR?

23  A.  Well, approximately one in four.

24  Q.  Okay.  Now, are you familiar with the process of filing

25  these CTRs?

Isidro Salinas - Direct

```
 1  A.  I am.
 2  Q.  Okay.  So I want to shift gears now from talking about the
 3  sheer number of CTRs that would increase, to just talking about
 4  the process of filing one.
 5      What do you -- what do you have to get from -- so we talked
 6  a little bit before how the business is sort of like a
 7  drive-through, where people want to race up, get in and out in
 8  a couple of minutes.  What kind of information do you have to
 9  get from a customer for a CTR?
10  A.  For a CTR, we have to obtain their personal identifying
11  information, which would be their driver's license, or ID,
12  passport, Social Security number, occupation.
13  Q.  Okay.  And if the -- if the customer is totally new to you,
14  how long does it take on the front end to that get that
15  information?
16  A.  On the front end, depending on the transaction amount, it
17  could take anywhere between five to ten minutes.
18  Q.  Okay.  Are you required to have anti-money laundering
19  training?
20  A.  Yes, we are.
21  Q.  And have you done it yourself?
22  A.  Yes.
23  Q.  And have you -- have your employees -- are they trained in
24  that?
25  A.  Yes, they are.
```

Isidro Salinas - Direct

1  Q.  And just really briefly, what does anti-money laundering
2  training -- money laundering training consist of?
3  A.  So anti-money laundering training, part of it consists of
4  knowing our customer, looking at transaction patterns, being
5  able to identify suspicious activity.
6  Q.  If somebody showed up with $15,000 in cash and wanted to
7  change it, didn't want to give their name or anything like
8  that, what would you do?
9  A.  We wouldn't be able to do that transaction.  We need the
10  information to conduct the transaction.  There's --
11  Q.  Do you also pay attention when there are small dollar
12  transactions?
13  A.  Yes, we do.
14  Q.  And what would you look out for, even if it were a
15  transaction under $10,000?  What would you look out for that
16  might be suspicious?
17  A.  Well, basic patterns, the frequency of the customer, what
18  their occupation is, to see if it ties, it matches to our
19  standards.  If he says he works at Walmart, well, does the
20  transaction amount kind of match his weekly salary?
21  Q.  So you're just paying attention in general to what's going
22  on?
23  A.  Yes.  Correct.
24  Q.  Okay.  I want to talk about -- we talked about the front
25  end, the customers rolling up.  I want to talk a little bit

Isidro Salinas - Direct

1  about the back end.  After you take that information for a CTR,

2  what do you do on the back end to fill it out and get it filed

3  with FinCEN?

4  A.  So on the back -- on the back end, we have one individual

5  that prepares the CTR.  They review the transaction.  They

6  draft up the CTR that's going to be submitted.  They prepare

7  all that documentation for my father or myself to review.  We

8  have two sets of eyes that review any transaction that needs to

9  be filed.

10     So they draft up the draft CTR, and then my father and I

11  review it, submit it, upload it to the system, and then couple

12  days later we go down -- we go on the system and download the

13  acknowledgment.

14  Q.  And why do you pay such careful attention on the back end

15  when you're filing the CTRs?

16  A.  Well, because we don't want any mistakes.  We don't want

17  anything misspelled, any numbers transposed.  We don't want to

18  have to go back into the system and submit an amended CTR.

19  Why?  Because we are routinely audited by the Texas Department

20  of Banking and also by the IRS for Title 31.

21          THE COURT:  How often are you audited?

22          THE WITNESS:  So for the Texas Department of Banking,

23  it's on a scaled rating of one to five, five being the worst.

24  So that would be less than 12 months, maybe even about six

25  months or so.  But we've always strived to be a one and two,

Isidro Salinas - Direct

1  which is strong and satisfactory.  So it's about an 18-month

2  cycle.

3          THE COURT:  And IRS?

4          THE WITNESS:  IRS, it's a little bit further out.

5  There's no -- I really don't know their schedule.

6          THE COURT:  Whenever they show up?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9          MR. ROWES:  That's probably an unhappy day for you.

10         THE WITNESS:  Correct.

11 BY MR. ROWES:

12 Q.  So let's just kind of put it all together.  So the

13 amount -- the amount of time, based on your experience, taking

14 the information from the customer and all the detailed work you

15 do on the back end, what is a realistic amount of time per CTR?

16 A.  So on the front end it would take about 15 minutes or so on

17 average.  On the back end, it would be approximately, about 30

18 minutes.  So in total, front and -- plus back end would be

19 about 45 minutes per transaction.

20 Q.  Okay.  And so if your -- if your volume of CTRs increases

21 from ten a month to 3,288 per month, at the amount of time per

22 CTR, do you have the capacity to handle that?

23 A.  We do not because we estimate that we would need about six

24 more -- six, seven employees per day to just focus on CTRs.  So

25 the cost, the knowledge, the space to have those employees, we

Isidro Salinas - Direct

1  just don't have it.

2  Q.  And is being an MSB a competitive business?

3  A.  It is.

4  Q.  Does it cost money to hire employees?

5  A.  It does.

6  Q.  And will that affect your ability to be competitive?

7  A.  It would.

8  Q.  Can you just hire anybody off the street to waltz in and do

9  CTRs for you?

10  A.  No, we don't.

11  Q.  Why not?

12  A.  Why?  Because they have to have the knowledge, and there's

13  a lot of risk involved in MSB, a lot of security.  There's a

14  lot of cash.  So we have to take all of that into account.  We

15  have -- we fingerprint our employees.

16  Q.  Okay.

17  A.  So --

18  Q.  Do they have to get training in anti-money laundering?

19  A.  Correct.  Yes.

20  Q.  And so it's not possible just to ramp up -- even if it were

21  financially possible to pay them, you can't just ramp up your

22  CTR processing in a matter of days or weeks?

23  A.  No.

24  Q.  So one of the assumptions in our conversation has been that

25  the number of people coming to your business isn't going to

Isidro Salinas - Direct

1  change under the $200 GTO.  But that's probably not realistic.

2  So I want to talk to you about how people are actually behaving

3  in the real world --

4  A.  Okay.

5  Q.  -- under the GTO.

6      So, you know, based on knowing your customers, are people

7  going to want to go through the whole rigmarole of doing a CTR

8  for a few hundred dollars?

9  A.  No.  The majority will not.

10  Q.  And how do you know that?

11  A.  Why?  Because we've currently been receiving customers from

12  other MSBs that are under -- that are not covered by the TRO,

13  in Hidalgo and at our Pharr location.  At our Pharr location we

14  cross the street, and there's an MSB that's having to comply.

15  So we've had customers come and ask us, hey, are you requiring

16  information for 200, $300?  And we told them, no, currently

17  we're not.  So we go and conduct those transactions.  So we've

18  seen it at both of the Hidalgo and Pharr locations.

19  Q.  So you know the customers are changing their behavior based

20  on the GTO?

21  A.  Yes.  Correct.  Yes.

22  Q.  Do you think customers will want to give their private

23  Social Security number and everything just for a small dollar

24  transaction?

25  A.  No, they would not.  They're very hesitant.  They're afraid

Isidro Salinas - Direct

```
 1  of identity theft.  So they're hesitant.
 2  Q.  Are there -- you mentioned you have a location in McAllen,
 3  right?
 4  A.  Correct.
 5  Q.  And are there ZIP Codes in McAllen that are not targeted by
 6  the GTO?
 7  A.  There are.
 8  Q.  And how far from your McAllen location is an MSB that is
 9  not subject to the GTO?
10  A.  So there's an MSB about half -- less than half a mile north
11  of us.
12  Q.  Okay.
13  A.  Basically just crossing the interstate.
14  Q.  So someone can drive for two or three minutes past your
15  McAllen location and go to a location where the GTO doesn't
16  apply?
17  A.  Right.  Correct.
18  Q.  And it's been your experience, because you're protected by
19  the TRO, that people do, in fact, drive a few minutes to a
20  different location, right?
21  A.  It has, yes.
22        THE COURT:  So let me -- while we're on that point,
23  someone on the Texas side wants to go to Reynosa, shop, eat
24  dinner, whatever it may be, and they don't want to do business
25  with someone having to do all this.  They take $300 in cash and
```

Isidro Salinas - Direct

```
 1   go across.  Can they change dollars to pesos on the other side?
 2          THE WITNESS:  They can, Your Honor.  And there is over
 3   a hundred MSBs on the other side.
 4          THE COURT:  Okay.  Probably not regulated?
 5          THE WITNESS:  They are to a certain point.
 6          THE COURT:  Okay.
 7          THE WITNESS:  I don't -- I'm not too familiar with
 8   their regulations.
 9          THE COURT:  Okay.  All right.  Go ahead.
10          MR. ROWES:  Thank you, Your Honor.
11   BY MR. ROWES:
12   Q.  And in addition to being able to just go across the border
13   and change your money there, what about at banks?
14   A.  At our Hidalgo location there is an IBC Bank right before
15   you cross into Mexico, as well in McAllen.  In McAllen, there's
16   one a block south from our McAllen location, and they do
17   exchange -- foreign exchange for pesos to dollars, dollars to
18   pesos for noncustomers.  They do have a threshold, though.  But
19   it is a low -- they do do that.  I've seen it personally at
20   the -- at the mall.
21   Q.  Okay.  So, in fact, banks are changing dollars to pesos for
22   noncustomers?
23   A.  They are.  Plus, IBC has been ramping up their marketing to
24   disclose that and to advertise that they're exchanging pesos --
25   or they have those services available.
```

Isidro Salinas - Direct

```
 1              THE COURT:  Do they say anything about not having to
 2    do all these disclosures?
 3              THE WITNESS:  I have not seen that, Judge.
 4              THE COURT:  Okay.  All right.  And then one other --
 5    while I'm thinking of it, on this point, people in Mexico want
 6    to come across and shop in the -- in Texas, and they bring
 7    pesos to get dollars, to your store.  If the GTO were in force,
 8    would those transactions have to be reported by CTR?
 9              THE WITNESS:  They would if they meet the threshold
10    limit.
11              THE COURT:  Okay.  All right.  But we won't get into
12    laundering pesos.  But I think the money's going that way, not
13    this way.  The drugs coming this way, the money and the guns
14    going that way.  You know, I've seen it a lot.  In fact, I
15    remembered two cases, one, these well-to-do Mexican college
16    students who had access to a private plane, and they were
17    taking all kind of cash back to Mexico.  Of course, they got
18    caught.  And then either a dentist -- I think it was a dentist
19    I had years ago, had his patients pay in cash, and he would
20    deposit $9,999, and got caught.
21         Go ahead.
22              MR. ROWES:  Thank you, Your Honor.
23    BY MR. ROWES:
24    Q.  I just have one last question for you, Mr. Salinas.  What
25    are the impacts on your business if you -- if the TRO expires,
```

Isidro Salinas - Direct

1    if Your Honor doesn't put in a PI, what will happen?

2    A.  So basically we would eventually have to close down.  We

3    don't have the capacity to meet with the GTO guidelines due to

4    the employment costs.  We're going to lose customers, which is

5    the most important part.  Customers are not going to want to

6    wait in line to cash -- in the drive-throughs to cash their

7    currency.  They're just going to either go to a ZIP Code that's

8    not covered.

9        In our case, in Hidalgo, they would go to Mexico.  They'd

10   have that option.  They're already headed that way.  So they

11   can to their business in Mexico.  And the customers that are

12   coming from Mexico to the United States, they would either

13   also -- before traveling to the United States, they would do

14   their business in Mexico and already come with their U.S.

15   dollars.

16   Q.  Okay.  And if a customer leaves your business, you're not

17   filing a CTR, right?

18   A.  If he leaves the business?  No, we're not.

19   Q.  And if you go out of business, you're not filing CTRs, are

20   you?

21   A.  Correct.  We're not.

22            MR. ROWES:  Okay.  No further questions.

23            THE COURT:  Cross.

24

25

Isidro Salinas - Cross

```
 1                    CROSS-EXAMINATION
 2   BY MR. GREEN:
 3   Q.  Good morning, sir.
 4   A.  Good morning.
 5   Q.  San Isidro only does currency exchange?
 6   A.  Correct.
 7   Q.  You mentioned that you have three locations?
 8   A.  Correct.
 9   Q.  Do you always work at the same location?
10   A.  No, I do not.
11   Q.  Do you -- so you move around?
12   A.  Correct.
13   Q.  Is there a certain schedule or pattern that you follow?
14   A.  There is not.
15   Q.  What about your father?
16   A.  My father does not also necessarily follow a specific
17   schedule.
18   Q.  Do all of the branches have the same hours?
19   A.  No, they do not.
20   Q.  What are the hours -- well, can you give me the hours of
21   each branch?
22   A.  Correct.  So our main location is open 24 hours.  The
23   reason is because the international bridge is open 24 hours.
24   So we service customers there 24 hours a day.
25       Our McAllen location is open Monday through Saturday from
```

Isidro Salinas - Cross

1  9:00 to 8:00 and Sunday from 9:00 to 7:00.

2      The Pharr location is open from 6:00 a.m. to 7:00 p.m.,

3  Monday through Saturday, and on Sunday as well.

4  Q.  How many people typically work at the Hidalgo location?

5  A.  Well, we have a total of 15 employees so --

6  Q.  And --

7  A.  So we have two employees per shift at our Hidalgo location.

8  Except overnight, it's only one employee.

9  Q.  Okay.  So at any time at the Hidalgo location there's two

10  people --

11  A.  Two tellers.

12  Q.  Two tellers?

13  A.  Two tellers.

14  Q.  What about additional employees?

15  A.  We have an additional office assistant that's there every

16  day except for Saturday and Sunday.

17  Q.  So would that be three people working at the Hidalgo

18  location?

19  A.  Approximately, yes, plus my father and myself.

20  Q.  Okay.  When you're working at that location?

21  A.  Correct.

22  Q.  Or when he is working at that location?

23  A.  Correct.

24  Q.  And then you mentioned overnight, there's one fewer person;

25  is that right?

Case 3:25-cv-02886-DLB   Document 471   Filed 05/14/25   Page 62 of 248
Case 3:25-cv-02886-DLB   Document 471   Filed 05/14/25   Page 64 of 248
65 of 248
Isidro Salinas - Cross

1  A.  Correct.  There's one individual.

2  Q.  So at the Hidalgo location, at any time, 24 hours a day,

3  there's at least two people?

4  A.  Except at night, there's only one.

5  Q.  Okay.  Only one teller?

6  A.  Only one teller at night.

7  Q.  And no one in the office?

8  A.  No.  Correct.

9  Q.  All right.  What about the Pharr location?  How many people

10  work at that --

11  A.  Pharr location, there's one individual per shift.

12  Q.  And that's a teller?

13  A.  Correct.  One teller.

14  Q.  Also an office person, or not?

15  A.  No.

16  Q.  So at the Pharr location, from 6:00 a.m. to 7:00 p.m.,

17  there's just one person?

18  A.  Correct.

19  Q.  What about McAllen?

20  A.  As well, one individual.

21  Q.  Okay.  Except when you're working there?

22  A.  Correct.

23  Q.  Or when your father's working there?

24  A.  Correct.

25  Q.  You described briefly the process of conducting a

Isidro Salinas - Cross

1  transaction, getting information from a customer and then, if

2  required, generating a CTR.  You described -- did I note

3  correctly that it takes 10 to 15 minutes to get the information

4  from a customer for a transaction?

5  A.  On the front end, yes, it could take anywhere from five to

6  ten minutes to do the whole transaction, counting the currency,

7  obtaining the information, speaking to the customer, if he's

8  new.  If he's not new, then it could be a little bit quicker.

9  But in general, yes, it's about five to ten minutes.

10 Q.  Okay.  For particularly the Hidalgo location that's open 24

11 hours, is there a busy time at that location?

12 A.  Yes --

13 Q.  What --

14 A.  -- there are.  There are peak times on the weekends, in the

15 morning, early in the morning.  On Friday afternoons, Thursday

16 afternoons, those are usual peak times, when individuals leave

17 work and are headed either across the border.  So yeah, there

18 are -- there are peak times.

19 Q.  What about slow time?

20 A.  As well, there are also slow times during the day.

21 Q.  What are typically the slow times at that location?

22 A.  At that location, during the week, anywhere between before

23 lunch and after lunch would be typical slow times.

24 Q.  Okay.  What about the Pharr location, typical slow time?

25 A.  As well.  Pharr is a little peculiar because they -- the

Isidro Salinas - Cross

```
 1   international bridge changed their hours of operation for

 2   passenger vehicles.  They now focus more on freight

 3   transportation.

 4       So at the Pharr location in the morning it's from 6:00 to

 5   8:00 a.m.  And the afternoons, it's about, approximately from

 6   4:00 in the afternoon to 6:00 p.m.

 7   Q.  And does most of the business at the Pharr location come

 8   from noncommercial traffic over the international bridge?

 9   A.  Correct.

10   Q.  And do you know what the hours are for that noncommercial

11   traffic over that international bridge?

12   A.  For the noncommercial, from 6:00 a.m. in the morning till

13   8:00, that's when the bridge is open.  And --

14   Q.  Two hours?

15   A.  Correct.

16   Q.  Okay.

17   A.  For individuals coming from Mexico to the United States.

18   Q.  Got it.

19   A.  So from the United States to Mexico, it's open all day.

20   Q.  But for the business that -- well, would you say that more

21   of your business comes from people coming from Mexico to the

22   United States or vice versa?

23   A.  At our -- at our Pharr location?

24   Q.  At the Pharr location, yes.

25   A.  At our Pharr location, you are correct.  Most of the
```

Isidro Salinas - Cross

1  business is from customers coming from Mexico to the

2  United States to purchase dollars.

3  Q.  Got it.

4      So would it be fair to say that, at the Pharr location, the

5  predictable busy time would be related to that two-hour

6  window --

7  A.  Correct.

8  Q.  -- every morning?

9  A.  Correct.  In the morning and in the afternoon.

10  Q.  Okay.  And what's the afternoon time?  I'm sorry.

11  A.  In the afternoons it's approximately from 4:00 to 6:00 in

12  the afternoon as well.

13  Q.  Okay.  Now let's talk about McAllen.  Is there a

14  predictable slow time at the McAllen location?

15  A.  There are.  Primarily before 11:00 it's usually slow, and

16  then it starts picking up when individuals go -- start to go

17  shopping and -- because we're right next to the -- to the mall.

18  Q.  Okay.  So the first couple of hours that that location's

19  open tend to be pretty slow?

20  A.  Correct.  Correct.

21  Q.  And then you say it picks up when people go shopping.  How

22  long does that busy period last, roughly?

23  A.  Between 11:00 and 4:00 in the afternoon, more or less.

24  Q.  Okay.  And then from 4:00 in the afternoon until it closes

25  at 8:00, except at 7:00 on Sundays, is it typically pretty

Isidro Salinas - Cross

```
 1  slow?
 2  A.  Correct.
 3  Q.  Got it.
 4      San Isidro has a license from the Texas Department of
 5  Banking to do currency exchange; is that right?
 6  A.  Correct.
 7  Q.  And there was a cost associated with obtaining that
 8  license?
 9  A.  Correct.
10  Q.  And there's an annual cost associated with renewing it; is
11  that right?
12  A.  Correct.
13  Q.  There are certain regulatory costs that just come with your
14  business?
15  A.  Correct.
16  Q.  What is the annual cost to renew that license, by the way?
17  A.  I don't know that information off the top of my head.
18  Q.  Okay.  San Isidro is required to maintain an AML compliance
19  program; is that right?
20  A.  Correct.
21  Q.  What does that program consist of?
22  A.  It consists of five pillars, which is policy and
23  procedures.  We have to designate a compliance officer.  We
24  also have to have training.  We have to have an internal audit,
25  and we also have to have the customer due diligence, knowing
```

Isidro Salinas - Cross

1  our customer, the KYC.

2  Q.  Who is compliance officer?

3  A.  He's an individual that's been working for the family

4  business for over 20 years.

5  Q.  Okay.  That's not necessarily the person who does CTRs, is

6  that right, if I understand your testimony?

7  A.  He does not necessarily file them -- or submit them to the

8  FinCEN website.  But he also is involved in that process.

9  Q.  So in a typical transaction where a CTR is generated from

10  San Isidro, would it be correct that the teller is the employee

11  who's obtaining information from the customer?

12  A.  Correct.

13  Q.  And then some other person is entering information into a

14  CTR form; is that right?

15  A.  Correct.

16  Q.  Would that be an employee in the back office?

17  A.  That's the office assistant.

18  Q.  And is there any technology or any -- can you tell me what

19  format the CTRs are prepared and submitted in?

20  A.  Sure.  They are submitted -- or they're drafted up on the

21  PDF version that's on the FinCEN website.

22  Q.  That's a PDF that's, like, four or five pages?

23  A.  Correct.  Depending on the transaction details, yes, that's

24  correct.

25  Q.  Okay.  And then what happens -- so after that form is

Isidro Salinas - Cross

1  completed, I think you said that you or your father then review

2  it?

3  A.  Correct.

4  Q.  And you're doublechecking the information in it?

5  A.  Correct.

6  Q.  Is there certain information that you can't confirm if you

7  weren't the one who did the transaction?

8  A.  No.  We can confirm all the information that we have

9  because we have a copy of the individual's license, and we have

10 a document where they fill out their Social Security number.

11 Q.  And then you have a separate transaction record --

12 A.  Correct.

13 Q.  -- that you can cross-check the information about cash in,

14 cash out?

15 A.  Correct.  Correct.  That's generated on the system itself.

16 We do have a software that does that for us.

17 Q.  Okay.  What is that software called?

18 A.  It's a -- it's a custom software that we came up with.

19 Q.  Okay.  Something --

20 A.  It's not something that we went out and purchased from a --

21 from a random company out there.  It's something that was

22 custom made.

23 Q.  And what information does that software capture for each

24 transaction that San Isidro conducts?

25 A.  So it captures the -- if we're going to purchase dollars,

Isidro Salinas - Cross

1    it captures the dollar amount.  It tells you the equivalent in
2    Mexican pesos.  It gives you the exchange rate.  Now, if it's
3    over a thousand dollars, it also would capture the customer's
4    information.
5    Q.  Okay.  So for every transaction that's over a thousand
6    dollars, you're required to collect customer information
7    already?
8    A.  Correct.
9    Q.  That's not a new requirement imposed by this GTO, right?
10   A.  Correct.
11   Q.  That's a requirement that's associated with your state
12   licensing to do currency exchange, right?
13   A.  Correct.
14   Q.  And what happens to that information, that customer
15   identifying information for every transaction over a thousand
16   dollars?
17   A.  So that information is stored in our database, and it is
18   reviewed by the Texas Department of Banking and the IRS when
19   they come and conduct their routine audits.
20   Q.  Okay.  So customer identifying information is already going
21   to state and federal regulators for every transaction that
22   San Isidro does over a thousand dollars; is that right?
23   A.  Correct.
24   Q.  I think you said in your declaration that there are certain
25   transactions between 200 and a thousand dollars that don't

Isidro Salinas - Cross

```
1   require you to obtain any information from the customer; is
2   that right?
3   A.  That is correct.
4   Q.  For those transactions there are records that have to be
5   created of the transaction that are available to state
6   regulators; is that right?
7   A.  That is correct.
8   Q.  What information has to be captured and preserved for state
9   regulators for those transactions between 200 and $1,000?
10  A.  It's basically the dollar amount that's exchanged, the
11  equivalent of the foreign currency, the exchange rate, the date
12  and time, the teller that conducted the transaction so that
13  that information is there.
14  Q.  Okay.  Now, for transactions that are in that range,
15  between 200 and 1,000, typically the state licensing
16  requirements don't require you to collect customer identifying
17  information for those transactions.  But what if there are
18  multiple transactions that, combined, would exceed that $1,000
19  threshold that are conducted by one customer on one day?
20  A.  So that's almost impossible for it to happen, especially if
21  it's a low dollar amount.
22  Q.  Oh, so it would be impossible for multiple transactions by
23  one customer in one day to combine to exceed a thousand
24  dollars?
25  A.  It's not common.
```

Isidro Salinas - Cross

1  Q.  It's not common?

2  A.  It's not common.

3  Q.  If it does happen, does that change the answer about

4  whether that customer's identifying information needs to be

5  captured so that it can be reviewed by state and federal

6  regulators?

7  A.  That is correct.  If that happens, we do come across and we

8  capture the information, we tell the individual, you know what?

9  You were here this morning.  You already exchanged $900, and

10  now you want to exchange 900 more.  That meets the threshold,

11  and we need to obtain that information in order for us to

12  conduct that transaction.

13  Q.  Okay.  If the first part of that sort of combined

14  transaction happens in the morning, for example, and the second

15  part happens in the afternoon, is it possible that different

16  employees might be working at that time?

17  A.  It's possible that different employees are working there at

18  that time.  But typically at our Hidalgo location there's --

19  the second teller that's there is usually there all day,

20  morning, in the afternoon.  So it's -- there's at least one

21  individual throughout the day that's been there since the

22  morning.

23  Q.  Okay.  But if there's not a record that's being kept of the

24  identity of the customer that comes early in the day, how does

25  the staff know if that same customer returns later in the day

Isidro Salinas - Cross

1  and conducts an additional transaction that then triggers that
2  reporting requirement?
3  A.  Well, that would be kind of difficult to keep record of or
4  to identify.  The same would happen if the customer goes to the
5  bank, to IBC, and they exchange the currency below the
6  threshold, and they go back later that day and exchange another
7  amount.  So it's fairly hard.
8  Q.  Okay.  In any event, the obligation to maintain that
9  customer identifying information for every transaction above
10 $1,000, that's not new, right?
11 A.  Correct.
12 Q.  And this risk that you run that even transactions below
13 that threshold might implicate the need to collect that
14 information, that's also not new, is it?
15 A.  Correct.
16 Q.  What about Suspicious Activity Reports?  Those are
17 required -- or those are recommended to be filed by FinCEN; is
18 that right?
19 A.  That is correct.
20 Q.  Who does those?
21 A.  We also do those at the office, at the back office.  So we
22 review the transaction.  We review the customer's history,
23 their frequency, how well we know each customer.  And we make
24 an analysis and determine if there's any qualifying
25 transactions to be filed as suspicious.

Isidro Salinas - Cross

```
 1   Q.  And you say it's someone in the back office who's reviewing
 2   to determine if transactions are suspicious?
 3   A.  Correct.
 4   Q.  What about the tellers?  Do they trigger if something looks
 5   suspicious?  Do they have any role to play in this?
 6   A.  Yes, they do.
 7   Q.  What is that?
 8   A.  Their role is to escalate the situation and let us know.
 9   They let the office assistant know.  They let the compliance
10   officer know, and they let my father and myself know as well.
11   Q.  Okay.  And then, finally, what about specially designated
12   nationals by the Office of Foreign Assets Control, sanctioned
13   people?  Is there any mechanism that San Isidro uses to verify
14   that a customer isn't on that list?
15   A.  Yes, we do.  We have a mechanism.  Our software determines
16   that, runs the customer's information through that database.
17   And if one -- if there is a hit, it alerts us, and at that time
18   we make the determination.
19   Q.  Is that possible, that there's a transaction that the
20   customer's information isn't being collected for?
21   A.  No.  We don't have any information to run it through.  So
22   no.
23   Q.  Right.
24        Let's look at an actual CTR form.  Could we bring up a
25   document on the screen, Exhibit 29-2.  And let's look at the
```

Isidro Salinas - Cross

```
 1  next page, please.
 2      Okay.  Does this look like the Currency Transaction Report
 3  that you would review in the back office?
 4  A.  It does.
 5  Q.  Okay.  It's a five-page form in total; is that right?
 6  A.  Initially, it is a five-page.  It just depends on the
 7  transaction detail.  It could incremental a couple more pages.
 8  Q.  Okay.  So this is Page 1.  I see a field that's labeled
 9  "filing name."
10  A.  Correct.
11  Q.  What goes in that field?
12  A.  So in that field we generate -- or we enter the specific
13  name for that file or for that CTR, somewhere where you can
14  reference back.
15  Q.  Okay.  So it's a name for the transaction?
16  A.  Correct.
17  Q.  Okay.  Otherwise, you check a box, you enter a name for the
18  transaction.  Are you done with Page 1?
19  A.  Page 1, that is correct.
20  Q.  Okay.  Let's look at the next page, please.
21      The label at the top of this page is "filing institution
22  contact information."  What goes in this -- on this page?
23  A.  On this -- on this page it's the filing institution's name.
24  In this case it would be our headquarters information.
25  Q.  Okay.  And let's zoom out to view the whole page.  Is all
```

Isidro Salinas - Cross

```
 1  of this the same for every CTR?
 2  A.  Yes.
 3  Q.  Okay.  Let's look at the third page.  "Transaction
 4  location"; is that right?
 5  A.  Yes.
 6  Q.  Okay.  At the bottom of this page, there's boxes 41 and 42.
 7  That's cash in and cash out, right?
 8  A.  Correct.
 9  Q.  That's different for every transaction?
10  A.  Correct.
11  Q.  Other than that, is everything on this page the same for
12  the location where that transaction's conducted?
13  A.  Well, the location could change.  It could either be
14  McAllen, Pharr or Hidalgo in our case.
15  Q.  Right.  So for your business, it's always going to be one
16  of those three?
17  A.  Correct.
18  Q.  And for every transaction at that location, Page 3 is
19  always the same?
20  A.  Yes.
21  Q.  Except for cash in, cash out at the bottom?
22  A.  Correct.
23  Q.  All right.  Let's look at the next page, please.  Person
24  involved in transaction, this is unique to the transaction,
25  right?
```

Isidro Salinas - Cross

1  A.  Correct.

2  Q.  We've got the individual's name.  We've got some fields

3  there in white but not in yellow.  What do you understand that

4  to mean?

5  A.  The fields in yellow are required, and the fields that are

6  not yellow are optional.  That's my understanding.

7  Q.  Okay.  So for the yellow fields that are required, we have

8  information in field 2 about who's conducting the transaction,

9  on whose behalf they're doing it for and whether they're a

10  common carrier.  What does "common carrier" mean here?

11  A.  I'm not familiar with that term.  I would have the --

12  because we're not -- we don't do those type of transactions.

13  We primarily focus on A, B and C.

14  Q.  Okay.  We've got individual's name, individual's address.

15  "TIN," is that also where you would put a Social Security

16  number?

17  A.  Correct.

18  Q.  Date of birth.  Of all of that information, is that

19  information that, for a transaction over a thousand dollars,

20  you would have to collect anyway?

21  A.  Correct.

22  Q.  Okay.  And let's zoom out and make sure we're not missing

23  anything at the bottom of that form.  We've got driver's

24  license information, including country, issuing state.  Is that

25  also information that you would have had to obtain already for

Isidro Salinas - Cross

1  every transaction over a thousand dollars?

2  A.  Correct.

3  Q.  Okay.  So let's zoom back out and look at this whole page.

4  Is there anything on this page that you wouldn't have already

5  had to obtain for every transaction over a thousand dollars?

6  A.  No.

7  Q.  And you already would have had to obtain it in the cases we

8  discussed of one customer on one day who does multiple

9  transactions that add up to more than a thousand dollars; is

10  that right?

11  A.  Correct.

12  Q.  All right.  Let's look at the last page, please.  Date of

13  transaction and then information about cash in and cash out; is

14  that right?

15  A.  Correct.

16  Q.  Is this information -- and let's zoom out and look at the

17  whole page.  Is there any information on this form that you

18  don't already have to document for every transaction that

19  San Isidro does?

20  A.  We already have that information.

21  Q.  Okay.  And that's required by the Texas Department of

22  Banking, right?

23  A.  Correct.

24  Q.  Okay.  Let's go ahead and take this form down, please.

25      You say -- you said in your declaration that 25 percent of

Isidro Salinas - Cross

1  San Isidro's transactions are for more than $200?

2  A.  Correct.

3  Q.  Do you have an estimate about the number of those

4  transactions that are between 200 and $1,000?

5  A.  I do.  It drops down to about 24 percent.

6  Q.  Okay.  Do you mean that 24 percent of San Isidro's

7  transactions are within that range, 200 to 1,000?

8  A.  Correct.

9  Q.  Okay.  As far as the impact of this GTO, 75 percent of

10  San Isidro's transactions are for less than $200; is that

11  right?

12  A.  Either less than $200 or above 10,000.

13  Q.  I see.  So would you agree then that 75 percent of

14  San Isidro's transactions are not affected by this GTO?

15  A.  Yes.  But a great part of that 75 percent has to do with

16  MSB-to-MSB transactions.

17  Q.  I'm not sure I follow that.

18  A.  That those are the ones where we have to go out and sell

19  our wholesale dollars to replenish our inventory.

20  Q.  Okay.  So those are CTRs that -- as you were describing in

21  your earlier testimony, that don't indicate a customer doing a

22  transaction at an MSB?

23  A.  Correct.  And I don't know what percentage of the 75

24  percent those transactions are.

25  Q.  Okay.  You talked about, in terms of doing a transaction,

Isidro Salinas - Cross

1  preparing a CTR, reviewing it and submitting it, a front end
2  and a back end.  The front end is collecting information from
3  the customer, right?
4  A.  Correct.
5  Q.  The back end is you or your father in the back office,
6  reviewing the CTR?
7  A.  Correct.
8  Q.  Now, you're cautious about reviewing the CTR.  But that's
9  not a requirement from FinCEN, that you rereview every CTR, is
10 it?
11 A.  It's not.  But based on my background and based on our
12 experience, it's a recommendation that's been made by Texas
13 Department of Banking examiners, because the more proactive
14 approach we take, the better our exams or our routine audits
15 go.  We don't want any negative comments on our -- on our
16 reports.  And so we don't want a comment on there that say,
17 okay, they filed a hundred CTRs.  But out those hundred, fifty
18 had to be amended.  We don't -- we don't want those negative
19 comments on there.
20 Q.  Okay.  Yeah.  There was also a reference in your earlier
21 testimony, I think, to potential criminal penalties related to
22 CTRs.
23 A.  That is correct.
24 Q.  Do you have any understanding of the meaning of penalties
25 for willful failure to comply or complete a CTR?  Do you --

Isidro Salinas - Cross

 1  just asking your layperson's understanding.  What does that

 2  mean to you, "willful"?

 3  A.  Willful is something that's done intentional.

 4  Q.  San Isidro developed its own software to capture the

 5  transaction information required by the Texas Department of

 6  Banking?

 7  A.  Correct.

 8  Q.  Have you explored at all what options are available to

 9  automate the process of completing CTRs?

10  A.  We have, and we are currently still working on that

11  process.  It's about a two-, three-stage process.  We have a

12  front end.  We're capturing the customer's information,

13  lowering the threshold to the required amount.

14      The second part would be adding a software or, like, a

15  scanner, where it's going to be able to obtain that

16  information, capture -- instead of having to actually go to the

17  copier and make a copy, it'll just make a copy for us on the

18  screen.

19      And on the back end we are also -- the last stage would be

20  exploring the batch filing.  But that's a little bit more

21  complex.  That's my understanding from our software engineer.

22  So we are exploring processes.

23  Q.  So when you refer to batch filing, does that mean that

24  San Isidro is considering developing a new software platform

25  internally to perform that batch filing --

Isidro Salinas - Cross

1   A.  Correct.

2   Q.  -- rather than purchasing it from a vendor?

3   A.  Yes.

4   Q.  Okay.  Have you gotten any quotes or estimates from vendors

5   about what that technology would cost?

6   A.  Speaking to our -- to our software engineer, he estimates

7   anywhere between -- for the whole process, anywhere between

8   6,000 to $12,000.  He doesn't have an exact number, but he's

9   breaking it down on stages.  So that's a rough estimate.

10  Q.  And would that be an annual cost?  Or what does that 6-

11  to -- I'm sorry.  You said 6- to $12,000?

12  A.  Correct.

13  Q.  How often is that?

14  A.  Well, that's just the development of the software -- of the

15  upgrades.  The annual cost is something that's set aside.  We

16  haven't even discussed that.  We're just trying to push it to

17  get that upgrade made available.

18      But that's -- to us, that's subsequent.  The most important

19  part is that we are going to lose the customers.  The customers

20  don't want to wait in line for such a low threshold.  And once

21  we lose that customer, we're not going to have them back.  Our

22  fixed expenses are remaining the same, and we're losing that

23  customer.  So our volume's going to go down.  So lowering our

24  volume and keeping the same amount of expenses is just running

25  us out of business.

Isidro Salinas - Cross

1  Q.  Now, the GTO, at least at this point in time, is for 180
2  days; is that right?
3  A.  That is correct.  But it's also -- it can be renewed.
4  Q.  It can be renewed, yes.
5       MR. GREEN:  All right.  Pass the witness.
6       THE COURT:  All right.  Before I hear redirect, let me
7  ask you, while I'm thinking about it.  So in a given year, your
8  three locations process how many transactions, both pesos to
9  dollars, dollars to pesos?
10       THE WITNESS:  Total transactions is approximately
11  160,000 transactions.
12       THE COURT:  160,000.  Okay.  How many of those are
13  10,000-or-more customers, not wholesale purchase by you all?
14       THE WITNESS:  I don't have that information at hand.
15       THE COURT:  Okay.
16       THE WITNESS:  I can get it to you.
17       THE COURT:  All right.  Well, that's fine.
18    How many -- percentage, how many of the transactions of
19  160,000 would probably be between one dollar and 300 or --
20       THE WITNESS:  I would --
21       THE COURT:  -- something in that range?
22       THE WITNESS:  I would probably estimate maybe about --
23  anywhere between 40 percent, maybe.
24       THE COURT:  Okay.
25       THE WITNESS:  Maybe.  I don't have a hard number.

Isidro Salinas - Cross

1          THE COURT:  So a thousand and over, that Mr. Green was
2    examining you about, is ten percent?
3          THE WITNESS:  A thousand and over?  I don't have that
4    number, Your Honor, as well.
5          THE COURT:  Okay.  But less than the up to 3- or 400?
6          THE WITNESS:  3- to 400, I don't have those specific
7    numbers.  I'm sorry.
8          THE COURT:  Okay.  But relatively speaking, you get
9    more volume at the -- or do you get more volume in the up to
10   $400 range as opposed to a thousand and over?
11         THE WITNESS:  Correct.  You are correct.
12         THE COURT:  Okay.  Shopping.
13         THE WITNESS:  Yes.
14         THE COURT:  Going across to eat dinner.
15         THE WITNESS:  Correct.  Because we service the average
16   individual, just hard-working class.
17         THE COURT:  Okay.  Paychecks or not?
18         THE WITNESS:  We don't do -- we don't cash paychecks.
19   But are individuals that either just withdrew their funds for
20   their weekly salary, cashed their check somewhere else and come
21   and exchange it with us.
22         THE COURT:  All right.  And then one other question,
23   subject to I might have some more, but for right now --
24         THE WITNESS:  Yes.
25         THE COURT:  -- are you able to quantify -- you alluded

Isidro Salinas - Cross

```
 1  in your direct testimony about, you've seen anecdotal examples
 2  of people going to a casa de cambio where they were going to
 3  have to do this, and then coming to you, so you don't have --
 4  because you're covered by the TRO.
 5            THE WITNESS:  Correct.
 6            THE COURT:  Is that -- the volume of that significant?
 7            THE WITNESS:  I would say it is.  In any given shift,
 8  it can be about two to three individuals.
 9            THE COURT:  Okay.
10            THE WITNESS:  So it is.  It is considerable.
11            THE COURT:  And of course you're not at the front?
12            THE WITNESS:  No.
13            THE COURT:  So you wouldn't know all of them?
14            THE WITNESS:  Not all of them.
15            THE COURT:  Okay.  All right.  Anything else,
16  Mr. Rowes?
17            MR. ROWES:  Just a few.  Just a few followup
18  questions.
19       Do you mind if we look at that exhibit again, the CTR, the
20  very first -- very first page, please.  I think it was -- you
21  called it 29-2 or something like that.  And just on the first
22  page.  Not this page, but the actual first page of the CTR.
23  And in the bottom, can you zoom up on this Paperwork Reduction
24  Act notice, please.  All right.  I'm going to just put a little
25  red line under here.  Whoops.  Is it working?  It's working.
```

Isidro Salinas - Redirect

```
 1        So I don't -- I don't know if you can make that out, Your
 2   Honor.  It's a little bit blurry.
 3             THE COURT:  I see it.
 4                    REDIRECT EXAMINATION
 5   BY MR. ROWES:
 6   Q.  But it estimates that the average -- can you see that,
 7   Mr. Salinas --
 8   A.  Yes.
 9   Q.  -- where it estimates the average time is 40 minutes per
10   response for a CTR?
11   A.  Correct.
12   Q.  And so when you -- when you say that you think it takes
13   about 30 minutes, based on your experience, to do the CTRs
14   start to finish, that's consistent with what the federal
15   government is saying on its own CTR form, correct?
16   A.  It is.  If not, we do it a little bit quicker.  But yes, it
17   is consistent.
18   Q.  Mr. Green mentioned the possibility of someone structuring
19   their transactions to avoid, say, the $1,000 threshold.  I'm
20   going to bring you $900 at 9:00 a.m.  I'm going to bring you
21   $900 at noon.  I'm going to bring you $900 at 3:00 p.m.  Is
22   that legal?
23   A.  No, it's not legal.
24   Q.  Why isn't it legal?
25   A.  Because it's structuring.  You can't -- you have to obtain
```

Isidro Salinas - Redirect

1  that information, and we would have to file a SAR.

2  Q.  Okay.  And so, in other words, if somebody came in and was

3  giving you transactions in order the avoid the reporting

4  requirement, you don't just take down their information and

5  say, hey, thanks, I just needed to get your information.

6      Tell me what you do.

7  A.  No.  We do -- they notify us at our -- if this happens at

8  our McAllen location and in the event that we're not there, the

9  teller lets us know, this is what's going on with this

10  situation.  I have obtained their information.  I've gathered

11  as much I can from that transaction.

12      So they escalate that to us.  We will review that

13  information, and we immediately file a SAR.  And we document

14  the customer's profile.

15  Q.  And so "SAR" stands for?

16  A.  Suspicious Activity Report.

17  Q.  Okay.  And so you guys are on the lookout for suspicious

18  people, right?

19  A.  We are.

20  Q.  Do you do your best?

21  A.  I'm sorry?

22  Q.  Do you do your best looking out for suspicious --

23  A.  Yes.  We do do our best.  We've also enhanced our software

24  to identify repeat customers and their -- and their transaction

25  pattern volumes.

Isidro Salinas - Redirect

1   Q.  And, you know, I recognize you're doing your best.  Can you

2   promise the Court that you're going to get every single drug --

3   every single drug cartel guy who comes in?  You going to get

4   every single one?

5   A.  No, I can't.

6   Q.  Is it -- you think it's possible to get every single one?

7   A.  No, it's not.

8   Q.  Mr. Green asked about whether it was really necessary to

9   check twice.  Based on your experience checking CTRs, I just

10  want to clarify, is it a good idea to be cautious?

11  A.  It is.

12  Q.  Is it a good idea to be cautious when dealing with state

13  regulators?

14  A.  It is.

15  Q.  Is it a good idea to be cautious when dealing with federal

16  regulators?

17  A.  It is.

18  Q.  When you were a state regulator for the State of Texas, did

19  you tell people, hey, go faster.  We don't care about attention

20  to detail?

21  A.  No.  It was quite the opposite.

22  Q.  Okay.

23  A.  Make sure you know your customer, and make sure who you're

24  dealing with.

25  Q.  Are your -- are your employees just slacking off when

Isidro Salinas - Redirect

 1  they're at work?

 2  A.  No, they're not.

 3  Q.  Could you -- if you just told them, hey, work faster, could

 4  they do hundreds of times more CTRs than they've been doing in

 5  the past?

 6  A.  They can't.  They're just going to start making mistakes

 7  and missing information.  And that's not the objective here.

 8  Q.  Okay.  I want to -- I think -- I'm not sure you understood

 9  Judge Biery's questions at the end.  So I just want to double

10  check.  In 2024, you did -- I think you testified earlier that

11  you did 115 CTRs in total?

12  A.  That is correct.

13  Q.  Okay.  And 95 of those were for your business, for MSB

14  business?

15  A.  Correct.

16  Q.  Okay.  So you did 20 CTRs for outside customers?

17  A.  Correct.

18  Q.  Okay.  So about maybe one or two CTRs per month for outside

19  customers?

20  A.  That is correct.

21  Q.  Okay.  And you testified that transactions above $200, you

22  did 3,288 per month?

23  A.  That is correct.

24  Q.  Okay.  And so some of those are going to be, I guess, above

25  a thousand dollars, right?

Isidro Salinas - Recross

1  A.  That is correct.

2  Q.  Okay.  But the portion of that 3,288 that's between 200 and

3  1,000, is that going to be, like, at least a thousand or 2,000

4  transactions?

5  A.  Yes.

6  Q.  Okay.  And so is it fair to say to Your Honor that you're

7  going to have to do at least a thousand to 2,000 CTRs under the

8  GTO between the 200- and $1,000-level per month that you

9  weren't doing before?

10  A.  That is correct.

11  Q.  Assuming you -- I mean, you mentioned your customers are

12  all going to go away.  But assuming your customers stay.

13  A.  Correct.

14       MR. ROWES:  No further questions.

15       THE COURT:  Recross?

16       MR. GREEN:  Briefly, Your Honor.

17    Can we look back at that Paperwork Reduction Act notice on

18  the bottom of this page here.

19                    RECROSS-EXAMINATION

20  BY MR. GREEN:

21  Q.  How long have you been working for -- you mentioned in your

22  direct that you returned to the family business at some point.

23  When was that?

24  A.  In 2021.

25  Q.  Okay.  Prior to 2021, had you been working in a capacity

Isidro Salinas - Recross

1   where you were familiar with CTRs?

2   A.   Yes.

3   Q.   How long have you been doing that?

4   A.   For about -- well, I started at the family business when I

5   was 18.   So on and off about 20 years or so.

6   Q.   Okay.   Have you ever been familiar with this estimate of an

7   average of 40 per minutes per CTR response?

8   A.   I've seen it.

9   Q.   Is that something that you've seen going back 20 years?

10  A.   I don't recall when was the last time I saw this.   I don't

11  know -- this online CTR form is a couple years old.   I don't

12  know exactly when it came into play.   But before this, it was

13  actually a manual CTR form.

14  Q.   Right.   So you mentioned during my questions to you that

15  San Isidro is currently working on developing technology

16  internally that would allow you to do batch filing of CTRs?

17  A.   Correct.

18  Q.   With that technology, do you think it would take 40 minutes

19  per CTR?

20  A.   I don't know.   I can't estimate to that -- to that point at

21  this moment because I'm not familiar with the batch process.   I

22  would assume that initially it's going to take about the same,

23  if not longer, just to get familiar with the system, and

24  eventually it may drop down.   I don't have an exact estimate.

25  Q.   So is it your testimony that with batch filing it will take

 1  40 minutes per CTR?

 2  A.  I don't know.

 3  Q.  Okay.  Do you know whether this estimate accounts for batch

 4  filing or other automation options that are available to MSBs?

 5  A.  I have no idea how they came up with the 40 minutes.  So I

 6  don't know.

 7          MR. GREEN:  Nothing further.

 8          THE COURT:  All right.  Mr. Rowes, anything else right

 9  now?

10          MR. ROWES:  No, Your Honor.

11          THE COURT:  All right.  You may step down.

12      We're in recess for 15 minutes.  Thank you.

13      *(Recess at 10:28 a.m. until 10:43 a.m.)*

14          THE COURT:  All right.  Next witness for the

15  plaintiffs.

16          MS. SANZ:  Your Honor, plaintiffs call Andres Payan,

17  Jr.

18          THE COURT:  All right.

19      *(Witness enters courtroom)*

20          THE COURT:  Sir, if you'll come here and raise your

21  right hand.

22      *(The oath was administered)*

23          THE COURT:  All right.  You may be seated.  Pull the

24  mic up.

25      And you may proceed.

Andres Payan, Jr. - Direct

```
 1              MS. SANZ:  Thank you, Your Honor.
 2              ANDRES PAYAN, JR., PLAINTIFFS' WITNESS, SWORN
 3                        DIRECT EXAMINATION
 4   BY MS. SANZ:
 5   Q.  Mr. Payan, good morning.  Would you please state --
 6   A.  Good morning.
 7   Q.  Good morning.  Will you please state your name for the
 8   record.
 9   A.  My name is Andres Payan, Jr.
10   Q.  Will you please spell that for the court reporter.
11   A.  A-N-D-R-E-S, P-A-Y-A-N, Jr., J-R.
12   Q.  Thank you.
13       What is the name of your business?
14   A.  Payan's Fuel Center, Incorporated.
15   Q.  And what type of business is Payan's Fuel Center?
16   A.  It's a convenience store with a gas station.
17   Q.  So when you say convenience store, is it the kind of
18   convenience store that we all kind of think about?
19   A.  Oh, yeah.
20   Q.  Somewhere you can go in to buy snacks?
21   A.  Yes.
22   Q.  Your Cheetos, your energy drinks, your lottery tickets?
23   A.  Cigarettes, yeah.
24   Q.  And cigarettes.
25   A.  Beer.
```

Andres Payan, Jr. - Direct

1    Q.   Okay.  And do you have just one location?

2    A.   Yeah.  It's just one location.

3    Q.   Where is it located?

4    A.   In El Paso, Texas.

5    Q.   And is Payan's a money services business --

6    A.   Yes.

7    Q.   -- registered with FinCEN?

8    A.   Yes.  We are also a money service business.

9    Q.   Okay.  And has Payan's had to comply with FinCEN's GTO

10   since April 14th?

11   A.   Yes, we have.

12   Q.   Okay.  Is Payan's a family business?

13   A.   Yes, we are.

14   Q.   Can you tell me a little bit more?  How long has the

15   business been in existence, and who works there?

16   A.   We've been in business for 50 years.  It was my

17   grandfather's initially, and then it was passed on to my dad.

18   And then he incorporated like ten years ago.

19   Q.   And do you work there?

20   A.   Yes, I do.

21   Q.   What do you do there?

22   A.   I'm the manager.

23   Q.   Do any other family members work there?

24   A.   Yes.  My mom, my dad and my sister.

25   Q.   And do y'all -- do you work there full-time?

Andres Payan, Jr. - Direct

1  A.  Yes, we do.

2  Q.  Okay.  Let's talk about the money services business that

3  you offer.  What services do you offer?

4  A.  We just offer check cashing.

5  Q.  So just check cashing.  No other -- no money exchange or

6  anything?

7  A.  Yeah.  No.  Just check cashing.  No money orders or

8  anything.

9  Q.  What kinds of checks do you cash?

10  A.  We cash payroll checks.  We cash government checks, like

11  from the federal government, state government, city.  We cash

12  income tax refund checks.  And pretty much that's about it.

13  Q.  Do you cash personal checks?

14  A.  No, we don't.

15  Q.  Are you familiar with your check cashing customers?

16  A.  Yes, I am.

17  Q.  How do you become familiar with them?

18  A.  I would say so because about 95 percent of the customers

19  are regulars that come on a periodic basis.

20  Q.  And what kind of people are they?

21  A.  They're mostly local people, people who live close in the

22  area.  They're construction workers.  They're, you know, blue

23  collar people.  They're people that might not have a bank

24  account or might not have good credit.  Yeah, those type of

25  folks.

Andres Payan, Jr. - Direct

1  Q.  Okay.  And the paychecks that they cash, where are those
2  coming from?
3  A.  They're coming from usually their places of employment.
4  That's about most of the checks that we get.
5  Q.  Are you familiar with those places of employment?
6  A.  Yes.  We sure are.
7  Q.  How do you become familiar with them?
8  A.  Because we know the -- we know the companies that are
9  written on the check.  We might even know some of the -- some
10 of the companies personally.
11     What else?  Like, if it's a corporate company, like
12 McDonald's, we just know it.  And if we don't know the check,
13 then we try to vet it.
14 Q.  You try to vet it?  Is that what you said?
15 A.  Yeah.  Yes, ma'am.
16 Q.  Okay.  What does that look like?
17 A.  We'll look up the -- we'll look up the information on the
18 state comptroller's web page or on the city, or we'll Google
19 the address, you know, on Maps, just try to do some work and
20 diligence in verifying.  I don't want to take a bad check.
21 Q.  And are there any other -- besides personal checks, are
22 there any other checks that you just won't cash?
23 A.  Yes.  We do not cash money order checks, cashier's checks,
24 insurance checks, retirement checks, anything that's, you know,
25 suspect or that we don't know personally.  We try to limit

Andres Payan, Jr. - Direct

 1  ourselves to local companies.
 2  Q.  Okay.  And what happens when do you come in -- when you do
 3  find a suspicious check or you feel like something's
 4  suspicious?  What do you do?
 5  A.  Well, I don't cash the check because I don't want to be out
 6  of the money.  And if it's something like a fraud or someone
 7  trying to pass on a stolen check, I'll report it to the police.
 8  Q.  I'd like to talk to you about that process before the GTO
 9  was in place, so taking yourself back a month or so.  Just
10  describe what happens when somebody comes into your store to
11  cash a check.
12  A.  They'll wait in line.  And then once they get to the
13  register, we'll have them endorse the check.  And then we'll
14  look at their ID, verify that it's them.  And then we'll write
15  down the information from the ID, their date of birth, their
16  driver's license -- their number of their ID or their passport.
17  And if everything turns out good, we'll cash the check, charge
18  them a fee and give them the money back.
19  Q.  Okay.  And where is all of this happening?
20  A.  This is happening in the convenience store, at the
21  registers.
22  Q.  So at the -- at the same counter as the guy with the
23  Cheetos?
24  A.  Yes.
25  Q.  The energy drinks?

Andres Payan, Jr. - Direct

1   A.  Yes.

2   Q.  Okay.  And just in the same line with all of the other

3   customers?

4   A.  Yes.  Yes, ma'am.

5   Q.  Okay.  How long did it -- does it typically take?

6   A.  It takes about a minute to cash a check.  It goes faster if

7   we know the check.  It's slower if we don't know the check.

8   Q.  All right.  Okay.  Let's talk about the impact of the GTO

9   on Payan's.  Has it hurt your business?

10  A.  It has really hurt my business.

11  Q.  In what way?

12  A.  We've seen a 30-percent drop in sales, in -- excuse me --

13  in check sales, check fee sales.  And we've also had to do a

14  lot more administrative work to do all of these CTRs, because

15  it's a lot of work.

16  Q.  So we'll talk about the CTRs.  But about the drop in

17  revenue, what's happening?  Why is there a drop?

18  A.  Because the customers are no longer coming to my business,

19  those 30 percent of people.  They're not -- not all my

20  customers are check cashers, but there's a lot of people that

21  come and cash their checks.  We cash -- we cash about 1,800

22  checks a month normally, and I'm losing a third of that.

23  Q.  And --

24          THE COURT:  Excuse me.  And then they buy stuff at the

25  store?

1        THE WITNESS:  Yes.

2        THE COURT:  Sometimes.

3        THE WITNESS:  Yes, Your Honor.  Uh-huh.

4        THE COURT:  Okay.  Go ahead.

5   BY MS. SANZ:

6   Q.  And just to be clear, the drop in revenue is from just the

7   check cashing business, right?  Or the 30 percent that you

8   talked about?

9   A.  Yeah.  That 30 percent is isolated to the check cashing.

10  But I'm also seeing a drop in how much gas I'm buying per week,

11  how many loads of -- you know, trucks come by per week.  Yeah,

12  that, too.

13  Q.  And --

14  A.  How much cigarettes I'm selling.  I know this just off the

15  top of my head.  I don't really have numbers.

16  Q.  But that's, like, maybe more loss associated with those

17  secondary kind of purchases that the -- that Judge Biery is

18  pointing to?

19  A.  Yes.

20  Q.  Okay.  And what is your understanding about why people are

21  not -- are skipping you by?

22  A.  I can't speak directly for them, but I think because some

23  might have an apprehension about giving, you know, a clerk at a

24  gas station their Social Security number.  And then we have

25  to -- you know, it takes longer to do this work.  We personally

Andres Payan, Jr. - Direct

1  make copies of their IDs, so that we don't, you know, make a

2  mistake or have something fall through the cracks.  So it's

3  just taking longer, and it's a lot more difficult to cash a

4  check.

5  Q.  Do you expect this to get worse?

6  A.  I think we're slowing down, yes, little by little, compared

7  to what it was.  From what I said, the 30 percent, I think it's

8  still slowing down some.

9  Q.  So do you expect that -- the customers that you lost, do

10 you expect them to come back?

11 A.  Not really.

12 Q.  Why do you say that?

13 A.  I'm better off expecting a new customer to come in rather

14 than an old customer that's been lost.  Because once they --

15 once they go away, they don't -- they tend not to come back.

16 Q.  Okay.  Let's talk about those paperwork burdens, the

17 Currency Transaction Reports --

18 A.  Uh-huh.

19 Q.  -- that you have to do now, right?

20 A.  Yes, ma'am.

21 Q.  Had you ever done one before the border -- or before the

22 GTO came into place?

23 A.  No.  No.

24 Q.  Will you have to do thousands now?

25 A.  Yes.

Andres Payan, Jr. - Direct

1    Q.  How many have you already done?

2    A.  We've done -- we've done 408, that we've done.

3    Q.  And do you have any that are waiting for you back in

4    El Paso?

5    A.  We have more than a hundred.

6    Q.  So you've done -- you've already had to do about 500 CTRs,

7    and you didn't have to do any before?

8    A.  Yes.  That's correct.

9    Q.  Okay.  I think that's it.

10        Oh, yeah.  How many -- how many minutes per CTR is it

11   taking you, would you say?

12   A.  Takes about 13 to 15 minutes.  It's just depending on who's

13   doing it, because there's so many people -- so many hands are

14   doing it.

15   Q.  So 13 to 15 minutes per CTR.  That's something -- that's

16   many hours per day --

17   A.  Yes.

18   Q.  -- you would say?

19        Okay.  Can I just ask you about the first -- the first week

20   after the GTO came into place --

21   A.  Uh-huh.

22   Q.  -- and you were doing these CTRs for the first time?

23        How was that for you guys?

24   A.  I had to get a new phone because I slammed my phone down in

25   frustration and -- yeah, I was -- it was very tough, very

Andres Payan, Jr. - Cross

1  frustrating because it was one of the few things at work that

2  I've done, that I couldn't, you know, get on top of no matter

3  how hard I tried.  It was very --

4  Q.  Did you -- did you ever have to stop cashing checks in

5  order to catch up?

6  A.  Yes, because I had to take a leave for paternity.  So my

7  parents stopped cashing checks for, like, almost a week.

8  Q.  Why did they stop cashing checks?

9  A.  So they could catch up, to get all the CTRs done.  And then

10  they started again.

11          MS. SANZ:  Okay.  I think I will pass the witness.

12          THE COURT:  All right.  Cross?

13                    CROSS-EXAMINATION

14  BY MS. POWELL:

15  Q.  Payan's has just the single location, correct?

16  A.  Yes, ma'am.

17  Q.  And all you do is cash checks; is that correct?

18  A.  Yes, ma'am.

19  Q.  What are Payan's regular hours for serving the public?

20  A.  From 5:00 a.m. until 11:45 p.m.

21  Q.  And do you cash checks during all of that time?

22  A.  We try to, yes.

23  Q.  Are there times when you might not?

24  A.  No.

25  Q.  Okay.

Andres Payan, Jr. - Cross

 1  A.  No, not really.

 2  Q.  Are there times of day that are particularly busy?

 3  A.  Yes, ma'am.

 4  Q.  When is that?

 5  A.  In the mornings and then around -- from 3:00 to -- 3:00 to

 6  6:00 p.m.

 7  Q.  In between there, is it relatively slow?

 8  A.  No.  It's slower, but it's not slow.

 9  Q.  Okay.  Slower is what I was going for.

10      And how many people are on duty there at one time?

11  A.  It's usually about three people, and then it's two

12  cashiers.

13  Q.  So three people plus the two cashiers or two cashiers plus

14  one other?

15  A.  Three chiefs, three bosses.

16  Q.  Okay.

17  A.  Me, my dad and my mom and my sister, and then it's two

18  cashiers per shift right.

19  Q.  So five people at any given time?

20  A.  Yes, ma'am.

21  Q.  Okay.  Are there times of year that are particularly busy?

22  A.  Yes.

23  Q.  Like what?

24  A.  Like around Christmastime, people get bonuses, so they'll

25  get two checks, and around income tax time.

Andres Payan, Jr. - Cross

1    Q.   Okay.  Are there times of the year that are -- that are
2    slower?
3    A.   Yes.  Yes.
4    Q.   Like what?
5    A.   Like January, February and sometimes the summer.  Sometimes
6    summer.
7    Q.   You filed a declaration in the case in California, correct?
8    A.   Yes, ma'am.
9    Q.   That declaration indicates that Payan's is located in a
10   low-income area; is that correct?
11   A.   Yes, ma'am.
12   Q.   In terms of the area itself, does the economy seem to be
13   improving?  Slowing?  Do you have an impression, as a
14   businessperson there?
15   A.   The area is pretty steady.  Pretty steady, yeah.
16   Q.   Do you think it is affected by any changes in cross-border
17   trade or tourism?
18   A.   A little bit, yeah.
19   Q.   And what of -- what kind of effects would those be right
20   now?
21   A.   Because they closed the entrance to -- because we're close
22   to the border.  So we're close to the bridge, and they closed
23   the entrance.  So we saw a drop a little bit when they closed
24   the road to go into Juarez.  So we saw a little bit of drop in
25   gas and other things.

Andres Payan, Jr. - Cross

1  Q.  Yeah.  Well, let's be more specific.  Do you know, in March
2  of this year, how much of Payan's net income was from check
3  cashing?
4  A.  Can you repeat that question, please?
5  Q.  Do you know, in March of this year, for example, how much
6  of Payan's net income was from check cashing, like a
7  percentage?
8  A.  Net income?  Well, it's about 1.5 percent.
9  Q.  1.5 percent of the company's income was from check cashing
10  profits?
11  A.  Profits?  It's a lot more.  But just raw income, net income
12  is 1.5 percent out of 500,000 in sales.
13  Q.  Okay.  Sorry.  I wasn't looking for net income overall, but
14  the portion of your net income that comes from check cashing.
15  Sorry I was unclear.
16  A.  1.5 percent per month.
17  Q.  Okay.  Okay.
18          THE COURT:  Well, that's gross income.
19          THE WITNESS:  Yes.
20          THE COURT:  You have 500,000 incoming, and 1.5 percent
21  is from check cashing.  That's gross income.
22          THE WITNESS:  Yes.
23          THE COURT:  Okay.  All right.  Go ahead.  I think.  I
24  mean, I could be wrong.  Because then the expenses would come
25  out, and that gives you the net.  But anyway.

Andres Payan, Jr. - Cross

1    Go ahead.

2  BY MS. POWELL:

3  Q.  Before the GTO, so unrelated to that, why would customers

4  come to cash checks at Payan's as opposed to, say, a bank, for

5  example?

6  A.  Well, from what I understand, banks have become more strict

7  with checks.  They also have less tellers in the banks.  And so

8  the lines to cash a check at the bank, because it's also free,

9  has been -- is very difficult.

10    And then, also, if you don't have an account at that bank,

11  they won't cash your check.  And if you do cash it, they hold

12  the funds for you.  They might hold the funds if it's from a

13  different company than the check that you cash.  So they'll

14  just come to us for the convenience.

15  Q.  And why might a customer choose Payan's as opposed to a

16  different money services business?

17  A.  Because we have a lot of money.  We don't run out.  We take

18  just about everything, and we don't stop.  And if I do have to

19  go -- I go back to the bank.

20  Q.  So because you can and, also, probably because it's

21  convenient for them?

22  A.  Yes, ma'am.

23  Q.  Payan's is required by federal regulations, as a money

24  services business, to maintain an anti-money laundering

25  program, correct?

Andres Payan, Jr. - Cross

```
 1   A.  Yes, ma'am.
 2   Q.  What is your understanding of what that is?
 3   A.  We have to be in compliance with that, and I guess we have
 4   to -- we have to train our employees.  We have to adhere
 5   certain rules and regulations, and we have to keep records.
 6   Q.  Payan's is required to designate someone to be in charge of
 7   compliance, correct?
 8   A.  Yes, ma'am.
 9   Q.  Who is that person?
10   A.  That is myself.
11   Q.  Okay.  So you are required, as part of that, to keep up to
12   date on FinCEN requirements, correct?
13   A.  Yes.
14   Q.  And how do you do that?
15   A.  I check the -- they send me emails.  And, also, my bank --
16   my bank notifies me of any changes.
17   Q.  And those emails are called FinCEN alerts; is that correct?
18   A.  Uh-huh.
19   Q.  Did you get a FinCEN alert about the GTO?
20   A.  I'm not sure.
21   Q.  But I think you said in your California declaration that
22   you at least found out about the GTO from your bank; is that
23   correct?
24   A.  Yes.
25           THE COURT:  You have to say "yes" or "no."
```

```
 1            THE WITNESS:  Sorry.  Yes.
 2   BY MS. POWELL:
 3   Q.  So in addition to just having an AML compliance program,
 4   you have other regulatory obligations, right?
 5   A.  Yes, ma'am.
 6   Q.  And I assume you keep your own business records for your
 7   business purpose so you know how much money comes in and goes
 8   out, correct?
 9   A.  Yes, ma'am.
10   Q.  And you know what there is to know about your money
11   services business, right, where it is, what it's licensed for,
12   things like that?
13   A.  Yes, ma'am.
14   Q.  And you keep information about all of your employees, for
15   example?
16   A.  Yes, we do.
17   Q.  For check cashing transactions prior to the GTO, I think
18   you testified that you still collected some information about
19   the customer and the transaction, correct?
20   A.  Yes.
21   Q.  So for every one of those transactions you collected their
22   name?
23   A.  Yes, ma'am.
24   Q.  And their date of birth, you said?
25   A.  Yes.
```

Andres Payan, Jr. - Cross

1  Q.  And you check their ID and keep a record of your ID

2  verification, correct?

3  A.  Yes.

4  Q.  Anything else?

5  A.  No.

6  Q.  Okay.  You sometimes also ask about where they got the

7  check, right?

8  A.  Yes.

9  Q.  Is that information you keep or not?

10  A.  No.

11  Q.  You just do it as part of verifying that the check is real?

12  A.  Yes, ma'am.

13  Q.  And if you have concerns, you'll look up the company and

14  things like that?

15  A.  (Nods head up and down).

16  Q.  But the other information, name, date of birth, identity

17  verification, you keep that?

18  A.  No.  I write it on the check itself.

19  Q.  But do you have a copy of the check?

20  A.  Yes, through the bank.

21  Q.  Okay.  So you have that information?

22  A.  Uh-huh.

23  Q.  Your California declaration also indicated that you

24  sometimes cash checks worth more than $3,000, but it's rare; is

25  that correct?

Andres Payan, Jr. - Cross

1  A.  Yes.

2  Q.  How rare?

3  A.  It only applies to check cashing season, really.

4  Q.  What's "check cashing season"?

5  A.  When people do their income taxes.

6  Q.  Okay.

7  A.  And after February 15th, the Treasury will start issuing

8  refunds to people who get, you know, big refunds.  And, well,

9  they'll bring them over to our business, and we'll try to cash

10  them.

11  Q.  Is that happening, like, now, or is it too late for check

12  cashing season?

13  A.  It's mostly over.

14  Q.  Okay.  Was it happening at the very beginning of the GTO

15  going into effect?

16  A.  Yes.

17  Q.  So around the time you were having so much trouble keeping

18  up with everything?

19  A.  Yes.  It was kind of ongoing.

20  Q.  So for transactions for checks worth more than $3,000, you

21  collect additional information about those, correct?

22  A.  Yes.

23  Q.  Because you're required to by federal regulation?

24  A.  Uh-huh.

25  Q.  That includes address and Social Security number?

Andres Payan, Jr. - Cross

1   A.   Yes.

2   Q.   And you keep that information?

3   A.   I make a copy of it, yes.

4   Q.   Okay.

5   A.   And of the check.

6   Q.   So all of those records we discussed that you keep, copies

7   of checks and so forth, those can be examined by federal

8   regulators; is that correct?

9   A.   I think so.

10  Q.   When the GTO went into effect, you had never filed a CTR

11  before, correct?

12  A.   Yes.  That's correct.

13  Q.   This was all new to you?

14  A.   Yes, ma'am.

15  Q.   For the first ten days or so you kept cashing checks before

16  you took a pause; is that correct?  I was using dates from your

17  declaration, but one of them was kind of unclear.  So I'm

18  really unsure.

19  A.   Yeah, about ten days.  Yes, ma'am.

20  Q.   For those ten days, how many GTO-affected transactions did

21  you do?

22  A.   I'm not too sure because my wife gave birth, and I was -- I

23  left on --

24  Q.   You were a little busy.  Congratulations, by the way.

25  A.   Thank you.  I left on April 23rd, was my last day.

Andres Payan, Jr. - Cross

1  Q.  Okay.

2  A.  And then they took over.

3  Q.  The declaration you filed in California that said when you

4  guys had paused on cashing checks for a while, you had 55 for

5  yourself to do as a backlog at that point?

6  A.  Yes.

7  Q.  But your mother and sister had others?

8  A.  Yes, because they continued cashing some more checks, and

9  then they got more backed up.

10  Q.  Yeah.  But if you had 55, even though you'd been out on

11  paternity leave since -- 23rd, you said?

12  A.  Uh-huh.

13  Q.  They maybe had more at that point if they kept going for

14  some days after that?

15  A.  Yes.

16  Q.  Do you have any sense of what your backlog or total number

17  was at that point?  Can you estimate?

18  A.  Honestly, I did not -- I couldn't tell you because I would

19  just admit them to FinCEN.  I wouldn't check how many I had

20  submitted.

21  Q.  Yeah.  Could you say whether it was more than 300 total for

22  those ten days, if you submitted them?

23  A.  No, it was not.

24  Q.  Okay.  Payan's resumed cashing checks after catching up on

25  the backlog, is that what I understood you to say?

Andres Payan, Jr. - Cross

1  A.  Yes, ma'am.

2  Q.  During the pause, did you continue cashing checks below

3  $200?

4  A.  Yes, we did.

5  Q.  Okay.  So you never stopped entirely and have now restarted

6  cashing checks?

7  A.  Correct.

8  Q.  You estimated earlier that it's been taking you around 13

9  to 15 minutes per CTR.  Does that include time spent collecting

10 information from the customer?

11 A.  Yes.  Yes, it does.

12 Q.  And doing the data entry and submitting the form?

13 A.  Yes.

14 Q.  To be clear -- please correct me if I'm wrong, but I think

15 I'm right.  The two pieces of information you need for the CTR,

16 that you would not have for every check cashing transaction,

17 are the address and tax ID number?

18 A.  Yes.  That's correct.

19 Q.  Anything else?

20 A.  I have to put in the bank account number.  I also have to

21 denote what type of transaction it is on the CTR.  And then I

22 also have to put in the amount that I paid to them, and I have

23 round it up because it doesn't take decimals.  And then I have

24 to calculate how much I charged them.

25 Q.  But you keep records about your own transactions in your

Andres Payan, Jr. - Cross

1  business records now, correct?

2  A.  Yes.

3  Q.  So that is information you have?

4  A.  Yeah.

5  Q.  It's not new information that needs to be created for a CTR

6  analysis, correct?

7  A.  Yes.  But I still have to reference it.

8  Q.  All right.  There are a few different ways to fill out and

9  submit CTRs.  Money services businesses use different methods.

10 I take it from your testimony that you use the form that's

11 available on the FinCEN website and submit it through the

12 online portal; is that correct?

13 A.  Yes, ma'am.

14 Q.  There is an option for using a secure file transfer

15 protocol.  Do you know what that is?

16 A.  No.

17 Q.  Okay.  It lets some businesses, that can set it up with

18 their current systems, to file a lot of CTRs at once.  I take

19 it you have not used one before, since you didn't know what it

20 was?

21 A.  Yes.  That is correct.

22 Q.  And you have not tried to set one up?

23 A.  Yes, I did.

24 Q.  You did?  How did you try?

25 A.  I tried to get ahold of the people, and they never got back

Andres Payan, Jr. - Cross

1  to me.  And I tried to do a batch filing, and it was only if I
2  was -- if it was programmed in XML.  And, finally, I tried to
3  reach out to a company to tell me.
4  Q.  Okay.  So when you say you tried to reach out to the
5  people, you mean you reached out to FinCEN's help desk?
6  A.  Yes.  Sorry.  Yes.
7  Q.  Did they provide you with the technical instructions for
8  doing batch filing?
9  A.  No.
10  Q.  So how did you set about trying to do the batch filing if
11  you didn't have their technical instructions?
12  A.  I Googled it, and then I attempted it myself.
13  Q.  Okay.  But it didn't work?
14  A.  Yes.  It did not work.
15  Q.  You said you consulted with someone.  Is that -- who is
16  that, or what is their role?
17  A.  I found a company that would work with MSBs, to see if they
18  could help me set up automated system to do -- to do those CTRs
19  for me.
20  Q.  And what did you learn from that process?
21  A.  Well, unfortunately, honestly, they haven't gotten back to
22  me.
23  Q.  Okay.  Did you contact any other companies?
24  A.  Yes.
25  Q.  Who else?

Andres Payan, Jr. - Cross

1    A.   I contacted three.  I spoke with one over the phone, and

2    they told me that they only worked with banks and credit

3    unions, to the one that did -- I spoke with over the phone.

4    Q.   So just for clarity, there are companies out there that

5    sell software for financial institutions of various kinds, and

6    you buy or license their software.  But there's also the

7    possibility to set up these secure file transfer protocols,

8    which doesn't necessarily require a whole separate software

9    platform.  Were you looking at one of those options or both of

10   those options?

11   A.   At both.

12   Q.   Okay.  Did you get any estimates for what that would cost

13   for your business?

14   A.   I already purchased it.

15   Q.   Oh, what did you purchase?

16   A.   The software to do that.  It's a -- it's a computer and a

17   software.  And, you know, it has a chip reader and an optical

18   reader.  Excuse me.

19   Q.   Are you using that now?

20   A.   No, because they haven't sent it to me.

21   Q.   You haven't received the software that you need?

22   A.   I have not received the software or the hardware.

23   Q.   Or the hardware?

24   A.   And I'm kind of upset about that.

25   Q.   Okay.  How much did you pay for it approximately?

Andres Payan, Jr. - Redirect

```
 1   A.  At least $3,300.
 2   Q.  And is that -- are you going to -- when do you expect to
 3   receive it?
 4   A.  I do not know.  I have to -- I have to contact them.  I
 5   contacted them last Wednesday or Thursday, and they said they
 6   would get back to me.  And they --
 7   Q.  What is the name of the company?
 8   A.  I'm not sure.  I have to look at my phone and my email.
 9   Q.  Okay.  But you have software that you think is going to
10   help you streamline the process?
11   A.  Yes.  I hope, yes.
12           MS. POWELL:  Okay.  I think that is all of my -- do
13   you have anything else?  That is all of my questions.
14           THE COURT:  All right.  Redirect.
15           THE WITNESS:  Thank you.
16                    REDIRECT EXAMINATION
17   BY MS. SANZ:
18   Q.  Mr. Payan, you testified earlier.  Correct me if I'm wrong,
19   but you testified earlier that you -- that before the GTO,
20   people would come in, and you'd check their ID, and you'd write
21   it down on the check, right?
22   A.  Yes, ma'am.
23   Q.  And then -- and then you'd verify if it was an okay check
24   and you'd endorse it and cash it, right?
25   A.  Uh-huh.
```

Andres Payan, Jr. - Redirect

1  Q.  Is the kind of information that you ever had to collect to

2  cash a check anything like the information that you have to

3  collect for a CTR?

4  A.  It's not.  Really, it's not.

5  Q.  Okay.  Are the vast majority of the checks that you cash

6  over $200?

7  A.  About 87 percent of them are more than $200.

8  Q.  Are the vast majority of those under $3,000?

9  A.  Yes.

10 Q.  And you've never cashed anything over $10,000, correct?

11 A.  No, no, no, no.

12 Q.  Okay.  Ms. Powell asked you about the fact that -- she made

13 the point that you continued cashing checks during that pause?

14 A.  Yes.

15 Q.  Under $200, right?

16 A.  Yes.  Uh-huh.

17 Q.  How do you make money on cashing checks?

18 A.  We charge a one-percent fee, plus 50 cents.

19 Q.  So am I right to say that if you cash a check for $1,500,

20 it's going to be worth more to you in revenue than a check for

21 $150?

22 A.  Yes.

23 Q.  And the pause made you have to cash checks below $200?

24 A.  Yes.

25 Q.  And that you've lost revenue in your check cashing

Andres Payan, Jr. - Redirect

1  business?

2  A.  Yes.

3  Q.  To the tune of about 30 to 35 percent?

4  A.  Yes.

5  Q.  Is the -- is the check cashing business important to

6  Payan's?

7  A.  Yes.  It's pretty important, yes.

8  Q.  Did you reach out to FinCEN to get help figuring out batch

9  filing or automated processes for their CTRs?

10  A.  Yes, ma'am.

11  Q.  Did anyone ever get back to you?

12  A.  No.

13  Q.  What do you expect the next -- if you have to keep

14  complying with this GTO for the next six months, what does that

15  look like for your family?

16  A.  It's going to be a lot more difficult for our business to

17  run.  It's like taking off the leg of a chair.

18  Q.  And what will it look like?  Will you have to lay anybody

19  off?

20  A.  I would probably reduce hours to the people that are

21  working there.

22  Q.  Will you have to reduce your salary?

23  A.  Maybe, yes.

24  Q.  What if the GTO is renewed and you have to continue with

25  the CTRs indefinitely?

Andres Payan, Jr. - Redirect

```
 1  A.  If things don't get better, I will stop cashing checks.

 2            MS. SANZ:  That's all, Your Honor.  Thank you.

 3            THE COURT:  All right.  Recross?

 4            MS. POWELL:  (Shakes head side to side).

 5            THE COURT:  Okay.  Thank you, sir.  You may step down.

 6  You may remain in the courtroom or be excused.

 7      Next witness?

 8            THE WITNESS:  Thank you.

 9            THE COURT:  Raise your right hand, please.

10      (The oath was administered)

11            THE COURT:  All right.  You may be seated.

12            MS. SANZ:  Your Honor, the plaintiffs have called Anna

13  Alvarado to the stand.  And I just want to alert the Court that

14  she has a blood sugar issue.  And so she is monitored by a pump

15  in her arm that translates to her phone.  And so she has

16  brought the phone up to the stand with her.  Is that okay?

17            THE COURT:  Oh, sure.  That's fine.

18            THE WITNESS:  Thank you.

19            THE COURT:  Okay.  We have to have a little bit of

20  levity in this very serious stuff.

21      (Discussion off the record)

22            THE COURT:  All right.  Go ahead.

23            MS. SANZ:  Thank you, Your Honor.

24

25
```

1    ANNA ISABEL ALVARADO, PLAINTIFFS' WITNESS, SWORN

2              DIRECT EXAMINATION

3  BY MS. SANZ:

4  Q.  Ms. Alvarado, can you please state your name and spell it

5  for the record.

6  A.  Yes.  Of course.  My name is Anna Isabel Alvarado.  It's

7  A-N-N-A, I-S-A-B-E-L.  Alvarado is A-L-V-A-R-A-D-O.

8  Q.  Thank you.  And what is the name of your business?

9  A.  My business is Reynosa Casa de Cambio, Incorporated.

10 Q.  And is Reynosa an MSB registered with FinCEN?

11 A.  Yes, it is.

12 Q.  And Reynosa is a plaintiff in this lawsuit covered by the

13 TRO, correct?

14 A.  Correct.  Yes.

15 Q.  Can you tell us about the history of your business?  Is it

16 a family business?

17 A.  Yes, it is.  My father, my late father, who passed away in

18 1995, began the business in 1978.  We became incorporated in

19 1993.  And I have been working for the business for 23 years.

20 Q.  Do any of your other family members work for the business?

21 A.  Yes.  We are a family business.  I am the youngest of five.

22 I have three older brothers and one older sister.

23 Q.  And do you all work for the business?

24 A.  Yes, we all do.

25 Q.  Are you the board of directors, or what do you do?

Anna Isabel Alvarado - Direct

```
 1  A.  Yes.  We all form the board of directors, us five, yes.
 2  Q.  And do you all work there full time?
 3  A.  Yes, we do.
 4  Q.  So your parents gave it to you guys.  And do you guys plan
 5  to give it to your kids?
 6  A.  We hope so, yes.  That is the plan.  And we are very proud
 7  of what my father began.  And we have continued to grow.  So
 8  yes, that's the plan.
 9  Q.  I'd like to talk to you about the services that Reynosa
10  offers.  What does Reynosa offer?
11  A.  So we are an MSB.  We do currency exchange, U.S. dollars,
12  Mexican pesos, some euros.  And we also do some check cashing,
13  very minimal, too, also just payroll checks, people we know,
14  Social Security checks, things like that.  And then we also
15  offer car insurance for nonresidents.
16  Q.  Do you -- do you consider yourself a currency exchange
17  business?
18  A.  Yes, absolutely.  Mostly, yes.
19  Q.  We'll talk mostly about -- when we talk about numbers and
20  stuff, we'll just stick to currency exchange since that's the
21  case.  Okay?
22  A.  Okay.
23  Q.  How many locations does Reynosa have?
24  A.  We have a total of 13 locations.
25  Q.  And kind of what region are they in?
```

Anna Isabel Alvarado - Direct

1   A.  Well, 11 of the locations are within the ZIP Codes.  So we

2   have locations in Hidalgo, McAllen, Mission, Progreso, Donna

3   and Brownsville, Laredo and Pharr.

4   Q.  Okay.  And then you have two locations that are outside of

5   the GTO.  Is that what you said?

6   A.  Yes.  Correct.

7   Q.  Okay.  How many people do you employ?

8   A.  We employ about 60 people, including ourselves.

9   Q.  Okay.  What is your role at Reynosa?

10  A.  I am the code compliance officer of the company.

11  Q.  Okay.  And what does that entail?

12  A.  Well, I am, I would say, the barrier.  It's my main job to

13  be checking for any suspicious activities, receiving auditors,

14  making sure that nothing is being infiltrated through the

15  transactions we are conducting.

16  Q.  Okay.  What does -- what does the job of compliance

17  include?

18  A.  Well, the job of compliance is, I oversee training of all

19  employees, which are obviously in front end of the receiving

20  transactions.

21  Q.  Sorry to pause you.  What does "front end" mean?  What do

22  you mean by that?

23  A.  The tellers, the cashiers.  So mainly I am the one handling

24  the trainings that we have for them.  I also handle the AML

25  program.  I do modifications to it.  Always striving to be more

Anna Isabel Alvarado - Direct

1  robust every time we get an independent review.  I receive
2  auditors, reviewers.  I handle all those, along with, also, my
3  brother and my sister.  We do have a compliance committee and a
4  SAR review committee.
5  Q.  Okay.  And SAR is?
6  A.  A Suspicious Activity Report.
7  Q.  Okay.  Why is compliance important for your business?
8  A.  I would say compliance -- it is my field, right?  But I
9  would say it's almost everything, aside from the customer.
10  Without compliance, we would have no business.  So I take my
11  job very seriously.
12  Q.  Okay.  And if you were not to comply -- and when we say
13  "compliance," what are we complying with?
14  A.  Obviously FinCEN, IRS, Texas Department of Banking, any
15  auditors, independent auditors, all of that, BSA act, U.S.
16  Patriot Act, all of that.
17  Q.  Okay.  And if you don't comply with all of that, what
18  happens?
19  A.  If we don't comply, we have no business.  So we could lose
20  our license.  We can be fined, which fortunately we have no
21  idea as to how much that would be.  It's because, never been in
22  the situation.  But yeah, we would ultimately lose our business
23  if there was no compliance.
24  Q.  Okay.  Do you have any special training, yourself, in
25  compliance?

Anna Isabel Alvarado - Direct

1  A.  Yes, I do.  I was certified by the Association of Certified
2  Anti-Money Laundering Specialists.  I received my certification
3  in 2018.
4  Q.  And what is -- what is account specialist or certified
5  anti-money laundering specialist?  What is that?  Who certifies
6  you?  What do you have to do?
7  A.  Okay.  So it's a big organization that trains us and
8  provides us with, you know, a bunch of webinars, conferences
9  and all that.  And they make sure that you are qualified to
10  receive those certifications by a point system.  So initially
11  you have to have education, and then you have to have vast
12  experience in a business that could possibly be used to launder
13  money.
14      So since I have been working for the family business since
15  I was 18, you know, that led me to 60 points.  And then after
16  that, I sat for an exam that covered many areas of money
17  laundering.
18  Q.  Are you proud of this certification?
19  A.  Yes.  I am pretty proud.  Sometimes regulators go and ask
20  me for tips on, you know, how to pass the exam.  And, you know,
21  it's quite -- it's quite difficult to get.  But I am proud.  My
22  sister, who is a compliance officer, is also certified from
23  ACAMS.
24  Q.  Let's talk about audits.  Is Reynosa audited?  Do they get
25  compliance reviews?

Anna Isabel Alvarado - Direct

1  A.  Yes, we do.

2  Q.  Can you describe those?

3  A.  Of course.

4  Q.  I'm sorry.  Let me be clear.  Tell us what reviews and

5  audits you guys go through.

6  A.  Okay.  So we have, of course, Title 31 compliance audits by

7  the IRS.  And those are random.  And then we have the Texas

8  Department of Banking, which also comes every 12 to 18 months,

9  depending on the -- on your rating.  And then we also hire

10  independent auditors to conduct independent reviews, to just

11  advise us on how to make our internal controls and procedures

12  even stronger.

13  Q.  And do you -- to your knowledge, this is part of the

14  licensing requirement of being an MSB, right?

15  A.  That's correct.

16  Q.  Okay.  So it's fair to say that MSBs are audited and

17  reviewed in kind of the same way that you just described.

18  A.  Yes, we are.  We are.  They are quite strict with us, as we

19  are with ourselves.  We are strict with ourselves because we

20  have to respond to them, yes.

21  Q.  Okay.  How has Reynosa performed on its reviews and audits?

22  A.  We have done very well.  So Title 31s, if there is some

23  human error in one CTR out of 4- or 500, it's very rare.

24      And with the Texas Department of Banking, we would normally

25  get 1s, which is the perfect score, right?  But lately, it's

1  very difficult to get a 1.  Most MSBs get a 2, which is

2  satisfactory.  And, you know, it was a -- it was a hard

3  swallow, when they give you a 2, when you're trying so, so, so

4  hard.

5      But when asked, you know, why was that, they said,

6  everything's great, but kind of like, you know, the professor

7  that won't give you a hundred because there's always room for

8  improvement.  So they give you a 2, and they recommend us

9  things, and we apply them.  And we just try to be stronger

10 every year.

11 Q.  Let's talk about money laundering.  Has Reynosa ever been

12 investigated for money laundering?

13 A.  No.

14 Q.  Have you personally ever been investigated for money

15 laundering?

16 A.  No.

17 Q.  What about your siblings?

18 A.  No.

19 Q.  Any employees?

20 A.  No.

21 Q.  To your knowledge, have any of your customers ever been

22 investigated for money laundering?

23 A.  Not to my knowledge, no.

24 Q.  Do you personally know of any MSBs that have been

25 investigated for money laundering?

Anna Isabel Alvarado - Direct

1   A.  No, I do not.

2   Q.  If there were an investigation, would Reynosa cooperate?

3   A.  Of course.  Yes.

4   Q.  What do you think -- what do you do if you think a customer

5   might be engaged in money laundering?

6   A.  Well, if I believe a customer might be engaged, it just

7   depends if I have their information on hand because they have

8   already provided their identification to me, or to our

9   employee, because they want to conduct a transaction.  If I

10  have that information, obviously I would file a Suspicious

11  Activity Report.

12      Now, we do reject a lot of transactions if we feel that

13  they do not -- or just -- they just don't pass the compliance

14  barrier that we have.  But if I have the information, obviously

15  a SAR is filed.

16  Q.  Okay.  And do you train your customers -- I'm sorry.  Do

17  you train your employees to know your customers?

18  A.  Yes.  We have -- we train them.  A lot of our employees

19  have been with us for many years.  So they're very well apt to

20  identify suspicious activity as well.

21  Q.  So they -- if they see somebody coming in with $800 one

22  day, and the next day the same person wants to come in with

23  another $800 and the next day another $800, what would they do?

24  A.  They would immediately contact me or my sister, one of the

25  compliance officers.  And they report that to me.  We document

Anna Isabel Alvarado - Direct

1   it.  Like I said, most of our employees are longtime employees.

2   And sometimes they -- you know, they have the same location.

3   So they become very savvy at, you know, just looking at the

4   customer and reporting that to me.

5   Q.  Okay.  And so would it be fair to say that you and your

6   employees are all on the lookout for shady characters trying to

7   make shady exchanges?

8   A.  Yes.  We always are.  Yes.  Of course.

9   Q.  Do you think that the cartels are using Reynosa to launder

10  money?

11  A.  I do not, no.

12  Q.  Why?

13  A.  I just think that the -- just back to the dollar amount,

14  it's very difficult.

15  Q.  I'm just -- I'm talking generally.

16  A.  Oh, generally.

17  Q.  Just generally speaking.

18  A.  No.  I sincerely don't.

19  Q.  Why?

20  A.  Just, it's -- there's too many barriers, you know.  They

21  have to come and give documentation when, you know, they could

22  just go find other means, you know, doing it not through MSBs,

23  just in between themselves, honestly, or people that have the

24  currency available and just doing it -- you know, not having to

25  go to a financial institution and be, you know, scrutinized by

Anna Isabel Alvarado - Direct

1   someone like me from the compliance department.
2   Q.  So we heard -- the government said this morning that MSBs
3   are vulnerable to abuse.  Do you think that Reynosa is
4   vulnerable to abuse by cartels?
5   A.  I would say there is a certain vulnerability with any
6   financial institution, not just MSBs.  So just like a bank,
7   when you go and don't have a bank account and you can exchange,
8   it's exactly the same thing.  In fact, you know, the compliance
9   department is composed of me and my sister and my brother.  And
10  we are direct, you know, owners of the business.  So I take
11  this very seriously.
12      So our training, it's very, very specific to -- you know,
13  it's not this other person that, you know, maybe doesn't have
14  the interest that I have of maintaining this, you know, almost
15  50-year business, you know, in compliance.  So yes, we all --
16  there's a vulnerability with every financial institution, but
17  that's why I and the rest of the compliance department is
18  there.
19  Q.  Let's talk about recordkeeping and reporting requirements.
20  And, again, we're just talking just generally.  We're not
21  talking about the GTO here.
22      So regarding exchanges, do you have to ask for customer
23  information for certain exchanges?
24  A.  Yes, we do, exchanges over $1,000.
25  Q.  Okay.  And do you have to keep that information for any

Anna Isabel Alvarado - Direct

1  period of time after you take it?

2  A.  Yes.  We are required to keep it for five years, but we

3  keep it indefinitely because it is electronic.

4  Q.  Okay.  And that information that you have to capture for a

5  thousand-dollar-plus transaction is the same kind of

6  information that you would eventually file with a CTR; is that

7  right?  Or is that different?

8  A.  Yes.  That is correct.  I believe -- we've been making

9  changes to our software, and I believe we added the male/female

10  field.  And that wasn't there.  But those are changes we're

11  trying to implement.  But yes, it's the same --

12  Q.  It's the same.  Okay.

13      And then -- but below a thousand dollars, you don't have to

14  ask for -- you don't have to ask for information?

15  A.  Correct.

16  Q.  Okay.  And then -- so you're capturing information.  You're

17  saving it.  Do you have to report, affirmatively report that

18  information of exchanges over a thousand dollars to FinCEN?

19  A.  We do not send any information.  So that information is

20  available to examiners, auditors.  So when we have a Title 31,

21  for example, we provide all transactions, even under --

22  transactions under a thousand, we can provide.  And we give all

23  of that information only when we have an examination or upon

24  request.

25  Q.  Just to be clear, because you had just said that there was

1   no information you capture under a thousand dollars --

2   A.  Oh.

3   Q.  But, of course, there's information that you capture,

4   right, under a thousand dollars.  Like, what do you capture,

5   for your -- for your own purposes under a thousand dollars?

6   Can you share that?

7   A.  Of course.  It's obviously the date, the amount, the

8   location, the cashier name, the rate and transaction number.

9   Q.  So it's like stuff that you would capture for your own

10  business purposes?

11  A.  Correct.

12  Q.  Is that fair to say?

13  A.  Yes.

14  Q.  But not for government purposes?

15  A.  Yes.

16  Q.  Okay.  But then at a thousand dollars you capture more.

17  And then -- and then when do you have to report that?

18  A.  Over a thousand, under 10,000, we do not report it unless

19  we have an audit.  So when there's an examination, we present

20  it to the examiner.

21  Q.  Let's pretend we're not in audit land.

22  A.  Okay.  No.  We have all of that information available at

23  any given time it's requested.

24  Q.  And you have to report it when?

25  A.  Report to --

Anna Isabel Alvarado - Direct

1  Q.  Like, you have to -- you have to report that information --

2  at what dollar threshold do you have to report that

3  information?

4  A.  I'm sorry.  But I don't believe --

5  Q.  It's my fault.  I'm not being clear.

6      Do you have to report transactions over $10,000?

7  A.  Yes.  Of course.

8  Q.  Okay.  All right.  But before $10,000, maybe you have to

9  collect some information, but you don't have to report it?

10  A.  That's correct.

11  Q.  Okay.

12  A.  I analyze the information for internal control purposes,

13  but it's not reported to anyone unless we're in an audit or

14  independent review.

15  Q.  All right.  So just because I was messy there, I'm just

16  going to recap.  You tell me if I'm wrong.  Okay?

17  A.  Yes.

18  Q.  So under a thousand dollars, you collect some minimal

19  information for your own business purposes but not for the

20  government?

21  A.  I'd like to correct that.  Actually, it's not minimal

22  information --

23  Q.  Okay.

24  A.  -- depending on the amount.  So if I deem the transaction

25  amount to be high -- and I'm being conservative when I say

Anna Isabel Alvarado - Direct

1   $3,000, right?  And, you know, I have someone bring in $3,000.

2   We instruct our employees to ask the purpose for their

3   transaction.

4        So in our database software, which is our KYC for our

5   customer, there is a field for notes.  So all employees are

6   instructed to write down notes that were given by the customer,

7   you know, purpose of transaction.  And when the amount gets

8   even higher, maybe, you know, 6-, 7,000, we ask for a proof of

9   source of funds or, you know, where the money's coming from.

10       So that is how I am able to go back and review these

11  transactions.  Since I am not at every single location at every

12  given moment, I go back and review all the notes provided.  And

13  I am very strict with our employees about the notes.  So I

14  request as much as possible, yes.

15  Q.  Okay.  And as it scales up in value?

16  A.  Yes.

17  Q.  At $200, you're not doing any of that?

18  A.  No.

19  Q.  Okay.  Okay.  Great.

20       So is the way -- so let's go to those $10,000 transactions.

21  So you're not reporting anything -- you're collecting

22  information and you're storing it, but you're not reporting

23  anything to the federal government until it's at 10,000, right?

24  A.  Correct.

25  Q.  Okay.  And the way you report those is the CTR, correct?

Anna Isabel Alvarado - Direct

1   A.  Correct.

2   Q.  Okay.  How many -- let's see.  On average -- this is

3   before, you know, not GTO time.

4   A.  Yes.

5   Q.  On average how many CTRs is Reynosa filing per month?

6   A.  An average, about 30 CTRs per month.

7   Q.  Okay.  And that's at the $10,000 threshold, right?

8   A.  Correct.

9   Q.  Okay.  How many exchanges over $200 is Reynosa averaging

10  per month?

11  A.  Between 6- and 7,000.

12  Q.  Between 6- and 7,000.  Okay.

13      So am I correct in stating that before the GTO you would be

14  doing about 30, 31 CTRs per month?

15  A.  Correct.

16  Q.  After the GTO, you're doing between 6- and 7,000 per month?

17  A.  That is correct.  In the 11 locations that fall in the ZIP

18  Codes, yes.

19  Q.  Oh, I see.  Okay.

20  A.  Yes.

21  Q.  The ones that will be affected by the GTO?

22  A.  Correct.

23  Q.  Okay.  Can you describe the CTR process?

24  A.  Okay.  So --

25  Q.  Starting from, like, information gathering for it and on?

Anna Isabel Alvarado - Direct

1  A.  Right.  The customer, again, arrive through one of our

2  locations, which mostly our drive-through -- identification,

3  take down all the information.  And then -- so we're talking

4  about what is required -- what would be required with a 200 or

5  with the 10,000?

6  Q.  Well, I mean, so when you -- when there's a CTR that's

7  going to be triggered --

8  A.  Okay.

9  Q.  So before the GTO, it's $10,000, right?  But after the GTO,

10  it's going to be 200.  What is that process going to look like?

11  A.  Okay.  So we take down all the information.  We scan their

12  identification.  It's not required, but we have a system where

13  we scan, and it shows up on the screen so that we can see the

14  person with their identification every time they come.  And

15  then after that, you know, after the ten days of the -- that we

16  give ourselves to file the CTR --

17  Q.  I'm sorry.  Can I pause you there?  Is all you do is scan

18  the -- scan the ID?

19  A.  No.  We take down all of their information.

20  Q.  All the information that would be required for a CTR?

21  A.  Yes, all the required information --

22  Q.  Thank you.  Go ahead.

23  A.  And then, after that, a report is generated.  With all the

24  transactions that require a CTR, we open the PDF file, fill

25  in --

Anna Isabel Alvarado - Direct

1  Q.  -- the PDF file, are you talking about the CTR?

2  A.  Correct, the CTR.  And we log on to the FinCEN website,

3  draw up the file profile.  You know, we upload and get a

4  confirmation number, and then again and again and again after

5  for each CTR.

6  Q.  So can I -- can I assume so you're filing one CTR at a

7  time?

8  A.  Yes.  Correct.

9  Q.  In PDF form?

10 A.  Yes.

11 Q.  To the FinCEN website?

12 A.  Yes.

13 Q.  And then you get a confirmation number.  What is that?

14 A.  Yes.  The BSA confirmation number.  Uh-huh.  And we write

15 that down.

16 Q.  And you get it immediately?

17 A.  Sometimes it takes a little while to get the BSA numbers.

18 And we rewrite them down on the report to just make sure we

19 didn't miss any CTRs, and we get a total amount, and we

20 corroborate that total amount of CTRs with what the system

21 produced, our internal software, just to make sure we didn't

22 miss a single CTR.

23 Q.  How many people are in the CTR review process?

24 A.  Oh, so right now the CTRs are done by my brother, Javier.

25 He's the president of the company.  He does the CTRs.  He fills

Anna Isabel Alvarado - Direct

1  them out.  And then he -- before submitting them, he passes

2  them down to his secretary.  He has two secretaries.  One of

3  the two.  Well, they only work one at a time.  And they review

4  it.  So it's -- you know, just to make checks and balances,

5  make sure everything's correct.  He goes back and submits.

6  He's the one that submits them onto the FinCEN website.

7  Q.  Okay.  So just to be clear, you have -- the president of

8  the company --

9  A.  Correct.

10  Q.  -- is doing the CTRs?

11  A.  Yes.

12  Q.  Why?

13  A.  I have a lot of work as it is.  I try -- currently, the

14  CTRs are over 10,000.  So by the time my brother receives the

15  transaction for a CTR, it has most definitely been through me.

16  So I have reviewed the customer, why they brought in the money,

17  the additional supporting documentation that presented because

18  we do not transact any transaction to an individual without

19  additional supporting documentation to support the source of

20  funds.  So by the time he files the CTR, I have already -- it

21  has passed compliance department.

22  Q.  I guess my question is more why is the president of the

23  company and one of the board of directors, chief compliance

24  officer, being the one to do CTRs?  Why not have a cashier do

25  this?

Anna Isabel Alvarado - Direct

1  A.  Right.  We would not delegate that authority to absolutely

2  anyone.

3  Q.  Why?

4  A.  It's just too -- it's too important.  It's too -- it holds

5  our business.  And we can't leave that to anyone that is not

6  completely invested in being compliant.

7  Q.  How many minutes is it taking to do each CTR?

8  A.  It depends.  If it's a pre-saved CTR, well, obviously a

9  pre-saved is, you know, another MSB that we know.  But I would

10 say, you know, maybe ten minutes.

11 Q.  Does that include the information gathering?

12 A.  You know, ten minutes of the actual filing of the --

13 filling out the CTR.

14 Q.  Yeah.

15 A.  With the customer and all of the -- creating the report and

16 analyzing if it's one or multiple transactions, which creates,

17 you know, filling out another field at the CTR, I would say a

18 total of maybe 20, 25 minutes.

19 Q.  Okay.  Twenty-five minutes per CTR, over 7,000 -- or 7,000

20 CTRs, what is going to be the impact of that on your business?

21 A.  Honestly, the only way I can describe it, in a sense that I

22 would approach it, it is impossible.  We do not plan on

23 delegating that -- you know, that to anybody else.  We have

24 been in the business for so long that I don't feel like I can

25 hand this to anybody else that does not have knowledge as to

Anna Isabel Alvarado - Direct

1  our business.  So I really don't think -- I mean, it would have
2  to be us, and it's an unsurmountable amount of work with
3  currently 11 locations in the GTO.
4  Q.  So that's the paperwork side and that burden.  Would you --
5  what is it going to do to your customers?
6  A.  We will lose our customers.  So in trying to be so
7  compliant -- that is definitely my favorite word.  There was a
8  lapse, as you all may know, that the TRO expired on May 9th.
9  We have been trying our best to take identification for
10 transactions, as of Friday midnight, you know, starting May
11 10th.
12      And, honestly, it has been -- it has been very difficult.
13 It has been devastating.  My brother and I have been here over
14 the weekend, and he has been constantly on the phone, trying to
15 mitigate the situation of explaining why this is going on to
16 our regular customers that are coming over to just purchase at
17 the mall.
18 Q.  Have you lost customers?
19 A.  Yes, we have.
20 Q.  About how many?
21 A.  I would say --
22 Q.  Or customer volume?
23 A.  Well, it's been two days, and it has been Mother's Day
24 weekend.  So I assume that somebody that made, you know, a
25 five-hour line at the bridge to cross, to come have dinner or

Anna Isabel Alvarado - Direct

1    lunch with their mom, is not going to stop from exchanging.
2    But we lost -- we saw about 50-percent decrease in these two
3    days.  And, again, I am here since Friday, and I'm not there.
4    So I haven't been able to review the transactions.  But from
5    the feedback of our employees, about half, yes.
6    Q.  I just have a few questions for you about the effect of
7    this, of the GTO in your -- in your view, as someone who's been
8    in this industry, you know, her whole adult life and is a
9    certified anti-money laundering specialist in her industry.  Do
10   you think that requiring a CTR for every transaction over $200
11   is going to help catch criminals?
12   A.  No, I do not.  Excuse me.  In fact, I think it might
13   inhibit what we are trying to do.  So I try to detect
14   suspicious activity, and I know that the BSA is trying to find
15   a paper trail of large and suspicious transactions.  A $200
16   transaction, it's not large, nor suspicious.  Even five of
17   those or ten of those are not large or suspicious.  So I
18   personally do not think it would be effective as far as from my
19   knowledge.
20   Q.  What did you think when you saw the 200 reporting
21   requirement come out?
22   A.  Okay.  So, first of all, we didn't receive any
23   correspondence as to this order.  We didn't receive an email.
24   We didn't receive any notice.  We had actually one of our
25   competitors reach out to us and extend us the information.  So

Anna Isabel Alvarado - Direct

1  we would have been completely unaware.  Maybe I would have
2  found out when I was at HEB, you know, when I saw the sign.
3      But, I mean, it was just -- I thought they had dropped to
4  zero, honestly.  Maybe I could work with another number.  But
5  200, I honestly thought they had left out a zero.  Then I saw
6  the 200 repeated several times.  And I thought, well, that's
7  impossible.  So yeah, that's initially what I thought,
8  honestly.  And all five of us did the same thing.  Yeah.
9  Q.  What do you expect compliance with the GTO to do to your
10 family's legacy?
11 A.  Honestly, it breaks my heart that we're having to go
12 through this.  We have been so compliant.  We strive to always
13 be compliant.
14     And so my father passed away when I was only 11, right?  I
15 have five -- you know, three brothers and a sister and
16 obviously my mom, who's 78 and still -- and still with us.  But
17 he only left us and this business.  So physically we only
18 have -- of my father and his struggles and everything he went
19 through, it's just the five of us and this business that we --
20 that we're fighting for.  And we're just not going to stop.
21 Even if this drives us to the ground, we will continue because
22 we will always be compliant.
23          MS. SANZ:  I'll pass the witness.  Thank you,
24 Ms. Alvarado.
25          THE WITNESS:  Thank you.

Anna Isabel Alvarado - Cross

```
 1            THE COURT:  All right.  Cross.
 2      While he's coming up, you mentioned the 30 CTRs of 10,000
 3  or more.
 4            THE WITNESS:  Yes, Your Honor.
 5            THE COURT:  And then there was earlier testimony about
 6  some of those CTRs are within the business.  You go and get
 7  more money for your inventory.  Are any of those kinds in the
 8  30 that you mentioned?
 9            THE WITNESS:  Yes, Your Honor, mostly, just as the
10  other businesses.
11            THE COURT:  So how many of the CTRs of 10,000 or more
12  are somebody, regular customer or not, coming in to exchange as
13  opposed to you all resupplying your inventory?
14            THE WITNESS:  Out of the 30, I would say maybe -- in a
15  month maybe five.
16            THE COURT:  Okay.
17            THE WITNESS:  Possibly five, yes.
18            THE COURT:  All right.  Cross.
19                      CROSS-EXAMINATION
20  BY MR. GREEN:
21  Q.  Good morning.
22  A.  Good morning.
23  Q.  You mentioned a KYC database?
24  A.  Yes.
25  Q.  What is that?
```

Anna Isabel Alvarado - Cross

1   A.  So it's our internal software.  So I like to call the

2   screen where the employee captures all the customer's

3   identification the KYC, because it not only holds their

4   identifying information.  It holds a scan of the

5   identification.  That may be driver's license, passport.  And

6   then it also holds a large field for notes, as far as

7   pertaining to the customer.

8   Q.  How long has Reynosa used that database?

9   A.  It has been around -- before I started working, we had -- I

10  don't know.  Over 23 years.  Obviously with many, many

11  revisions, many revisions.

12  Q.  Of course.

13  A.  So there's a bunch of updates.  And we just always tried to

14  make it, you know, the best we can.  So it's been revised many

15  times.

16  Q.  So for the transactions that customers do at Reynosa, that

17  database captures the name of the customer, their address?

18  A.  Correct.  All the BSA-required information is captured in

19  the database, yes.

20  Q.  Is there anything that has to go into a CTR that isn't

21  captured in the KYC database?

22  A.  No.

23  Q.  And are there any transactions at Reynosa that entering the

24  customer information into the KYC database is not required for?

25  A.  I guess the notes, just the notes and the actual scan of

Anna Isabel Alvarado - Cross

1  the identification.  It's not required.  We are not required to
2  submit the scan of the CTR.  But the notes and the
3  identification are additionally on the KYC.
4  Q.  Right.  And, actually, that was a bad question.  Let me ask
5  that question a different way.
6      For Reynosa's own purposes, do you require the KYC database
7  to be completed for every transaction?
8  A.  For every transaction in excess of $1,000, currently, yes.
9  Q.  Okay.  So only for transactions over a thousand dollars?
10 A.  Yes.  Correct.  Because that's the only instance where
11 we're requiring identification at the moment.
12 Q.  Understood.
13     Does Reynosa also do money transmission?
14 A.  So we were required to obtain a money transmission license
15 because there are just a couple of customers, our business
16 customers, for example.  We have a supermarket in the area.  So
17 they receive pesos, and they bring in -- the pesos in to our
18 business.  And they want -- they don't want cash.  They don't
19 want dollars.  So we have to issue -- they wanted us to issue a
20 check.  So we issue a check from our bank account to them,
21 because they don't want, you know, currency and pesos into cash
22 and dollars.  They don't want to go and deposit cash into their
23 accounts.  They want a check.
24 Q.  Okay.  So would that explain why Reynosa might be licensed
25 to do currency exchange?

Anna Isabel Alvarado - Cross

1  A.  So we are licensed to do currency exchange and money

2  transmissions because, since we are issuing a check for that

3  transaction, there's a -- there's a period where the money --

4  until the check is deposited, our check is deposited into their

5  account, that was considered to be a money transmission.  But

6  we do not do money transmission to individuals, or we don't

7  advertise for it or anything like that.

8  Q.  Understood.  Understood.

9     You testified about customers that Reynosa has lost in the

10 last couple of days.  Why would customers not want to return to

11 Reynosa because of this GTO?

12 A.  Well, for example, last night, you know, we were in the

13 hotel room.  I believe it was almost 11:00 p.m.  So we get, you

14 know, a call from -- there was a car, you know, with a family.

15 I don't know if they had money left over or what from their

16 spending.  There was four people in the car, you know.

17    By the time each one of them -- I think the only -- one

18 transaction was for $50.  The other ones were, like, 250.  So

19 by the time each one of them in the vehicle, which is a family,

20 gives their identification, I want to say the car was there for

21 about 45 minutes.

22    So we were connecting via, you know -- I don't -- my

23 brother is a tech guy.  But he was connecting -- trying to help

24 the employee because, you know, it was, like, four

25 identifications in a car, you know.  And this is supposed to

Anna Isabel Alvarado - Cross

 1  be, like, a streamlined process, right?  You know?  And it just
 2  was taking a really long time.  So I doubt they will come back.
 3  Q.  So just a function of delay?
 4  A.  Yeah.  Mostly.  And, well, of course there is the case of
 5  identity theft.  I mean, there's just -- identity theft is just
 6  increasing so much.  And, you know, we train our employees to
 7  be very cautious with information and all that.  So new scams
 8  are just growing left and right.  We get those calls, you know,
 9  20 times day.  So people just are hesitant to give their
10  personal information.
11  Q.  But for the KYC database, Reynosa is already collecting
12  that information for all transactions over a thousand dollars,
13  right?
14  A.  Correct.  For over a thousand dollars, yes.
15  Q.  Okay.  Do you -- have you personally ever completed a CTR?
16  A.  Yes, I have.  Many years -- when the FinCEN filing system
17  began, you know, we would do it together.  And then I -- about
18  seven years ago, when I took over the compliance department and
19  just the overseeing of suspicious activity and all that, my
20  brother was the one that started.  But yes, I have initially.
21  You know, it was a long time, but I have.
22  Q.  Under the process that exists now at Reynosa, it sounds
23  like you were describing that the employees and then ultimately
24  your brother, the president, would prepare and review the
25  five-page PDF version of the CTR?

Anna Isabel Alvarado - Cross

1  A.  Uh-huh.

2  Q.  Is that right?

3  A.  That's correct.  Yes.

4  Q.  Has Reynosa considered any other way of submitting CTRs?

5  A.  So in the short period of time we were given, trying to

6  separate the different aspects of how we're going to handle

7  this, you know, employee training and all that, we have had a

8  short amount of time to research other -- you know, I believe

9  it was mentioned, batch.

10      But honestly, it's something -- I researched just in

11  Google.  I didn't contact a company.  So these companies are --

12  you know, they're offering -- even with, you know, 11

13  locations, or 13 in total, we're just not large enough.  So we

14  haven't been able to get any sort of relief on how to file this

15  any faster.

16  Q.  Have you -- do you know if Reynosa has requested any quotes

17  from vendors that might provide software used to automate

18  CTR --

19  A.  We haven't requested, honestly.  We have dedicated most of

20  the time to figuring out how to make this from scratch, like we

21  have everything else.

22  Q.  Is there someone within Reynosa who developed the KYC

23  database that you use for internal --

24  A.  Yes, there is.  We have an IT programmer that developed our

25  software and is constantly making revisions to it to make it

Anna Isabel Alvarado - Cross

1  stronger.  And we have reached out to him.  But he has no

2  knowledge of how to do any batch or CTR filing or anything of

3  that.  So he hasn't -- he hasn't been any help.

4  Q.  Is that something that you've asked him to work on?

5  A.  We have asked him to help us, you know, in the -- that we

6  will eventually have to do that because, honestly, don't see

7  how we will be able to, you know, file all these CTRs.  So we

8  are looking into it, but we're nowhere near being able to

9  produce a batch file.

10 Q.  Okay.  Are you the designated AML compliance officer for

11 Reynosa?

12 A.  Yes.

13 Q.  In that role, do you generally need to be aware of news

14 from FinCEN about the requirements for MSBs?

15 A.  Yes.  Of course.

16 Q.  How do you keep current on what FinCEN is requiring from

17 MSBs?

18 A.  Well, we receive correspondence through AML.  I am

19 registered, obviously.  I have my own ID for the FinCEN

20 website, and my brother has his.  So he files under his, and I

21 have my filing PIN and everything.  So we receive information

22 there.  But, you know -- as then as far as, like, banking, we

23 get emails.  So we get notifications about everything.

24     And I was actually very surprised that we did not receive

25 anything about the GTO, especially with a 30-day period.  It

Isidro Salinas - Redirect

```
 1   was -- that was quite surprising.
 2   Q.  So you said that you get emails.  Are there email lists
 3   that FinCEN issues, that you sign up for?
 4   A.  No.  I believe it's just with your ID.
 5   Q.  So there's an ID that you have to log in to the FinCEN
 6   website?
 7   A.  Yes.  It's your email.  Your ID is your email.  Uh-huh.
 8   Q.  Okay.  Separately, are there -- is there an email list that
 9   sends news alerts from FinCEN, that you can subscribe to, that
10   you're aware of?
11   A.  Not that I'm aware of.  ACAMS also does send me a lot of
12   information, the Association of Certified Anti-Money Laundering
13   Specialists.  So also they put out there a lot of information
14   that is relevant to MSBs.
15   Q.  Is that a national organization?
16   A.  Yes.
17   Q.  Okay.
18       (Discussion off the record)
19           MR. GREEN:  I'll pass the witness.
20           THE COURT:  Redirect, if any.
21                       REDIRECT EXAMINATION
22   BY MS. SANZ:
23   Q.  I just have a couple of questions.  Ms. Alvarado, about
24   batch filing, you had previously testified that it takes you 20
25   to 25 minutes to do a CTR with all of the steps included.  Even
```

Isidro Salinas - Redirect

1  if you got batch filing going, say you were able to connect

2  directly to FinCEN and upload, you know, 5,000 records at a

3  time, do you have any idea yet how much that will shave off of

4  that 20 to 25 minutes?

5  A.  Honestly, no, I don't.  The filtering of the transactions

6  still has to be done because -- so there's -- I believe, from

7  what I've researched, the batch filing is some sort of XML

8  spreadsheet, something like that.  We have to filter which

9  transactions were multiple, which transactions were on behalf

10  of a business.

11     So it's not as streamline as, you know, it may seem.  We

12  still have to do a lot of sorting and filtering, and then -- to

13  be able to send I believe a batch of, like, all just, you know,

14  like, single transactions or something like that.

15  Q.  So in your -- and as far as you know, batch filing isn't

16  going to be the panacea to the GTO?

17  A.  No.  Actually, it's very stressful, actually.  For someone

18  who's in compliance and not, you know, IT savvy, I'm worried.

19  I don't know how to approach that or who to look for because

20  it's just not available.

21     And we have reached out to FinCEN.  We reached out to

22  FinCEN right when the GTO, you know, was released, you know,

23  just asking for help.  You know, you send a message.  Maybe

24  seven to ten days later we get a -- I believe what seemed like

25  an AI-generated response, because it was very generic.  There

Isidro Salinas - Redirect

1    was no -- there was no -- you know, any guidance as to how to

2    proceed and help.  So it's quite frustrating, actually, yes.

3    Q.  And if you got batch filing going, would it solve the

4    problem of people leaving your business because they don't want

5    to give their information?

6    A.  No, it wouldn't.

7    Q.  Would it solve the problem of people being worried about

8    identity theft?

9    A.  No.

10            MS. SANZ:  I think that's it.

11            THE COURT:  Recross?

12            MR. GREEN:  Not from us.

13            THE COURT:  All right.  Ma'am, I wanted to ask you a

14   question or two.

15            THE WITNESS:  Yes, Your Honor.

16            THE COURT:  Hold on here.  Oh, yes.  So you have 11

17   locations?

18            THE WITNESS:  Within the -- that would fall under the

19   GTO, yes.  Thirteen in total.

20            THE COURT:  Okay.  And two of them are in location

21   under which this TRO --

22            THE WITNESS:  Yeah.  Two of them do not fall under the

23   GTO.  And that would be one in McAllen and one in Donna.

24            THE COURT:  Okay.  But you all are plaintiffs or not?

25            THE WITNESS:  Yes, we are the plaintiffs.  Yes.

Isidro Salinas - Redirect

```
 1  Uh-huh.
 2         THE COURT:  All right.  Because there's some people
 3  who testified that are not plaintiffs.
 4         THE WITNESS:  Oh, no, no, no.
 5         THE COURT:  But at any rate -- so of the locations
 6  that are in the ZIP Code covered by the TRO and then the others
 7  that are not --
 8         THE WITNESS:  Yes.
 9         THE COURT:  -- is there some significant difference
10  right now?
11         THE WITNESS:  No, not that I've noticed.  We have
12  maintained our customer base.  Well, up until two days that we
13  tried -- we tried to implement this.
14         THE COURT:  Okay.  But the ones that are in other ZIP
15  Codes are not covered by the GTO, correct?
16         THE WITNESS:  Correct.
17         THE COURT:  Okay.  All right.  Very well.  Thank you,
18  ma'am.  You may step down.
19         THE WITNESS:  Thank you.
20         THE COURT:  Mr. Rowes, I understand that you all may
21  be having lunch brought in?
22         MR. ROWES:  That's right, Your Honor.  I mean, we can
23  do whatever Your Honor wants but --
24         THE COURT:  Do you know if it's here or --
25         MR. ROWES:  It is.
```

1          THE COURT:  It is?

2          COURT SECURITY OFFICER:  Your Honor, it's at post one.

3          THE COURT:  Down there?

4          COURT SECURITY OFFICER:  Yes.

5          THE COURT:  Okay.  All right.  We will be in recess

6    for 45 minutes.  Thank you.

7       *(Recess at 12:04 p.m. until 12:47 p.m.)*

8          THE COURT:  Mr. Rowes, while we're waiting for

9    everybody, I did want to have a followup on something

10   Ms. Powell said.  So if you'll come to the lectern.

11         MR. ROWES:  Certainly, Your Honor.

12         THE COURT:  And let me look at my notes here.  Oh,

13   yes.  Of course, I've already ruled that we're going to put

14   together, make a whole record and so forth.  But whatever

15   happens, either or both sides could appeal.

16      And so my legal question is, how do you respond to the

17   government's or the defendant's argument that this Court should

18   only be looking at the administrative record and not testimony

19   or declarations?

20         MR. ROWES:  Sure.  So that's the default rule.  It's

21   true that administrative records are typically closed and

22   they're reviewed under the Administrative Procedure Act's

23   various standards for constitutionality, arbitrary and

24   capriciousness, compliance with procedures.

25      But courts have recognized that when the administrative

```
 1   record is incomplete, and not just for reasons of bad faith,
 2   but when the administrative record is incomplete because the
 3   government hasn't compiled a proper administrative record, that
 4   courts can and do supplement.  And I'd ask the Court to look at
 5   exactly one case, Judge O'Connor up in Dallas.  It is the
 6   national gun rights case.  We cite it extensively in the motion
 7   to supplement, and it is on all fours here.
 8       And the problem with the administrative record is that
 9   FinCEN created it behind closed doors, without asking anybody
10   anything about it.  And what Judge O'Connor said is, you can't
11   have the agency create the record that it wants, not talk to
12   anybody else and then come into court and say, this is the only
13   evidence you can consider.
14       And the reason why is because the premise behind the
15   administrative record under the APA is that parties are
16   permitted, either through notice and comment or through a
17   contested adjudication, to put their evidence into the record.
18   FinCEN didn't give anybody an opportunity to put things into
19   the record.  If they had, everything you're hearing today, Your
20   Honor, would be in the record.
21       And so when the government -- when the government
22   deliberately excludes the commentary that's required either
23   under notice and comment or through a contested adjudication,
24   courts do supplement the administrative record.  All of the
25   analysis is in our motion and in the national gun rights case.
```

```
 1          THE COURT:  All right.  And in that case, result was a
 2   finding of what?
 3          MR. ROWES:  So the result was that -- the ATF had made
 4   a rule about what a machinegun is.
 5          THE COURT:  Right.
 6          MR. ROWES:  And, you know, so -- as Your Honor
 7   probably knows, looking at -- you know, doing federal cases for
 8   years, there's lots of argument, what's a machinegun?  What's a
 9   magazine?  What's this?  What's that?  And the ATF had created
10   its definition without asking anybody.  And then they showed
11   up, and they said, well, here's what it is, and nobody's
12   allowed to question it because this is the administrative
13   record, and it's closed.
14       And Judge O'Connor, he quoted the plaintiff's analogy
15   there, which is, suppose the government goes into private and
16   looks at an orange and then declares it to be a potato and then
17   comes into court and says, nobody's allowed to question that an
18   orange isn't a potato because we created an administrative
19   record.  And he said, that's absurd.
20       It's the same situation here.  We weren't given a chance.
21   And so this is the chance.
22          THE COURT:  Does that result in injunctive relief, or
23   they withdrew the rule or policy and started over?  What
24   happened?
25          MR. ROWES:  No.  So in that case the outcome was an
```

1    injunction against the definition, that the injunction was

2    defective under the APA.

3            THE COURT:  Did it go up?

4            MR. ROWES:  You know, I think it might actually -- so

5    the decision was rendered in November of 2024.  So I think it

6    might be on appeal right now.  But we don't have a decision

7    from the Fifth Circuit.

8            THE COURT:  Okay.  Talking about gun cases, we've had

9    this flurry of -- I guess starting with *Bruen* and the history

10   and traditions and yak, yak, yak.

11       *(Discussion off the record)*

12           THE COURT:  All right.  Ready for -- was it one more

13   witness or two?

14           MR. ROWES:  We've got two, Your Honor.  But --

15           THE COURT:  Okay.

16           MR. ROWES:  -- one will be quite -- the next one

17   should be pretty short, and then we should be able to get

18   through the second one probably in about 45 minutes, too.

19           THE COURT:  Okay.  Very well.  Next witness.

20           MS. SANZ:  Your Honor, the plaintiffs call Arnoldo

21   Gonzalez, Jr.

22           THE COURT:  All right.  Sir, if you'll raise your

23   right hand.

24       *(The oath was administered)*

25           THE COURT:  All right.  You may be seated.

Arnoldo Gonzalez, Jr. - Direct

1    You may proceed, counsel.

2         MS. SANZ:  Thank you.

3         ARNOLDO GONZALEZ, JR., PLAINTIFFS' WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MS. SANZ:

6    Q.  Hello, Mr. Gonzalez.  Will you please state your name and

7    spell it for the record.

8    A.  It's Arnoldo Gonzalez, Jr.  It's A-R-N-O-L-D-O,

9    G-O-N-Z-A-L-E-Z, Jr.

10   Q.  Thank you.

11       What is the name of your business?

12   A.  High Value, Inc.

13   Q.  High Value, Inc.  And where is it located?

14   A.  Laredo, Texas.

15   Q.  And do you have more than one location, or just one?

16   A.  Only one.

17   Q.  Is High Value an MSB, registered with FinCEN?

18   A.  Yes.

19   Q.  And is it a plaintiff in this lawsuit covered by the TRO?

20   A.  Yes.

21   Q.  What does High Value do?

22   A.  It's currency exchange, only cash.

23   Q.  Do you --

24   A.  Dollars to pesos, pesos to dollars.

25   Q.  Dollars to pesos, pesos to dollars?

Arnoldo Gonzalez, Jr. - Direct

1   A.  Yes.

2   Q.  And nothing else?

3   A.  That's it.

4   Q.  Okay.  Where do you live?

5   A.  In Laredo, Texas.

6   Q.  Okay.  And Laredo is right across the border?

7   A.  Yeah.  Actually, the business is five blocks from the

8   bridge.

9   Q.  Okay.  And what's on the other side?

10  A.  Nuevo Laredo, Mexico.

11  Q.  And so Laredo is a border town?

12  A.  Yes.

13  Q.  Can you just describe briefly what life is like in a border

14  town?

15  A.  Families go -- come back and forth, relatives go shopping.

16  And part of it are also tourists.

17  Q.  So do you personally cross the border frequently?

18  A.  Yes.

19  Q.  Why?

20  A.  I go with my doctor in Mexico and get my medicine from

21  Nuevo Laredo.

22  Q.  Do you have any family in Nuevo Laredo?

23  A.  Yes.

24  Q.  Who?

25  A.  My son lives over there.

Arnoldo Gonzalez, Jr. - Direct

1    Q.   Why?

2    A.   He's married with a Mexican woman.

3    Q.   Where does he live?

4    A.   In Nuevo Laredo, Mexico.

5    Q.   So they live in Nuevo Laredo.  And where does he work?

6    A.   He works on Laredo, Texas, at Grifols Plasma Center.

7    Q.   Does he use exchange services?

8    A.   Yes.  He has to take pesos to his family.

9    Q.   Would you say that currency exchange for these reasons is a

10   critical business and a critical service in Laredo?

11   A.   It's a common service.  People need it.

12   Q.   Why do they need -- why do they need it?

13   A.   Because they have to go -- if they go on and purchase

14   something into Mexico, they need pesos.  If the Mexicans are

15   needing to come shopping to the United States, they need

16   dollars, and back and forth.

17   Q.   What about you?  Do you need dollars and pesos?

18   A.   Yeah.  I need to go and take -- buy my medicine and all

19   that in Mexico.

20   Q.   Okay.  So you have a doctor in Mexico, right?

21   A.   Yes.

22   Q.   And do you have -- do you go to that doctor frequently?

23   A.   It's about every month or every two months, depends.

24   Q.   Do you have a condition that you're managing?

25   A.   A what now?

Arnoldo Gonzalez, Jr. - Direct

1  Q.  Do you have a physical condition that you're --

2  A.  Oh, yeah.  I'm diabetic.

3  Q.  Okay.

4  A.  I'm insulin resistant.  And he has been treating me.

5  Q.  And you've been happy with his treatment?

6  A.  Oh, yes.

7  Q.  Okay.  Is medical care in Mexico less expensive than in the

8  United States?

9  A.  Very much difference.

10 Q.  And how do you pay your doctor?

11 A.  Cash.

12 Q.  Okay.  And I assume that you exchange currency when you go

13 to see your doctor?

14 A.  Yes.

15 Q.  What do -- what is that amount typically that you exchange

16 when you go to see your doctor?

17 A.  250 to 300.

18 Q.  Okay.  Is it ever anywhere near $10,000?

19 A.  No.

20 Q.  Okay.

21 A.  No.

22 Q.  But it sounds like it's always more than 200?

23 A.  Oh, yes.  Yeah.

24 Q.  Okay.

25 A.  This one medicine, I have to pay out $134, that I take.

Arnoldo Gonzalez, Jr. - Direct

1  Q.  Okay.  Before the GTO, so -- before the GTO, every time you

2  go to the doctor, do you get a report about your financial

3  activity sent to the Federal Crimes Enforcement Network?

4  A.  No.

5  Q.  How do you feel about FinCEN getting those reports every

6  time you exchange a few hundred dollars?

7  A.  I don't like it.  I wouldn't be -- I don't like to be under

8  the magnifying glass of the government.

9  Q.  Why?

10  A.  And there's other options.  I could go to IBC and make an

11  exchange there, and they won't ask for anything.

12  Q.  Let's talk about that.  Actually, we'll get to that.  Let

13  me find out about High Value first.

14  A.  Okay.

15  Q.  How long has it existed?

16  A.  Twenty-five years.

17  Q.  Okay.  And do you employ anybody?

18  A.  We have four employees and me, cashiers.

19  Q.  And what kind of -- what kind of customers does High Value

20  have?

21  A.  Tourists and local people that are coming back, back and

22  forth.

23  Q.  Do you have any business customers doing business on either

24  side of the border?

25  A.  Yes, but not that much.

Arnoldo Gonzalez, Jr. - Direct

1   Q.  Okay.  Would you say most of your customers are tourists?

2   A.  Yeah, about 80 percent.

3   Q.  Okay.  And any other -- and the other 20 percent is maybe

4   businesses and --

5   A.  Businesses and local people coming back and forth.

6   Q.  Okay.  How often do you get a customer wanting to make an

7   exchange over $10,000?

8   A.  It's not that common.

9   Q.  Is currency change a very competitive business?

10  A.  Yes, ma'am.

11  Q.  Okay.  Where are your nearest competitors?

12  A.  Half a block from me, across the street and one block

13  ahead.  There's a lot of money exchanges around.

14  Q.  Okay.  And are some of those money exchanges business

15  banks?

16  A.  Yeah.  Just crossing the street, there's a bank.  And four

17  blocks from my business, it's IBC.

18  Q.  As a plaintiff, you were in the room when -- you were

19  allowed to be in the room when opening statements were made.

20  Were you here?

21  A.  Yes.

22  Q.  Okay.  Did you hear Ms. Powell say that banks don't change

23  money from people who are not their customers?

24  A.  That's the second person I hear that.

25  Q.  Did you hear her say that?

Arnoldo Gonzalez, Jr. - Direct

1  A.  From an auditor, they said they won't ask to comply them

2  because they only attend customers from the bank.  And that's

3  not true.

4  Q.  So it's not true?

5  A.  It's not true.

6  Q.  How often does High Value currently do CTRs?

7  A.  A month?  Ten to 15.

8  Q.  Okay.  And are those all retail customers coming to

9  High Value?

10  A.  No.  Most of that is to refurbish my inventory.

11  Q.  Okay.  How do you expect the GTO to impact your business?

12  A.  It's going to -- we're going to have to close, actually.

13  It's hard to comply.  From -- to doing 10, 15 CTRs, and now 24

14  a day, it's impossible to do it.

15  Q.  Is that what you estimate?  You'll be doing 24 per day?

16  A.  Yeah.  Uh-huh.

17  Q.  So that's a big burden?  Is that what you're saying?

18  A.  Oh, yes.

19  Q.  Okay.  What about -- what about customers?  Will you get

20  the same amount of customers after the GTO?

21  A.  No, because there's other options.

22  Q.  So tell me about those options.

23  A.  Crossing the bridge, there's more than a hundred money

24  exchanges.

25  Q.  Okay.

Arnoldo Gonzalez, Jr. - Direct

 1   A.   And the banks, the bank is four blocks from me.

 2   Q.   Okay.  Let's look at that.

 3        Kendall, will you pull up Exhibit Number 12, please.

 4        And there should be a screen.  It should pop up in a second

 5   here.  Mr. Gonzalez, this is -- for the record, I'm showing you

 6   what's been previously marked as Exhibit Number 12 for

 7   identification.  Can you please tell me what this is a photo

 8   of?

 9   A.   That's a billboard from IBC Bank:  Offering pesos,

10   available for everyone.

11   Q.   And by "everyone," do we think we mean noncustomers?

12   A.   Yes, ma'am.

13   Q.   Okay.  Have you seen -- have you seen what's in this

14   picture yourself?

15   A.   I do not understand the question.

16   Q.   Oh, have you -- is this -- is this an accurate picture?

17   A.   Oh, yeah.  That's about five blocks from my business.

18        MS. SANZ:  Okay.  I'd like to offer this into evidence

19   as Plaintiffs' Exhibit Number -- is it 12 or we going do to 1?

20   Okay.  Exhibit Number 12, please.

21        THE COURT:  All right.  Ms. Powell or Mr. Green, I'm

22   sure you object for the record.

23        MS. POWELL:  Yes.

24        THE COURT:  And objection's noted and overruled and

25   admitted.  And I'll send you a bill for helping you practice

Arnoldo Gonzalez, Jr. - Direct

```
 1  law.
 2      Go ahead.
 3      (Plaintiffs' Exhibit Nos. 12 admitted)
 4          MS. SANZ:  Thank you.
 5  BY MS. SANZ:
 6  Q.  Okay.  So it says:  Pesos available for everyone.  Is that
 7  what you said?
 8  A.  Yes.
 9  Q.  Okay.  And that's five blocks from your house?
10  A.  From -- no.  From my business.
11  Q.  From your store?
12  A.  Yeah.
13  Q.  Okay.  Let's go ahead and look at what has previously been
14  marked as Exhibit Number 13, which should come up.  Can you
15  describe what this is?
16  A.  It's a sign from IBC:  Pesos and dollars available for
17  everyone.
18  Q.  And have you seen this before?
19  A.  In almost all those -- all the IBC Banks have that sign.
20  Q.  Have you seen this picture before?
21  A.  Yes.
22  Q.  And it's accurate to your knowledge?
23  A.  Yes.
24          MS. SANZ:  Okay.  And I'd like to offer this into
25  evidence as Plaintiffs' Exhibit Number 13.
```

1          THE COURT:  Same objection, noted, overruled,

2    admitted.

3       *(Plaintiffs' Exhibit No. 13 admitted)*

4          MS. SANZ:  Thank you.

5    BY MS. SANZ:

6    Q.  One more.  Can we go to Exhibit Number 14, please.

7          And here's another photograph.  Can you tell me what you

8    see here?

9    A.  That's it in Spanish.  "*Pesos, dólares, disponible para*

10   *todos*," the same thing as in English.

11   Q.  And as far as you know, is this an accurate picture?

12   A.  Yes.  And that's outside Family Bank, Commerce Bank.  It's

13   outside IBC, also.

14         MS. SANZ:  And so I'd like to move for this to be

15   admitted as Plaintiffs' Exhibit Number 14, please.

16         THE COURT:  Objection noted, overruled, admitted.

17      *(Plaintiffs' Exhibit No. 14 admitted)*

18         MS. SANZ:  Thank you, Your Honor.

19   BY MS. SANZ:

20   Q.  So, Arnold, would you consider these banks your

21   competitors?

22   A.  Yes.

23   Q.  Are they going to have to comply with the GTO?

24   A.  No.  They're not asking for it.

25   Q.  Are they right across the street from you and down the

Arnoldo Gonzalez, Jr. - Direct

 1   block in your town?

 2   A.   Yes.  Uh-huh.

 3   Q.   Why else might a customer stop coming in to High Value, do

 4   you think?  Are they just going to all go to the banks?

 5   A.   No.  Across the bridge and exchange them.  There's about a

 6   hundred money exchanges on the Mexican side.

 7   Q.   Is there any other reason why they might stop coming in to

 8   High Value?

 9   A.   No.  Because --

10   Q.   Why are they going to go somewhere else that's not under

11   the GTO?

12   A.   Because they don't -- most of the customers do not want to

13   give you the information.

14   Q.   Do you have any idea why?

15   A.   Most of it is because of -- what you call it?  Identity

16   theft.

17   Q.   You think that's their primary concern?

18   A.   Yeah.

19   Q.   As far as the advertisements from competitors, were these

20   in place -- do you recall, were these --

21   A.   They had -- they had some simple signs, pesos and dollars,

22   and that's about it.  Now they're putting:  Available for

23   everyone.

24   Q.   Okay.  And to your knowledge, has that happened since the

25   GTO has gone into effect?

Arnoldo Gonzalez, Jr. - Direct

1  A.  Yes.

2          THE COURT:  I'm sorry.  I was thinking about something

3  else I wanted to ask him.  But I think you may have asked one

4  of the questions I had.  Repeat that.

5          MS. SANZ:  Yeah.  My question was if he had seen ads

6  like this before the GTO became -- you know, was published.

7          THE COURT:  Okay.  It looks.  Yes.  It looks like a

8  pretty new sign and temporary.  So that's what I was going to

9  ask.

10      So go ahead and answer.

11          THE WITNESS:  Yeah.  Before, they had small signs,

12  pesos and dollars.  That's about it.  But now they're putting

13  in these *disponible para todos*, available for everyone.

14          THE COURT:  But that's happened within the last month

15  or two?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.  Go ahead.

18          MS. SANZ:  Thank you.

19  BY MS. SANZ:

20  Q.  So you think you might lose customers, you're saying?

21  A.  Uh-huh.  Yes.

22  Q.  And you think you'll have an explosion of paperwork; is

23  that right?

24  A.  Uh-huh.

25  Q.  Okay.  Do you -- what do you expect to happen for your

Arnoldo Gonzalez, Jr. - Cross

```
 1  family out of that?
 2  A.  I'll be left without my payroll.
 3          MS. SANZ:  I think --
 4      (Discussion off the record)
 5          MS. SANZ:  Okay.  I think I will pass the witness.
 6  Thank you.
 7          THE COURT:  All right.  Cross.
 8      While Ms. Powell is getting ready, those signs remind me
 9  also of the kinds of signs that Mr. Green's grandfather and I
10  used to go up and put out.
11      (Discussion off the record)
12          THE COURT:  All right.  Ms. Powell, you probably know
13  more about San Antonio history than you ever wanted to know.
14  But go ahead.
15          MS. POWELL:  More is better.
16                      CROSS-EXAMINATION
17  BY MS. POWELL:
18  Q.  Well, let's start where you ended, with IBC Bank.  Have you
19  been in to an IBC Bank for currency exchange?
20  A.  No, ma'am.
21  Q.  So you don't know what fees they charge noncustomers?
22  A.  The customers -- just by information I have from the
23  customers.  I've never exchanged there.
24  Q.  And you don't know what their current fees are?
25  A.  No.
```

Arnoldo Gonzalez, Jr. - Cross

1    Q.  For non-account holders?

2    A.  No.

3    Q.  You don't know what their exchange rate for non-account

4    holders is?

5    A.  But the customers say they don't charge anything.

6    Q.  You don't think they charge anything for currency exchange

7    for --

8    A.  Customers that have gone there say that they don't -- they

9    don't charge anything or ask for anything.

10   Q.  And you don't know how their exchange rate compares to

11   yours in terms of buying and selling pesos?

12   A.  No, because they don't have a sign outside.  And I don't go

13   inside and check.

14   Q.  And you haven't surveyed other banks generally to find out

15   whether they generally serve non-account holders?

16   A.  Yes.  Falcon International Bank also does that, and he's

17   just crossing the street.  But they don't have signs outside.

18   Q.  Okay.  That's a little different than the question I asked,

19   which is, have you generally inquired as to whether banks

20   usually serve non-account holders for cash transactions?

21   A.  I don't know.

22   Q.  Okay.  High Value is registered as a dealer in foreign

23   exchange, correct?

24   A.  MSB, yes.

25   Q.  Yes.

Arnoldo Gonzalez, Jr. - Cross

1   The public MSB registration by FinCEN also lists it as a
2   check casher?
3   A.  I don't do cash -- checks.  Sorry.
4   Q.  Have you ever done checks?
5   A.  No.
6   Q.  Do you know why it's listed as a check casher on the MSB
7   registration?
8   A.  I really don't know.  No.
9   Q.  Okay.  And High Value just has the one location, correct?
10  A.  Only one location.
11  Q.  Okay.  And it is really very close to the border crossing,
12  correct?
13  A.  About five blocks.
14  Q.  And it's on the southbound side?
15  A.  Right where I-35 ends, one more block.
16  Q.  All right.  That's probably one of the things that makes it
17  convenient to your customers, right; that it's just before
18  someone crosses the border, and you're on the southbound side?
19  A.  Yeah.  That's why the gas station is Last Chance.
20  Q.  Yeah.  And I assume that makes it very convenient to a lot
21  of customers, especially tourists, as you said before?
22  A.  Yes.
23  Q.  And most of your business, you said, is dollars to pesos?
24  A.  Most of it is dollar to pesos.
25  Q.  Okay.  Leaving aside the GTO as of, you know, March, why

Arnoldo Gonzalez, Jr. - Cross

1  would someone come to you instead of to a bank to change

2  dollars to pesos?

3  A.  One is the rate, and the other one is convenience.

4  Q.  And why would someone come to High Value instead of a

5  different MSB?

6  A.  That depends on where the customer likes the service that

7  he receives.

8  Q.  And in your case it might just be because they're headed

9  south, and that's the last place to stop, correct?

10  A.  Yes.

11  Q.  Is your business -- are there slow times during the day?

12  A.  Yeah.

13  Q.  Regular day.

14  A.  After 11:00.  From 11:00 to 4:00 gets a little bit slow.

15  But customers come in.

16  Q.  Am I correct it was a 24-hour operation?  Correct?

17  A.  Yes.

18  Q.  Okay.  And there are busy times of day, too, I assume?

19  A.  Oh, yeah.  From in the morning till 11:00, and in the

20  afternoon, after 4:00.

21  Q.  And there's a cashier on duty all the time, it sounds like.

22  And sometimes you're there in the office?

23  A.  I'm always there, and only one cashier.

24  Q.  Okay.  There are a lot of regulatory requirements that

25  apply to money services businesses in general, correct?

Arnoldo Gonzalez, Jr. - Cross

1   A.   Yes, ma'am.

2   Q.   Including those imposed by the Texas Department of Banking?

3   A.   Uh-huh.

4   Q.   And others imposed by FinCEN?

5   A.   Yes.

6   Q.   One of the federal requirements is to develop, implement

7   and maintain an effective anti-money laundering program,

8   correct?

9   A.   Yes.  AML.

10  Q.   Yeah.  Yep.

11       And that is supposed to be, I'm quoting here, "reasonably

12  designed to prevent individuals from using the money services

13  business to facilitate money laundering," correct?

14  A.   That's what we try to do.

15  Q.   Part of having an effective compliance program is having a

16  designated compliance official, correct?

17  A.   Correct.

18  Q.   Is that you?

19  A.   Yes, it's me.

20  Q.   And you are charged with keeping up to date on FinCEN

21  requirements?

22  A.   Yes, ma'am.

23  Q.   How do you do that?

24  A.   I check on the website.  That's about it.

25  Q.   Okay.

Arnoldo Gonzalez, Jr. - Cross

```
 1  A.  Because we didn't receive any email on this.
 2  Q.  But in order to stay up to date, you check on the website?
 3  A.  On the website.
 4  Q.  Yeah.
 5  A.  With our colleagues.
 6  Q.  Got it.
 7      In addition to complying with a wide variety of regulatory
 8  obligations, you maintain some business records for your own
 9  purposes, correct?
10  A.  Uh-huh.
11  Q.  You need to know how much money comes in and goes out?
12  A.  Correct.
13  Q.  And those business records will -- you will also have
14  records identifying the employees of High Value, correct?
15  A.  Uh-huh.
16  Q.  And you hire people you trust, I assume?
17  A.  I don't have that much turnover on employees.
18  Q.  Sorry?
19  A.  Most of the employees I have have been with me 25 years.
20  Q.  Got it.  Got it.
21      For a small dollar transaction before the GTO, you have
22  business records of the transaction itself?
23  A.  Uh-huh.
24  Q.  How many dollars, how many pesos.  And you have a record of
25  all those transactions even for lower amounts?
```

Arnoldo Gonzalez, Jr. - Cross

```
1   A.  Yeah.  Dollars are checked.

2   Q.  Yeah.

3   A.  Even a dollar transaction.

4   Q.  Yeah.

5       Do you -- you take identifying information of the customer

6   for any transaction worth more than a thousand dollars,

7   correct?

8   A.  Correct.

9   Q.  And that's required by the federal regulations?

10  A.  By Texas.

11  Q.  Texas, too.  Yeah.

12      Do you ever check ID for lower amount transactions?

13  A.  No.

14  Q.  And do you do that personally?  Is it the cashier?

15  A.  No.  The cashier gets all the information and gets copy of

16  everything.

17  Q.  Now, when they are collecting that information, how do they

18  do it?  Do they ask the customer to fill out a form?  Do they

19  just ask the questions and write the answers?

20  A.  No, no.  They even get a copy of the IDs and everything.

21  And they fill out the Social Security number.

22  Q.  I'm sorry.  Who fills it out?

23  A.  The cashier.

24  Q.  So the cashier asks the questions and fills out the

25  answers?
```

Arnoldo Gonzalez, Jr. - Cross

1   A.  Yes.  And gives them -- and gives them the money back.

2   Q.  Okay.  And takes a photo of the ID?

3   A.  Yeah.  We need to keep a photo of everything.

4   Q.  Yeah.

5       And that's all kept in your system?

6   A.  Oh, yes.  Well, actually copies.  I don't have a system.

7   We're too small.

8   Q.  So it's kept in paper?

9   A.  Yeah.  The copies, yes.  The transactions, we do have a

10  computer system.

11  Q.  Okay.  If a customer -- if you are collecting that

12  information for a customer doing a $1,500 transaction and they

13  come back at some other time, have you retained that

14  information about them so that you don't necessarily need to

15  get it again, or do you get the information again?

16  A.  The system maintains a database -- a base on the

17  information of the customer.

18  Q.  So if you have returning customers, you have their

19  information saved?

20  A.  Yes.

21  Q.  Yeah.  And I assume you'll check with them to make sure

22  that's still current?

23  A.  Oh, yes.

24  Q.  Yeah.  But you don't necessarily have to input it again

25  into the system?

Arnoldo Gonzalez, Jr. - Cross

1  A.  No.  If he came by one time, it's in the system.

2  Q.  For a transaction worth more than $3,000, you collect yet

3  more information, correct?

4  A.  Yes.

5  Q.  And what do you collect there?

6  A.  Any information from where the money came from or what are

7  they going to purchase or all that.

8  Q.  And you sometimes file Suspicious Activity Reports?

9  A.  Actually, in my -- in my position, any time that a customer

10  does not want to give the information, we just won't give them

11  the service, and they leave.  And I don't have any information

12  on them to make a SAR.

13  Q.  Have you ever filed a Suspicious Activity Report?

14  A.  One or two --

15  Q.  Okay.

16  A.  -- in 25 years.

17  Q.  Okay.  If someone came to High Value over -- and said they

18  want to conduct three $900 transactions to avoid giving their

19  name, you would not do that, correct?

20  A.  No.  If they say, I have 1,500, and they'll go down to 900,

21  I don't want their business.  They have to leave.

22  Q.  What if they came back, you know, every eight hours over

23  the course of the day?  Would there be a different cashier on

24  duty?

25  A.  Most of the time, no.  Almost -- sometimes yes.  Sometimes

Arnoldo Gonzalez, Jr. - Cross

1  no.  But anybody that's going to exchange more than a thousand

2  dollars, they'll ask for a special rate.  Under 200 -- or 200,

3  they won't ask for -- and then I don't know that somebody's

4  coming back.

5  Q.  Right.  So you won't necessarily know if someone changes

6  $900 three times or something like that?

7  A.  Most of the time the cashier will tell me about it.

8  Q.  Yeah.  If the cashier knows.

9  A.  They're 25 years' experience.  They'll do.

10  Q.  I mean, presumably, the same person is not usually there

11  for 24 hours straight?

12  A.  Yeah.  But sometimes, for two shifts, it's the same

13  cashier.

14  Q.  Okay.  When High Value files a CTR now, who does the

15  filing?  Is that you?

16  A.  No.

17  Q.  Okay.

18  A.  My secretary.

19  Q.  Okay.  Have you seen it done?  Do you know how it works?

20  A.  More or less.  But *pero* I've never done that.  She's the

21  one experienced on that.

22      The thing that I do know, she'll take about 15 minutes for

23  every single CTR she has to make.

24  Q.  And since you haven't done it yourself, you're basing that

25  on what she's reporting back to you?

1  A.  She's in front of me.

2  Q.  Okay.  Oh, so you're watching her do it?

3  A.  Yeah.

4  Q.  Yeah.

5      Does she -- does High Value use -- so there's a few

6  different ways to fill out CTRs.  Does High Value use a

7  fillable PDF and then submit that through the online portal?

8  A.  No.  It's direct on the -- on the FinCEN *esta* line.  But

9  the PDF one, the one that you showed.

10 Q.  Okay.  Yeah.  Yeah.  Okay.

11     Well, you saw us show the form before.  I can pull it back

12 up if it's helpful to remember anything.

13 A.  I'm not familiar with it.

14 Q.  Okay.  Well, one of the categories of information it

15 requires is information about the money services business.

16 A.  Uh-huh.

17 Q.  You have all the information about High Value, correct?

18 A.  Yes.

19 Q.  And that's the same on every form?

20 A.  Yes.

21 Q.  And you could even pre-fill it if you wanted to, couldn't

22 you?

23 A.  I think she's doing it.  I really don't know.  The thing is

24 that the system is pretty slow.  That's the main, main thing.

25 Q.  Well, it's a fillable PDF, you can fill out on your

Arnoldo Gonzalez, Jr. - Cross

1  computer.  Do you mean your system's slow?

2  A.  No.  The online system, on FinCEN.

3  Q.  Okay.  Well, submitting it online, is that what takes so

4  long, hitting "submit"?

5  A.  Yes.

6  Q.  Because you can fill it all out offline, I think.

7  A.  I really don't know.

8  Q.  Okay.  So one of the categories is information about the

9  money services business.  The next page is about the money

10 services business location.  You only had one location,

11 correct?

12 A.  Only one location.

13 Q.  So that's the same every time.  And then there's

14 information about the customer --

15 A.  Uh-huh.

16 Q.  -- and the required fields we went through before.  That's

17 all the same information you collect for transactions worth

18 over $1,000?

19 A.  Over 1,000.  Yes, ma'am.

20 Q.  And the last page is the transaction itself, cash in or

21 cash out?

22 A.  Yeah.

23 Q.  And you have that about every transaction, correct?

24 A.  Uh-huh.

25 Q.  So the only pieces of information you don't have ready-made

Arnoldo Gonzalez, Jr. - Cross

1  for every transaction already are the customer's identifying

2  information?

3  A.  And the amount.

4  Q.  And what?

5  A.  And the amount.

6  Q.  Right.  That's going to be different.  Correct.

7      Your corrected declaration estimated that the GTO would

8  require about 24 additional CTRs per day, correct?

9  A.  Yes.  Correct.

10  Q.  And how much additional time did you estimate that would

11  take, total?

12  A.  Cashier time and --

13  Q.  All together.

14  A.  It's 25 minutes.

15  Q.  Okay.  And that 25 minutes covers collecting those six

16  pieces of identifying information?

17  A.  And putting it into the system.

18  Q.  Putting into it the system.  Got it.

19      But some of that information you already collect for

20  transactions worth more than a thousand dollars, correct?

21  A.  I don't understand your question.

22  Q.  Some of the information you need to collect from the

23  customer, you already get for certain transactions, correct?

24  A.  You have to put it into the system anyway.

25  Q.  Right.  I'm just talking about the information collection

Arnoldo Gonzalez, Jr. - Cross

1  piece.  Some of that you do anyway, correct?

2  A.  Sometimes, yes.

3  Q.  Yeah.

4  A.  But if we're -- but if we're doing it for the GTO, those

5  are going to be new customers.  They're not same customers.

6  Q.  Why are they new customers?

7  A.  Because they're not in the system before.  They didn't -- I

8  didn't ask for any information before.  Over 1,000 right now,

9  yes, I have a database.  But not for the new customers that are

10  going to come in.  And if they come in.

11  Q.  So if any of these people conducting $500 transactions have

12  previously done a transaction worth more than a thousand

13  dollars, you have their information already?

14  A.  Those, yes.

15  Q.  Okay.  The 24 additional CTRs per day that you estimated

16  accounts for transactions worth between 200 and 10,000, right?

17  A.  Yes.  Correct.

18  Q.  Got it.

19     Since the Court ordered the government not to apply the GTO

20  to you, have you counted -- has it been, in fact, about 24 each

21  day since then?

22  A.  This information that I gave you, it's the 2024

23  information.

24  Q.  Okay.  So have you counted in the last couple of weeks to

25  see how many it would have been if you had to file CTRs?

Arnoldo Gonzalez, Jr. - Cross

```
 1   A.  No, no.
 2           THE COURT:  Well, can you estimate?  About the same as
 3   last --
 4           THE WITNESS:  About the same as last year, yeah.
 5           THE COURT:  Okay.
 6           THE WITNESS:  It hasn't changed.
 7           THE COURT:  All right.  Okay.
 8   BY MS. POWELL:
 9   Q.  But you haven't counted to see if it has changed?
10   A.  No.  I haven't counted.
11   Q.  Have you counted how many of those fall between 200 and a
12   thousand dollars in worth?
13   A.  I think I have it here.  200 to what?
14   Q.  A thousand.
15       Sorry.  What are you checking on?
16   A.  I have a -- $200.  It's 24 daily.
17   Q.  What are you looking at?  I'm just curious.
18   A.  Notes.
19           MS. POWELL:  Okay.  Can we maybe get a copy of that?
20           MR. ROWES:  Sure.
21   BY MS. POWELL:
22   Q.  And that's just based on the 2024 data?
23   A.  2024 data.
24   Q.  In addition to the PDF form, there are a few other ways
25   that some money services businesses can file CTRs.  I
```

Arnoldo Gonzalez, Jr. - Cross

1  understand you're familiar by now with the fact those exist.
2  A.  I've been hearing it.  But I don't trust it, really.
3  Q.  Why not?
4  A.  Because I'm not going to send a batch and only have a
5  number.  When the auditor comes in, I'm going to give, there's
6  the batch?
7  Q.  So you don't trust the software?
8  A.  No, ma'am.  Because I've had problems, that I print the
9  CTR, and it isn't in the system, but I have a copy of what I
10 did.  And they couldn't do anything about it.
11      With a batch, if they tell me there's information missing,
12 how -- I'm going to tell them that it's their problem.  It
13 isn't my problem.  It's hard.  A batch number -- right now, the
14 auditor comes in, and they want paper.  The CTR that I made,
15 put it on the system, and I have it printed out so they could
16 see it.
17      Given a batch number, it's going to take very long for them
18 to check.  And there's a mistake, I'm going to be responsible
19 for it.  And that's not right.
20 Q.  So you haven't even looked into the batch filing because
21 you don't trust it?
22 A.  No.  The thing is, I'm a very small business.  But I don't
23 trust it.  I think there's more problems than benefits on it.
24 Q.  So you haven't, say, gotten estimates from different
25 companies that could help you?

Arnoldo Gonzalez, Jr. - Cross

1  A.  No, no.

2  Q.  And you definitely probably haven't looked into

3  commercially available software that will do it for you?

4  A.  No.  The thing is, how I'm going -- how I am going to take

5  care of my audits with a batch number?  I don't understand

6  that.

7  Q.  Are you aware that money services businesses do, in fact,

8  use batch filing and get audited?

9  A.  Maybe.  I don't know.  I haven't done that.

10  Q.  Okay.  How many times in 2025 so far have you changed

11  currency for your personal use?

12  A.  2025?  Last month.

13  Q.  But how many times this year?

14  A.  This year?  About twice.

15  Q.  Twice in the last -- what is it?  It's May.  So --

16  A.  Four or five months.

17  Q.  Sorry.  Having trouble here.

18  A.  I need to go back on June 5th.

19  Q.  Is that a typical frequency for you?

20  A.  A month or every two months I have to go to be checked.

21  Q.  And when's the last time you went?

22  A.  About -- last month, I think.

23  Q.  Okay.  How much money did you change?

24  A.  Between 250, 300, you know.  Only one of -- one of my

25  medicines costs $130.

Arnoldo Gonzalez, Jr. - Cross

1    Q.  And the previous time you went this year, do you remember

2    how much money you changed that time?

3    A.  About 250.

4    Q.  So that's pretty typical for you?

5    A.  Yes.

6    Q.  Did you use High Value to change the money both times?

7    A.  Yes.

8    Q.  Do you ever use a different method for changing currency?

9    A.  No, because I get a special rate.

10         THE COURT:  I would hope.

11   BY MS. POWELL:

12   Q.  When you change money at High Value, do you do the

13   change-out yourself or you use a cashier?

14   A.  No, cashier.

15   Q.  Cashier does it for you?

16   A.  I don't handle the money.

17   Q.  Yeah.  And you don't pay the same rate the customer does?

18   A.  No.  Give me a special rate.

19   Q.  Special rate for the owner.  Got it.

20         Is the transaction recorded in High Value's books?

21   A.  Oh, yes.  Yes.

22   Q.  Do High Value's books reflect that you were the customer,

23   to explain the special rate?

24   A.  No, because I authorize.  No.  It is in the -- it shows on

25   the -- on the report, but we don't know who exchanged it.

Arnoldo Gonzalez, Jr. - Cross

1  Q.  You know.

2  A.  I know because I was the one that --

3  Q.  So your business records will reflect that you did a

4  transaction for yourself at a special rate, but it won't --

5  A.  At a special rate, yes.

6  Q.  No auditor could figure out that it was you?

7  A.  No.

8  Q.  You prefer the government not know about each currency

9  exchange you do worth more than $200, right?

10  A.  Yes, ma'am.

11  Q.  Why is that?

12  A.  Like I said, I do not want to be under a magnifying glass

13  of the government.  I'm not doing anything bad.

14  Q.  So it's definitely not that you think there's anything

15  incriminating there?

16  A.  No, no.  The thing is, I'm not comfortable with it.

17  Q.  So if the GTO goes into effect, will you change your money

18  elsewhere?

19  A.  Yeah, at IBC or in Nuevo Laredo.

20  Q.  Well, you already told me that you haven't checked on fees

21  and rates at IBC.

22  A.  Well, I'll go and check.

23  Q.  So if the GTO goes into effect, you'll make sure the

24  government does not get your information, and go somewhere else

25  instead?

 1  A.  They have it.  I can't go -- I can't eliminate that.  But
 2  I'm not going to do it every time I exchange money, for the
 3  government to know that I'm doing it.  It isn't -- I don't
 4  see --
 5  Q.  I guess -- I guess I'm just wondering --
 6  A.  I don't see no benefit for a person, for $200, to exchange
 7  $200, that are going to groceries, or $300, for the government
 8  to know what they're doing.  That's about it.
 9  Q.  I guess my question is, what is your plan if the GTO goes
10  into effect?  Are you going to go somewhere else so the
11  government doesn't get your information, or are you going to
12  stay here?
13  A.  I have friends in Nuevo Laredo, money exchanges.  I have --
14  like I said, I'll go to the IBC and see what's the rate there.
15  Q.  So your answer is, you will go somewhere else?
16  A.  Oh, yes.  Yes.
17  Q.  Okay.  Just to return to a previous subject about how you
18  keep track of FinCEN updates to their requirements, are you
19  subscribed to their alert system?
20  A.  Yes.
21  Q.  Yeah.
22  A.  Yeah.  But the thing is, they didn't send us anything on
23  that.  I got it through another -- from a colleague.
24  Q.  I thought you checked the website.  It was on the website
25  on March 11th.

Arnoldo Gonzalez, Jr. - Cross

```
 1  A.  Well, after they told me, I checked it and saw it.
 2  Q.  Oh, okay.  Okay.  And that's one of the ways you keep up to
 3  date on FinCEN requirements?
 4  A.  Uh-huh.
 5  Q.  You also, presumably, hear from your state regulator?
 6  A.  Uh-huh.
 7  Q.  And you heard from them about FinCEN requirement?
 8  A.  Yes.
 9  Q.  They likely heard from FinCEN, but --
10  A.  But direct from FinCEN, nothing.
11          MS. POWELL:  Okay.  I think I'm ready to pass the
12  witness.
13          THE COURT:  Redirect, if any.
14          MS. SANZ:  Nothing from us, Your Honor.
15          THE COURT:  All right.  Thank you, sir.  You may step
16  down.
17      One more?
18          MR. ROWES:  Just one more, Your Honor.
19          THE COURT:  All right.  I'm glad to know that there
20  are other old Luddites, non-techy people like me.
21          MR. ROWES:  You're not the only one, Your Honor.
22  Trust me.
23          THE COURT:  I'm getting better.  But my 11-year-old
24  granddaughter can show me what to do.
25          (Discussion off the record)
```

Ashley Light - Direct

```
 1        (Witness enters courtroom)
 2            MR. ROWES:  Your Honor, the plaintiffs would like to
 3   call Mrs. Ashley Light.
 4            THE COURT:  All right.  Ma'am, if you'll come up here,
 5   please.  Hello.
 6            THE WITNESS:  Hi.
 7            THE COURT:  If you'll raise your right hand.
 8        (The oath was administered)
 9            THE COURT:  All right.  You may be seated.
10        Counsel, you may proceed.
11            MR. ROWES:  Thank you, Your Honor.
12            ASHLEY LIGHT, PLAINTIFFS' WITNESS, SWORN
13                    DIRECT EXAMINATION
14   BY MR. ROWES:
15   Q.  Good afternoon.  Would you state your name, please.
16   A.  Clarissa Ashley Light.
17   Q.  And where do you work?
18   A.  Valuta Corporation in El Paso, Texas.
19   Q.  Okay.  And is Valuta Corporation a plaintiff in this case?
20   A.  No.
21   Q.  Okay.  And so you're not covered by the Court's TRO,
22   correct?
23   A.  No.
24   Q.  And so you are subject to the GTO, right?
25   A.  Yes.
```

Ashley Light - Direct

```
 1   Q.  And Valuta is an MSB?
 2   A.  Yes.
 3   Q.  And what is your position?
 4   A.  I am president and sole owner of Valuta.
 5   Q.  And has -- the GTO, since it went into effect last month,
 6   has it had an impact on your business?
 7   A.  Yes.
 8   Q.  We'll get back to that, actually, in a minute.
 9       How long have you been president of Valuta?
10   A.  Just the last six months.
11   Q.  And did you work at Valuta before you became president?
12   A.  Yes.
13   Q.  And what happened six months ago that made you president?
14   A.  My dad passed away.
15   Q.  And did your dad start the business?
16   A.  Yes.
17           THE COURT:  That's all right.
18           THE WITNESS:  I'm sorry.
19   BY MR. ROWES:
20   Q.  And what number is on your Texas MSB license?
21   A.  One.
22   Q.  So your dad started the first MSB in Texas?
23   A.  Yeah.  Well, we were -- yes.  We were license number one.
24   I believe he started the first one.
25   Q.  What was your dad's policy on being involved with dirty
```

Ashley Light - Direct

1  money?

2  A.  So against it, and for multiple reasons.  He was a man of

3  integrity and, also, he couldn't compete with dirty money.

4  Q.  Did your -- did your dad ever work with law enforcement to

5  help root out dirty money?

6  A.  Yes, very closely.

7  Q.  And what did your dad teach you about complying with the

8  law?

9  A.  He was meticulous about it.  "When in doubt, fill it out"

10  was policy.  So dot every i, cross every t.

11  Q.  Okay.  How long had you worked at Valuta before you became

12  president six months ago?

13  A.  I worked in an administrative-type role assisting him when

14  my mom passed away.  So that was 2017.

15  Q.  Okay.  And so you're on your own now without your parents?

16  A.  Yes.

17  Q.  And has it been tough taking over as president?

18  A.  Yes, big shoes to fill.

19  Q.  And do you have longtime employees?

20  A.  Yes.  Yes.

21  Q.  And how long have your longtime employees been there?

22  A.  I've known them my whole life, 40 years, 40 plus years for

23  the longest one and 30 plus years for the others.

24  Q.  Do your employees rely on Valuta for their living?

25  A.  Yes.

Ashley Light - Direct

1  Q.  And does your family rely on Valuta to support yourselves?

2  A.  Yes.

3  Q.  Have you been working to keep up with the number of CTRs

4  you have to file since the GTO went into effect?

5  A.  Yes.

6  Q.  How late are you working on the CTRs?

7  A.  Day and night, you know, sometimes into 12:00, 1:00, 2:00

8  in the morning.

9  Q.  So you have to run your business during the day, and then

10 you have to stay up half the night doing CTRs right now?

11 A.  Yes.

12 Q.  And are you a mom?

13 A.  Yes, I am.

14 Q.  How many kids do you have?

15 A.  I have two.

16 Q.  How old are they?

17 A.  Five and 11.

18 Q.  Okay.  Is having to do all the CTRs affecting your ability

19 to take care of your family?

20 A.  Well, yeah.  I mean, it cuts into a lot of time, yes.

21 Q.  Okay.  So sitting here today, how many CTRs do you have

22 piled up that are -- and the clock is ticking, that you've got

23 to get them filed, how many do you have right now?

24 A.  Right now I have about 700.

25 Q.  Okay.  And how many -- how many minutes do you think it

Ashley Light - Direct

1  takes at this point?  You've gotten the information from the

2  customer, it sounds like.  So at least that front end part is

3  out of the way.  How much time does it take you to actually go

4  ahead and enter these into your -- into FinCEN's system?

5  A.  From start to finish a CTR takes us about 20 minutes.

6  Q.  Okay.  So you've got 20 minutes times about 700 in front of

7  you?

8  A.  Yeah.

9  Q.  And this is work you're doing in the middle of the night?

10  A.  Yeah.  Yeah.  Yes.

11  Q.  I want to talk a little bit about the services that Valuta

12  offers, because the witnesses we've heard from were mostly

13  currency exchange, just cash for cash.  But you do a little bit

14  more than that.  So why don't you tell us, what are the -- what

15  are the types of MSB services you provide?

16  A.  Sure.  We do currency transactions.  We do check cashing.

17  And we also are an agent of MoneyGram.  So we offer their

18  services as well.

19  Q.  Okay.  And so for MoneyGram -- why don't you just explain

20  to the judge what that involves, being an agent?

21  A.  Sure.  You can buy money order that you would use to pay

22  rent or a bill, or you can send money to somebody, or you can

23  receive money that's been sent to you.

24          THE COURT:  Okay.

25

Ashley Light - Direct

1  BY MR. ROWES:

2  Q.  But you mentioned that you're doing -- you also do currency

3  exchange, which we've heard of before.

4  A.  Yes.

5  Q.  And what percentage of your transactions are currency

6  exchange?

7  A.  Like, 75 percent.

8  Q.  And so on a money transfer -- so not the -- not making a

9  money order, not making a check to pay your utilities.  What is

10  a money transfer through MoneyGram?

11  A.  Money transfer is when somebody comes in with money, and

12  they want to send it home or to a loved one.  So they give us

13  money.  We enter it in the MoneyGram system.  And they're given

14  a receipt with a code.  And they share that information with

15  their loved one on the other side.  And their person can go

16  pick up their money wherever MoneyGram is available.

17  Q.  Okay.  Are there a lot of people in the El Paso area who

18  have family on the Mexican side?

19  A.  Oh, yes.

20  Q.  Okay.  And so sending money home to your family is pretty

21  common?

22  A.  Very normal, yeah.

23  Q.  And can you also use the MoneyGram service to send within

24  the United States, I presume?

25  A.  Yes.

Ashley Light - Direct

1  Q.  Okay.  You mentioned earlier that you're subject to the
2  GTO, and you're kind of working night and day, right?
3  A.  Yes.
4  Q.  I want to talk about the impacts on your -- on your
5  business.  So you mentioned that you're an agent for MoneyGram.
6  Are you actually still providing those services right now?
7  A.  We are.  But because of the paperwork, we had to cap it.  I
8  couldn't stay on top of it.  So we capped it to keep it just
9  under $200 until we see what happens or until I catch up.
10 Q.  Okay.  So all the business you were doing with MoneyGram
11 above $200, you've had to cut that off right now?
12 A.  Yes.
13 Q.  And so you're losing income related to your money transfer
14 business?
15 A.  Yes.
16 Q.  And I guess if your money order business is going through
17 MoneyGram, it's the same thing with that, right?
18 A.  Yes.
19 Q.  About how many transactions -- did you do some research?  I
20 know you -- I know you did -- you filed a declaration in the
21 case in California, right?
22 A.  Yes.
23 Q.  And you did some research as part of that?
24 A.  Yes.
25 Q.  In 2024, how many transactions did you do in a month?

Ashley Light - Direct

1   A.  In a month, we did about 5,000 -- oh.

2   Q.  I'm sorry.  That are over $200, that would qualify for the

3   GTO.

4   A.  Oh.  Well, prior to this -- I did more of a percentage.  It

5   was about 65 percent are over 200.

6   Q.  Okay.  So about 65 percent of your transactions in 2024 per

7   month would require a CTR under the -- under the GTO?

8   A.  Yeah.

9   Q.  And without the GTO, what percentage of your transactions

10  required a CTR?

11  A.  Oh, very few.  In 2024, we sent 123 total CTRs.

12  Q.  Okay.  And are some of the CTRs that you do the sort of MSB

13  to MSB, to be buying cash wholesale?

14  A.  Yes.

15  Q.  Okay.  So you went from doing about ten CTRs a month to --

16  approximately how many do you have to do under the GTO now?

17  A.  Let's see.  Well, like I said, I have filed over 800 so

18  far, and I have around 700 waiting for me.

19  Q.  So we're at least -- we're at least 15 -- so you went from

20  ten a month to at least now 1,500 a month?

21  A.  Yes.

22  Q.  And that's -- and that's even though you've cut off all of

23  your MoneyGram business over 200 bucks?

24  A.  Yes.

25          THE COURT:  Is that a month or this -- the last few

Ashley Light - Direct

```
1   months?
2            THE WITNESS:  That's since April 14th.
3            THE COURT:  Since what?
4            THE WITNESS:  That's since April 14th.
5            THE COURT:  Just April?
6            THE WITNESS:  Yes.
7            THE COURT:  Okay.  All right.
8   BY MR. ROWES:
9   Q.  So in the last month -- so April 14th.  Today's May 12th --
10  you've done 15 -- you've had -- you have 1,500 CTRs that need
11  to get to FinCEN before the clock runs out?
12  A.  Yes.
13  Q.  So doing -- has there -- we know that you have lost your
14  MoneyGram aspect of your business.  Has the number of
15  transactions you're doing, the currency exchange transactions,
16  also gone down because of the GTO?
17  A.  Yes.
18  Q.  And how many -- about how many transactions do you think
19  you're losing a day because of the GTO?
20  A.  I mean, quite a few.  Right now, for 2025, a month we're
21  averaging about 4,400 the first quarter of the year versus
22  5,689 a month for last -- 2024.
23  Q.  Have --
24  A.  So it's a big difference.  We've seen a big drop.
25  Q.  And have customers -- over the last couple of weeks, since
```

Ashley Light - Direct

```
 1  you've been trying to comply with the GTO, have customers who
 2  have come in to change money, sort of in that range, between
 3  $200 and a thousand dollars -- have they left when you said
 4  that they have to fill out all the paperwork?
 5  A.  Oh, yeah.  Yes.
 6  Q.  Have you personally seen customers leave?
 7  A.  Yes.
 8  Q.  And did you -- you ever talk to them about why they leave?
 9  A.  Yeah.  A lot of our customers are Spanish speaking, and I'm
10  not as fluent as I wish I was.  So I'm kind of hearing it while
11  they're speaking with some of the staff.  But, you know, they
12  don't -- they don't like it.  They don't want to do it.  Maybe
13  they don't want to wait in line.  I mean, there's multiple
14  reasons.
15  Q.  Okay.  You mentioned your customers.  Let's sort of talk
16  about them.  Like, who are your customers?  What kind of people
17  are they?
18  A.  Most of our customers are just working class people.
19  They're waiters or waitresses and construction workers and
20  teachers, retirees, you know, just working class people.
21  Q.  Are you required to follow anti-money laundering rules?
22  A.  Yes.
23  Q.  Okay.  We talked about -- and we talked about how your dad
24  was super strict about that, right?
25  A.  Yes.  Absolutely.
```

Ashley Light - Direct

1  Q.  Are you on the lookout for maybe shady or criminal type
2  customers?
3  A.  Yes.  For two reasons.  Just to -- because that's the right
4  thing to do.  But, also, there's a thing called a Suspicious
5  Activity Report, that we're also required by law to just keep
6  tabs on.  So anybody that might fit that suspicious activity,
7  we have to file a report on that.
8  Q.  Okay.  You know, El Paso's right on the border.  Maybe some
9  people have the idea that it's kind of the wild west.  Do you
10  feel like it's the wild west for you and your business?
11  A.  No, no, not at all.
12  Q.  Do you get audited frequently?
13  A.  Yes, very frequently.
14  Q.  Do you feel like you have a lot of regulations to comply
15  with?
16  A.  We do.  And we do.
17  Q.  And are the people you hire trained?
18  A.  Yes.
19  Q.  Can you -- so it looks -- it looks like you're facing a
20  huge amount of work.  Can you just go and hire someone off the
21  street to come in and start punching CTRs into a computer?
22  A.  No.  That would be very irresponsible for me to do that,
23  for multiple reasons.
24  Q.  And why is that?  Why don't you give us a few of the
25  reasons?

Ashley Light - Direct

1  A.  Well, it's sensitive information.  It's people's personal
2  information.  It's their business.  It's their transactions.
3  They're also -- you know, we're sending these in to FinCEN, and
4  you can't be sloppy about that, which is part of why it's
5  time-consuming.  Because even though I may not be the one that
6  enters each CTR physically myself, I go through and I check
7  each one so that it's right before sending it off.  So you
8  can't just have some random person come do that.
9  Q.  So you're the president.  The buck stops with you.  It's
10  got be right?
11  A.  Yeah.  Yeah.  It's my responsibility.
12  Q.  Okay.  Are you concerned about penalties from FinCEN if
13  you're -- if you wind up out of compliance?
14  A.  Yes.  Definitely.  They could -- if we got hit with enough
15  or a big one, it would take us out of business.
16  Q.  And what about -- what about just for the purposes of your
17  audit?  Like, do you care if you make mistakes in your
18  paperwork?
19  A.  I do care.  We get high scores on all of our audits.  And
20  that's not going to stop.
21  Q.  And what are you trying to do with your employees to try
22  to -- have you at least tried to get people to work a little
23  bit faster?  Are you doing -- what are you doing?
24  A.  I mean, we call it all hands on deck right now.  So
25  everybody has their log of customers that they've done

Ashley Light - Direct

1  transactions of over 200.  I have everybody helping fill out
2  the initial form.  Yeah.  So everybody's playing their role.
3  Ultimately, my cashiers are not compliance officers, you know.
4  So I can't put that responsibility on them and have something
5  go wrong, you know.
6  Q.  And if people don't want to change money with you, can they
7  go and change money across the border?
8  A.  Sure.
9  Q.  And what about -- are there other MSBs that are not in
10 targeted areas around you?
11 A.  I believe so.  I believe so.
12 Q.  Okay.  How did you learn about the GTO, by the way?
13 A.  On social media I learned about it.  And a reporter called
14 to ask, and we didn't really know what he was talking about at
15 the time.  And so we looked it up.  And then our bank sent out
16 an email and called me.  And then, finally, the Texas
17 Department of Banking sent out a memo.
18 Q.  And did you contact FinCEN to help you?
19 A.  Yeah.  I've contacted FinCEN to help me in multiple --
20 regarding multiple issues.  But you just send an email, and you
21 get kind of, like, a canned response, an AI-type response --
22 Q.  Okay.  So --
23 A.  -- with an attachment.
24 Q.  All right.  What if you called the help line?  You call the
25 phone number.  Does somebody -- does a human being pick up the

Ashley Light - Direct

1  phone and say, let me help you with your problem?

2  A.  No.  They say:  Send us an email.

3  Q.  Okay.  And so then -- all right.  So you listened to the

4  automated, "send us an email," and you send an email?

5  A.  Yes.

6  Q.  Does a human being write you back an email to help you?

7  A.  No.

8  Q.  And what do you get back from -- and you said it was an

9  automated response?

10  A.  Yeah.  It was like:  Thank you for submitting your help

11  ticket.  You're number dot, dot, dot.

12     And you get maybe a PDF attached.

13  Q.  And how big was the PDF?

14  A.  Pretty big.

15  Q.  Okay.  Well, actually, why don't we take a look at it.

16     Kendall, can we pull up the PDF that FinCEN sent?  Do you

17  see it?  I can't remember what the exhibit number is.

18        THE CLERK:  It's slow.

19  BY MR. ROWES:

20  Q.  Here we go.  All right.  This is Plaintiffs' Exhibit Number

21  11.

22     Ms. Light, do you recognize the first page?

23  A.  Yes.

24  Q.  Okay.  Is this the first page of the PDF you got in your

25  automated email from FinCEN?

Ashley Light - Direct

```
 1  A.  Yes.
 2         MR. ROWES:  Okay.  Your Honor -- I know Your Honor
 3  loves technology.  We got 140 pages of computer code here.  But
 4  we're not going to go through each one.  I know you're probably
 5  disappointed.  But I'd like --
 6  BY MR. ROWES:
 7  Q.  Did you take a -- did you try to read this document?
 8  A.  I did try.  I did my best.
 9  Q.  And what's in it, based on your layperson's perception?
10  A.  I have no idea.  I don't -- I tried so hard to understand
11  batch reporting.  And it just -- I have no idea.
12  Q.  Okay.  Is it -- does it have technical computer code?
13  A.  Yes.
14  Q.  All right.  Did you show this to a computer expert to try
15  to get an opinion?
16  A.  I did.  I reached out to our system administrator, and I
17  asked them if they could help me understand it, to see if we
18  can just streamline the process in any way.  And he said it's
19  not for humans to read.  He said it's for computers to
20  understand, so I shouldn't feel bad.
21  Q.  So anyway, it's not for humans to read.  A computer
22  engineer said -- here's a random page.  It's actually the
23  second page.
24      And you can just leave it there, Kendall.
25         MR. ROWES:  You can see, Your Honor, it's got lots of
```

Ashley Light - Direct

1  bullet points and things like that.  I would encourage Your

2  Honor just to leaf through it for a minute with your law clerk

3  sometime.  And this is what you get from FinCEN when you ask

4  for help.

5       THE COURT:  Okay.  It reminds me of going to the

6  doctors or hospital.  And in order for them to provide the

7  service, you have to go through all this stuff that's printed

8  like that.  And nobody has time to read it.  And then if you

9  don't agree to it, they won't help you.

10      MR. ROWES:  Right.

11      THE COURT:  So I get it.

12 BY MR. ROWES:

13 Q.  Just a couple -- just a couple more questions.  Will your

14 family suffer losses to the family business if the GTO stays in

15 place?

16 A.  Oh, yes.  Yeah.  This is not sustainable, what is happening

17 right now.

18 Q.  So it sounded to me like you're saying your number of

19 customers is going down, correct?

20 A.  Yeah.

21 Q.  And your labor costs are skyrocketing right now, correct?

22 A.  Yeah.  The customer number is going down, as well as the

23 amount that they want to trade.  So, you know, small trade

24 numbers and small customer numbers, it's just -- it doesn't

25 work.

Ashley Light - Direct

1  Q.  But the thing that's not going down is the explosion in

2  paperwork?

3  A.  Oh, the paperwork is there, for sure.

4  Q.  Is the GTO a threat to your employees' livelihood?

5  A.  It is.  Yes.

6  Q.  Is the GTO preventing honest, hard-working people from

7  having access to valuable services like MoneyGram, now that

8  you've had to cut them off?

9  A.  Definitely, yes.

10  Q.  Is there a danger that the GTO could destroy the family

11  business that your father started?

12  A.  Yeah.  Yes.

13  Q.  Based on your knowledge of your customers and your

14  employees and your family and your family business, are you a

15  tool of the Mexican drug cartels?

16  A.  No, we are not.

17        MR. ROWES:  No further questions, Your Honor.

18        THE COURT:  All right.  Before cross, let me ask

19  you -- and if it was covered, I missed it.  But do you have

20  people from Mexico coming across to El Paso and changing pesos

21  to dollars?

22        THE WITNESS:  Sure.  Sure.  Yeah.

23        THE COURT:  And so if the exchange rate is whatever it

24  is, that they are bringing enough pesos to receive $200 or

25  more, are you having to do the CTR on them?

Ashley Light - Direct

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Okay.  Is that frequent?
 3              THE WITNESS:  Oh, yeah.  Yeah.  On the border it's
 4   very normal for people to have life on both sides.
 5              THE COURT:  Do you know of any of those experience --
 6   your experience or customers, of money laundering happening
 7   from Mexico to the United States?
 8              THE WITNESS:  No.
 9              THE COURT:  Or any Suspicious Activity Reports of
10   people bringing pesos to dollars in the United States, in your
11   experience?
12              THE WITNESS:  No.  Not personally, no.
13              THE COURT:  Okay.  All right.  Cross.
14              THE WITNESS:  Can I add one thing to that?
15              THE COURT:  Sure.
16              THE WITNESS:  If there is an amount that strikes us as
17   larger than normal, we ask for some sort of paperwork.  So
18   let's say somebody has sold a car, and they want to come trade
19   the money, then we say, okay, do you have a bill of sale you
20   can show us?  So we're doing our due diligence on our side, as
21   we should and as we have to and we're required to.
22              THE COURT:  Okay.  All right.  Cross.
23              MS. POWELL:  Sure.
24
25
```

Ashley Light - Cross

```
1              CROSS-EXAMINATION
2  BY MS. POWELL:
3  Q.  Valuta is registered as a money services business with
4  FinCEN and with the Texas Department of Banking?
5  A.  Yes.
6  Q.  And you're registered to do currency exchange, check
7  cashing, money transfers and money orders; is that correct?
8  A.  Yes.
9  Q.  Anything I left out?
10 A.  Currency transaction, MoneyGram services, check cashing.
11 No.
12 Q.  And you have just the single location?
13 A.  Yes.
14 Q.  How far is it from the border?
15 A.  It's about a mile.
16 Q.  And no other locations or branches?
17 A.  No.
18 Q.  What are the business's regular hours?
19 A.  We're open 24 hours a day, seven days a week.
20 Q.  And how many people are typically on duty?
21 A.  Anywhere from maybe two or three, sometimes one in the
22 evening.
23 Q.  Okay.  Are there times of day that are particularly busy?
24 A.  Sure.  I mean, it just comes in waves.  Sometimes it's
25 morning.  Depends if it's like a payday or a holiday.  Those
```

Ashley Light - Cross

```
 1   are going to be much busier.  The summertime's busier than, you
 2   know, January or February.  So just waves of business.
 3   Q.  Okay.  Are there slower times of day?
 4   A.  Yeah.  I mean -- yeah.  There's lulls in the day sometimes.
 5   Yeah.
 6   Q.  And it sounds like there are slower times of the year, too?
 7   A.  Yeah.  Yes.
 8   Q.  You filed a declaration in the California case, correct?
 9   A.  Yes.
10   Q.  You described -- I'm paraphrasing here, I think.  You
11   described downtown El Paso's economy as weakened and slowing;
12   is that correct?
13   A.  Yeah.  It's having a tough time right now.  It's a little
14   bit of a tough time.
15   Q.  Why is that?
16   A.  I don't know.  I'm sure there's many reasons.  They're
17   trying.  You know, they're trying to revive downtown.  So --
18   but it's just -- it's not in a great spot right now.
19   Q.  And I assume general economic troubles affect your
20   business, too, because it affects customers?
21   A.  True.  Yes.  Yeah.
22   Q.  What about right now?  I read in the news about declines in
23   cross-border trade and tariffs and fears of immigration
24   enforcement.  Does that affect you?
25   A.  Yeah, a little bit.  We can -- we can tell that people
```

Ashley Light - Cross

1 are -- people are hanging onto their money a little bit more.

2 As an example, like, the weekends, people would come shopping

3 downtown quite a bit.  But now you don't see the weekends as

4 busy.  Kind of like that.

5 Q.  Before the GTO -- I guess after the GTO, too, but I'm

6 thinking just in general before the GTO -- why would customers

7 come to Valuta instead of go to a bank?

8 A.  I would -- well, I would assume just because it's quick.

9 That's what we do.  Whereas, usually with a bank, if you're

10 going to request a different currency, it may take a few days

11 and all that.  We have it on hand.

12 Q.  And some banks don't serve non-account holders?

13 A.  Oh, correct.  Yeah.

14 Q.  Yeah.  Valuta is required by federal regulation to maintain

15 their AML compliance program, correct?

16 A.  Yes.

17 Q.  And to designate a primary compliance officer?

18 A.  Yes.

19 Q.  Is that you?

20 A.  No.  It's been our GM.  But, I mean, I'm in there, too.

21 Q.  Okay.

22 A.  Ultimately, I'm responsible for everything that happens

23 there now.

24 Q.  So your general manager is the designated compliance

25 person, but others are involved, including you?

Ashley Light - Cross

```
 1  A.  Yeah.  I would say myself, yes.
 2  Q.  Anyone else in sort of overseeing compliance?
 3  A.  We have to submit certain reports throughout the year, that
 4  maybe our accountant helps with, independent reviews, stuff
 5  like that.  So she's got a hand in it a little bit, too.  But
 6  mostly it's just the GM and myself.
 7  Q.  So your designated compliance person is required, as part
 8  of an effective program, to stay up to date on FinCEN
 9  regulatory requirements, correct?
10  A.  Yes.
11  Q.  And how do they do that?  How do they do that?
12  A.  Well, we just -- I mean, things don't change all that
13  often, that we know of.  So we just check in on it.  We also
14  have regular audits.  So that keeps you up to date with
15  requirements and whatnot.
16  Q.  So you get audits.  You probably get information from Texas
17  Department of Banking?
18  A.  Yes.
19  Q.  Do you check the website?
20  A.  Yes.
21  Q.  Okay.  And your compliance people, whoever that includes,
22  assures compliance with a wide variety of state and federal
23  requirements, right?
24  A.  Yes.
25  Q.  Texas imposes its own recordkeeping requirements on aspects
```

Ashley Light - Cross

```
 1  of your business?
 2  A.  Yes.
 3  Q.  And, of course, you maintain your own business records for
 4  your own purposes, right?  You need to know how much money goes
 5  in and out?
 6  A.  Yes.
 7  Q.  You need to know what transactions are happening when?
 8  A.  Yes.
 9  Q.  You need to know -- have identifying information about your
10  employees?
11  A.  Yes.
12  Q.  Okay.  Your declaration from the California case walked
13  through some of the regulatory requirements and your AML
14  compliance measures on different kinds of transactions.  For
15  money orders, when you did money orders, was that -- were those
16  all through MoneyGram?
17  A.  Yes.  Yeah.
18  Q.  Okay.  But when you did them, you collected -- you did them
19  from any -- up to 2,500, correct?  Is that right?
20  A.  Yes.  Yes.
21  Q.  And no amount over that?
22  A.  No.
23  Q.  And you collected customer identifying information for any
24  amount over $900, correct?
25  A.  Yes.
```

Ashley Light - Cross

1  Q.  Okay.  Is that a state or federal requirement or just part

2  of your AML compliance?

3  A.  That's actually a MoneyGram.  They have their own computer,

4  their own machine, their own program.  So in order to do a

5  MoneyGram or send or receive or whatever, we have to follow

6  their prompts.  So you can't --

7  Q.  So as part -- it's probably part of MoneyGram's AML

8  compliance program?

9  A.  Yes.  Yeah.

10  Q.  When you were doing that, did people ever refuse to give

11  their information?

12  A.  Not that I know of.

13  Q.  Including tax ID numbers and things like that?

14  A.  Well, it's individual to individual.  So we don't do, like,

15  tax ID numbers for that.

16  Q.  Social Security numbers?

17  A.  Yes.  When required, yes.  They were fine with that.

18  Q.  And no one ever refused?

19  A.  Oh, I'm sure over the years somebody has.  But typically,

20  no.

21  Q.  So even for, like, a $900 transaction, you didn't get

22  pushback about that?

23  A.  No.  I mean, you have to pay your rent, you have to pay.

24  Q.  When you collected that information for the purpose of

25  these MoneyGram money orders, is it stored in your system?

Ashley Light - Cross

```
 1   A.  No.  It's stored in the MoneyGram system.
 2   Q.  Got it.
 3   A.  Yeah.
 4   Q.  Yeah.  If the customer returns for another transaction, is
 5   the information still there, such that you can sort of, is this
 6   still your identifying information, or do you have to reenter
 7   it all over?
 8   A.  Oh, you have to reenter it.
 9   Q.  For money transfers, you only did those up to a thousand
10   dollar threshold when you did them, right?
11   A.  Yes.
12   Q.  But even for those smaller dollar transactions, you
13   collected customer identifying information?
14   A.  For MoneyGram?
15   Q.  Uh-huh.
16   A.  Yes.
17   Q.  Because MoneyGram required it?
18   A.  Yes.  That is --
19   Q.  As part of their AML compliance program probably?
20   A.  Yes.
21   Q.  Yeah.  Did people ever refuse?
22   A.  I don't know.  I don't think so.
23   Q.  Okay.
24           THE COURT:  But included Social Security number,
25   address, all of that?
```

Ashley Light - Cross

```
 1              THE WITNESS:  Typically.  Typically.  MoneyGram sort
 2    of -- for instance, at the beginning of the GTO, they were
 3    requiring a Social Security number no matter what.  If you're a
 4    Mexican national, you don't have a Social Security number.  So
 5    you couldn't -- we couldn't even do that.  But then they took
 6    it off, and then they put it back on.  So they're kind of, I
 7    think, trying to work out their own way of doing this.
 8              THE COURT:  Okay.
 9              THE WITNESS:  So they've got their own system, and we
10    can't -- we don't really have any power over it.  You know, if
11    we can go through the prompts, we go.  And if we can't, then
12    maybe we'll call the help line or them, whatever.  They set
13    their own.
14              THE COURT:  Does the MoneyGram help line help?
15              THE WITNESS:  They're more helpful than FinCEN.  You
16    get to talk to a person.  So that's helpful.
17              THE COURT:  Okay.  Go ahead.
18    BY MS. POWELL:
19    Q.  For check cashing --
20    A.  Yes.
21    Q.  -- you had, and I assume still have, a dollar limit on
22    those, too, correct?
23    A.  Yes.
24    Q.  What's that?
25    A.  Oh, gosh.  Sorry.  I'm on the spot here.  Our check cashing
```

Ashley Light - Cross

```
 1   is -- sorry, guys.
 2   Q.  I wrote it down --
 3   A.  1,500.
 4   Q.  So I have 1,500 for payroll checks and up to 5,000 for tax
 5   returns; is that correct?
 6   A.  Yes.
 7   Q.  And you check ID for all check cashing transactions?
 8   A.  Yes.
 9   Q.  Why is that?
10   A.  To prevent check fraud.
11   Q.  So for anyone cashing a check, no matter the amount, you
12   are verifying their identity and keeping records about the
13   transaction itself?
14   A.  Yes, for checks, yes.
15   Q.  And for currency exchange, I think both Texas and FinCEN
16   require the identity collection for anything over a thousand
17   dollars, correct?
18   A.  Yes.
19   Q.  And that's what you have been doing and continue to do?
20   A.  Yes.
21   Q.  So even before the GTO, you would maintain those records,
22   including Social Security number for transactions worth more
23   than a thousand dollars?
24   A.  Yes.
25   Q.  Do people ever refuse to provide it?
```

Ashley Light - Cross

```
 1   A.  Usually not with the thousand number.  I think they --
 2   they're a little more understanding maybe because of the dollar
 3   amount.  So typically, no, nobody has a problem with that.
 4   Q.  Are you also subject to regular audits?
 5   A.  Yes.
 6   Q.  By whom?
 7   A.  We are audited by the Texas Department of Banking, the IRS.
 8   Our bank has a yearly audit and, also, MoneyGram.
 9   Q.  And when you're audited, the auditors have access to all of
10   that information I just described?
11   A.  To an extent.  When you get audited, you're given a time
12   frame.
13   Q.  Okay.
14   A.  If they want to see -- for instance, if the IRS wants to
15   see our last report from the state, we have to request that
16   and, you know, so on and so forth.  But typically, yes, in a
17   time frame.
18   Q.  Okay.  How many GTO-affected transactions has Valuta done
19   since the GTO went into effect, total?
20   A.  How many?  Well, I guess what I covered earlier.  I've sent
21   over 800, and I have about 700 waiting for me.  So I'd say
22   around 1,500.
23   Q.  Around 1,500?
24           THE COURT:  Since the imposition of the GTO?
25           THE WITNESS:  Yes.
```

Ashley Light - Cross

```
 1              THE COURT:  Okay.
 2   BY MS. POWELL:
 3   Q.  And those 800 CTRs, did you do them all personally?
 4   A.  I'm having the cashiers help me with some of the data
 5   entry, but I've personally sent them all off, yes.
 6   Q.  So they're doing some of the data entry, and then you're
 7   verifying and submitting?
 8   A.  Yes.
 9   Q.  Okay.  So that 20 -- was it 20 minutes or 25?  I forget
10   what you said.
11   A.  Twenty.
12   Q.  Twenty minutes per CTR that you estimated, that includes
13   information collection, data entry, verification and
14   submission?
15   A.  Yes.
16   Q.  Okay.
17   A.  And confirmation of submission.  And then you also get a
18   separate, additional confirmation that you have to tag on to
19   the first confirmation.  So you get a confirmation that you
20   sent it, and then FinCEN gives it, like, a BSA identification
21   number --
22   Q.  To file that?
23   A.  -- on top of the -- yeah.
24   Q.  So it's all filed in one place?
25   A.  Yeah.  Yeah.
```

Ashley Light - Cross

1  Q.  Assume that's not super time consuming, to put it in a

2  file?

3  A.  It takes its time, yeah.

4  Q.  There are, as I think you discussed a little bit about, a

5  few different ways to fill out and submit CTRs.  It sounded

6  like from your testimony what you're doing is filling out the

7  PDF and individually submitting each one on the web portal; is

8  that correct?

9  A.  Yes.

10  Q.  A lot of the information that goes into that form, you

11  maintain already, correct, based on what we just discussed;

12  that you have information about your MSB, your MSB location,

13  you collect customer identity for a lot of transactions, and

14  you maintain transaction records?

15  A.  Yes.  Yes.  I mean, we didn't maintain any of the

16  identification of the customers for the transactions under a

17  thousand, which is why they're piling up so much.  So now

18  that's new.  But the rest of the information, yes, we had.

19  Q.  That's new for currency exchange, right?

20  A.  Yes.

21  Q.  All right.  The secure file transfer protocol, the

22  technical option for batch filing, I take it you tried to do

23  that, and it did not work out?

24  A.  Well, I tried to understand it, guys.

25  Q.  Oh, I believe you.  I think it requires a certain amount of

Ashley Light - Cross

1  technical knowhow to implement those instructions.

2  A.  So yeah, I reached out to our systems administrator, and

3  they're trying to figure out a way to streamline the process

4  for us.

5  Q.  Okay.  So I believe what my friend had up on the screen

6  earlier are the technical instructions for how to do that.  And

7  FinCEN sent you those.  But you need someone who's technically

8  proficient to figure out how to do it.  Is that what I'm

9  hearing?

10  A.  Yes.

11  Q.  Okay.  So what estimates have you gotten for how much that

12  would cost to figure out how to set that up?

13  A.  They haven't given me a number yet.  They're hitting --

14  they're hitting roadblocks because their company is actually

15  based out of Canada.  So they're hitting roadblocks of actually

16  testing it, because you have to register as an MSB to get a

17  user account to -- so on and so forth.  So they haven't given

18  me exact numbers yet.  But based off what we've paid in the

19  past, it'll probably be in the thousands.

20  Q.  Well, have you gotten any estimates from, say, a U.S.-based

21  company that has done things like this before?

22  A.  No.  I've just done it through our system and --

23  Q.  So in addition to sort of configuring your system for batch

24  filing through secure file transfer protocol, some MSBs use a

25  commercial software, sort of.  And I think there are lots of

Ashley Light - Cross

1  different options, some geared towards banks, some towards
2  MSBs.  Have you looked into any of those?
3  A.  Well, we do have the commercial -- we do have a commercial
4  system.  But I haven't gone outside of the system that we have
5  in place right now, no.
6  Q.  What system do you use?
7  A.  They're called Clear View Systems.
8  Q.  Okay.  And the company you're working with, did they help
9  you set up the software in the first place?  Is that why you're
10 working with them?
11 A.  Yes.
12 Q.  Okay.  But it sounds like you haven't gone beyond your
13 current system admin to find -- to see if there's some other
14 way to get this done, and you haven't gotten any estimates yet?
15 A.  I haven't, no.  The cost is the biggest deal.  So I was
16 trying -- I've been trying to just keep it in-house and work
17 with what we have, but --
18 Q.  I mean, if it's as many hours putting in as you described,
19 that seems like $2,000 worth of work.  If it saved you, you
20 know, hundreds of hours, would it not be worth --
21 A.  Yeah.  If I had more time, I'd probably spend some time
22 looking into it.  I'm doing -- I'm doing CTRs all day.  No.
23 No.  Yeah.  To answer your question, I've just checked with the
24 system that we have.  I haven't gone outside to check.
25        MS. POWELL:  I think I'm done.

Ashley Light - Cross

```
 1          THE COURT:  What is -- going back to the cost of the
 2  upgrade, software, whatever all that is, batches -- I know how
 3  to make batches of cookies.  I don't know how to make --
 4          THE WITNESS:  Same.
 5          THE COURT:  -- batches of whatever this stuff is.  But
 6  anyway.  And you said -- and I may have been thinking about
 7  something else.  But 5,000, 10,000 to do this automated system,
 8  if it worked?
 9          THE WITNESS:  Yeah.
10          THE COURT:  Ballpark?
11          THE WITNESS:  I mean, I wouldn't -- I wouldn't be
12  surprised if it was around $5,000.  We pay a yearly fee, and we
13  pay an update fee, and we --
14          THE COURT:  Speaking of ballparks, I highly recommend
15  that you go to the El Paso baseball stadium.  That's wonderful.
16          THE WITNESS:  Yes.
17          THE COURT:  And, frankly, I think El Paso downtown is
18  cleaner than San Antonio.
19          THE WITNESS:  I agree.
20          THE COURT:  I'll bet you would.  For one thing, the
21  air, it's not humid like it is here.
22      All right.  So cost of business, employees, all of that
23  sort of thing.
24          THE WITNESS:  Yeah.
25          THE COURT:  Someone comes in and changes a thousand
```

Ashley Light - Cross

```
 1   dollars to pesos or vice versa.
 2             THE WITNESS:  Okay.
 3             THE COURT:  But a thousand dollars.  How much is your
 4   gross income from that transaction?
 5             THE WITNESS:  It depends on the rate that day.  I
 6   mean, it's retail.  So we're selling money.  So it depends on
 7   the rate that day.
 8             THE COURT:  A range of?
 9             THE WITNESS:  Oh.
10             THE COURT:  Five dollars?  Ten dollars?
11             THE WITNESS:  Maybe -- gosh.  Maybe five dollars.
12             THE COURT:  Five?
13             THE WITNESS:  Uh-huh.  Ten dollars maybe, on a
14   thousand.
15             THE COURT:  Okay.  So you have to have a lot of
16   transactions to buy $5,000 worth of software for you to spend
17   more time with your kids?
18             THE WITNESS:  Yes.  Yeah.  We definitely rely on
19   quantity of customers because the dollar amount they're
20   bringing in is not --
21             THE COURT:  Right.  So a $200 transfer, that generates
22   all this extra effort, you're making --
23             THE WITNESS:  Nothing.
24             THE COURT:  -- pennies?
25             THE WITNESS:  Yeah.  Yeah.  I mean, you have to
```

 1 | file -- even if someone just comes in to make change, that's a
 2 | CTR.  So, you know, everything.  I mean, we're making a buck
 3 | off change or -- yeah.
 4 |         THE COURT:  Okay.  All right.  That's what I thought.
 5 |     All right.  Redirect.  Finish up.
 6 |         MR. ROWES:  Sure.  Just a couple quick questions.
 7 |                   REDIRECT EXAMINATION
 8 | BY MR. ROWES:
 9 | Q.  When you say "making change," you mean like a restaurant
10 | might come over and just ask you to --
11 | A.  Yeah.
12 | Q.  -- break a bunch of bills, so that they can serve --
13 | A.  Yeah.
14 | Q.  Okay.  And that might generate a CTR?
15 | A.  It's a CTR.
16 | Q.  Okay.  A couple -- a couple quick questions.  So MoneyGram
17 | sometimes requires a Social Security number, and sometimes it
18 | doesn't, right?
19 | A.  Correct.
20 | Q.  Comes and goes?
21 | A.  Correct.
22 | Q.  Is MoneyGram the United States government?
23 | A.  No.
24 | Q.  Does MoneyGram have the words Criminal Enforcement Network
25 | in its name?

Ashley Light - Redirect

```
 1   A.  No.
 2   Q.  Okay.  So maybe a customer doesn't mind so much dealing
 3   with MoneyGram to send some money to mom.  But they might --
 4   A.  Sure.
 5   Q.  -- worry about being put on a list of potential criminals?
 6   A.  Yeah.  Correct.  Yes.  If they're sending money home,
 7   you'll do what it takes to get that money to your family there.
 8           THE COURT:  I hate to interrupt, but I have to.
 9           MR. ROWES:  It's okay, Judge.
10           THE COURT:  That was a really good leading question
11   that Ms. Powell didn't object to, and I'll object, but I'll
12   overrule my objection.
13           MR. ROWES:  Thank you, Your Honor.  This --
14           THE COURT:  Go ahead.
15           MS. POWELL:  No reason for me, Your Honor.
16           MR. ROWES:  Yeah.  That was -- that was just kind of
17   like my mulligan, I was trying to get in right at the end.
18           THE COURT:  I know -- I know what you were doing.  I
19   didn't just ride in on the last turnip truck.
20           MR. ROWES:  All right.  You caught me.  I appreciate
21   it.  All right.  One last -- you know what?  I think that's it.
22   That's it.
23       Thank you, Ashley.
24           THE COURT:  All right.  Recross, leading or otherwise?
25   You can lead.
```

```
 1              MS. POWELL:  (Shakes head side to side).
 2              THE COURT:  Thank you, ma'am.
 3              THE WITNESS:  I'm done?
 4              THE COURT:  Yes.  You can have a seat there.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  All right.  I think, in the course of the
 7    openings and the course of our colloquy and dialogue with the
 8    witnesses, we've talked about all the different legal points,
 9    arguments.  Certainly, Ms. Sullivan and I have been working on
10    them for a while.  However, I don't want to cut anybody off.
11    And so if the plaintiff has any final brief closing statements,
12    fine.  If not --
13              MR. ROWES:  I do.  It'll be really brief, Your Honor.
14    And it's really just on the points of law, a few points.
15         So Your Honor mentioned the Loper Bright case.  And I think
16    that -- I think it matters.  And here's why.  What the Supreme
17    Court said in Loper Bright is that agencies aren't entitled to
18    deference on their interpretation of statutes.  That's what
19    courts do.  They interpret statutes.
20              THE COURT:  Well, that's what I -- the way I read it.
21              MR. ROWES:  Yep.  And so I think that's right.  And
22    that actually applies directly here.  And I'll explain why.  A
23    big controversy in this case is whether the GTO is a rule or an
24    order.  And FinCEN's -- or the government's position is that
25    it's an order because we called it an order and because the
```

```
 1   word "order" is in the statute.

 2        Now, this is an APA case.  The APA defines "order."  An

 3   order is the result of an adjudication.  The word "order" has a

 4   specific meaning.

 5        I think the government is asking for deference on what the

 6   meaning of the word "order" is; that Your Honor doesn't get to

 7   use or shouldn't use just the definition of "order" in the APA.

 8   And under Loper Bright, the Court doesn't owe the government

 9   any deference on the meaning of the word "order."  And the

10   meaning of the word "order" is adjudication.  Adjudication

11   means it is the result of a specific proceeding, specific

12   parties under a specific fact record.  And that did not happen

13   preceding the GTO.

14        Next point.  Under the APA, one of the granddaddy cases,

15   State Farm Mutual, we cite that in our briefs.  And it says the

16   government's decision has to be reasoned.  But the courts also

17   say, if you ignore something big, your decision isn't reasoned.

18   And I would encourage the Court to take a look at Texas v. EPA,

19   in which the Fifth Circuit struck down a rule on the grounds

20   that they missed out on something big.

21        And I can illustrate this really quickly.  Suppose that

22   Mr. Murray calls you up and he says, I just bought a great

23   suit, perfect color, fantastic style.  I can't wait to show it

24   to you.  And then he shows up, and it's on the hanger, and it's

25   like the size for a five-year-old.
```

1    Okay.  Now, would you say, gee, that was a reasoned

2 purchase?  No, you wouldn't.  Because even though it's a great

3 color and even though it's a great style, he left out something

4 big.  Does it fit?

5    And what FinCEN left out of the administrative record is

6 what the Court has heard today, the impact in the real world on

7 real people.  And under the APA, the government can't say, we

8 looked at factor one and two, and we did all our homework on

9 those.  And if they haven't looked at number three, if that's a

10 big hole in the record, it renders it arbitrary and capricious.

11 And that's what happened here.  It is not a reasoned decision

12 because of what's missing in the record.

13    *On the Fourth Amendment, Ms. Powell mentioned the Shultz*

14 case, which is the Supreme Court's decision from 1974.  Let's

15 assume that is the right framework, *Shultz*, on reporting

16 requirements.  The Supreme Court considered $10,000 in 1974,

17 which was the equivalent of $70,000 today.  Justice Powell's

18 concurrence provided the deciding vote.  And Justice Powell

19 said, what matters here is that this is an abnormally large

20 transaction.

21    FinCEN has been -- FinCEN has been transparent about the

22 fact that they're going after everything but de minimis

23 transactions.  They dropped the reporting requirement by 98

24 percent.  Imagine if the *Shultz* case, in 1974, had been a

25 reporting requirement for $30.  Every transaction over $30 gets

1    a CTR.  Under the reasoning of Justice Powell's concurrence in

2    particular, that is unconstitutional under the Fourth

3    Amendment.

4        Now, I don't -- it's not clear that that's actually the

5    right framework.  The right framework might be that this is a

6    general warrant.  The Fifth Circuit's framework in

7    *United States v. Smith* is that the government is just going on

8    a hunt for criminal suspects.  They're doing it without regard

9    to who is innocent and who's guilty.  They're making a big

10   list.  They're rummaging through people's lives the same way

11   the reviled British colonial Army would rummage through

12   people's homes.  And that is the evil that the Fourth Amendment

13   was intended to resist.

14       On the reasonableness point of a reporting requirement, the

15   Court can take a look at the *Morton Salt* case from 1950.

16   That's what the Supreme Court relied on in *Shultz*.  And that

17   was a case about a specific cease and desist letter to 12

18   companies, from the FTC, that was the result of an

19   individualized adjudication.

20       And the Supreme Court said, this is reasonable under the

21   Fourth Amendment because it is constrained.  It's the result of

22   a proceeding.  The GTO has none of the characteristics of an

23   adjudication like the one in *Morton Salt*.

24       The last point I'll make is the ultra vires point.  The

25   statute does not authorize FinCEN to issue any kind of order it

```
 1  wants.  It says that it has to be to a specific business or
 2  group of businesses.  It has to have some sort of basic
 3  constraint on it.
 4      FinCEN's position appears to be that, we have the authority
 5  under the statute to write a GTO for any number of businesses
 6  across the United States in any amount of money; that tomorrow,
 7  with the stroke of a pen, Director Gacki could say every
 8  grocery store in the United States that does a transaction over
 9  five cents has to do a CTR and that the statute gives me
10  authority to do that.
11      If that's true -- I don't think the statute does.  If that
12  is true, then that violates the non-delegation doctrine because
13  there is no intelligible principle in the statute.  It also
14  violates the major questions doctrine.  Because if Congress
15  truly intended to give FinCEN such massive disruptive power,
16  Congress would have been absolutely clear about it.
17      So however this Court looks at it, we have serious APA
18  problems.  We have serious Fourth Amendment problems, ultra
19  vires, major questions, and non-delegation.
20      The last point I want to make is about the remedy.  And I
21  would like the Court to reconsider its understanding.  I know
22  from reading the transcript of the TRO that I think what the
23  Court was worried about is imposing some kind of nationwide or
24  universal injunction.  But the APA is different.  It is
25  specifically different; that the remedy in an APA case is
```

1    vacating the rule.  It is not enjoining the defendant as to

2    plaintiffs.  It is vacating the rule.

3        And I would ask the Court -- I would ask the Court to take

4    a look at Pages 19 and 20, a single paragraph in our response

5    brief.  And Justice Kavanaugh, very recently, in *Corner Post*,

6    explained that the APA is unique.  When courts determine that

7    the APA -- that a rule or an order violates the APA, the

8    correct remedy is to vacate the agency action.  It is not to

9    enter a universal injunction.  Justice Kavanaugh was making the

10   distinction.  This is not a universal injunction.  It is

11   vacatur of the rule.

12       And the Fifth Circuit itself, in 2024 -- this is in *Career*

13   *Colleges*, and I'm quoting the Fifth Circuit.  "The text of

14   Section 706 directs federal courts to vacate agency actions in

15   the same way that appellate courts vacate the judgments of

16   trial courts."

17           THE COURT:  And what was Justice Kavanaugh's case?

18           MR. ROWES:  That's called *Corner Post*.  We cite it

19   here.  And the citation is 603 U.S. 799.  And his -- if you

20   take a look at pincite 838, that's sort of where his discussion

21   is.

22       In the -- in 2021, the Fifth Circuit vacated an OSHA rule

23   about the pandemic and vacated the rule.  And so it meant that

24   the rule was void and unenforceable everywhere.  That's not

25   because it was a universal injunction.  It's because the

1   Fifth Circuit vacated the rule.

2       THE COURT:  Okay.  And is that the -- you had

3   mentioned the Fifth Circuit a little bit earlier.  Is that the

4   case you were referring to?

5       MR. ROWES:  The first Fifth Circuit case was *Career*

6   *Colleges*, and that's 98 F.4d 220.  And where the Fifth Circuit

7   vacated the rule in the pandemic, that's *BST Holdings v. OSHA*,

8   17 F.4d 604.  And those cases are about vacating rules, which

9   is why the appropriate remedy here, including at the

10   preliminary injunction stage, is vacating --

11       THE COURT:  All right.  Well, that was my -- that was

12   my next question.  Certainly, were there to be a trial on the

13   merits, you'd have a final judgment.  But this is a preliminary

14   hearing.  If the relief were granted for now, would the

15   preliminary injunction be satisfactory, as to these parties, of

16   course?

17       MR. ROWES:  It would be -- it would be satisfactory as

18   to the parties.  But the Court can, as a matter of law -- and I

19   believe the *Texas v. EPA* case involved a preliminary

20   injunction, in which the rule is vacated as a matter of law.

21       THE COURT:  Okay.  The *Texas-EPA* case you've already

22   talked --

23       MR. ROWES:  I'm sorry.  That's also on Page 19 of our

24   reply brief, Your Honor.

25       THE COURT:  Okay.  All right.  That was *Texas-EPA*?

1          MR. ROWES:  *Texas v. EPA*.  It's a 2016 case.

2          THE COURT:  Okay.  All right.  Anything else right

3  now?

4          MR. ROWES:  No.  I think if Your Honor doesn't have

5  any questions, that's it for me.  Thank you, Your Honor.

6          THE COURT:  Oh, I have lots of questions, but none

7  that you could answer.

8          MR. ROWES:  All righty.

9          THE COURT:  They're more spiritual or philosophical.

10         MR. ROWES:  How do you know I'm not the guy to answer

11  those?

12         THE COURT:  All right.  Ms. Powell or Mr. Green?

13         MS. POWELL:  You get me.  Sorry.

14         THE COURT:  Either one.

15         MS. POWELL:  I wanted to respond to a couple of points

16  he made and close out, unless there's anything specific you

17  want me to answer first.

18         THE COURT:  No.  I don't -- I think I have it pretty

19  well lined up here.  I understand.  The issue's joined.

20         MS. POWELL:  Yes.  Excellent.

21      I need to pick a mic.  I'm sorry.  I was echoing between

22  them.

23      On notice and comment and rulemaking, I think I said this

24  before.  But to the extent I did not, our argument is not, we

25  called it in order; therefore, it's an order.  Our argument is,

1    Congress called it an order.

2        And the one thing the APA says is not a rule, subject to

3    notice and comment and rulemaking, are orders.  And Congress

4    specifically chose the word "order" here, in contrast to the

5    word "regulation," which they use when they expect there to be

6    a rulemaking, as they do for regular currency transaction

7    reporting.

8        Second, on the Judge O'Connor opinion and the need to look

9    outside the record to see whether the agency has considered the

10   relevant factors, certainly don't agree with Judge O'Connor's

11   opinion, but I think in some ways his example he gives actually

12   really well demonstrates why you don't need to look outside the

13   record.

14       You can tell, because the question the Court would be

15   answering as to whether a potato is an orange or vice versa --

16   would be, did you consider the factors that Congress intended

17   you to consider?  You don't need a lot of scientific

18   information that the agency failed to put in the record to

19   determine whether Congress intended you to consider the

20   roundness and plant-based nature of it in determining whether

21   or not a potato is an orange, right?  That is a question of

22   statutory interpretation, what the relevant statutory factors

23   are and as a matter of record review, to see whether they

24   actually considered those relevant statutory factors.

25       I feel -- on the remedy point, I just wanted to echo what I

1    think you were maybe getting at, at the end there, which is, we

2    disagree with them on the matter of remedy.  But even if they

3    were correct on the matter of remedy, we're not there yet.

4    We're at the preliminary injunction stage.  And the Court

5    should certainly not issue the sort of injunction that even

6    Justice Kavanaugh thought was probably inappropriate at the

7    preliminary stage because it might vacate the rule later.

8              THE COURT:  Right.  And that's, I guess, my point --

9              MS. POWELL:  Yeah.

10             THE COURT:  -- that vacatur, in my mind at least,

11   procedurally comes down here, after you've made the -- heard

12   everything, gone through the due process, we used to call it --

13   y'all have heard of that?

14             MS. POWELL:  Familiar with the concept.

15             THE COURT:  I had a good friend, who's a lawyer, but

16   never really practiced.  And he said, well -- he's a very

17   bright guy, but he was in banking.  This was just last week.

18   And he said, well, you know, I can understand, you know, doing

19   this and that legally -- process for citizens.  But I'm not so

20   sure about this noncitizens.  And I think he -- yeah.  He says,

21   because it talks about "citizens."  I said, no, it doesn't.

22             MS. POWELL:  Persons.

23             THE COURT:  It says "persons."  Anyway.

24             MS. POWELL:  Nope.  Nope.

25             THE COURT:  So if someone with a law degree has

1   forgotten that, how is the average person to know?

2       But anyway, go ahead.

3           MS. POWELL:  Fair enough.

4           THE COURT:  But to your point, I'm not going to decide

5   vacatur in this order.  So that's down the road.  And, of

6   course, as I said earlier, if these folks who are not in this

7   lawsuit want to file their own lawsuit or if the judge in

8   California does something more expansive than what this Court

9   might do, the chips will fall.

10          MS. POWELL:  My general wrap-up points, you know, the

11  government's not going to dispute that the GTO imposes some

12  regulatory burden on covered entities and some compliance

13  cutoffs.  For some of those covered money services businesses,

14  especially those who already have automated reporting software

15  and things like that, that burden is going to be really minimal

16  to de minimis.  There's an adjustment to the system, after

17  which the CTRs will continue to take the three minutes they

18  usually take each and will not likely pose a significant

19  financial or compliance burden on those businesses.

20          THE COURT:  But if -- but if the customer doesn't want

21  to give their Social Security number and there are options to

22  accomplish the customer's result without giving all that

23  private information, that's separate and apart from the

24  burdensome cost.

25          MS. POWELL:  True.  The witnesses today speculated a

1  great deal about what their customers think and why they're

2  going and where they'll go, without a lot of sort of specific

3  personal information given.  And I appreciate why that might

4  be.

5       But I don't think we've seen sort of a mass change.  It's

6  just not true, as a general matter, that they're going to go to

7  banks instead, because banks are going to collect similar

8  information or collect higher fees.  There might be individual

9  cases where they do for specific reasons or specific geographic

10  reasons.  But it's not going to happen as a general matter, we

11  don't think.

12       What we heard over and over again from these witnesses is

13  that their customers likely choose them because they're already

14  there.  It's convenient.  It is relatively fast.  Those things

15  are not going to change for the most part, right?

16            THE COURT:  But if the experience from the testimony

17  is that things have changed, is that relevant to the

18  discussion?

19            MS. POWELL:  So relevant in terms of showing that

20  there are some costs on plaintiffs.  And I don't think we

21  dispute that there are.  But I don't think those ruinous costs,

22  right?  At least I don't think they've shown that they are,

23  such that it is an emergency where the Court needs to intervene

24  prior to final judgment here.

25       Bearing in mind that for a lot -- for at least many

1   businesses, this burden is not necessarily going to be
2   substantial.  You also heard over and over from witnesses today
3   that they already collect this information on a lot of
4   transactions, and their customers don't balk.  Not all
5   transactions, right?  And customers might feel differently
6   about lower dollar ones.  But it is also a thing that customers
7   can get used to because they are used to it in other settings.
8       We saw that they've included in their time estimates and
9   compliance estimates time spent collecting information that
10  they already collect for other transactions, for information
11  that they already turn over to auditors in virtually every
12  transaction.
13      And I just sort of generally think that, while a CTR can
14  take a long time, especially if one is unfamiliar with it, if
15  they're new to them -- you saw the form.  It is a relatively
16  simple form and consists mainly of information that they
17  already have, with for some transactions the exception of name,
18  address, Social Security number and date of birth.  But only
19  some transactions, because many of them collect that
20  information for other transactions.
21      So we don't believe that plaintiffs have shown the sort of
22  emergency harm necessary for injunctive -- for relief.  But
23  even if they had, the government's interest here is, in fact,
24  weighty.  The government reasonably concluded that this
25  information is necessary to effectuate the purposes of the Bank

Secrecy Act.  To collect this information will and, in fact, is
advancing interests in assessing money laundering risks and
facilitating the tracking of money sourced from illicit
activity.

THE COURT:  If the preliminary injunction were granted
for a period of, oh, a few months, depending on the appellate
process perhaps -- but at any rate, to get to a trial on the
merits, how is the government going to be harmed by a six-month
delay?

MS. POWELL:  Well, the GTO expires in early September,
Your Honor.

THE COURT:  But it can be renewed.

MS. POWELL:  Huh?

THE COURT:  It can be renewed.

MS. POWELL:  It can or it could not, right?  If we
need to start this process over in order to get the full
snapshot, that's actually going to impose additional burden on
the businesses who have been complying.  We think it would be
far better to get at least the short four-month snapshot that
we have remaining in the original -- in the original GTO and
see where things are after that and whether it's even necessary
to renew it.  It may not be.  We don't know.

What we would not want to do is find ourselves in the
Nether Land, where we're enjoined and yet -- where we're
enjoined and it expires, without full consideration and

1    decision on the issues.

2          THE COURT:  All right.  But the same process could be

3    undertaken again?

4          MS. POWELL:  Right.  But --

5          THE COURT:  Which --

6          MS. POWELL:  -- the information is useful now.  And

7    it's useful now in addressing what the government very much

8    views as an urgent situation at the border.

9          THE COURT:  Okay.

10         MS. POWELL:  I'm not saying the sky is going to fall

11   without the GTO.  I'm saying it does exactly what Congress

12   anticipated GTOs would do, which is facilitate ongoing

13   investigations, financial intelligence collection to disrupt

14   drug cartel activity on the border, which is a problem.

15         THE COURT:  And the sky is not going to fall.  But on

16   the other hand, if it -- if there were no injunction -- I'm

17   sorry.  If there were a preliminary injunction and FinCEN can't

18   use this information for four or five months, the overall drug

19   trafficking/money laundering situation on the border is not

20   likely to be changed one way or the other?

21         MS. POWELL:  You mean by the GTO?

22         THE COURT:  Right.

23         MS. POWELL:  There's obviously limited detail and

24   nothing in the record.  But my understanding is that FinCEN is

25   confident that they are getting actionable intelligence now,

```
 1   even with the California portion enjoined.

 2          THE COURT:  Okay.  Well, maybe so.  But that, again,

 3   is on the merits, down the road, and we have the comparison.

 4      All right.  Anything else?

 5          MS. POWELL:  Not from me, if the Court doesn't have

 6   further questions.

 7          THE COURT:  That's it.

 8          MS. POWELL:  Oh, sorry.  I had one thing I wanted to

 9   mention before I forgot.  I apologize.

10      The 40-minute notice on the CTR fillable form itself is

11   actually an error drawn from an old paperwork reduction action

12   notice in, like, the '90s I think, when they used to take

13   that long to manually fill out.  The current Paperwork

14   Reduction Act notice time should read, consistent with the

15   Federal Register notice, that it's an average of eight minutes

16   because they range from three minutes to a little over 20.

17          THE COURT:  Our government would make a mistake?

18          MS. POWELL:  It happens, I'm told.

19          THE COURT:  Okay.  Mr. Rowes, I think you had your

20   hand up.

21          MR. ROWES:  I did.  The one quick thing is that the

22   government has said that it's only going to not enforce the GTO

23   until Friday.  And so unless the Court wants to see an order or

24   a motion from our side --

25          THE COURT:  It's not necessary.
```

```
 1              MR. ROWES:  Okay.  All right.  Thank you, Your Honor.
 2        The other thing, too, is that there were two exhibits
 3   today.  Neither one of us formally moved them in, but I think
 4   we can just stipulate to their admission, subject to your
 5   objection.
 6              MS. POWELL:  Yeah.  Subject to objection about
 7   consideration on the merits.
 8              THE COURT:  Okay.
 9              MR. ROWES:  Okay.  Thank you.  Thank you, Your Honor.
10              THE COURT:  All right.  And I assume, to the extent
11   we're making a full record now and in the future, there's no
12   objection to the Court considering the testimony of the witness
13   in the TRO hearing.  Mr. Rowes?
14              MR. ROWES:  No, not on plaintiffs' side, Your Honor.
15              THE COURT:  To the extent that the government still
16   objects to any testimony, but --
17              MS. POWELL:  Right.  So the government objects to its
18   consideration on the success on the merits of plaintiffs'
19   claims because that should be limited to the record, to be
20   clear.  But --
21              THE COURT:  Okay.  All right.  Well, I had written
22   some notes.  And because of the well-done arguments -- and by
23   the way, I thank the tech people and the support people.  All
24   of my mothers -- all of the women in my family, including
25   daughters, are support people in various places, going back
```

1   several generations.

2       So I'm going to have to amend this as I go.

3       First of all, the Court is going to take under advisement

4   the ultra vires and non-delegation arguments.  Otherwise, the

5   Court has reviewed the administrative record and will continue

6   to do so and other evidence considered in the temporary

7   restraining order and in this motion for preliminary

8   injunction.

9       The preliminary motion for -- or excuse me.  Plaintiffs'

10  motion for a preliminary injunction is granted in part, for the

11  reasons stated by the plaintiffs, other than the ultra vires

12  and the non-delegation issue.  The Court finds the plaintiffs

13  are likely to succeed on the merits on at least one of their

14  claims.  Plaintiffs are likely to suffer irreparable harm

15  without an injunction.  The balance of equities tips in favor

16  of the plaintiffs, and an injunction is in the public interest.

17      Accordingly, the defendants Pam Bondi, Attorney General of

18  the United States; Scott Bessent, Secretary of the Treasury;

19  Andrea Gacki; and the Financial Crimes Enforcement Network,

20  their agents and employees, are preliminarily enjoined from

21  enforcing the April 14, 2025, geographic targeting order

22  against the plaintiffs in this case.  No bond will be required,

23  and a written order and opinion will be forthcoming.

24      Mr. Rowes, anything else at this time?

25          MR. ROWES:  No.  Thank you, Your Honor.

```
 1              THE COURT:  Ms. Powell?

 2              MS. POWELL:  (Shakes head side to side).

 3              THE COURT:  All right.  Thank you.  We're in recess.

 4   * * *

 5        (Hearing adjourned at 2:45 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                           -oOo-

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   Date:  5/14/2025        /s/ Chris Poage
                            United States Court Reporter
6                            262 West Nueva Street
                            San Antonio, TX  78207
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```