1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC. and ESPERANZA GOMEZ ESCOBAR,<br><br>                              Plaintiffs,<br><br>v.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, et al.,<br><br>                              Defendants. | Case No.: 25-CV-886 JLS (DDL)<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>(ECF No. 22) |

Presently before the Court are Plaintiffs Novedades y Servicios, Inc. and Esperanza Gomez Escobar's Motion for Preliminary Injunction ("Mot.," ECF No. 22) and Memorandum of Points and Authorities in Support Thereof ("Mem.," ECF No. 22-1), filed on April 29, 2025. Defendant United States of America ("Government") filed an Opposition ("Opp'n," ECF No. 40) and Plaintiffs filed a Reply ("Reply," ECF No. 42). Also before the Court is the Brief of *Amicus Curiae* Money Services Business Association, Inc. in Support of Plaintiffs' Motion for Preliminary Injunction ("MSBA Br.," ECF

No. 41).  The Court heard oral argument on May 15, 2025.  ECF No. 45.  Having considered the Motion, the Parties' arguments, the law, and the evidence, the Court **GRANTS** Plaintiffs' Motion.

Before proceeding, the Court restates, for clarity's sake, the bench ruling made during the hearing on Plaintiffs' oral motion to augment the record with the declarations attached to the Motion for Preliminary Injunction and the declarations attached to the MSBA Brief.  Plaintiffs' oral motion is **GRANTED IN PART** with respect to the declarations attached to the Motion (ECF No. 22) and **DENIED IN PART** with respect to the declarations attached to the MSBA Brief (ECF No. 41).  To the extent Plaintiffs' oral motion is denied, it is denied without prejudice.  Plaintiffs are free to renew their oral motion in writing, if they so desire, so the Court may reach a more reasoned and thoughtful decision with the benefit of full briefing.  Further, as stated on the record, Plaintiffs' Request for Judicial Notice (ECF No. 44) of the transcript from the preliminary injunction hearing in the parallel case being heard in the Western District of Texas is **GRANTED** to the extent it enlightens the Court as to the procedural status of that case.  *See Tex. Ass'n of Money Servs. Bus. v. Bondi*, No. SA-25-CA-00344-FB (W.D. Tex. filed Apr. 1, 2025).

Having dispensed with that preliminary, the Court summarizes this Order as follows.  Plaintiffs are likely to succeed on the merits of three of their claims under the Administrative Procedure Act—those being the *ultra vires* claim, the notice-and-comment claim, and the arbitrary and capricious claim.  Plaintiffs have demonstrated that they will suffer irreparable harm absent emergency injunctive relief.  And Plaintiffs have demonstrated that the balance of equities tips strongly in their favor, and that the public interest will be served by the issuance of a preliminary injunction.  For those reasons, as elaborated upon below, the Court enjoins enforcement of the Southwest Border Geographic Targeting Order throughout the Southern District of California pending the conclusion of this litigation.

/ / /

/ / /

# BACKGROUND

On March 11, 2014, the Secretary of the Treasury, acting through the Financial Crimes Enforcement Network ("FinCEN"), issued the Southwest Border Geographic Targeting Order ("SWB GTO"). *FinCEN Issues Southwest Border Geographic Targeting Order,* Fin. Crimes Enf't Network (Mar. 11, 2025), https://www.fincen.gov/news/news-releases/fincen-issues-southwest-border-geographic-targeting-order (hereinafter, "*GTO Press Release*"). The SWB GTO, which was published in the Federal Register on March 14, 2025, and went into effect on April 14, 2025, imposes new recordkeeping and reporting requirements on money services businesses ("MSBs") in select zip codes in Texas and California. Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (Mar. 14, 2025). The day after the SWB GTO went into effect, Plaintiffs filed this lawsuit, alleging that the issuance of the SWB GTO suffered from several substantive and procedural defects. ECF No. 1 ("Compl."). Namely, they allege the GTO: (1) violates the Fourth and Fifth Amendments to the United States Constitution, (2) violates multiple provisions of the Administrative Procedures Act ("APA"), and (3) was issued without sufficient statutory authority. *Id.* Plaintiffs also allege that the GTO's authorizing statute, 31 U.S.C. § 5326, violates the non-delegation doctrine. *Id.* Before discussing how the SWB GTO fits into this case, a broad overview of the statutory and regulatory backdrop is helpful.

## I.    Statutory and Regulatory Background

### A.    *The Bank Secrecy Act and Implementing Regulations*

Congress enacted the Bank Secrecy Act ("BSA") in 1970 "in response to increasing use of banks and other institutions as financial intermediaries by persons engaged in criminal activity."[1]    *Ratzlaf v. United States*, 510 U.S. 135, 138 (1994);

---

[1] The BSA is the colloquial name for the "Currency and Foreign Transactions Reporting Act, its amendments, and the other statutes relating to the subject matter of that Act." 31 C.F.R. § 1010.100(e).

Pub. L. No. 91-508, 84 Stat. 1114 (1970).  The Act contains a series of recordkeeping and reporting requirements intended to serve multiple purposes as expressed by statute.  Some of these purposes include: (1) "prevent[ing] the laundering of money and the financing of terrorism;" (2) "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal activity;" and (3) "establish[ing] appropriate frameworks for information sharing . . . to identify, stop, and apprehend money launderers and those who finance terrorists."  31 U.S.C. § 5311.  The Act followed "extensive hearings" in Congress revealing that legislators had "two major problems" in mind related to "the enforcement of the regulatory, tax, and criminal laws of the United States."  *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974).  Congress first felt, with respect to affairs at home, the "need to insure that domestic banks and financial institutions continue to maintain adequate records of their financial transactions with their customers."  *Id.*  And Congress further, with respect to affairs away from home, "was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments."  *Id.* at 27.

This case, at its core, concerns the first problem: domestic affairs.  Since the BSA's inception, Congress has delegated broad authority to the Treasury Secretary to assume responsibility for tackling that problem.  *See Shultz*, 416 U.S. at 30 ("[T]here is no denying the impressive sweep of the authority conferred upon the [Treasury] Secretary by the Bank Secrecy Act of 1970.").  The Secretary's broad authority is reflected in one of the pillars of the BSA and its implementing regulations, the currency transaction report ("CTR").

CTRs arose in 1972 as a requirement under 31 U.S.C. § 5313(a).  Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912 (Apr. 5, 1972) (to be codified at 31 C.F.R. pt. 103) (final rule establishing the CTR).  That statute provides:

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or

1
2
3
4
5

> currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a).  The Secretary, in turn, has exercised that authority to require "financial institutions" to file a CTR each time they transact in cash in amounts exceeding $10,000.  31 CFR § 1010.311.  The term "financial institution" is defined by regulation to cover a wide berth of businesses, including, but not limited to, those organized as banks, securities brokers, and, most pertinent here, money services businesses ("MSBs").  *Id.* § 1010.100(t).

The regulations go on to define MSBs as persons conducting business, however extensive, in one of a few predefined capacities.  *Id.* § 1010.100(ff).  Such capacities include, but are not limited to, exchanging currency (i.e., dollars for foreign currency or vice versa), cashing checks, and issuing traveler's checks or money orders.  *Id.*  MSBs are subject both to the general $10,000 CTR reporting requirement described above as well as additional recordkeeping requirements as further prescribed by the Secretary.  MSBs must register with FinCEN within 180 days of the date the business is established.  *Id.* § 1022.380.

With respect to the CTR requirement, a CTR is a five-page document that collects certain information from a business that conducts a covered transaction.  *See* ECF No. 22-9 at 16–20.  Such information includes, for example, the customer's name, age, gender, address, phone number, email address, social security number or taxpayer identification number, occupation, and driver's license or passport number.  *Id.*  The CTR also asks for the amount of money involved in the transaction as well as bank account numbers for transmitting/receiving the money.  *Id.*  Software has been developed to automate the CTR reporting process, but the software, according to the general manager of an El Paso, Texas MSB, can cost up to $3,700 per month.  Declaration of Antonio Carpio ("Carpio Decl.")

¶ 24, ECF No. 22-4.

Beyond requiring MSBs (and all other financial institutions) to report CTRs, the Secretary compels the collection of certain records of transactions conducted at lower thresholds. For instance, MSBs must obtain and retain certain information when they accept transmittal orders of $3,000 or more. *Id.* § 1010.410. They must also maintain records of certain information when they "issue or sell a bank check or draft, cashier's check, money order or traveler's check for $3,000 or more." *Id.* § 1010.415. And in the event an MSB "knows, suspects, or has reason to suspect that" a transaction or pattern of transactions aggregating to at least $2,000 presents indicators of illegal activity or money laundering, it is required to report what is known as a Suspicious Activity Report ("SAR"). *Id.* § 1022.320. All of this builds upon MSBs' obligation to maintain a robust anti-money laundering ("AML") program consisting of the implementation of policies and procedures to assure compliance with the above requirements, the designation of a compliance officer, and the imposition of education and/or training of appropriate personnel. *Id.* § 1022.210.

Compliance with the Secretary's directives is not optional; indeed, failure to comply can carry stiff penalties. Willful violations of the Act can subject businesses to civil penalties nearing $100,000, 31 U.S.C. § 5321(a)(1), as well as criminal fines capped at $250,000 and imprisonment of up to five years, *id.* § 5322(a). Even negligent violations can carry up to a $1,430 civil penalty. *Id.* § 5321(a)(6); 31 C.F.R. § 1010.821. Under the BSA framework, the Secretary receives broad latitude to administer and enforce the above-discussed provisions. *See id.* § 321 (outlining the general authority of the Secretary).

## B. Geographic Targeting Orders and FinCEN

A little over a decade after the BSA was enacted, Congress built atop the Act's foundation when it enacted the Anti-Drug Abuse Act of 1986 ("ADAA"). Pub. L. 99-570, 100 Stat. 3207 (1986). The ADAA passed in response "to what was perceived as a dangerous spread of drugs," *United States v. Bannister*, 786 F. Supp. 2d 617, 645 (E.D.N.Y. 2011), and legislators saw financial institutions as part of the problem.

Congress, thus, as part of a 1988 amendment to the ADAA, developed a new tool for the Secretary to use to root out money laundering: the geographic targeting order. *See* 31 U.S.C. § 5326; Anti-Drug Abuse Act of 1988, Pub. L. 100-690, tit. VI, § 6185(c), 102 Stat. 4181 (1988).

Similar to the CTR, the geographic targeting order imbues the Secretary with broad authority to impose recordkeeping and reporting requirements. Because the GTO's authorizing statute, § 5326, is central to this suit, the Court recites the statute's main provision in its entirety:

> **(a)    In general. --** If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
>
> > i.    to obtain such information as the Secretary may describe in such order concerning—
> >
> > > **(A)**    any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe: and
> > >
> > > **(B)**    any other person participating in such transaction;
> >
> > ii.    to maintain a record of such information for such period of time as the Secretary may require; and
> >
> > iii.    to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a). Section 5326 was amended several times over the ensuing years, first in 1992 to add subsection (c), which prohibits the subjects of a GTO from disclosing the

GTO's existence "to any person except as prescribed by the Secretary," *id.* § 5326(c), and then again in 2001 to extend the maximum effective period of a GTO from 60 to 180 days, *id.* § 5326(d).

Other than what is described above, Title 31 of the United States Code is otherwise silent as to any procedural limits placed on the Secretary's authority to promulgate a GTO. Nevertheless, through notice-and-comment rulemaking in 1989, the Secretary placed a few procedural limits on himself. *See* Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions, 54 Fed. Reg. 33675 (Aug. 16, 1989) (to be codified at 31 C.F.R. pt. 103) (final rule establishing "the procedures that Treasury would follow in issuing [a GTO]"). These self-policing procedures are today, after several amendments, codified at 31 C.F.R. § 1010.370, and they largely mimic the terms of the GTO-enabling statute, § 5326. They do, however, add a notice provision not present in the statute, which dictates that all GTOs "shall be directed to the Chief Executive Officer of the financial institution or nonfinancial trade or business . . . ." 31 C.F.R. § 1010.370(b).

The next year, in 1990, then-Secretary of the Treasury Nicholas Brady established by Treasury Order the Financial Crimes Enforcement Network, a bureau within the Treasury Department otherwise known as FinCEN. Treas. Order 105-08 (Apr. 25, 1990). FinCEN's original mission was "to provide a governmentwide, multisource intelligence and analytical network in support of the detection, investigation, and prosecution of domestic and international money laundering and other financial crimes . . . ." *Id.* To this day, the bureau remains central to "support[ing] law enforcement efforts and foster[ing] interagency and global cooperation against domestic and international financial crimes," and to that end, the Secretary has delegated to FinCEN the authority to "take all necessary and appropriate actions to implement and administer the provisions of the Bank Secrecy Act . . . ." Treas. Order 180-01 (Jan. 14, 2020).

/ / /

/ / /

## II.    Factual Background

One of the many businesses covered by the BSA is Plaintiff Novedades y Servicios, Inc. ("Novedades), "a small, independently owned business that provides money transfers, money orders, and check cashing services" to members of the San Diego, California community.  Compl. ¶ 14.  By offering those services, Novedades, which is owned and managed by Plaintiff Esperanza Gomez Escobar, falls within both the broader coverage of the BSA as a whole and within the narrower coverage of the regulatory scheme applicable to MSBs.  *Id.* ¶¶ 8, 18; 31 C.F.R. § 1010.100(ff).  Escobar not only manages Novedades, but she is also a customer of Novedades, as she engages the business's services to "send[] money to family members outside the United States."  Compl. ¶ 8.  In Escobar's estimation, the average transaction at Novedades falls somewhere between $300–450, but the vast majority of transactions are above $200 while in "all the years that it has been in business, [Novedades] has never completed a cash transaction over $10,000 and has therefore never had to file a Currency Transaction Report."  *Id.* ¶¶ 16, 36.

That $200 figure is critical.  On March 11, 2025, acting pursuant to its authority under § 5326, FinCEN issued the SWB GTO, requiring "all [MSBs] located in 30 ZIP codes across California and Texas near the southwest border to file [CTRs] with FinCEN at a $200 threshold, in connection with cash transactions."  *GTO Press Release*.  A few days later, the full SWB GTO was published in the Federal Register.  *See* 90 Fed. Reg. 12106.

The SWB GTO leaves all other BSA requirements in place.  These include, for example, the longstanding $10,000 CTR and $2,000 SAR requirements.  *Id.* at 12107.  But now, with the government's heightened focus on transnational cartels and their concomitant threat to national security, *see* Exec. Order. No. 14157, 90 Fed. Reg. 8439 (Jan. 29, 2025), FinCEN found "that reasonable grounds exist for concluding that" additional recordkeeping and reporting requirements are necessary "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."  SWB GTO, 90 Fed. Reg. at 12107.  To that end,

FinCEN required all MSBs inside a select grouping of zip codes at the United States-Mexico border in Texas and California to file a CTR within 15 days for every "deposit, withdrawal, exchange of currency or other payment or transfer, . . . which involves a transaction in currency, of more than $200 but not more than $10,000." *Id.* MSBs were further required to retain reports of all CTRs filed under the SWB GTO for five years from the SWB GTO's expiration (including any renewals thereof). *Id.* Such terms were to be effective from April 14, 2025, through September 9, 2025. *Id.*

Escobar perceives the SWB GTO to impose "business-crushing burdens." Compl. ¶ 42. By FinCEN's own estimate, CTRs result in, on average, eight minutes of additional paperwork per report. *Id.* ¶ 27 (citing 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024)). But that average is calculated to include "large firms with automated processes to generate the reports." *Id.* (citing 85 Fed. Reg. 29022, 29029 (May 14, 2020)). In contrast, for smaller businesses like Novedades that do not have automated procedures for filing CTRs, FinCEN estimates that each CTR takes 23.93 minutes to process. *Id.* Based on its historical business activity, Novedades, using FinCEN's estimates (recall that Novedades had never filed a single CTR before the SWB GTO), predicts it would have to spend around 30,000 minutes per month, or around 15–17 hours per day, filing CTRs. *Id.* ¶ 87. To satisfy this regulatory burden, Novedades would need to add at least one full-time employee to its payroll, a cost the business cannot absorb if it wishes to keep its doors open. *Id.* ¶ 88.

So, Escobar alleges that she can either take on this cost to remain in compliance or risk being the subject of a civil enforcement action. *Id.* ¶ 80. Even more concerning to Escobar is the risk that noncompliance may expose her to criminal prosecution. *Id.* Per a Frequently Asked Questions document provided by FinCEN, each willful violation of the SWB GTO may result in, on the civil side, liability up to $71,545 (or greater for transactions over that amount) and, on the criminal side, fines up to $250,000 and/or imprisonment of up to five years. *Frequently Asked Questions,* Fin. Crimes Enf't Network (Apr. 16, 2025), https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf (hereinafter, "*GTO FAQ*").

Beyond the direct regulatory burden on Novedades, Escobar alleges that the SWB GTO will impose other costs on her business. Because the SWB GTO only covers select zip codes, including the one in which Novedades operates, Escobar suggests that customers can simply take their business to MSBs that are not covered by the geographical scope of the SWB GTO. Compl. ¶ 85. At least one MSB is just a five-minute drive from Novedades but is not covered by the SWB GTO, so Escobar fears her customers will conduct their transactions there instead. *Id.* ¶ 83. Such a fear is justified, according to Escobar, because of the reputational damage associated with customers' perception that "Novedades is prying into their personal information (either on its own initiative or at the behest of the government) when other MSBs outside the targeted area are not." *Id.* ¶ 86. And as to the customers who are willing to share their information with Novedades or other covered MSBs when they execute a transaction, Escobar alleges the Government's data collection will infringe upon the privacy interests both of Novedades and its customers. *Id.* ¶¶ 90, 103.

## III. Procedural Background

Escobar and Novedades filed their Complaint on April 15, 2025, asserting claims rooted in constitutional, statutory, and procedural defects in the SWB GTO. *See* Compl. The next day, they moved for a temporary restraining order ("TRO") seeking to enjoin the Government from enforcing the SWB GTO, which had gone into effect on April 14, 2025. *See* ECF No. 8. The Court set an expedited briefing schedule, and on April 22, 2025, the Parties appeared before the Court for a hearing on the TRO Motion. *See* ECF No. 15. The Court issued a ruling from the bench granting the TRO Motion and followed the ruling with a written Order setting forth the basis for the TRO. ECF No. 16 ("TRO Order").

In the TRO Order, the Court found that Plaintiffs had demonstrated a substantial likelihood of success on the merits of their claims that the SWB GTO was unlawfully issued without undergoing the notice-and-comment procedures prescribed by 5 U.S.C. § 553 and that the SWB GTO was arbitrary and capricious under 5 U.S.C. § 706(2)(A). *Id.* at 2. The Court further found that Plaintiffs had suffered and will continue to suffer

immediate and irreparable harm absent a TRO, including the threat of business closure and the loss of customers and goodwill, and that the balance of equities and public interest favored granting a TRO. *Id.* at 2–3. Finally, the Court found good cause to issue the TRO for a total of 28 days in anticipation of Plaintiffs filing the instant Motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although a plaintiff seeking a preliminary injunction must make a showing on each element, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Under this approach, a court may issue a TRO or preliminary injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation marks omitted). Generally, a TRO or preliminary injunction is considered "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The moving party has the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

## DISCUSSION

### I.    Likelihood of Success on the Merits

In their Motion, Plaintiffs argue that the SWB GTO: (1) violates the Fourth Amendment under the U.S. Constitution, (2) failed to undergo the notice-and-comment procedures prescribed by the Administrative Procedure Act ("APA"), (3) is arbitrary and capricious, (4) was issued in excess of statutory authority (i.e., *ultra vires*), and (5) was

promulgated under a statute that violates the non-delegation doctrine. Plaintiffs' non-delegation challenge may come last in the briefing, but it is where the Court will begin. Though not strictly necessary for each of Plaintiffs' claims, it is only logical to start by interpreting the GTO-enabling statute, § 5326, as many of the claims are overlapping and rely heavily on a proper reading of the law. Because "a nondelegation inquiry always begins . . . with statutory interpretation," that is where the Court first turns. *Gundy v. United States*, 588 U.S. 128, 135 (2019).

### A.    *Non-Delegation Doctrine*

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Whereas the "executive power shall be vested in a President," U.S. Const., Art. II, § 1, and the judicial power "in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish," *id.*, Art. III, § 1, all "legislative Powers herein granted shall be vested in a Congress of the United States," *id.*, Art. I, § 1. The question in a delegation challenge then becomes "whether the statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

As the Supreme Court has long held, Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy*, 588 U.S. at 135 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). But that is not to say that Congress cannot delegate at all. Indeed, "Congress has found it frequently necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution . . . ." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). The Supreme Court has thus "deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta*, 488 U.S. at 372–73 (quoting *Am. Power & Light Co. v. Sec. & Exch.*

*Comm'n*, 329 U.S. 90, 105 (1946)).

This standard, as is commonly understood today, asks simply "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy*, 588 U.S. at 135. To answer that question, courts first must "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* at 136 (first citing *Whitman*, 531 U.S. at 473; and then citing *Am. Power & Light*, 329 U.S. at 104–05). "Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I." *Id.*

The SWB GTO, according to Plaintiffs, "runs afoul of the non-delegation doctrine because the statute that FinCEN relied on to promulgate it, 31 U.S.C. § 5326, contains no such intelligible principle." Mem. at 22. Section 5326 requires as a prerequisite only that FinCEN "finds . . . that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof," but Plaintiffs contend that those "purposes" fail to erect sufficient guardrails to rein in what is essentially limitless discretion delegated to the agency. *Id.* Plaintiffs view that discretion as "absolute" because FinCEN can require reports from whomever it desires on whatever transactions it deems necessary, so long as those reports carry out the BSA's purposes. *Id.*

Broad as FinCEN's authority under § 5326 may be, that authority remains constitutionally sound under modern precedent. "Only twice in this country's history (and that in a single year)" has the Supreme Court found a congressional delegation so lacking in an intelligible principle as to be unconstitutional. *Gundy*, 588 U.S. at 146 (first citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); and then citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935)). In those two cases, both decided in 1935, one "provided literally no guidance for the exercise of discretion, and the other . . . conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474). By contrast, the Supreme Court has "repeatedly turned down many

non-delegation challenges, including in cases involving very broad conferrals of authority." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1267 (9th Cir. 2021). To put it mildly, "[p]revailing on a non-delegation challenge is thus a tall order." *Id.* at 1266.

Section 5326 is nowhere near the statutes held unconstitutional in *Schechter Poultry* or *Panama Refining*. Congress allowed the agency to act here only upon a finding "that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof . . . ." 31 U.S.C. § 5326(a). Those purposes are expressly delineated in 31 U.S.C. § 5311, found just a few pages away in the U.S. Code. FinCEN thus possesses a clearly defined rubric by which to act. That rubric might be broad, but the Supreme Court has "upheld, again without deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373–74 (collecting cases upholding delegations under standards such as "prevent[ing] unfair or inequitable distribution of voting power among security holders," "determine[ing] just and reasonable rates," and "regulat[ing] . . . as public interest, convenience, or necessity require").

Even upon a finding that reasonable grounds exist for invoking § 5326, Congress has also narrowed FinCEN's allowable response. The agency, as delegated by statute, may set a dollar threshold for collecting certain information concerning the transaction and the participants thereof. 31 U.S.C. § 5326(a). FinCEN is then made responsible for establishing retention and reporting requirements for said information. *Id.* And importantly, FinCEN was authorized to "issue an order" to accomplish as much. *Id.* This direction from Congress is far from the freewheeling authorization to, as Plaintiffs see it, make the code rather than prescribe it. Mem. at 23 (citing *Schechter Poultry*, 295 U.S. at 541).

Where, as here, "Congress has placed multiple specific restrictions on the [agency's] discretion to define [culpable] conduct," those "restrictions satisfy the constitutional requirements of the nondelegation doctrine." *Touby v. United States*, 500 U.S. 160, 167 (1991) (upholding a delegation to the Drug Enforcement Administration to temporarily

schedule a substance using expedited procedures when doing so is "necessary to avoid an imminent hazard to the public safety"). Put differently, Congress has "clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light*, 329 U.S. at 105. This conclusion comports with that of at least one other district court to have considered a similar, yet broader challenge leveled at FinCEN. *See United States v. Langenberg*, No. 8:09CR183, 2009 WL 3157397, at *4–5 (D. Neb. Sept. 28, 2009) (rejecting a non-delegation challenge to various BSA provisions and regulations implemented thereunder).

In short, through § 5326, Congress set the general policy of authorizing additional recordkeeping and reporting requirements, and it established a discernible benchmark for when FinCEN was permitted to invoke that authority. FinCEN was left with "merely the interstitial task of determining" when the benchmark was met and what recordkeeping and reporting requirements to impose. *Melgar-Diaz*, 2 F.4th at 1267. Plaintiffs have thus failed to show that they are likely to succeed on the merits of their non-delegation claim.

### B.    Ultra Vires

The Court next turns to the *ultra vires* argument. Under the APA, courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C) (cleaned up). For much of the recent past, when analyzing whether an agency had properly acted within its statutory limits, courts had been instructed to "generally apply *Chevron* to determine whether to defer to the agency's interpretation of the statute." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 976 (9th Cir. 2020) (citing *Nw. Env't Advocates v. Env't Prot. Agency*, 537 F.3d 1006, 1014 (9th Cir. 2008)). Now, however, after the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts review agency interpretations of statutes de novo, exercising their own "independent judgment in deciding whether [the] agency has acted within its statutory authority." *China Unicom (Ams.) Operations Ltd. v. Fed. Commc'ns Comm'n*, 124 F.4th 1128, 1143 (9th Cir. 2024) (alteration in original) (quoting *Loper Bright*,

603 U.S. at 412). "Doing so requires using 'all relevant interpretive tools' to determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 400).

Plaintiffs argue that the SWB GTO was issued in excess of FinCEN's statutory authority. They reach this conclusion based on the "plain language" of § 5326, which they say only authorizes the imposition of a reporting requirement much more limited than that imposed by the SWB GTO. Mem. at 21. Plaintiffs' reading of the statute is primarily premised upon several textual clues, which, when placed in context, demonstrate that the SWB GTO is not what Congress had in mind when it enacted § 5326. *Id.* This reading, in Plaintiffs' view, is buttressed by the major questions doctrine. Naturally, the Court will first consider that doctrine's applicability.

### 1.    Major Questions Doctrine

"[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent" counsel in favor of caution when reviewing the exercise of administrative power. *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (citing *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014)). In such cases, the court's analysis of an agency's proffered interpretation of a statute differs from the normal course. More than simply persuading the court that it has the best reading of the statute, the agency must "'point to clear congressional authorization' to justify the challenged program." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (quoting *West Virginia*, 597 U.S. at 723). Several competing justifications for this canon of construction have been suggested, but the bottom line is this: When applicable, the major questions doctrine calls for enhanced scrutiny of the asserted administrative authority. *Compare West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) ("The major questions doctrine works . . . to protect the Constitution's separation of powers."), *with Nebraska*, 600 U.S. at 514 (Barrett, J., concurring) ("In my view, the major questions doctrine grows out of . . . commonsense principles of communication.").

The Ninth Circuit recently established a "two-prong framework" for dealing with

the major questions doctrine. *State v. Su*, 121 F.4th 1, 14 (9th Cir. 2024). Such a framework has been characterized in the following way:

> First, we ask whether the agency action is "unheralded" and represents a "transformative expansion" in the agency's authority in the vague language of a long-extant, but rarely used, statute. Second, we ask if the regulation is of "vast economic and political significance" and "extraordinary" enough to trigger the doctrine. If both prongs are met, the major questions doctrine applies, and we should greet the agency's assertion of authority with "skepticism" and require the agency to identify "clear congressional authorization" for its action.

*Id.* (internal citations omitted).

Here, the Court concludes that Plaintiffs' argument falters at the first prong because FinCEN is not relying on § 5326 to exert "an unheralded power to regulate 'a significant portion of the American economy'" based on a longstanding, yet seldom-used statute. *Utility Air*, 573 U.S. at 324 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Congress enacted § 5326 in 1988 and, since that time, FinCEN has exercised its GTO powers under the statute on numerous occasions. *See* Declaration of Andrea Gacki ("Gacki Decl.") ¶ 7, ECF No. 40-1 (detailing the agency's various GTO use cases). For instance, as FinCEN Director Andrea Gacki explained by declaration, "FinCEN has issued several GTOs in the past that required a great number of businesses in certain geographic areas to report on cash transactions at dollar thresholds far below existing BSA reporting thresholds." *Id.* Where, as here, the relevant provisions at issue "have been regularly invoked," those provisions are decidedly poor candidates for heightened scrutiny under the major questions doctrine. *See Su*, 121 F.4th at 14; *see also United States v. Cal. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1220 (9th Cir. 2024) (declining to find that an FDA regulation "represent[ed] a sudden assertion or 'transformative expansion' of authority" because the regulation's "power rest[ed] on key provisions of the [Food, Drug, and Cosmetic Act], not a rarely used 'gap filler'" (internal citations omitted)). This conclusion holds true even though the SWB GTO sets a reporting threshold at $200, a level so low it has rarely been seen before. *See Mayfield*, 117 F.4th

at 617 ("That means that even though the particular salary level in question here is novel, the assertion of authority to consider salary is not.").

On the second prong, too, the Court concludes that Plaintiffs have not made a sufficient showing that the SWB GTO "present[s] a matter of extreme 'economic and political significance.'" *Cal. Stem Cell Treatment Ctr.*, 117 F.4th at 1220 (quoting *West Virginia*, 597 U.S. at 721).  With respect to economic significance, although the "Supreme Court has never set a floor on what qualifies as economically vast," the SWB GTO does not appear to resemble the magnitude of administrative actions found to fit the bill.  *See Su*, 121 F.4th at 21–22 (Nelson, J., concurring).  Economically significant actions have included the "Clean Power Plan's $1 trillion reduction in GDP, at issue in *West Virginia*," or the $50 billion at issue in *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758 (2021).  Here, by contrast, though neither Party offers a concrete estimate of the compliance costs expected to result from the SWB GTO, it appears facially implausible for the costs to mirror such extravagant sums.  Similarly, with respect to political significance, the SWB GTO imposes a recordkeeping and reporting obligation on just thirty out of the tens of thousands of zip codes around the country.  SWB GTO, 90 Fed. Reg. at 12107.  A regulatory action of that scope is not in the same ballpark as the eviction moratorium covering over 80% of the nation at issue in *Alabama Association of Realtors*, or the carbon emission standards at issue in *West Virginia* that, if implemented, would have "substantially restructure[d] the American energy market." *Cal. Stem Cell Treatment Ctr.*, 117 F.4th at 1220–21 (internal citations omitted).

To be sure, the mere fact that the SWB GTO falls outside the grips of the major questions doctrine does not foreclose Plaintiffs from prevailing on their *ultra vires* claim. *See Su*, 121 F.4th at 14 (continuing on to conclude that an executive order did not violate the major questions doctrine even after concluding that the executive order exceeded the authority granted to the executive branch).  It is, of course, possible for an agency action that presents a mere "minor question" to still run afoul of the agency's statutory authority. But where, as here, the major questions doctrine does not apply, the nature of the inquiry

is relaxed to a de novo standard of review that calls upon the "court to exercise its independent judgment in interpreting and expounding upon the laws." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 119 (2015) (Thomas, J., concurring).

### 2. Whether SWB GTO is Consistent with § 5326

Having declined to apply the major questions doctrine, the Court's obligation is now "to independently identify and respect [congressional] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 404. As alluded to above, Plaintiffs contend that FinCEN's SWB GTO is inconsistent with the statutory authority delegated to the agency under § 5326, and they do so on the basis of three textual clues. *First*, Plaintiffs point to Congress's decision to authorize GTOs by "order," which they say the SWB GTO is not. Mem. at 21. *Second*, Plaintiffs identify language in the statute suggesting GTOs ought to be aimed at narrower classes of businesses rather than the SWB GTO's indiscriminate spray aimed at "everyone meeting certain regulatory criteria." *Id. Third*, because the statute, in subsection (c), prohibits the public disclosure of GTOs without FinCEN's sign-off, Plaintiffs submit that the SWB GTO—which was published publicly in the Federal Register—was not a congressionally authorized action. *Id.*

The Court agrees. Under a plain language reading of § 5326, Congress has authorized FinCEN to utilize GTOs as limited, investigatory tools directed to an identifiable business or group of businesses based on particularized facts. FinCEN, here, has exceeded that authority. As will be explored in more detail below, this conclusion is based on the statute's text, structure, history, and context. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)

### a. Whether the SWB GTO is an "Order"

The GTO-enabling statute expressly permits FinCEN to "issue *an order* requiring" a business or group of businesses to collect and report certain information the agency deems necessary to carry out the purposes of the BSA. 31 U.S.C. § 5326(a) (emphasis added). Borrowing from the APA's definition, Plaintiffs argue that the SWB GTO is not

an "order" at all, but instead a rule of general applicability and prospective effect. And if that is the case, then FinCEN did not issue an "order" as the agency was singularly authorized to do by § 5326. Fully addressing Plaintiffs' argument entails two steps: first, interpreting the statute to discern, with precision, what Congress authorized; and second, interpreting the SWB GTO to determine whether it fits within the scope of that delegated authority.

i.    Interpreting § 5326

Courts begin with the presumption that words in a statute should be interpreted "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). But ordinary meaning takes a backseat when "context requires a different result." *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007) (citing 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47:28 (6th ed. 2000)). Here, the Court finds that context militates in favor of interpreting the word "order" in § 5326 consistent with its meaning as defined by the APA. Both Parties seem to agree.

Central to the APA is the basic dichotomy between rules and orders, both of which find meaning in the Act's text. *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994). A rule, as defined by the APA, is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). A rulemaking, by straightforward inference, is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). By contrast, an order, as defined by the APA, is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making by including licensing." *Id.* § 551(6). An adjudication is the "agency process for the formulation of an order." *Id.* § 551(7).

The Government itself highlights this distinction in its Opposition. Whereas the BSA, the Government points out, specifically authorizes FinCEN to "prescribe[] by regulation" the general CTR reporting requirement (which has been set at $10,000) in

21

31 U.S.C. § 5313(a), the BSA, in stark contrast, authorizes FinCEN to "issue an order" to implement a GTO in 31 U.S.C. § 5326(a). Plaintiffs, for their part, approve of this construction. *See* Mem. at 17. And so it appears that there is no dispute in this matter as to what § 5326(a) authorizes. Both Parties settle on the understanding that the clearly expressed distinction between acting "by regulation" in § 5313 and acting "by order" in § 5326 reflects congressional intent to limit the agency's authority in issuing GTOs to acting by order.

The Court agrees with this understanding. "Here, the context of these words—the water in which they swim—indicates that Congress used them as terms of art." *United States v. Hansen*, 599 U.S. 762, 775 (2023). At the time Congress created the GTO power in 1988, the BSA was already in its present form of authorizing Treasury to require CTRs "by regulation." *See* Act of Sept. 13, 1982, Pub. L. No. 97-258, 96 Stat 877. So when the 1988 ADAA amendment authorizing GTOs became law, Congress had a clear textual anchor by which to judge the language it could choose from. Congress opted to deviate from § 5313 when it authorized GTOs to issue by "order" in § 5326, and the Court does "not presume to ascribe this difference to a simple mistake in draftmanship." *Russello v. United States*, 464 U.S. 16, 23 (1983). This difference "strongly suggests [Congress] acted 'intentionally and purposefully in the disparate' decisions." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (quoting *Russello*, 464 U.S. at 23).

The Court, therefore, proceeds with the understanding that Congress: (1) intentionally adopted the meaning of "order" from the APA in § 5326 and (2) exclusively intended to allow GTOs to issue by "order" as so understood. By the Court's reading of the briefs and interpretation of the arguments at hearing, the Parties agree. Accordingly, it is likely that FinCEN may only issue a GTO by order as defined by the APA. The question next becomes whether the SWB GTO at issue here is, in fact, an order.

/ / /

/ / /

ii.    Applicability to SWB GTO

"[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding" on the legal significance of any given administrative action. *Allina Health*, 587 U.S. at 575 (first citing *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc); and then citing *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C. Cir. 1978)). The contents of the SWB GTO reveal that it is not an order under the APA's definition.

There are three primary considerations when drawing the line between legislation and adjudication: "(1) whether the government action applies to specific individuals or to unnamed and unspecified persons; (2) whether the promulgating agency considers general facts or adjudicates a particular set of disputed facts; and (3) whether the action determines policy issues or resolves specific disputes between particular parties." *Gallo v. U.S. Dist. Ct. for Dist. of Ariz.*, 349 F.3d 1169, 1182 (9th Cir. 2003), *cert. denied*, 541 U.S. 1073 (2004). Put differently, the line is drawn between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Or as Justice Scalia put it, "there is really no alternative except the obvious meaning, that a rule is a statement that has legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 217 (1988) (Scalia, J., concurring).

Under any articulation of the rule versus order divide, the SWB GTO is a rule. The SWB GTO imposes new recordkeeping and reporting obligations on a class of businesses with no individualized factual determinations as to whether any business in particular is uniquely vulnerable to money laundering. *See Gallo*, 349 F.3d at 1182 ("The effect of the law is to revoke a general class of licenses, but unlike a disbarment proceeding, the ground for doing so is not individual . . . misconduct."). The administrative record could not be clearer on this point—FinCEN, though recognizing that "MSBs along the southwest border are a point of vulnerability in the U.S. financial system," made no factual finding that any

single one of the targeted MSBs showed any signs of being susceptible to drug trafficking organizations ("DTOs").  Administrative Record ("AR"), ECF No. 18-2 at 000011.  Yes, FinCEN made particularized findings as to thirty specific zip codes in California and Texas, concluding that those zip codes were targeted based on specific risk factors such as proximity to the border and historical per capita CTR filings.  *Id.* at 9–13.  But the particularized findings of an adjudication, which results in an order, must be made with respect to the regulated parties, not regulated zip codes.  *See Fla. E. Coast Ry.*, 410 U.S. at 246 ("No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances.").

In issuing the SWB GTO, FinCEN "did not adjudicate any dispute between specific parties."  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017).  Instead, the SWB GTO, which imposes severe civil and criminal penalties on a broad swath of businesses if they fail to comply, "create[s] rights, impose[s] obligations, [and] effect[s] a change in existing law pursuant to authority delegated by Congress."  *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003) (citing *Yesler Terrace*, 37 F.3d at 449).  By imposing a reporting obligation of exclusively prospective effect on "a broad category of individuals not yet identified," the SWB GTO bears "all the hallmarks of a rule."  *Yesler Terrace*, 37 F.3d at 448–49.

The Government resists this conclusion on two grounds.  *First*, citing *United States v. W.H. Hodges & Co.*, 533 F.2d 276 (5th Cir. 1976), the Government contends that the SWB GTO "is not exclusively legislative in nature."  Opp'n at 13.  By this, the Court understands the Government to suggest that the SWB GTO has investigatory features in addition to legislative features, and as such, the GTO is not a rule as defined by the APA.  *Second*, the Government contends that the SWB GTO is not necessarily a rule simply because it affects "a group of businesses."  *Id.*  Neither argument holds water.[2]

---

[2] At hearing, the Government clarified a third argument: that Congress authorized FinCEN to act by "order," so the SWB GTO is *ipso facto* an "order."  The circularity of this argument is facially apparent.  An administrative action does not conform with a congressional delegation by the mere act of invoking

As it relates to the first argument, the Fifth Circuit in *W.H. Hodges* carved a third category out of the rule/order dichotomy: investigatory actions. 533 F.2d at 278. There, the Secretary of Agriculture issued an order "in the course of an investigation of rates charged by stockyard marketing agencies in Louisiana" that required 38 marketing agencies to file a special report. *Id.* When seventeen of the marketing agencies failed to comply with the order, the government brought enforcement actions against the defaulted marketing agencies, seeking injunctive relief and damages. *Id.*

In affirming the district court's grant of summary judgment to the government, the Fifth Circuit, in a single sentence, rejected the marketing agencies' argument that the order requiring the special reports was unlawfully issued without undergoing the APA's notice-and-comment procedures. *Id.* Here is the entirety of what that court said: "The order at issue here was clearly investigatory in nature, as opposed to an adjudicatory or rule-making process, and hence not subject to the procedures governing rule-making outlined in the APA." *Id.* (citing *Genuine Parts Co. v. Fed. Trade Comm'n*, 445 F.2d 1382, 1388 (5th Cir. 1971)). Aside from that one line, the court did not expound in the slightest as to when an administrative action may be exclusively investigatory as opposed to a rulemaking.

Almost a decade later, however, that same court revisited the question. *See U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1149–50 (5th Cir. 1984). Upon reflection, the court recognized that rulemaking and investigation "are not mutually exclusive." *Id.* at 1150. In other words, "information-gathering can be the result of a rule, and preliminary investigative activity can mold conduct in clearly identifiable ways." *Id.* (internal citations omitted). With that refined understanding, the court held that an OSHA instruction "set[ting] forth the criteria and method by which OSHA selected employers for routine safety and health inspections" was not categorically exempt from the APA as an

---

that delegation. Instead, the Court must ask whether or not the agency, in substance, "acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

investigatory measure because the instruction established criteria that "guide[d] the agency in exercise of its statutory authority to conduct inspections." *Id.* at 1147, 1150.

The same can be said here. The SWB GTO molds the conduct of the targeted MSBs "in clearly identifiable ways" by prescribing a precise reporting requirement for every cash transaction above $200. *Id.* at 1150. More than merely requiring the production of a report, FinCEN "has outlined with considerable specificity the actions that it expects the regulated industry to undertake in order to produce [a transaction report] satisfactory to the agency." *Guardian Fed. Sav. & Loan Ass'n*, 589 F.2d at 663. Further, unlike the order in *W.H. Hodges*, the SWB GTO was not issued to a narrow set of businesses already under investigation for a crisply defined purpose. *See W.H. Hodges*, 533 F.2d at 278 (issuing the order *in the course of* a pre-existing investigation). For an administrative action to be purely investigatory in nature, the action "must focus on specific parties and particularized matters . . . ." *Genuine Parts*, 445 F.2d at 1388 (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950)). FinCEN's own stated purpose of the SWB GTO is to help the agency "identify cartel-related, money-laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States." AR at 000012. Thus, by FinCEN's own admission, the SWB GTO is a *pre-investigation* tool. So even if *W.H. Hodges* does set forth a narrow investigatory carveout to the notice-and-comment requirement, the SWB GTO falls outside the carveout because its stated purpose is to gather generic, innocuous information that may someday lead to an investigation rather than to gather party-specific information to support an investigation that is already underway.

The Government's second argument fares no better. The Government contends that the fact that the SWB GTO may impact a group of businesses rather than a single business does not preclude categorizing the GTO as an order. Opp'n at 13 (first citing *Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017); and then citing *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016)). Phrased differently, the Government submits that because even an order "may affect agency policy

and have general prospective application," the SWB GTO must be an order. *Neustar*, 857 F.3d at 894.

The Government is correct as a matter of black-letter administrative law that "the fact than an agency action governs a 'large number' of similar cases 'carries little weight' in deciding whether it is a rule or order." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023). But to say that an order *can* affect a large number of interested persons is to say nothing at all about whether the SWB GTO actually is an order. A does not lead to B.

In any event, the Government's two cited cases, *Neustar* and *National Biodiesel*, just drive home the point that the SWB GTO is not an order resulting from an adjudication. Take *Neustar*, for instance, where the court stated the following:

> In this case, the Order under review determined the rights and obligations of two parties . . . that were then entitled to negotiate for [a] contract. It applied existing rules and regulations [to the parties] in a fact-intensive determination that occurred on a case-by-case basis. . . . This individualized determination was not intended to impact law or policy; rather, it resolved interests in a specific bidding competition.

*Neustar*, 857 F.3d at 895 (internal citations omitted). That passage clearly illustrates the meaning of an adjudication as contemplated by the APA and how such an act is different from a rulemaking. *See Bowen*, 488 U.S. at 221 (Scalia, J., concurring) ("Adjudication deals with what the law was; rulemaking deals with what the law will be."). The SWB GTO does not take existing law and apply it to the facts of a given case. Instead, it creates new obligations, punishable by civil and criminal penalties, for a broad class of businesses that had no such obligation before the SWB GTO issued. Such an act is a legislative rule. *See Hemp Indus.*, 333 F.3d at 1088 ("[I]f there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations."); *see also Shultz*, 416 U.S. at 26 ("[W]e think it important to note that the [BSA's] civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would

impose no penalties on anyone.").

>   b.   Additional Features of § 5326

On its own, the Court's conclusion above that the SWB GTO is not an "order" as defined by the APA is enough to find Plaintiffs' *ultra vires* claim likely to succeed on the merits. But other textual indicators in § 5326 reinforce the Court's conclusion. For one, the statute authorizes FinCEN to direct a GTO to "any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." 31 U.S.C. § 5326(a). Plaintiffs argue this language, when read in context, "limits GTOs to an *identified* business or group of businesses, not a *category* of businesses such as 'MSBs' that apply indiscriminately to everyone meeting certain regulatory criteria." Mem. at 21. The second indicator sprouts out of subsection (c), which prohibits subjects of a GTO from "disclos[ing] the existence of, or terms of, the order to any person except as prescribed by the Secretary." 31 U.S.C. § 5326(c). The SWB GTO flouts this instruction, Plaintiffs say, because of its publicized and conspicuous nature. The Government is silent in its Opposition on these arguments, ostensibly believing its job was done once it demonstrated that the major questions doctrine and non-delegation doctrine did not apply. *See* Opp'n at 13 ("Plaintiffs . . . rely entirely on the 'major questions doctrine' and the non-delegation doctrine.").

As an initial matter, the major questions doctrine and non-delegation doctrine are simply the beginning of the inquiry, not the end. The mere fact that the major questions doctrine is held to be inapplicable to a given statutory interpretation problem does not absolve the Government of the responsibility of defending its construction. There is no "major questions" prerequisite for bringing an *ultra vires* claim; plenty of courts have held governmental action invalid as *ultra vires* even in the absence of a major question. *See, e.g.*, *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 537 F.3d 1006, 1019–20 (9th Cir. 2008) (striking down EPA regulation as *ultra vires* without discussion of major questions doctrine); *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 980 (D.C. Cir. 2022) (finding, with no mention of the major questions doctrine, that the Postal Service

acted *ultra vires* in refusing to take statutorily mandated measures).   Likewise, the Government is misguided in tying the non-delegation analysis to the *ultra vires* analysis. Opp'n at 14 ("Nor does the nondelegation doctrine somehow aid Plaintiffs' ultra vires claim . . . .").   One, quite simply, has little to do with the other.   As explained above, the non-delegation doctrine holds that "Congress generally cannot delegate its legislative power to another Branch." *Mistretta*, 488 U.S. at 372 (citing *Field v. Clark*, 143 U.S. 649, 692 (1892)).   But even a properly delegated power can be stretched beyond congressional limit when an agency acts beyond the power delegated.   *See Biden*, 600 U.S. at 495 (discussing how a power delegated to the executive branch "has limits").

Notwithstanding the Government's muddled response to Plaintiffs' statutory arguments, the Court independently agrees with Plaintiffs that the text and structure of § 5326 contemplates action more limited in scope than the SWB GTO.   By authorizing the targeting of "any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area," the Court finds it likely that Congress intended for FinCEN to carefully choose its targets on a more granular basis than it did here.

Congress's phrasing in § 5326 authorized FinCEN to target a single business (i.e., "any domestic financial institution or nonfinancial trade or business") or multiple businesses ("i.e., "group of domestic financial institutions or nonfinancial trades or businesses").   The most natural way to read this provision, in context, is that FinCEN may issue an order resulting from a factual determination with respect to either a single business or with respect to a group of multiple businesses.   The provision does not authorize the issuance of an order, as the Government did here, resulting from a factual determination with respect to a zip code or geographical area.   This latter, more generalized factual determination is inconsistent with Congress's instruction that FinCEN act by "order."

Additional context is supplied by subsection (c).   As touched on above, § 5326(c) provides: "No financial institution or nonfinancial trade or business or officer, director, employee or agent of a financial institution or nonfinancial trade or business subject to an

order under this section may disclose the existence of, or terms of, the order to any person except as prescribed by the Secretary." 31 U.S.C. § 5326(c). A confidentiality provision such as this is strong evidence that Congress intended for GTOs to be issued directly to the targeted businesses, not to the public at large. The provision, in turn, implies that it must be feasible for FinCEN to provide individualized notice to the targeted businesses. In other words, subsection (c)'s inclusion in § 5326 only makes sense in a world in which FinCEN knows *ex ante* which business(es) are subject to the GTO.

But a sweeping GTO, like the SWB GTO, that targets an entire industry without consideration of the particularized need for the given GTO with respect to the specific targeted businesses is in tension with subsection (c). As elaborated upon below, Treasury's own contemporaneous understanding of subsection (c) at the time of enactment as well as FinCEN's historical use of GTOs are both consistent with the Court's interpretation of the statute as authorizing GTOs to issue by "order" on the basis of particularized findings of fact.

The addition of subsection (c) was not insignificant to Treasury's understanding of § 5326. Indeed, it appears as though subsection (c) merely codified the agency's wish to maintain GTOs under a shroud of secrecy. The year after § 5326 was enacted, Treasury set out to promulgate procedural rules for the agency to abide by in issuing GTOs. At that time, there was no subsection (c). Yet in a notice of proposed rulemaking for what is now codified at 31 C.F.R. § 370, Treasury took the position that GTOs "will not be published in the Federal Register. They will be issued only to the affected financial institutions." Proposed Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions, 54 Fed. Reg. 12238, 12239 (Mar. 24, 1989). The agency went on to say that it "normally would request that a financial institution subject to a geographic targeting order not notify the public of the enhanced reporting and recordkeeping requirement limits." *Id.* at 12240. The reason behind that intended practice was "to ensure that the purpose of the order is not circumvented." *Id.*

Treasury reiterated those same points when it published the final rule five months

later.  *See* Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions, 54 Fed. Reg. 33675 (Aug. 16, 1989).  In addition to repeating the same statements as above, the agency responded to comments expressing concern that serving notice of a GTO on a targeted business might be frustrated without designating a point of contact for the business.  *Id.* at 33677.  Finding "that these suggestions have merit," Treasury specified that a business's CEO was best situated to receive notice on behalf of the institution such that other "senior officials at the targeted financial institution will be informed of the issuance of the order."  *Id.*  This requirement found its way into 31 C.F.R. § 1010.370(b), which establishes the internal procedural requirement that a GTO "shall be directed to the Chief Executive Officer of the financial institution or nonfinancial trade or business."  This feature, which shines a light on the particularized nature of GTOs, is still in effect today.

Three years later, Congress took Treasury's regulatory practice and enshrined it into law.  *See* Housing & Community Development Act of 1992, Pub. L. 102-550, Title XV, § 1514, 106 Stat. 3672.  Accordingly, it appears likely that Congress's addition of subsection (c) in 1992 was merely meant to ratify Treasury's practice of maintaining confidential procedures when issuing GTOs.  *See Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933) (reasoning that an administrative practice "has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new").  That understanding of the scope of delegated authority under § 5326 cannot be squared with FinCEN's more modern practice, as exemplified by the SWB GTO, of engaging in a GTO-by-press release campaign directed at unnamed and unidentified businesses without regard to maintaining surreptitious procedures.  Thus, the 1992 amendment is "weighty evidence of congressional approval of [Treasury's] interpretation" of the BSA—especially in light of the amendment's temporal proximity to the 1989 regulation—and, as a result, suggests that the SWB GTO was issued "in excess of statutory jurisdiction, authority, or limitations."

5 U.S.C. § 706(2)(C).

FinCEN's historical use of GTOs further illustrates the point. Courts have "long extended 'great respect' to the 'contemporaneous' and consistent view of the coordinate branches about the meaning of a statute's terms," and such respect appears warranted here. *See Loper Bright*, 603 U.S. at 430 (Gorsuch, J., concurring) (quoting *Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827)). Director Gacki, in her declaration, identifies several GTOs from years past to validate the notion that the SWB GTO is not without precedent. Gacki Decl. ¶ 7. A closer look, however, reveals quite the opposite.

Consider, for instance, the two GTOs FinCEN issued in the New York City metropolitan area in the 1990s ("New York GTOs"). Based on the press releases Director Gacki cites to in her declaration, FinCEN issued GTOs throughout 1996 and 1997 to New York City money remitters that were themselves suspected of laundering money to Colombia and Dominican Republic. *Treasury Acts Against Flow of Dirty Money to Colombia*, Fin. Crimes Enf't Network (Dec. 23, 1996), https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia (hereinafter "*Colombia GTO*"); *Treasury Cracks Down on Remittances to Dominican Republic*, Fin. Crimes Enf't Network (Sept. 4, 1997), https://www.fincen.gov/news/news-releases/treasury-cracks-down-remittances-dominican-republic (hereinafter "*Dominican Republic GTO*"). Strikingly, those press releases tout the hefty investigations that took place *prior to issuing the GTOs*. For example, the Colombia GTO was used to impose lower threshold reporting requirements "on *specified* financial service providers" after laying a foundation premised upon several antecedent indictments in the area. *See Colombia GTO*. The Colombia press release highlights the July 24, 1996 guilty plea from Vigo Remittance Corp. and the "[n]umerous other agents and their employees [who] have been successfully prosecuted for money laundering over the past few years." *Id.*

In contrast, here, the Government points to no investigation that took place prior to the SWB GTO to justify its existence nor does the Government point to any particularized

suspicion with respect to any individual MSB in the targeted area.  In fact, FinCEN's admitted purpose in issuing the SWB GTO is "to generate new leads and identify new and related subjects in ongoing cases."  AR at 000012.  Yet it sought out to accomplish that task by publicly issuing a press release on March 11 of this year, over a month before the effective date of the SWB GTO.  This newfangled execution elucidates just how far GTOs have drifted from Congress's original intention—as expressed in the plain language of the statute—for GTOs to be confidentially issued orders covering a business or narrowly tailored group of businesses based on particularized findings of fact.  *Cf. United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (describing a 1991 GTO issued to a single money remitter after a government informant uncovered evidence of wrongdoing and after the IRS had executed a search warrant on the remitter).  Thus, though not dispositive, the agency's past practice when invoking § 5326 underpins the Court's conclusion above.

All said, based on the text, context, structure, and historical record, the Court concludes that the SWB GTO is likely to have been issued in excess of FinCEN's statutory authority.[3]  Plaintiffs have, therefore, shown that they are likely to succeed on their *ultra vires* APA claim.

### C.    Notice-and-Comment

As a background principle of administrative law, a "notice and comment period is generally required for agency rulemaking, but not for adjudications."  *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th Cir. 2008) (first citing 5 U.S.C. § 553; and then citing *Cisneros*, 37 F.3d at 448).  To promulgate a rule, the notice and comment regime establishes a three-step procedure for agencies to follow: "(1) publishing notice of the proposed rule-making in the *Federal Register*; (2) providing a period for interested persons to comment on the proposed rule, which comments will be considered by the

---

[3] It should be noted that, as far as the Court is aware, none of FinCEN's previously issued GTOs were legally challenged in court on APA grounds like the SWB GTO is being challenged here.  Some, if not all, of those previous GTOs may very well have been lawfully issued consistent with congressional authority.  The Court, of course, takes no position on the legality of any GTOs other than the one being challenged in the instant case.

agency prior to adopting the rule; and (3) publishing the adopted rule not less than thirty days before its effective date . . . ." *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005) (internal citations omitted). This procedure reflects Congress's "judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Id.* at 1004–05 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)).

There is no dispute here that the SWB GTO did not undergo the notice-and-comment procedures spelled out by the APA. The dispute is over whether those procedures were required in the first place. As explained above, Plaintiffs argue that, regardless of the label, the SWB GTO is substantively a rule that required notice-and-comment. The Government counters by maintaining that the SWB GTO is an order and was expressly exempted from notice-and-comment, most notably via § 5326(c), which prohibits targeted businesses from disclosing the existence of a GTO.

The Court agrees with Plaintiffs. Though the structure of § 5326—which specifically prohibits the targets of a GTO from disclosing the existence of that action to the public—"indicates that Congress intended to abrogate the APA's notice-and-comment requirements in a 'clear' or 'plain' way in a later statute," the Court concluded above that the actual SWB GTO issued here is not an order as actually authorized by that statute. *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1145 (6th Cir. 2022) (citing *Lockhart v. United States*, 546 U.S. 142, 145–46 (2005)). The SWB GTO "create[s] rights, impose[s] obligations, [and] effect[s] a change in existing law" such that it is a rule as defined by the APA. *Hemp Indus.*, 333 F.3d at 1087. Because such "rules have the 'force and effect of law' and may be promulgated only after public notice and comment," FinCEN likely violated the APA by issuing the SWB GTO without following the notice-and-comment procedures of 5 U.S.C. § 553. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 986 n.19 (1983)). Thus, Plaintiffs are likely to succeed on their notice-and-comment APA claim.

### D.    Arbitrary and Capricious

Plaintiffs' final APA argument is that the SWB GTO is arbitrary and capricious. Under the APA, courts may hold agency actions to be unlawful if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The standard is "highly deferential, presuming agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).  A court must be "searching and careful" in its review of an agency action but is not to substitute its judgment for that of the agency. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000) (citing *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993)).

The court's review "is limited to 'the grounds that the agency invoked when it took the action.'"  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 758 (2015)).  The agency must examine the relevant data and articulate a satisfactory explanation for its action.  *State Farm*, 463 U.S. at 43.  Plaintiffs bear the burden of showing that agency action was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Plaintiffs raise six independent reasons as to why the SWB GTO is arbitrary and capricious.  Those reasons are: (1) FinCEN failed to consider the scope of the problem,

(2) the $200 threshold is arbitrary, (3) the 30 targeted zip codes are arbitrary, (4) FinCEN failed to consider cartel countermeasures, (5) FinCEN does not have the capacity to convert CTR-acquired intelligence into actionable leads and real prosecutions, and (6) FinCEN failed to consider the impact on MSBs.  Mem. at 18–20.  The Government recasts these arguments into two broad categories, responding that (1) the $200 threshold is both reasonable and properly informed and (2) the 30 targeted zip codes were chosen because of specific criteria that was reasonably assessed.  In support of its position that the SWB GTO is not arbitrary and capricious, the Government compiled an administrative record consisting of an internal memorandum submitted to FinCEN Director Gacki, AR 4–20 ("FinCEN Memo"), as well as attachments of the documents cited in the Memo.

Given the substantial overlap in several of the Parties' competing interpretations of the administrative record, the Court will proceed to analyze the two most salient reasons why Plaintiffs have the better of the argument.  This is not to say that Plaintiffs' remaining arguments have no merit; the Court simply finds it sufficient to resolve this case on the two grounds stated below.[4]

### 1.     Failure to Consider the Burden on Targeted MSBs

Having carefully reviewed the administrative record, the Court finds that FinCEN failed to consider the degree to which the SWB GTO would impose a regulatory burden on targeted MSBs.  Failure to consider an important aspect of the problem, like the effect of the regulation on the impacted community, is sufficient to conclude that the SWB GTO is arbitrary and capricious.  *See E. Bay Sanctuary Covenant*, 994 F.3d at 984 (citing *State Farm*, 463 U.S. at 43).  That is especially true when the agency is charged with determining

---

[4] The Court would be remiss not to comment on its concern over the missing date on the FinCEN Memo.  AR at 000004 (dated "March XX, 2025").  As the Court finds it, the administrative record contains no clear indication that the agency considered *anything at all* prior to issuing the SWB GTO.  This, on its own, is problematic for the Government's assertion that it considered the relevant facts *before* issuing the SWB GTO.  Despite this concern, the Court will assume, for purposes of the instant Motion, that the FinCEN Memo does indeed pre-date the SWB GTO.  That assumption, it should be said, rests on shaky grounds.

whether "reasonable grounds exist for concluding that [the regulations] are necessary." 31 U.S.C. § 5326(a); *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 759 (2015) (concluding that an agency "must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary").

To start, the published GTO itself in the Federal Register is silent as to expected compliance costs. AR at 000001–03. The published GTO describes the various parameters of what the targeted MSBs were required to report, when reports are due, how long reports must be retained, and more. *Id.* But the Federal Register provides no indication that the agency considered the burden on the impacted businesses. So the Court must proceed to the FinCEN Memo to discover whether the agency considered this important factor.

That document is similarly devoid of adequate consideration of compliance costs. The FinCEN Memo is a seventeen-page document that steps through the historical backdrop of the SWB GTO, the justification for the SWB GTO, and the expected scope of the SWB GTO. *See generally* FinCEN Memo. The Memo cites to governmental reports that support the conclusion that MSBs are generally susceptible to abuse by DTOs, journalistic exposes uncovering the nature of money laundering operations, and several instances of federal indictments filed against corrupt MSBs that have taken complicit roles in laundering money across the border. The agency, however, cites to no authority whatsoever to demonstrate its appreciation for the costs of compliance. *See Michigan*, 576 U.S. at 759.

The FinCEN Memo touts the limited geographic scope of the SWB GTO to show that it concerned itself with "limit[ing] burden," AR at 000013, but there was no effort to quantify the burden or to acknowledge what effect the SWB GTO might have on the MSB industry in the southwest. Just once in the Memo does FinCEN recognize that "the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result," but the agency immediately proceeds to dismiss that burden as "merely a reporting obligation" that is not expected "to materially alter typical fees charged for cash services, given that the reporting period is temporary" and that continued competition from

banks will drive down prices. *Id.* at 17. No justification is provided in the Memo as to how the agency reached that facile conclusion.

In its Opposition, the Government cites to internal FinCEN estimates of the time burden imposed by filing a CTR, but that explanation is too little too late. Under the *post hoc* justification doctrine, it is well-settled that "courts assess agency action based on the official explanations of the agency decisionmakers, and not based on after-the-fact explanations advanced by *agency lawyers during litigation* . . . ." *Regents*, 591 U.S. at 67 (Kavanaugh, J., concurring in part and dissenting in part) (emphasis in original) (collecting cases). The Government's insistence that it considered the eight-minute CTR time burden (by FinCEN's estimate) at the time FinCEN issued the SWB GTO is belied by the record. *See* Opp'n at 10 n.7. There is, from the Court's review, no mention of or reference to that time burden in the record.

Even if the agency had considered industry burden at the time it issued the SWB GTO, there is no evidence that it weighed that burden against the benefits. Assuming that FinCEN sincerely believes the influx of CTRs to the Government's databases will somehow prove useful in deterring money laundering in the future, the Court finds nothing in the FinCEN Memo or anywhere else in the record that demonstrates the agency assessed that benefit to outweigh the costs. "[T]o look at only one side of the scales, whether solely the costs or solely the benefits, flunks th[e] basic requirement" of considering all important aspects of the problem. *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (citing *State Farm*, 463 U.S. at 43). Because the agency failed to undertake the sensitive balancing act of weighing the burden on the private sector against the need for increased security for international remittances, the SWB GTO is likely arbitrary and capricious. *See Michigan*, 576 U.S. at 753 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decision." (emphasis in original)).

/ / /

/ / /

25-CV-886 JLS (DDL)

2.    *Failure to Articulate a Rational Basis for the $200 Threshold or to Consider Reasonable Alternatives*

Potentially contributing to FinCEN's failure to consider the industry burden of the SWB GTO is the fact that the agency similarly failed to articulate a rational basis for the $200 reporting threshold.  Assessing the burden of a regulation on private industry is, after all, a heroic task if the agency makes no factual findings whatsoever as to what percentage of transactions in the regulated industry will be covered in the first place.  In the FinCEN Memo, the agency states in a conclusory fashion that the $200 threshold "would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate."  AR at 000016.  But that conclusion, reached without any citation or authority, does not demonstrate that "the agency considered relevant factors and articulated a rational connection between the facts found and the choice made."  *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).

As helpful context, FinCEN broadly justifies the SWB GTO—or, more specifically, the reduced reporting threshold—as necessary to "help make structuring more difficult, thereby increasing the cost of doing business for cartels."  AR at 000012.  Structuring is, as defined by regulation, "conduct[ing] or attempt[ing] to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements" as promulgated by FinCEN.  31 C.F.R. § 1010.100(xx).  Put simply, to structure a large transaction that would otherwise exceed an applicable reporting threshold is to divide it into multiple, smaller transactions that, individually, are below the reporting threshold.  The Government contends that cartels use so-called "money mules" to structure large, illegitimate transactions "by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations."  AR at 000010.  Thus, as FinCEN's theory goes, "the $200 threshold is low enough both to prevent the successful structuring of transactions to avoid CTR requirements and to increase the cost of doing business for drug

cartels."  Gacki Decl. ¶ 19.

This theory is not without appeal and the record contains at least some evidence that structuring is a real device used by money launderers to disguise drug proceeds "to look like routine remittances."  AR at 000010.  As illustrations, the FinCEN Memo highlights two corrupt MSBs—one located in Sacramento, California and the other located in Atlanta, Georgia—that laundered money to Mexico "by breaking transactions into smaller amounts . . . ."  *Id.*  Never mind that both of those examples cited by FinCEN took place far from the United States-Mexico border; they at least provide factual evidence to support FinCEN's claim that corrupt structuring is a real problem.

The trouble with the record, however, is that it lacks any factual findings necessary to assess just how low the agency's reporting threshold should go.  On the face of the FinCEN Memo, the agency sought out to exclude de minimis amounts while sweeping in all cash transactions vulnerable to abuse, but that stated objective requires first determining what dollar amounts are: (1) de minimis and (2) vulnerable to abuse.  FinCEN not only failed to explain how it landed on $200, but the evidence that the agency supposedly relied on contradicts its conclusion.

The FinCEN Memo makes no mention of what the agency finds particularly notable about $200.  FinCEN broadly pronounces that structuring below $10,000 is a problem worth fighting, but it provides no analytical context as to the transactional profile of MSBs.  The Memo says nothing about average illicit transaction amounts, average licit transaction amounts, or anything in between.  And the Memo similarly says nothing about what makes a $200 transaction vulnerable to abuse.  True, $200 is less than $10,000.  But by that logic, any dollar amount less than $10,000 would pass muster.  The Government provides no limiting principle or mechanism for understanding when a reporting threshold goes so low as to be counterproductive.

As Plaintiffs point out, the January 2025 Center for Strategic and International Studies ("CSIS") study, relied on by the FinCEN Memo, declines to go so far as to endorse a $200 reporting requirement.  That study found that the average remittance transaction is

around $390, which is well below the $10,000 CTR threshold and even quite below the SAR threshold.  AR at 000160.  But, according to the study, laundering large amounts of money in such small transactions may not prove feasible.  As the study put it:

> To succeed via this method, criminal organizations must recruit a large number of vendors in the sending and receiving localities. While it would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border, recent investigations into money laundering mechanisms suggest that millions are laundered without a single dollar ever crossing into Mexico using Chinese money launderers.

*Id.*  This passage suggests that structuring transactions at "de minimis" levels, as understood by FinCEN, may be so impracticable that DTOs have resorted to more complex networks, primarily through Chinese Money Laundering Organizations ("CMLOs"), to evade detection.  The February 2024 National Money Laundering Risk Assessment, published by the Treasury Department and similarly relied on by the FinCEN Memo, also stresses the emergence of CMLOs as alternatives to low-dollar value remittances.  *See* AR at 00057 ("Since [2022], law enforcement has reported that CMLOs have become more prevalent and are now one of the key actors laundering money professionally in the United States and around the globe.").  In light of these factual findings, the CSIS study suggested lowering certain reporting thresholds to align more closely with those set by Mexico at $1,000.  *Id.* at 000163.  The FinCEN Memo does not engage with this policy proposal from CSIS.

   With FinCEN having cited these authorities as support, the Court is unable to find that the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Nat'l Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1125 (9th Cir. 1997).  Instead, more accurately described, the agency leaped to the supposition that $200 is somehow a suitable dividing line between de minimis transactions and transactions vulnerable to abuse, and then it left that supposition unsupported by any concrete facts rationally leading to that conclusion.  Suppositions without a factual underpinning are not "within the bounds of reasoned decisionmaking

required by the APA." *Baltimore Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 104 (1983).

Moreover, the Court is unable to find that FinCEN considered reasonable alternatives to the $200 reporting threshold. As noted above, the FinCEN Memo recognizes that the reporting requirement "would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result." AR at 000017. But the agency declined to consider any other reporting thresholds that might allow FinCEN to collect "highly useful" reports, 31 U.S.C. § 5311(1), while still mitigating this recognized burden on MSBs. Several alternatives, however—like the $1,000 CSIS proposal noted above—appear directly in the administrative record that FinCEN purports to have relied on before issuing the SWB GTO. Although the Court's responsibility is not "to ask whether [the agency's] decision was 'the best one possible' or even whether it was 'better than the alternatives,'" the agency still must "consider the evidence and give reasons for [its] chosen course of action." *Dep't of Com. v. New York*, 588 U.S. 752, 777 (2019) (quoting *Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

Beyond the CSIS proposal, and as discussed by *amicus*, the FinCEN Memo cites to an October 2024 Department of Homeland Security ("DHS") blogpost that discusses MSB vulnerabilities to money laundering. MSBA Br. at 14 (citing AR at 000405). In that blogpost, DHS urges investigators to utilize the Transaction Record Analysis Center ("TRAC") database as a means of identifying complicit MSB agents. AR at 000405. That database, the blogpost reveals, contains over 337 million transactions representing "subpoenaed financial transactions from numerous global MSBs." *Id.* (cleaned up). These records are "exclusively available to authorized federal, state and local law enforcement," yet FinCEN makes no mention of the database in its Memo that otherwise presses the need to ramp up data collection without any consideration for the enhanced burden on industry. Because an "agency's recognition of [a problem], without any meaningful discussion of the issue in the context of alternatives . . . points to the agency's failure to 'consider an

important aspect of the problem' and 'articulate a satisfactory explanation for its action,'" the Court finds it likely that the SWB GTO is arbitrary and capricious.[5] *Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, No. 20-2074 (BAH), 2022 WL 4447293, at *31 (D.D.C. Sept. 23, 2022) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Ass'n*, 934 F.3d 649, 656, 668–71 (D.C. Cir. 2019)).

For the reasons discussed above, the Court finds that Plaintiffs have shown that they are likely to succeed on the merits of their arbitrary and capricious claim under the APA.

### E.    Fourth Amendment

The final argument in the Motion is a constitutional argument.  In Plaintiffs' view, the SWB GTO is defective under the Fourth Amendment because the GTO operates as a general warrant that violates the privacy interests of: (1) the covered MSBs and (2) the covered MSBs' customers.  The Government opposes this argument on the ground that the SWB GTO is a garden-variety reporting requirement that is consistent with countless other reporting requirements that have been upheld as constitutionally permissible under the Fourth Amendment.

Although the Parties ardently disagree on this issue, the Court declines to reach it. Because the SWB GTO is likely unlawful for multiple non-constitutional reasons, the Court defers on reaching the Fourth Amendment issue until addressing it becomes necessary.  *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, Nos. 22-55988, 22-56036, 2024 WL 5692756 (9th Cir. May 14, 2025) (observing the longstanding principle requiring "courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them" (internal quotation marks and citation omitted)).

/ / /

/ / /

/ / /

---

[5] In relying on the MSBA Brief, the Court is not considering the attached declarations, which were objected to on the record at hearing.  The Court relies on the MSBA Brief solely for the purpose of identifying areas in the Government's own administrative record that affect the Court's analysis above.

## II.    Irreparable Harm

Plaintiffs argue they will suffer irreparable harm from the SWB GTO in three ways. They first claim economic harms through increased compliance costs and reduced transaction volume, both as a direct result of the SWB GTO. These economic harms are so severe, Plaintiffs say, that "Novedades will have to close." Escobar Decl. ¶ 48. And according to Plaintiffs, even if the economic harms were not so severe, they still constitute irreparable harm due to the Government's sovereign immunity, which would prevent Plaintiffs from recovering any monetary damages. Mem. at 10 (citing *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015)). Second, and independent of the economic harm, Plaintiffs claim they will suffer a loss of goodwill and control over their business reputation. *Id.* Third, Plaintiffs claim that irreparable harm results as a matter of course any time constitutional rights are violated. In support of their argument, Plaintiffs attach a declaration of Plaintiff Esperanza Escobar as well as a series of declarations from other individuals who either work at or utilize the services of MSBs.

The Government's main rebuttal is that Plaintiffs overstate the burden of complying with the SWB GTO and speculate as to the detrimental impact the GTO will have on Novedades. A sizable chunk of the Government's briefing quibbles with Plaintiffs' estimates for how long it takes to complete a CTR and faults Plaintiffs for not exploring automated batch-filing, which it says would reduce the burden of compliance. Opp'n at 21–22. The Government also contends that the Court should limit its consideration of the evidence exclusively to the declarations directly bearing on the two Plaintiffs before the Court—Escobar and Novedades—and it lodges a general objection "to all of the non-party evidence attached to Plaintiffs' motion."[6] *Id.* at 23.

---

[6] The Court was left unclear after the hearing as to the Government's position on irreparable harm. The Court understood the Government to concede the existence of irreparable harm last month during the TRO hearing, and counsel appeared to concede the same at the Preliminary Injunction hearing. Yet the Opposition quite forcefully argues that Plaintiffs have not established irreparable injury. *See* Opp'n at 21–23. In any event, the Court will assume for purposes of the instant Motion that the Government does indeed dispute whether Plaintiffs have satisfied the irreparable harm prong.

As an initial matter, the Court **OVERRULES** the Government's objection. "At this preliminary stage, plaintiffs may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary injunction motion to meet their burden." *City and County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (cleaned up) (quoting *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam)). And here, it is perfectly sensible for Plaintiffs to corroborate their claims of irreparable harm with the experiences of those individuals and businesses that have been most exposed to the SWB GTO. The SWB GTO went into effect on April 14, 2025, but this Court issued a TRO one week later covering the Southern District of California. ECF No. 16. Meanwhile, the SWB GTO remains in effect along the border in Texas, where, with the exception of ten MSBs who successfully obtained a similar TRO limited to the ten named plaintiffs in a parallel case, covered businesses have been required to comply with the SWB GTO for over one month. *See Tex. Ass'n of Money Servs. Bus. v. Bondi*, No. SA-25-CA-00344-FB (W.D. Tex. Apr. 11, 2025), ECF No. 13. Evidence of the regulatory burden on the businesses that have remained subject to the SWB GTO is, of course, highly probative of the practical effect the SWB GTO would have on Novedades, considering the fact that FinCEN has been enjoined from enforcing the SWB GTO against Novedades since April 22, 2025. The Court, therefore, will consider the third-party declarations to the extent they validate Plaintiffs' allegations of irreparable harm, but it will not consider harm to third parties as a substitute for examining the likelihood of imminent and irreparable harm to Plaintiffs themselves. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Even if the Court were to limit itself to the Escobar declaration as the Government requests, Plaintiffs still have met their burden of demonstrating imminent irreparable harm. Escobar estimates that at least 99% of Novedades transactions are over $200 and thus within the sweep of the SWB GTO. Escobar Decl. ¶ 41. With over 2,000 total transactions each month, complying with the SWB GTO would add close to 1,000 hours of work per month of completing and submitting CTRs, or over 30 hours per day. *Id.* ¶ 50. Escobar

bases that calculation on her optimistic assumption of 25 minutes per CTR, *id.*, an assumption directly in line with FinCEN's own estimate of 23.93 minutes per CTR for non-automated filers, 85 Fed. Reg. 29029, and well below the 40-minute estimate that is printed directly on the CTR itself, ECF No. 22-9 at 16.  For a business that typically maintains one person on duty at a time, the Court finds credible Plaintiffs' avowal that the regulatory burden imposed by the SWB GTO would be simply unsustainable for Novedades.  Because the "threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable," the Court concludes that Plaintiffs have met their burden on this prong.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)).

Beyond this risk of business closure, Escobar's declaration also demonstrates a non-speculative impact on Novedades's reputation and goodwill in the community. Escobar states that, if put back into effect, the SWB GTO "will cause customers to discontinue business with Novedades."  Escobar Decl. ¶ 48.  The Government counters that Escobar's contentions are merely speculative, but the Court finds that Escobar's declaration is replete with ample evidence of concrete harm.  For the one week the SWB GTO was in effect in California, Escobar claims that "[a]pproximately 50–60% of the customers [she] explained the [reporting] requirement to left the store without completing a transaction."  Escobar Decl. ¶ 43.  She goes on to claim that customers told her that they "planned to go to MSBs in unaffected zip codes," and that "one customer even told [her] that an MSB in an unaffected zip code had called him to convince him to go there instead." *Id.* ¶ 49.  Escobar further recounts that "customers were reluctant to give [her] their personal information and expressed skepticism and fear."  *Id.* ¶ 44.  With the SWB GTO in force, it is evident that Novedades "stood to lose its newfound customers and accompanying goodwill and revenue."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37–38 (2d Cir. 1995)).  This, too, supports the Court's finding of irreparable

harm.

The Court has no doubt that the Texas MSB associates who filed declarations alongside Escobar's declaration have experienced similar harms. *See, e.g.*, Declaration of Mariceli Castro ("Castro Decl.") ¶¶ 34–36, ECF No. 22-8 (discussing an exodus of customers to nearby MSBs, reducing business by 50–60%); Amended Declaration of Andres Payan, Jr. ("Payan Decl.") ¶ 29, ECF No. 22-3 (describing how he is "buried in CTRs," with "about 100 CTRs stacked up on [his] desk"); Declaration of Antonio Carpio ("Carpio Decl.") ¶ 25, ECF No. 22-4 (explaining how his MSB is "hemorrhaging money," having "lost at least 15% or more of [his] business"); Declaration of Clarissa Ashley Light ("Light Decl.") ¶ 19, ECF No. 22-7 ("We are losing up to 10 customers per day because of it."). But the Court need not consider those declarations to comfortably conclude that Plaintiffs themselves will suffer irreparable harm absent a preliminary injunction. These severe harms weigh in favor of issuing the requested relief.

## III.    Balancing of the Equities and Public Interest

After assessing the plaintiff's likelihood of success on the merits and prospect of facing irreparable harm, "district courts must 'give serious consideration to the balance of equities and the public interest.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 27). "In weighing the equities, courts 'balance the competing claims of injury' and 'consider the effect on each party of the granting or withholding of the requested relief.'" *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 655075, at *23 (W.D. Wash. Feb. 28, 2025) (quoting *Winter*, 555 U.S. at 24). The public interest inquiry, meanwhile, "primarily addresses impact on non-parties rather than parties." *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). These two factors merge "[w]here the government is a party to a case in which a preliminary injunction is sought." *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

The harm to Plaintiffs absent a preliminary injunction is, as evidenced by the record,

concrete and severe. Novedades is "a small, independent business with a small storefront" that is typically "manned by one person at a time." Escobar Decl. ¶ 6. Escobar, the manager and president of Novedades, relies on her business to make a living and support her family, and she has demonstrated the non-speculative possibility of a destructive impact on Novedades if the business once again is required to comply with the $200 recordkeeping and reporting requirement of the SWB GTO. *Id.* ¶ 62. Because of the "great financial risk" the SWB GTO imposes on Plaintiffs, *id.*, the Court finds Plaintiffs' interest in continuing the business considerable, *see hiQ Labs*, 31 F.4th at 1190.

On the other hand, the Court appreciates the Government's concern with addressing money laundering and the risks associated with cartel activity infecting the domestic financial system. Enjoining enforcement of the SWB GTO during the pendency of this litigation surely impedes, however slightly, the Government's ability to implement a widescale data collection program, the product of which could, in theory, prove useful in certain national security and homeland security functions.

But "[t]he public interest is not served by maintaining executive actions that conflict with federal law . . . ." *Pacito*, 2025 WL 655075, at *24 (citing *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). And the abstract nature of the public interest the Government claims to serve here does not imply that the issuance of a preliminary injunction would in any way thwart the Government's ability to combat emergent threats through other investigatory and prosecutorial tools. In the words of Director Gacki, the SWB GTO will "collect data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels . . . ." Gacki Decl. ¶ 11. That Director Gacki herself envisions the mere possibility that the SWB GTO will someday prove useful is a testament to the want of urgency with which the GTO must be

implemented. The absence of any non-speculative evidence that the data collected by the SWB GTO will, in fact, keep the public safer as juxtaposed with a wealth of non-speculative evidence that the SWB GTO will, in fact, threaten the existence of Novedades and, in turn, the livelihood of Esperanza Escobar and her family, leads the Court to conclude that the balance of equities and public interest tip sharply in Plaintiffs' favor. In conjunction with serious questions going to the merits, the *Winter* factors thus weigh in favor of issuing the requested preliminary injunction. *See Pacito*, 2025 WL 655075, at *24 (citing *CTIA—The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 841 (9th Cir. 2019)).

## IV.    Scope of Injunction

This Court's TRO—entered on April 22, 2025—applied to all covered businesses, as defined by the SWB GTO, that are located in the Southern District of California. ECF No. 16 at 3. Plaintiffs urge the Court to enter a preliminary injunction "at least as broad," citing circuit precedent that permits reviewing courts to set aside agency action on a nationwide basis when the challenged action is held to be unlawful. Mem. at 24 (first citing *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018); and then citing *E. Bay Sanctuary Covenant*, 994 F.3d at 987). Such universal relief, they say, is the appropriate remedy when a plaintiff prevails on an APA challenge. *Id.* The Government disagrees, arguing that this Court's powers under constitutional and equitable principles are inherently limited to redressing the specific injuries of the named parties before the Court. Opp'n at 24. The APA, according to the Government, incorporates these familiar principles. *Id.* (citing 5 U.S.C. § 705).

The Court will, once again, issue temporary injunctive relief to all covered businesses, as defined by the SWB GTO, that are located in the Southern District of California. As a general background rule, "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). But the APA expressly departs from this background rule; indeed, the "Federal Government and the federal courts have long understood

§ 706(2) to authorize vacatur of unlawful agency rules . . . ." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). Thus, when administrative actions are found to have violated the APA, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents*, 908 F.3d at 511 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). And on an interim basis, § 705 of the APA provides that, at a preliminary stage in the proceedings, courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." Courts have generally interpreted that statute to conclude that "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *See, e.g.*, *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

Accordingly, though mindful of the "extraordinary" nature of injunctive relief, *Winter*, 555 U.S. at 22, the Court finds it appropriate to enjoin the Government from enforcing the SWB GTO throughout the entire Southern District of California. The Court takes the APA at face value as authorizing vacatur of an administrative action unlawfully issued under the APA, a remedy equally available on a preliminary injunction. However, given the weighty questions of law implicated by the SWB GTO, the Court will limit relief to within its jurisdiction as consideration of those questions "might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 22). Pending the conclusion of the litigation in this matter, the Court **ORDERS** that Defendants, and their officers, agents, servants, employees, and all persons acting in concert or participation with them, are temporarily enjoined from enforcing,

implementing, or otherwise giving effect to the SWB GTO, as it applies to **ALL COVERED BUSINESSES, AS DEFINED BY THE SWB GTO, THAT ARE LOCATED IN THE SOUTHERN DISTRICT OF CALIFORNIA**.  The Court further **ORDERS** that no bond shall be required given the "significant public interest underlying this action."   *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698-SI, 2025 WL 1358477, at *24 (N.D. Cal. May 9, 2025) (citing *Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102–03 (D. Haw. 2015)).

**IT IS SO ORDERED.**

Dated:  May 21, 2025

*Janis L. Sammartino*

Hon. Janis L. Sammartino
United States District Judge